UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | Master Case No. 09-cv-6935 (JGK) |
| In Re ProShares Trust Securities Litigation ) | |
| ) | ECF Case |
| ) | |
| ) | **Oral Argument Requested** |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ...........................................................................................................6

    A.    The Defendants .............................................................................................6

    B.    The Structure and Operation of ETFs ........................................................8

    C.    The Registration Statements at Issue .......................................................10

    D.    ProShares' Registration Statements Contain Detailed Descriptions of the ETFs' *Daily* Investment Objectives and the Operation and Performance of the ETFs over Longer Periods .......................................11

        1.    The ETFs have daily investment objectives ...............................12

        2.    The ETFs do not seek to achieve their objectives for longer than one day ..........................................................................13

        3.    Compounding prevents the ETFs' cumulative returns from matching the cumulative returns of the index for longer periods .............13

        4.    Leverage amplifies the effect of compounding on cumulative returns ........................................................................14

        5.    Volatile markets further amplify the effects of compounding and leverage on cumulative returns ...........................................15

ARGUMENT ..............................................................................................................16

I.    THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR OMISSIONS IN THE PROSHARES REGISTRATION STATEMENTS ...................................................................17

    A.    ProShares' Registration Statements Fully and Accurately Disclosed the Daily Nature of the Investment Objectives and the Impact a Daily Objective has on Cumulative Returns over Longer Periods .................................18

    B.    The Complaint Alleges No Actionable Misstatements or Omissions Relating to the Performance of the Funds for Periods Longer Than a Day .............................................................21

    C.    Plaintiffs Cannot Establish Liability by Hindsight by Comparing Supposedly "Anticipated" and "Actual" Cumulative Returns over Arbitrarily Selected Periods .......................................................24

i

D.    The Complaint Alleges No Actionable Misstatements or Omissions Regarding the Magnitude of the Risk of Holding ETFs for Longer Periods..................................................................................27

E.    FINRA's Statements Regarding ETFs Do Not Establish or Even Support a Claim for Registration Statement Liability ...........................................30

F.    The 2009 Registration Statement Disclosures do not Establish or Support Liability for Earlier Statements ...............................................32

II.    PLAINTIFFS' SECTION 11 CLAIM ALSO FAILS BECAUSE THE ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED MISSTATEMENTS OR OMISSIONS ........................................33

III.    PLAINTIFFS LACK STANDING TO BRING THE CLAIMS AS ALLEGED IN THE COMPLAINT .................................................................36

IV.    THE CLAIMS ASSERTED AGAINST THE ADDITIONAL DEFENDANTS IN THE AMENDED CONSOLIDATED COMPLAINT MUST BE DISMISSED .................................................................................38

A.    The Claims Against the New Defendants are Barred by the Statute of Limitations ...................................................................................38

B.    The Claims Based on Defendants' Status as "Attorneys-In-Fact" Fail to State a Claim.................................................................................39

V.    THE BREACH OF CONTRACT CLAIM ASSERTED BY INDIVIDUAL PLAINTIFFS STEVEN AND SHERRI SCHNALL FAILS TO STATE A CLAIM........................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ...................................................................................................16

*In re Ambac Fin. Group, Inc. Secs. Litig.,*
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ..........................................................................39

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) .....................................................................................16, 31

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) .........................................................................................................18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .........................................................................................................16

*Clark v. Nevis Capital Mgmt., LLC,*
    No. 04 Civ. 2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ..............................35

*Crowell v. Ionics, Inc.,*
    343 F. Supp. 2d 1 (D. Mass. 2004) ..............................................................................34

*Denny v. Barber,*
    576 F.2d 465 (2d Cir. 1978) ..........................................................................................32

*Dodds v. Cigna Secs., Inc.,*
    12 F.3d 346 (2d Cir. 1993) ............................................................................................39

*Donovan v. American Skandia Life Assurance Corp.,*
    96 Fed. Appx. 779 (2d Cir. 2004) ...............................................................................32

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) ..........................................................................................33, 34, 36

*ECA and Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) ....................................................................................17, 33

*Ganino v. Citizens Utilities Co.,*
    228 F.3d 154 (2d Cir. 2000) ..........................................................................................26

*Garber v. Legg Mason, Inc.,*
    347 Fed. Appx. 665 (2d Cir. 2009) ..............................................................................31

*Greenberg v. ProShares Trust,*
    No. MRS-L-0011-1-09 (N.J. Sup. Ct. July 9, 2010) .................................................20

*Halperin v. eBanker USA.com*,
   295 F.3d 352 (2d Cir. 2002)........................................................................18, 19, 23

*In re AES Corp. Secs. Litig.*,
   825 F. Supp. 578 (S.D.N.Y. 1993)........................................................................28

*In re AIG Advisor Group*,
   No. 06 CV 1625(JG), 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007).....................16

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*,
   No. 04 Civ. 4885(SWK), 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005)................36

*In re Ambac Fin. Group, Inc. Secs. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)..................................................................39

*In re Fuwei Films Secs. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)..................................................................17

*In re JP Morgan Chase Secs. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................................17

*In re Lehman Bros. Secs. and ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010)..................................................................36

*In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................17

*In re Merrill Lynch & Co. Research Reports Secs. Litig.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003)..................................................................34

*In re Morgan Stanley and Van Kampen Mut. Fund Secs. Litig.*,
   No. 03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. 2006)................................34

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y.2006)...........................................................34, 36

*In re Vivendi Universal, S.A. Secs. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009)..................................................................34

*Krouner v. Am. Heritage Fund, Inc.*,
   899 F. Supp. 142 (S.D.N.Y. 1995)......................................................................32

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009)......................................................17, 29, 30

*Lentell v. Merrill Lynch Co.*,
   396 F.3d 161 (2d Cir. 2005).................................................................................34

*Lin v. Interactive Brokers Group, Inc.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008)............................................................................ passim

*McGraw-Hill Cos. v. Vanguard Index Trust*,
  139 F. Supp. 2d 544 (S.D.N.Y. 2001).................................................................................9

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland*,
  No. 08 CV 5093, 2010 WL 1172694 (S.D.N.Y. March 26, 2010)..................................25, 37

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996)......................................................................................................28

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008)...............................................................19, 25,27, 29

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).....................................................................................16, 17, 36

*Rubin v. MF Global, Ltd.*,
  634 F. Supp. 2d 459 (S.D.N.Y. 2009)...........................................................................17, 19

*Schoenhaut v. American Sensors, Inc.*,
  986 F. Supp. 785 (S.D.N.Y. 1997).....................................................................................23

*Spicer v. Chicago Bd. Options Exch., Inc.*,
  No. 88 C 2139, 1992 WL 380929 (N.D. Ill. Dec. 10, 1992) ..............................................22

*Staehr v. The Hartford Fin. Servs. Group, Inc.*,
  547 F.3d 406 (2d Cir. 2008)................................................................................................39

*Steinberg v. PRT Group, Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000)..................................................................................18

*Steven and Sherri Schnall v. LPL Financial Corp.*,
  FINRA Case Number 09-02157 ..........................................................................................40

*Young v. Nationwide Life Ins. Co.*,
  183 F.R.D. 502 (S.D. Tex. 1998).......................................................................................35

**STATUTES**

15 U.S.C. § 77k...................................................................................................................17

15 U.S.C. § 77k(a) .........................................................................................................17, 24

15 U.S.C. § 77k(e)........................................................................................................33, 34

15 U.S.C § 77m...................................................................................................................38

15 U.S.C. §77s(a) .......................................................................................................22

**OTHER AUTHORITIES**

17 C.F.R. § 230.421 ...................................................................................................30

17 C.F.R. § 274.11A .............................................................................................10, 22

David M. Geffen, *A Shaky Future for Securities Act Claims Against Mutual Funds* .................35

Fed. R. Civ. P. 12(b)(6) .................................................................................1, 16, 18, 34

*Restatement (Third) of Agency* § 6.01 .......................................................................39

Securities and Exchange Commission, *Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-end Management Investment Companies.* ..................32

Securities and Exchange Commission, *Exchange-Traded Funds (ETFs)* ....................................31

Securities and Exchange Commission, *Exchange Traded Funds; Proposed Rule* ....................8, 9

Securities and Exchange Commission, *Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold Investors* ...........................................31

Securities and Exchange Commission, *Registration Form for Registered Open-End Management Investment Companies* (Form N-1A) (SEC 2052) .......................................11, 24

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants ProShares Trust, ProShares Trust II, ProShare Advisors LLC, SEI Investments Distribution Co., Michael Sapir, Louis Mayberg, Edward Karpowicz, William Seale, Simon Collier, Charles Todd, Barry Pershkow, Steven Brancato and Stephenie Adams (collectively, "ProShares"), together with defendants Russell Reynolds and Michael Wachs (the "Independent Trustees"), submit this memorandum in support of their motion to dismiss the Amended Consolidated Class Action Complaint (the "Complaint").

## PRELIMINARY STATEMENT

Plaintiffs purport to bring this class action on behalf of investors in thirty-one ProShares exchange-traded funds ("ETFs") with daily investment objectives tied to an underlying benchmark index.  All of the ETFs at issue have a key common feature:  their investment objectives are stated solely in terms of *daily* results.  In the Complaint, plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933, as amended (the "Securities Act"), alleging that the registration statements for the ProShares ETFs contained material misstatements and omissions relating to the risk that the funds would not achieve their stated objectives on a *cumulative* basis for periods longer than a day.  Crucially, plaintiffs do *not* allege that the ETFs failed to meet the funds' stated investment objectives on a *daily* basis.  Instead, the plaintiffs contend that, contrary to their expectations, the "actual" *cumulative* returns of the ETFs (for periods of time carefully selected by plaintiffs) did not match the *cumulative* returns for those periods that the plaintiffs "anticipated."

The plaintiffs' claims all fail as a matter of law because the complaint identifies no material misstatement or omission of fact.  The very risks plaintiffs describe in the Complaint were clearly and consistently explained in the funds' registration statements.  Shareholders were

informed that "[t]he Funds do not seek to achieve their stated investment objective over a period

of time greater than one day because mathematical compounding prevents the Funds from

achieving such results."  *See, e.g.*, Appendix of ProShares Trust Disclosures ("Appendix A"),

attached as Exhibit 1 to the Declaration of Robert A. Skinner filed herewith ("Skinner Decl."), at

2.F.  The effect of compounding on cumulative returns was then explained in further detail.  For

example:

> Over time, the cumulative percentage increase or decrease in the net asset value of
> the Fund may diverge significantly from the cumulative percentage increase or
> decrease in the multiple of the return of the underlying Index due to the
> compounding effect of losses and gains on the returns of the Fund.
> **Consequently, for periods greater than one day, investors should not expect
> the return of the Fund to be twice the return of the underlying Index**.
> Appendix A at 3.A (emphasis added).

The registration statements went on to illustrate that this compounding effect was more likely to

have a negative effect on a fund's cumulative returns during periods of high volatility.

In light of these disclosures, no investor could reasonably "anticipate" that the ETFs'

cumulative returns would track the cumulative returns of the underlying index over time –

instead, investors were specifically told that they "should not expect" that outcome.  Indeed, a

recent decision by a state court in New Jersey found that ProShares clearly disclosed in the

registration statements that the ETFs had daily investment objectives.  Plaintiffs thus have no

colorable claim that they were misled about this basic feature of the ETFs.[1]

In an attempt to plead around the comprehensive disclosures in the registration

statements, plaintiffs assert several theories of liability, none of which survives scrutiny.  First,

plaintiffs allege that, despite many *explicit* disclosures to the contrary, ProShares *implied* that

---

[1] In fact, the purchase and sale records attached to the Complaint demonstrate that a number of
the named plaintiffs themselves engaged in short-turnaround purchases and sales of their ETF
shares in the span of one or a few days; this demonstrates quite clearly that they understood the
daily nature of the funds' investment objectives.

investors' cumulative returns over time would match their supposed "anticipated" cumulative returns by including information in the registration statements on annual returns and fees. Plaintiffs ignore, however, that the Securities and Exchange Commission ("SEC") *requires* funds to include such information in their registration statements – and indeed specifies the very time periods and assumed rates of return that should be used in such illustrations.  Plaintiffs cannot establish liability based on SEC-mandated information.  Plaintiffs also take this annual return and fee information out of context, highlighting it without mentioning the explicit warnings throughout the registration statements that actual cumulative returns would likely deviate from "anticipated" cumulative returns over time.

Second, plaintiffs employ classic pleading by hindsight, attempting to make their case by relying on allegedly large differences between "anticipated" and "actual" cumulative returns in the ETFs over selected periods of time in 2008 and 2009.  But plaintiffs' hindsight comparisons are arbitrary.  2008-09 saw the most volatile financial markets in living memory, and the periods of time reflected in plaintiffs' comparison charts were cherry-picked by plaintiffs for dramatic effect – with no apparent connection to the dates on which any plaintiff actually bought and sold the funds' shares.  The supposedly large divergence between "anticipated" and "actual" cumulative returns disappears if different ending dates (still within the proposed class period) are used for the comparisons.  This illustrates why courts uniformly reject pleading by hindsight in securities cases like this one:  the registration statements were required to be accurate and forthcoming about the nature of the funds and their prospective risks when issued – they were not required to predict the future and anticipate the level of market volatility in 2008-09.

Third, plaintiffs assert that public pronouncements by the Financial Industry Regulatory Authority ("FINRA") regarding leveraged and inverse ETFs in the summer of 2009 somehow

demonstrate that the funds' disclosures were inadequate.  But FINRA regulates the brokers who

sell the ETF shares to customers, not the fund companies like ProShares that issue the shares and

file the accompanying registration statements with the SEC.  Accordingly, the FINRA notices

cited by plaintiffs are expressly targeted at the brokers' sales practices regarding certain types of

ETFs and at ensuring that the brokers are recommending such funds to customers for whom such

investments are suitable.  Nowhere does FINRA criticize ProShares' (or any other funds') ETF

registration statement disclosures.  To the contrary, in a later joint statement by both FINRA and

the SEC – a statement featured in some of plaintiffs' earlier complaints but conspicuously absent

from the current pleading – the regulators in fact urge the brokers and their customers to *read the

funds' prospectuses*, in order to understand the risks disclosed there.  Plaintiffs point to no public

statement in which FINRA or the SEC has ever criticized the ProShares ETFs' registration

statements.

       Fourth, the fact that registration statements issued after the class period include further

enhancements to the ETFs' risk disclosures in no way demonstrates that the disclosures made

during the class period were deficient.  Like all mutual funds, the ETFs in ProShares Trust are

required to regularly update the offering documents comprising their registration statement (*i.e.*,

a prospectus and a statement of additional information ("SAI")), and the disclosures are often

updated from year to year.  The fact that disclosures beginning in 2009 included some amplified

language does not constitute an admission by ProShares that the prior iterations were

insufficient.  Nor does it take away from the substance of the earlier disclosures – which

consistently put investors on clear notice of the daily nature of the funds' investment objectives.

       In addition to the full disclosure of all relevant risks, the securities claims also fail for a

second, independently sufficient reason.  Any declines in the funds' share prices were not the

result of any purported misstatement or omission, and thus loss causation is absent.  Section 11

of the Securities Act precludes recovery if the decline in the value of a security "result[ed] from"

something *other* than the alleged misstatements or omissions in the security's prospectus.  None

of the misstatements or omissions alleged by plaintiffs caused the funds' share prices (which

closely track their net asset value ("NAV")) to be inflated, only to decline when the "truth"

became known.  To the contrary, because the share prices are a direct function of the value of the

fund's underlying portfolio securities, the plaintiffs would have experienced the same investment

returns regardless of whether there were additional or different disclosures regarding the

cumulative return risk.

   The Complaint suffers from additional failings as well.  Although plaintiffs purport to

bring their claims on behalf of the shareholders in 31 ProShares ETFs (listed in Exhibit C to the

Complaint), the named plaintiffs own shares in only 21 of those funds.  Under well-established

law, plaintiffs lack standing to bring claims with respect to funds in which no named plaintiff

bought shares.  Similarly, the Complaint asserts claims regarding funds that were not purchased

during the alleged class period and claims regarding registration statements pursuant to which no

shares were purchased by named plaintiffs.  Plaintiffs have no basis to assert such claims.

Further, plaintiffs have named additional defendants for the first time in the consolidated

amended complaint filed on September 24, 2010.  These claims against ProShares Trust II and

several individual defendants are barred by the one-year statute of limitations governing

Securities Act claims, as plaintiffs were demonstrably on notice of their claims against these

defendants no later than August 5, 2009 – when the first class action complaint in this case was

filed.  In addition, plaintiffs have asserted claims against three individual defendants based

solely on their role as "attorneys-in-fact" under power of attorney documents on file with the

SEC.  There is no basis for liability against these agents, who have merely signed the registration statements on behalf of, and at the direction of, other signatory-principals – and do not step into the principals' shoes for purposes of their alleged liabilities.

Finally, individual plaintiffs Steven and Sherri Schnall assert a breach of contract claim against ProShares Trust.  This claim is quite transparently a Section 11 claim dressed up in common law clothing.  Plaintiffs never adequately allege how a contract was formed between ProShares, an issuer, and the Schnalls, two individual investors, when the Schnalls bought their shares on the secondary market from a third party and through a broker.  Moreover, ProShares Trust plainly did not "promise" a particular return on the Schnalls' investment.  Rather, the gravamen of this claim is the same as in the class claims – that the disclosures regarding the risks of cumulative returns were inadequate – and it fails for the same reasons.

ProShares and the Independent Trustees respectfully submit that the Complaint should be dismissed in its entirety.

## BACKGROUND

### A.   The Defendants

Defendants ProShares Trust and ProShares Trust II (together, the "ProShares Trusts") are Delaware statutory trusts.  ProShares Trust is as open-end management investment company registered with the SEC under the Investment Company Act of 1940, as amended (the "1940 Act").  *See, e.g.*, 9/28/07 Registration Statement ("RS") at SAI 4 (Skinner Decl. Ex. 3).[2] ProShares Trust II is a commodity pool registered with the Commodity Futures Trading

_____

[2] All the registration statements cited herein are referenced in the Complaint.  The prospectus and SAI comprising a registration statement typically have separate, non-sequential page numbering; thus, page number references to the SAI portion of a registration statement are cited herein as "at SAI _".  All ProShares registration statements are publicly available on the SEC's website.  An exemplar registration statement is included as Exhibit 3 to the Skinner Declaration, while the relevant disclosures from all the registration statements at issue in the putative class period are summarized in Appendices A and B (Exhibits 1 and 2 to the Skinner Declaration).

Commission ("CFTC"). 11/21/08 RS (ProShares Trust II) at F-21. Both ProShares Trusts are comprised of a number of separate investment portfolios ("ETFs" or "funds"), each organized as a separate series of one of the Trusts, and each with its own trading symbol. *Id*. at F-21, 92, 9/28/07 RS at 2. Certain of the ETFs have been offered to investors since 2006. 5/31/07 N-CSR at 1.[3] Defendant ProShare Advisors LLC ("ProShare Advisors") serves as the investment advisor for ProShares Trust and its ETFs. 9/28/07 RS at 2. Nonparty ProShare Capital Management LLC ("PCM") is the sponsor, commodity pool operator, and commodity trading advisor for ProShares Trust II and its ETFs. 11/21/08 RS (PS II) at 1. Defendant SEI Investments Distribution Co. ("SIDCO") serves as the distributor for all the funds. *Id.* at F-17; 9/28/07 RS at SAI 41.

   Individual Defendant Michael Sapir is the Chairman and CEO of ProShare Advisors and PCM, and is also an Interested Trustee of ProShares Trust. 9/28/07 RS at 128, SAI 24-25; 11/21/08 RS (PS II) at 64. Individual Defendant Louis M. Mayberg is the President of ProShare Advisors and ProShares Trust. 9/28/07 RS at 128, SAI 25. Individual Defendant Edward Karpowicz is the Principal Financial Officer of ProShares Trust II. 11/21/08 RS (ProShares II) at 65. Individual Defendant William E. Seale is the Chief Investment Officer for ProShare Advisors. 9/28/07 RS at 128.  Individual Defendant Simon D. Collier was the Treasurer of ProShares Trust from 2006-2008. *Id*. at SAI 25; 9/28/10 RS at 30. Individual Defendant Charles S. Todd has been the Treasurer of ProShares Trust since 2008. 9/28/10 RS at 30. Individual Defendants Russell Reynolds, III and Michael Wachs are Independent Trustees of ProShares Trust. 9/28/07 RS at SAI 24. Individual Defendants Barry Pershkow, Steven Brancato, and Stephenie Adams signed one or more of the registration statements on behalf of other Individual

---

[3] ProShares Trust sends an annual report to its shareholders. Form N-CSR is used to file a version of this annual report with the SEC.

Defendants as "attorneys-in-fact" under power of attorney documents on file with the SEC.  *See, e.g.*, *id*.; 9/29/08 RS; 11/21/08 RS (ProShares I).  Each of the Individual Defendants is named because he or she allegedly signed one or more of the registration statements in question.

**B.      The Structure and Operation of ETFs**

As the SEC noted in a recent release, ETFs have become "an increasingly popular investment vehicle."  Securities and Exchange Commission, Exchange-Traded Funds; Proposed Rule, 17 C.F.R. Parts 239, 270, 274 (hereinafter "SEC ETF Release") at 14618, available at http://www.sec.gov/rules/proposed/2008/33-8901fr.pdf (Skinner Decl. Ex. 4).  An ETF typically is comprised of a portfolio of securities designed to track an underlying benchmark or index.  A *leveraged ETF* seeks to deliver a multiple of the daily performance of the index it tracks.[4]  An *inverse ETF* seeks to deliver the opposite of the daily performance of the index it tracks.  A *leveraged inverse* ETF thus seeks a daily return that it is a multiple of the opposite of the daily performance of the index it tracks.[5]

Most ETFs are investment companies regulated by the SEC under the 1940 Act while some are publicly offered commodity pools regulated by the CFTC.[6]  ETFs are similar in many ways to traditional open-end mutual funds (or traditional commodity pools), but feature some important structural differences.  First, whereas traditional mutual fund shares are purchased by investors directly from the fund itself and later "redeemed" or sold back directly to the fund, ETF shares are bought and sold by investors on the secondary market (other than for certain large institutional purchasers of "Creation Units," as described below), through brokers – much like

---

[4] ProShares Trust offers the Ultra S&P 500, a fund designed to provide daily investment results of double (200%) the daily performance of the S&P 500 Index.  9/28/07 RS at 24.

[5] ProShares Trust offers the UltraShort Russell 2000, a fund designed to seek daily investment results that correspond to twice (200%) the inverse of the daily performance of the Russell 2000 index.  *Id*. at 79.

[6] The same structural and trading concepts explained below apply whether the ETF is an investment company or a commodity pool.

shares in a public company are traded.  Second, because of this secondary market, shares of

ETFs can be bought and sold throughout the trading day, at market prices that can vary over the

course of a day.  SEC ETF Release at 14619.  By contrast, the share price of a traditional mutual

fund is typically set just once a day, as of the close of the market, and is required by law to be

equal to the *pro rata* net asset value ("NAV") of the securities comprising the fund's portfolio.

Although ETF share prices are set by the secondary market, the prices tend in practice to

track the NAV of the fund very closely.  *See* SEC ETF Release at 14619 n.9 ("The shares of

many ETFs often trade on the secondary market at prices close to the net asset value ("NAV") of

the shares . . .").  *McGraw-Hill Cos. v. Vanguard Index Trust*, 139 F. Supp. 2d 544, 546-47

(S.D.N.Y. 2001) (explaining that while ETFs do trade on the secondary market, "because ETF

shares may be created and redeemed by market makers at net asset value . . . ETF shares

typically do not trade at prices that vary greatly from their net asset values").[7]

Plaintiffs allegedly invested in a number of the ProShares ETFs "pursuant or traceable"

to the ProShares registration statements listed on Exhibits A and B to the Complaint.  Complt. ¶

12.  Plaintiffs seek to represent a class of persons who purchased or acquired shares of the 31

---

[7] The close tracking between share price and NAV is the result of the mechanism by which ETF shares are distributed to the market place.  Shares are issued by an ETF in large blocks known as "Creation Units," which are generally purchased by large financial firms and other institutional investors ("authorized participants") at a price equal to the NAV.  The Creation Unit investors can also sell shares back to the fund at the NAV.  Individual investors in turn purchase smaller blocks of shares from the authorized participants on the secondary market at a market price, with the assistance of brokers.  In the event of a meaningful disparity between the market price for a share and its NAV, a salutary arbitrage opportunity arises for the institutional Creation Unit investors:  they can buy up "under-valued" shares (*i.e.*, those trading at a market price below NAV), bundle them into Creation Units, and sell them back to the fund at the NAV – which increases demand for the shares and drives up the market price in line with the NAV.  The opposite occurs in the event the shares are trading above the NAV:  the institutions purchase more Creation Units from the fund and sell shares on the market, thus increasing supply and driving the market price down.  *See* SEC ETF Release at 16420; *see also* 9/28/07 RS at 120 (noting that the Funds are expected to be attractive to arbitrageurs, whose "trading activity is critical to ensuring that shares trade at or close to net asset value per share")

ProShares ETFs listed on Exhibit C between August 6, 2006 and June 23, 2009. *Id.* at ¶¶ 13, 38. As detailed below, however, the registration statements provided comprehensive disclosure of the funds' daily investment objectives and the likelihood that those objectives will not be achieved on a cumulative basis for time periods longer than a day.

**C.**     **The Registration Statements at Issue**

ProShares Trust's registration statements are filed with the SEC on Form N-1A. *See* 17 C.F.R. § 274.11A; Form N-1A, *Registration Form for Registered Open-End Management Investment Companies* (SEC 2052) ("Form N-1A") (Skinner Decl. Ex. 5). Under the federal securities laws, the registration statement of a mutual fund is comprised of its prospectus, its statement of additional information ("SAI"), and certain other information, including exhibits and undertakings. ProShares Trust issues prospectuses covering the multiple ETFs that comprise the Trust. Pursuant to the requirements of the Securities Act and 1940 Act, ProShares Trust is required to update each fund's prospectus at least annually. This update is occasionally supplemented or reissued during the year, and a new prospectus will sometimes be issued as part of the offering of a new fund during the course of the year. The 1940 Act also mandates that ProShares Trust send shareholders semi-annual updates listing, among other things, the amounts and values of the securities held by each fund. The Trusts' semi-annual and annual reports are all incorporated by reference into the prospectuses. *See, e.g.* 12/29/06 RS at 337.

ProShares Trust II files its registration statements with the SEC using Form S-3[8]. *See, e.g.*, Form S-3, Registration Statement Under the Securities Act (SEC 870). Under the federal securities laws, the registration statement of a publicly traded commodity pool is comprised of a prospectus and other information, including certain exhibits and undertakings. ProShares Trust

---

[8] ProShares Trust II filed its original registration statement using Form S-1, but has filed all subsequent statements using Form S-3, the form for seasoned issuers.

II issues prospectuses covering the multiple ETFs that comprise the Trust.  Pursuant to the requirements of the Securities Act, ProShares Trust II is required to update each fund's prospectus at least every three years.  This update is occasionally supplemented or reissued during the year, and a new prospectus will be issued as part of the offering of a new fund.

Plaintiffs purport to assert claims with respect to misstatements and omissions in multiple registration statements listed in the Complaint at Exhibit A (for ProShares Trust) and Exhibit B (for ProShares Trust II).  The disclosures relevant to the Complaint are similar across all registration statements.  Appendix A (ProShares Trust) (Skinner Decl. Ex. 1) and Appendix B (ProShares Trust II) (Skinner Decl. Ex. 2) contain the relevant disclosure provisions from each of the registration statements and show how these disclosures changed over time (if at all).  As discussed in Section III, *infra*, the named plaintiffs appear to have only purchased securities pursuant to five of these registration statements:  those dated December 29, 2006, September 28, 2007; September 29, 2008 (all ProShares Trust) November 21, 2008, and February 27, 2009 (ProShares Trust II).  This memorandum will focus primarily on the first four of these prospectuses[9], although Appendices A and B demonstrate that there is no meaningful difference between the disclosures in these documents and those covering other periods.

**D.**  **ProShares' Registration Statements Contain Detailed Descriptions of the ETFs'** ***Daily*** **Investment Objectives and the Operation and Performance of the ETFs over Longer Periods**

Consistently throughout the class period, the operative registration statements for the Trusts clearly disclosed that (i) ProShares ETFs have *daily* investment objectives; (ii) the funds do *not* attempt to achieve their objective for periods longer than a day; (iii) compounding

---

[9] Given the short period of time between the November 2008 and February 2009 registration statements, the discussion below will focus on the November 2008 registration statement for ProShares Trust II.  All of the relevant disclosures in the February 27, 2009 registration statement are set forth in Appendix B (Skinner Decl. Ex. 2).

prevents the funds' cumulative returns from matching the cumulative returns of the index for

longer than one day, and may cause a significant divergence; (iv) the effect of compounding on

cumulative returns is amplified in funds that utilize leverage (as many of the ProShares ETFs

do); and (v) volatile markets further amplify the effects of compounding and leverage on

cumulative returns.

### 1.   *The ETFs have daily investment objectives*

The registration statements issued throughout the putative class period disclose

repeatedly that each ProShares ETF has an investment objective of tracking (inversely and/or by

a multiple) its respective index for one day.  For example, the earliest registration statement

listed by plaintiffs in Exhibit A states that both Ultra ProShares and UltraShort ProShares funds

"seek to provide daily investment results" that corresponded to the "daily performance of their

applicable indexes."  6/22/06 RS at 5, 15.  This information was repeated in each subsequent

operative registration statement throughout the class period for both ProShares Trusts.  *See, e.g.*,

12/29/06 RS at 4, 108, 199; 9/28/07 RS at 6, 19, 66; 9/30/08 RS at 6, 21, 66; 11/21/08 RS

(Proshares Trust II) at 1-2.  This daily objective was also reiterated in the information section for

*each individual fund*.  *See, e.g.*, 12/29/06 RS at 74 ("[DIG] seeks daily investment results . . . that

correspond to twice (200%) the daily performance of the Dow Jones U.S. Oil & Gas Index");

9/28/07 RS at 100 ("[SRS] seeks daily investment results . . . that correspond to twice (200%) the

inverse (opposite) of the daily performance of the Dow Jones U.S Real Estate Index.").  Indeed,

the phrase "daily investment" appears over 250 times in each of the operative registration

statements, including on the *very first page* (after the table of contents).  *See, e.g.*, 12/29/06 RS at

4; 9/28/07 RS at 6, 9/30/08 RS at 6.

2.      ___The ETFs do not seek to achieve their objectives for longer than one day___

The registration statements throughout the class period also specifically stated that the funds did not seek to achieve their respective investment objectives for longer than one day.  *See, e.g.* 12/29/06 RS at 313 ("The Funds do not seek to achieve their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results."); 9/28/07 RS at 6 ("Each series of ProShares . . . is designed to seek daily investment results . . . . The Funds do not seek to achieve their stated investment objective over a period of time greater than one day."); 9/30/08 RS at 6 (same); 11/21/08 RS (ProShares Trust II) at 1-2 (same).  This point was reiterated in the annual reports sent to shareholders and incorporated by reference into the funds' registration statement.  *See, e.g.*, 5/31/08 N-CSR at 2 ("ProShares ETFs are designed to provide either 200%, -200% or -100% of index performance on a daily basis (before fees and expenses).  A common misconception is that the Funds also should provide 200%, -200% or -100% of index performance over longer periods, such as a week, month or year.  However, Fund returns over longer periods are generally less than or greater than the returns that would result from such an expectation.").

3.      ___Compounding prevents the ETFs' cumulative returns from matching the cumulative returns of the index for longer periods___

The registration statements further explained that compounding prevents the funds from achieving cumulative returns that match the cumulative returns of the index (or the inverse or stated multiple thereof) for periods longer than a day.  *See, e.g.*, 12/29/2006 RS at SAI 16 ("While close tracking of any Fund to its benchmark may be achieved on any single trading day, over time the cumulative percentage increase or decrease in the net asset value of the Shares of a Fund may diverge significantly from the cumulative percentage decrease or increase in the benchmark due to a compounding effect."); 9/28/07 at SAI 18 (same); 9/30/08 at SAI 16-17 (same); 11/28/08 (ProShares Trust II) at 4, 22-23 (same).  Investors were specifically warned that

they should *not* expect the funds' cumulative returns to match those of the index (or the inverse

or stated multiple thereof) for periods longer than a day.  *See, e.g.*, 12/29/06 RS at 7 ("Over time,

the cumulative percentage increase or decrease in the net asset value of the Fund may diverge

significantly from the cumulative percentage increase or decrease in the multiple of the return of

the underlying Index due to the compounding effect of losses and gains on the returns of the

Fund.  *Consequently, for periods greater than one day, investors should not expect the return of*

*the Fund to be twice the return of the underlying Index*.") (emphasis added).[10]

### 4.    *Leverage amplifies the effect of compounding on cumulative returns*

The effect of compounding on cumulative returns – which is a feature of virtually all

investments – is *amplified* in a fund that uses leverage, as many of the ProShares ETFs do.

Leveraged ETFs use a variety of derivative instruments such as swaps, futures contracts and

options as a means of magnifying market movements so that they can attempt to achieve results

equal to two or three times the performance (or inverse) of their underlying index.  *See, e.g.*,

12/29/06 RS at 318.  The registration statements clearly disclose the additional risks resulting

from the use of these leveraging techniques.  *See, e.g.*, *id*. at 318 ("Over time, the use of

leverage, combined with the effect of compounding, will have a more significant impact on a

Fund's performance compared to the index underlying its benchmark than a fund that does not

employ leverage.  Therefore, the return of the index over a period of time greater than one day

---

[10]  Compounding is common to all investments that earn cumulative returns over time, not just
leveraged products.  Compounding can have both positive and negative consequences for
cumulative returns.  For example, if a mutual fund's NAV is equal to $10,000 and gains 1% on
Day 1, the resulting NAV will be $10,100 ($10,000 original value plus the 1% increase of $100).
If the NAV gains another 1% on Day 2, the new NAV will be $10,201 ($10,100 plus the 1%
increase of $101) – which is *more* than a 2% cumulative increase.  Because of compounding, the
two consecutive 1% increases result in more cumulative gain than a single 2% increase.  By the
same token, if the same fund *lost* 1% on Day 2 following its 1% gain on Day 1, the resulting
NAV would be $9,999 ($10,100 less the 1% decrease of $101).  Because of compounding, the
cumulative effect of the 1% gain followed by the 1% loss is a net decrease of $1 – and does not
simply bring the fund back to its starting NAV.

multiplied by a Fund's specified multiple or inverse multiple (e.g., 200% or -200%) will not generally equal a Fund's performance over that same period."); 9/28/07 RS at 8 ("[T]here is a special form of correlation risk that derives from these Fund' use of leverage, which is that for periods greater than one day, the use of leverage tends to cause the performance of a Fund to be either greater than or less than the index performance times the stated multiple in the Fund objective"); 9/29/08 at 9; 11/21/08 (ProShares Trust II) at 23-24.  This warning is repeated in the annual reports sent to shareholders and incorporated by reference into the funds' SAIs.  *See, e.g.*, 5/31/08 N-CSR at 328.

### 5. *Volatile markets further amplify the effects of compounding and leverage on cumulative returns*

Finally, the registration statements also disclosed that volatile markets could make the effects of compounding and leverage even more pronounced.  *See, e.g.*, 9/28/07 RS at 7, SAI 18-20) (noting that index volatility affects a leveraged ETF's return for periods longer than one day and using "wedge" graphs to show that increased index volatility will increase the likelihood that the ETF will underperform if held for longer periods of time – including results in the *opposite direction* in periods of high volatility) (an example of a "wedge" graph can be seen in Appendix A at 5.A.); 9/29/08 RS at SAI 17-19 (same); 11/21/08 RS at 22 ("It is possible to lose money over time when an underlying benchmark is up (down) for the corresponding Ultra (UltraShort) Fund due to the effects of daily rebalancing, volatility, and compounding.").[11.]  This principle is reiterated in the annual reports sent to shareholders, which are incorporated by reference into the funds' statement of additional information.  *See, e.g.*, 5/31/08 N-CSR at 328 ("In general, given a particular index return, increased volatility of the index will cause a decrease in the performance

---

[11]   The registration statements included warnings about the effects of compounding and leverage on ETFs held longer than one day from the first offering of ETFs in 2006.  Beginning in 2007, ProShares separated out index volatility as another factor that could cause divergence of an ETF from its underlying index when held for periods longer than one day.

relative to the index performance times the stated fund multiple."); *Id*. at 2 ("In general, periods of higher index volatility will cause the effect of compounding to be more pronounced."); *Id*. at 6 ("Daily volatility for the U.S equity markets increased from a year ago. . . .  At a given index return level, increased volatility tends to negatively impact performance over time.").

## ARGUMENT

When challenged by a motion to dismiss, plaintiffs' factual allegations must be sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  To survive a motion to dismiss under *Twombly*, a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* at 555.  It is not enough for a plaintiff to plead facts that are "merely consistent with" a right to relief; a plaintiff must allege facts "plausibly suggesting" liability.  *Id.* at 557.  While the court must take all well-pleaded facts as true in deciding a motion to dismiss under Rule 12(b)(6), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

In addition, the particularity requirement of Rule 9(b) applies to claims brought under Section 11 of the Securities Act when those claims are "grounded in fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Even claims that are not "styled or denominated" as fraud are held to the Rule 9(b) heightened pleading requirements if they are based on allegations of fraud. *Id*. at 171; *In re AIG Advisor Group*, No. 06 CV 1625(JG), 2007 WL 1213395, at *13 (E.D.N.Y. Apr. 25, 2007).  When applicable, Rule 9(b) requires that a plaintiff specify which statements were fraudulent, identify who made the statements, specify when and where the statements were made, and explain why the statements were fraudulent.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Plaintiffs assert allegations of intentional or reckless

misrepresentation by alleging that the defendants provided a misleading mix of information to be filed with the SEC enabling the funds to grow quickly. *See, e.g.*, Complt. ¶¶ 4-5; *In re JP Morgan Chase Secs. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (complaint "sound[s] in fraud" when it contains 'wording and imputations . . . classically associated with fraud") (quoting *Rombach*, 355 F.3d at 172).  In the end, whether plaintiffs' claims sound in fraud is of little matter.  The Complaint fails to meet the pleading standards of either Rule 8 or Rule 9(b) since the disclosures in the registration statements on their face fully and accurately describe the nature of the securities and the risks described in the Complaint.

## I.     THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR OMISSIONS IN THE PROSHARES REGISTRATION STATEMENTS

To state a claim under Section 11 of the Securities Act, a plaintiff must allege that an offering document contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *In re Fuwei Films Secs. Litig.*, 634 F. Supp. 2d 419, 433-34 (S.D.N.Y. 2009); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 466 (S.D.N.Y. 2009).  A false or misleading statement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *ECA and Local 134 IBEW Joint Pension Trust  v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal citations and quotation marks omitted).  To state a claim based on an omission, a plaintiff must demonstrate that the omission is material and that defendants had a legal obligation to disclose the allegedly omitted information.  *See* 15 U.S.C. § 77k; *In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003).  For an omission to be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Landmen Partners Inc. v. Blackstone Group,*

*L.P.*, 659 F. Supp. 2d 532, 540 (S.D.N.Y. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).

An actionable misrepresentation claim arises only if the relevant disclosure documents *read as a whole* could have misled a reasonable investor about the securities offered.  *See Lin v. Interactive Brokers Group, Inc.*, 574 F. Supp. 2d 408, 418-19 (S.D.N.Y. 2008).  "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *Halperin v. eBanker USA.com*, 295 F.3d 352, 357 (2d Cir. 2002).

A.   **ProShares' Registration Statements Fully and Accurately Disclosed the Daily Nature of the Investment Objectives and the Impact a Daily Objective has on Cumulative Returns over Longer Periods**

Plaintiffs' Section 11 claim fails as a matter of law because the Complaint points to no fact in the funds' registration statements that is even arguably false or misleading, and asserts no omission of material fact necessary to make the registration statements not misleading.  Simply put, the registration statements, read as a whole, could not have misled a reasonable investor about the daily nature of the funds' investment objectives and the impact of having a daily objective on cumulative returns for periods longer than a day.  A complaint alleging material misstatements and omissions cannot survive a motion to dismiss if the registration statement amply discloses the risks in question.  As explained by the court in *Steinberg v. PRT Group, Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000):

> If a plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint.  In such a situation, dismissal of the complaint is proper, for no additional facts can prove the claims.  The Second Circuit has consistently affirmed Rule 12(b)(6) dismissals of securities claims where the risks of which plaintiffs complained were disclosed in the prospectus. (internal citations omitted)

18

Courts in this circuit routinely dismiss securities claims where the registration statement sufficiently discloses the risks or other features about which plaintiffs claim to have been misled. *See, e.g.*, *Halperin*, 295 F.3d at 361 (dismissing claims where "[t]he allegedly omitted facts were either disclosed or implied in the offering memoranda"); *accord Rubin*, 634 F. Supp. 2d at 470; *Lin*, 574 F. Supp. 2d at 418.

As detailed in the Background section above and as set forth in the attached Appendices (Skinner Decl. Exs. 1 and 2), the operative registration statements for the ProShares ETFs amply disclosed the funds' features as to which plaintiffs claim to have been misled.  In clear and oft-repeated disclosures, the registration statements explained that:  (i) ProShares' ETFs sought daily investment results (*see, e.g.* Appendix A at 1.A.-L.; Appendix B at 1.A.-C.); (ii) ProShares' ETFs did not attempt to track their underlying indexes for longer than one day (*see, e.g.* Appendix A at 2.A.-L.; Appendix B at 2.A.-C.); (iii) because of compounding, for time periods longer than one day the percentage increase or decrease of a fund could "diverge significantly" from the percentage decrease or increase in its benchmark index (*see, e.g.* Appendix A at 3.A.-L.; Appendix B at 3.A.-C.); (iv) the use of leverage amplified the effects of compounding on cumulative returns (*see, e.g.* Appendix A at 4.A.-L.; Appendix B at 4.A.-C.); and (v) increased volatility of the underlying index can also cause a decrease in the fund's performance relative to the index performance times the fund multiple.  *See, e.g.* Appendix A at 5.A.-F.; Appendix B at 5.A.-C.  These disclosures are easily of "sufficient precision and clarity to alert prudent investors to the nature of the offerings and the risks entailed."  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008).

In a recent New Jersey state court action against ProShares asserting state securities fraud and common law fraud claims, the court dismissed the shareholder's claims because the

registration statement made ample disclosures regarding the daily nature of the relevant fund's investment objective.  The judge noted in a decision read from the bench that the ProShares prospectus made clear that its ETF had a daily investment objective and was not designed to track a multiple of the index over time.  Thus, even if (as alleged by the plaintiff there) a sales representative had assured the plaintiff that the fund's cumulative returns would track a multiple of the benchmark's returns over time, such representations were contradicted by the clear disclosures in the prospectus – thus defeating the claims.  *See Greenberg v. ProShares Trust*, No. MRS-L-0011-1-09, Transcript of Motion (July 9, 2010) at 39-44 (Skinner Decl. Ex. 6).  The same reasoning applies with equal force in this case:  the express disclosures in the registration statement conclusively trump plaintiffs' attempts to read contrary meaning into the documents.

Indeed, plaintiffs can hardly claim to have been unaware of the daily investment objective of the ProShares ETFs, given how certain of the named plaintiffs themselves were utilizing the ETF investments in their own portfolios.  Exhibit D to the Complaint sets forth each named plaintiff's declaration of his or her purchases and sales of ProShares ETFs.  These records reflect that a number of the named plaintiffs executed multiple short-term buys and sells of ProShares' ETFs within the course of a single day or just few days.  For example, Exhibit D demonstrates that plaintiff John White repeatedly engaged in intra-day trading of the fund with ticker symbol SDS.  His first listed purchase of SDS shares was 66,000 shares on July 1, 2009 and he sold those shares *the same day* (for a profit).  He purchased 12,000 shares on July 13, 2009 and sold the shares *the same day* (again for a profit).  Indeed, of all the shares he bought over the three months as identified in Exhibit D, most were sold either the same day or the next trading day.  Plaintiffs cannot credibly allege that a reasonable investor could read the registration statement and not understand the daily nature of the ETFs' investment objectives.

Conspicuously absent from the Complaint is any allegation that the ETFs failed to meet their stated investment objectives on a daily basis.  Plaintiffs have no basis to assert that the registration statements' descriptions of the daily investment objectives were false.  Thus, plaintiffs primarily allege material *omissions* that supposedly rendered the registration statements misleading – particularly with respect to whether actual cumulative returns over time would match "anticipated" or "expected" cumulative returns.  As discussed in the following sections, however, these allegations run headlong into the registration statements' actual disclosures, which clearly and consistently described the funds' features in a way that could not have misled a reasonable investor.

**B.    The Complaint Alleges No Actionable Misstatements or Omissions Relating to the Performance of the Funds for Periods Longer Than a Day**

Faced with the repeated risk disclosures in the registration statements regarding cumulative returns over time, plaintiffs allege that these warnings were somehow rendered ineffective because ProShares "consistently empowered and encouraged investors to hold ProShares' leveraged ETFs for substantial periods of time, including periods of one year." Complt. ¶ 64; *see also* Complt. ¶¶ 65(a)-(g), 94-95, 132, 136.  Notably, however, plaintiffs point to no assertion in any of the registration statements that ProShares' ETFs were attempting to track their benchmark indices for more than one day, or any statement that the funds would in fact achieve this.  As discussed above, the registration statements stated flatly the opposite, that investors "should not expect" such results.  Unable to assert the falsity of the funds' actual disclosures, plaintiffs instead attempt to make out their case by *implication* – that the registration statements misleadingly *implied* that cumulative returns over time would match supposed "anticipated" cumulative returns, thus "encouraging" long-term investments based on a false

premise. *See, e.g.*, *id*. at ¶¶ 94-95 ("Defendants misleadingly *implied* . . . that results could improve by holding for a period of a year.") (emphasis added).

To this end, plaintiffs point to tables and other disclosures in the registration statements illustrating various effects of holding ETF shares for a year or even longer periods. *See, e.g.*, *id*. at ¶ 65(a)-(g), 132, 136. Plaintiffs suggest that such disclosures somehow misleadingly implied to the reasonable investor that the cumulative returns for such periods would match those of the index. But plaintiffs ignore the fact that many of these illustrations regarding longer-term investments are in fact *required by SEC regulation* to be included in the registration statement in order to allow investors to compare mutual fund features (*e.g.*, performance history, fees) on an apples-to-apples basis. *See* 17 C.F.R. § 274.11A; SEC Form N-1A at 11-12, 16-17 (Skinner Decl. Ex. 5). Indeed, the SEC specifies the very time periods and assumed rates of return that funds should utilize in such illustrations. *See id.* For example, plaintiffs point to ProShares' illustration of the costs of investing $10,000 in its ETFs for periods of one or three years assuming a 5% annual return, Complt. ¶ 65(f), yet this precise disclosure is specifically mandated by the SEC. *Compare* 9/28/07 RS (Skinner Decl. Ex. 3) at 21 *with* SEC Form N-1A (Skinner Decl. Ex. 5) at 12. Such mandated disclosures cannot possibly establish liability against ProShares, particularly where plaintiffs make no allegation that the illustrations are inaccurate. *See* 15 U.S.C. §77s(a) ("No provision of this subchapter imposing any liability shall apply to any act done or omitted in good faith in conformity with any rule or regulation of the Commission."); *see also Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 C 2139, 1992 WL 380929 at *4 (N.D. Ill. Dec. 10, 1992) (noting that defendant complied with SEC prospectus regulations, and if defendant included language "in good faith reliance on the SEC rule, then no liability follows"). There is no colorable basis to assert that ProShares was sending an implicit

message to potential investors by including SEC *mandated* disclosures that appear in virtually identical form and fashion throughout all mutual fund and exchange-traded fund prospectuses.

Plaintiffs would also have the Court ignore the context in which these illustrations are presented, including express warnings of the risks that plaintiffs assert were being implicitly downplayed.  But the law requires that the registration statements be read as a whole when determining whether a reasonable investor could be misled.  *See Lin*, 574 F. Supp. 2d at 418-19; *Halperin*, 295 F.3d at 357.  There is simply no basis to conclude that ProShares *implied* in the registration statements that cumulative results would track the benchmark when the *express* disclosures in the same document state precisely the opposite.

For example, plaintiffs allege that ProShares provided tables of different projected returns for its ETFs over a period of one year.  *See* Complt. ¶ 65(a).  But plaintiffs omit the following: (i) the title of the table specifically stated "the Fund Objective is to Seek Daily Investment Results"; (ii) the lead-in section to the tables stated "for periods greater than one day, the use of leverage tends to cause the performance of a ProFund to be either greater than, or less than, the index performance times the stated multiple in the fund objective"; and (iii) the tables referred investors to the sections in the prospectus and the SAI on "Correlation Risk," which again warned investors that the fund may diverge from its index over periods longer than one day.  *See* 9/28/07 RS at SAI 18-20; Appendix A at 5.A.  Even if the projected return illustrations could be read as an implicit assurance regarding cumulative returns, the surrounding cautionary language belies any such unfounded implicit assurance.  *See, e.g.*, *Schoenhaut v. American Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) ("Reading the Prospectus as a whole and taking the challenged statements in context . . . the challenged statements were surrounded by express cautionary language addressing the substance of the challenged statements.").

The Complaint also points to interviews and other public statements attributed to ProShares CEO Michael Sapir regarding the ability of investors to hold ProShares ETFs for more than a day. *See, e.g.*, Complt. ¶¶ 68-72, 197-98. Such comments are not part of the registration statement and thus form no basis for liability under Section 11. *See* 15 U.S.C. § 77k(a). Moreover, even if the Court were to take Mr. Sapir's comments into consideration in ruling upon Section 11 liability, the substance of his comments provides no support for plaintiffs' claims. Mr. Sapir's statements in no way contradict ProShares' ample disclosures. Mr. Sapir simply stated that an investor could pursue a "buy and hold" strategy using ProShares ETFs as long as the investor carefully monitored the investment's performance and rebalanced the position if necessary to bring it in line with the desired investment result. *See* Complt. ¶ 198. ("[T]he key is to monitor performance, and if a leveraged or inverse ETF deviates from its benchmark by more than is desired, 'what you should do is buy or sell shares to bring it back in line.'"). Such statements are perfectly consistent with ProShares' disclosures. The ETFs have a daily investment objective. If they are to be held for longer than one day, they need to be monitored to ensure that the effects of compounding, leverage, and index volatility do not cause them to deviate significantly from the shareholder's investment objectives.[12]

### C. Plaintiffs Cannot Establish Liability by Hindsight by Comparing Supposedly "Anticipated" and "Actual" Cumulative Returns over Arbitrarily Selected Periods

Many pages in the Complaint are devoted to graphs purporting to show divergence between what plaintiffs dub the "anticipated" cumulative returns for the ETFs (based on the

---

[12] This analysis applies equally to Mr. Sapir's statements comparing ETFs to margin accounts. *See* Complt. ¶ 68. Nowhere do plaintiffs allege that Mr. Sapir's comparison is false. And of course a margin account, which effectively leverages the account-holder's investment returns through borrowing, must also be monitored on an ongoing basis. Nowhere do plaintiffs explain how such a comparison (even if relevant to their Section 11 claim) could mislead investors into thinking that the cumulative returns of the funds would match those of the index over time.

underlying benchmark's cumulative returns) and the "actual" cumulative returns achieved for selected periods of time.  *See, e.g.*, Complt. ¶¶ 84-93; 95-100; 122-25; 137-38.  Plaintiffs apparently intend by this to convince the Court that something *must* have been wrong with ProShares' disclosures, since investors in the funds at those times would have lost substantial sums of money.  By urging the Court to look at the results of hypothetical investments instead of evaluating the registration statements themselves, however, plaintiffs are engaging in classic hindsight pleading, which has been consistently rejected by the Second Circuit.  *See, e.g.*, *Lin*, 574 F. Supp. 2d at 421 ("To be actionable under Section 11, the registration statement must contain an untruth or material omission 'when such part became effective' . . . plaintiffs [must] at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were [ ] knowable, at the time of the offering.") (*quoting* 15 U.S.C. § 77(k)(a)); *accord New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland*, No. 08 CV 5093, 2010 WL 1172694, at *14 (S.D.N.Y. March 26, 2010); *see also*, *Panther Partners*, 538 F. Supp. 2d at 66 ("In assessing whether a misrepresentation or omission was material, courts may not employ 20/20 hindsight; instead, they must consider whether the misrepresentation or omission was material on the date the prospectus or registration statement was issued.").

Rather than provide graphs based on the dates when any actual named plaintiff bought and sold the ETFs in question, plaintiffs instead cherry-pick date ranges for maximum effect, using different three-month ranges for UltraShort Funds (Complt. ¶¶ 84-93), UltraLong Funds (*id*. at ¶¶ 122-125), and Short Funds[13] (*id*. at ¶¶ 137-138) (as well as an additional 18-month range for some UltraShort Funds (*id*. at ¶¶ 95-100)).  Given the previously discussed relationship

---

[13] Plaintiffs include a graph showing the performance over time of the fund with ticker symbol EFZ.  *See* Complt. ¶ 137.  But EFZ is not one of the funds at issue in the case, as it is not listed in Exhibit C to the Complaint.

between volatility in the benchmark indices and underperformance by the ETFs, a feature that

was disclosed in the registration statements, it is thus not surprising that plaintiffs picked time

periods (ranging from late 2008 to early 2009) characterized by extreme and historically

unprecedented volatility in the underlying indices and markets generally.  *See, e.g.*, 5/31/09 N-

CSR at 4 ("Similar extreme volatility levels were reached previously only during the Great

Depression period (1929 to 1932) and in the equity market crash of 1987.").  For example,

plaintiffs include a graph depicting the performance of the Ultra Real Estate Fund ("URE") from

October 27, 2008 to January 28, 2009 (Complt. ¶ 122) without explaining why this graph is

relevant, given that no named plaintiff held shares of URE during any part of that time frame.

Indeed, no named plaintiff even bought shares of URE until February 2009.  *See* Exhibit D

(named plaintiff David Bowman first bought shares of URE in February 2009 and named

plaintiff Martin Norris first bought URE shares in September 2009).

Plaintiffs also fail to provide an explanation for how they picked the cut-off date for each

graph.  That choice makes a significant difference.  For example, plaintiffs include an example

showing that from January 16, 2009 to April 20, 2009, the Dow Jones U.S. Real Estate Index

("DJUSRE") fell 14.43% but the UltraShort Real Estate Fund ("SRS") (which was designed to

track on a daily basis double the inverse of the DJUSRE) fell 44.08% instead of gaining 28.85%

as allegedly expected.  Complt. ¶ 84.  Plaintiffs provide no explanation for why April 20, 2009 is

the correct date to evaluate, however.  Had plaintiffs instead run the same simulation from

January 16, 2009 to March 6, 2009, for example, the DJURE would have fallen 34.7% and

shares of SRS would have gained 67.1% – almost exactly the double of the inverse.[14]  Similarly,

---

[14] These returns are derived from the same publicly available share and index price data relied
upon by plaintiffs in the Complaint.  Such data is appropriate for use in a motion to dismiss.  *See,
e.g.*, *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court

plaintiffs include an example showing that from January 6, 2009 to April 6, 2009, the Dow Jones

U.S. Financials Index ("DJUSFN") fell 22.84% but shares of the UltraShort Financials Fund

("SKF") (which was designed to track on a daily basis double the inverse of the DJUSFN) fell

17.34% instead of gaining 45.68% as allegedly expected.  Complt. ¶ 85.  Again, however, had

plaintiffs instead run the same simulation from January 6, 2009 to March 6, 2009, the DJUSFN

would have fallen 47.7% and shares of SKF would have gained 145.2% (more than triple the

inverse).  Clearly ProShares' ETFs were not inevitably going to perform the opposite way they

were "supposed to" (*see, e.g.*, *id.* at ¶ 1, 144), but instead "diverge[d] significantly" from their

respective benchmarks (both positively and negatively) when held for longer time periods due to

a combination of compounding, leverage, and index volatility – just as disclosed in the

registration statements.[15]  Plaintiffs chose arbitrary date ranges to make the alleged omissions

seem material by magnifying their purported losses; this is pleading by hindsight and must fail.

*See Panther Partners*, 538 F. Supp. 2d at 66; *Lin*, 574 F. Supp. 2d at 421.

> ### D.     The Complaint Alleges No Actionable Misstatements or Omissions Regarding the Magnitude of the Risk of Holding ETFs for Longer Periods

Faced with the comprehensive disclosures in the registration statements, plaintiffs

attempt to argue that ProShares did not disclose *enough* about the risks regarding cumulative

returns for periods longer than a day.  These claims are again flatly contradicted by ProShares'

actual disclosures.  First, plaintiffs allege that the registration statements misleadingly failed to

disclose the potential *magnitude* of the deviation between the funds' cumulative returns and

those of the benchmark indices times the fund's multiple.  *See, e.g.*, Complt. ¶ 66 ("In no

---

may take judicial notice of well-publicized stock price without converting the motion to dismiss into a motion for summary judgment.").

[15] Indeed, the registration statements disclosed that, in periods of lower index volatility, fund returns over longer periods could be higher than the stated multiple of the index.  *See* Appendix A at 5A.-F.

Registration Statements did Defendants even state that there would be substantial deviations."). This allegation is directly contradicted, however, by the repeated disclosures that cumulative returns might diverge "significantly." *See, e.g.*, 12/29/06 RS at 7 ("Over time, the cumulative percentage increase or decrease in the net asset value of the Fund may diverge *significantly* from the cumulative percentage increase or decrease in the multiple of the return of the underlying Index due to the compounding effect of losses and gains on the returns of the Fund.") (emphasis added); 9/28/07 RS at SAI 18 ("While close tracking of any Fund to its benchmark may be achieved on any single trading day, over time the cumulative percentage increase or decrease in the net asset value of the Shares of a Fund may diverge *significantly* from the cumulative percentage decrease or increase in the benchmark due to a compounding effect.") (emphasis added); 9/29/08 RS at SAI 17 (same).

Second, plaintiffs allege that ProShares failed to disclose that the cumulative returns over longer periods could trend in the opposite direction from the benchmark's cumulative return. <u>See</u>, *e.g.*, Complt. ¶¶ 82, 120, 131. Any such "failure" cannot establish liability. Issuers of securities are under no obligation to anticipate and disclose risks in the particular fashion that plaintiffs may with hindsight believe they should have. *See, e.g.*, *In re AES Corp. Secs. Litig.*, 825 F. Supp. 578, 588 (S.D.N.Y. 1993) ("[W]hen defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves."); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 7 (2d Cir. 1996) (noting that while the prospectuses contained "no specific statement" about the alleged bias, a reasonable investor would not be unaware of the risk based on the other disclosures).

The registration statements disclosed repeatedly that investors should not expect cumulative returns to match those of the index, and that the divergence of those returns would be

amplified by leverage and by market volatility – all of which could cause a "significant" divergence.  Indeed, the "wedge" graphs illustrate quite clearly that, *for cumulative returns*, the funds will do worse relative to their benchmarks – including results in the *opposite direction* – during periods of high volatility.  *See* 9/28/07 RS at SAI 18-20, 9/29/08 RS at SAI 17-19; 11/21/08 RS at 24-26; Appendix A at 5.A-F; Appendix B at 5.A-C.  For example, the "wedge" graph illustrating one-year cumulative returns for ETFs seeking to achieve 200% of the inverse of the index's daily return (Appendix A at 5.A (3rd graph)), shows that in a one-year period with cumulative index returns of -5% (and thus "anticipated" returns of +10% in plaintiffs' view), substantial index volatility would cause significant *negative* cumulative performance in the fund in that year (as much as -31.4%, assuming index volatility of 40%).  Plaintiffs have no basis to allege that these disclosures would lead a reasonable investor to believe that the funds' net cumulative return over time would always trend in the same direction as that of the benchmark index.  By the same token, it cannot have been a material omission not to explain all the possible permutations of how the funds' cumulative returns might diverge from their benchmarks over time.  *See, e.g.*, *Panther Partners*, 538 F. Supp. 2d at 664 ("The securities laws do not require clairvoyance in the preparation of offering documents; these documents are not guarantees of an offering's subsequent success, nor do they insure investors against the vicissitudes of technology and industry, nor the volatility of the stock market itself.").  Accordingly, this alleged omission cannot be seen as material, as there is not a "substantial likelihood" that a reasonable investor would view the alleged omissions as "significantly altering the total mix of information made available." *Landmen Partners Inc.*, 659 F. Supp. 2d at 540.

Third, plaintiffs also allege that the registration statements were rendered misleading by the omission of a mathematical formula that allegedly allows for the calculation of the results of

holding the ETFs for longer than a day.  *See* Complt. ¶¶ 1-3, 103-115.[16]  It strains credulity for

plaintiffs to assert that a reasonable investor required the inclusion of this formula in order to

fairly understand the nature of the investment and the risks it entailed.  The formula is a complex

quadratic function that required plaintiffs ten paragraphs to explain in the Complaint; it requires

four variables as inputs, one of which is the "annualized volatility of the index during the holding

period" – hardly a piece of information that the average investor is likely to have at her

fingertips.  There is simply no reason to think that the average investor could in fact use such a

formula to calculate for herself the likely cumulative returns over time of her ETF investment or

the magnitude of divergence between those returns and those of the benchmark.  This is why the

ProShares registration statements explain in prose and in the "wedge" graphs what the formula

purports to explain algebraically – that the cumulative return over time will diverge from the

benchmark, and that divergence will be amplified by leverage and market volatility.[17]  Here

again, the alleged omission of the mathematical formula cannot be seen as material, as there is

not a "substantial likelihood" that a reasonable investor would view the alleged omissions as

"significantly altering the total mix of information made available." *Landmen Partners Inc.*, 659

F. Supp. 2d at 540.

### E.    FINRA's Statements Regarding ETFs Do Not Establish or Even Support a Claim for Registration Statement Liability

Plaintiffs cite to a succession of FINRA notices and analyst reports, apparently in support

of an argument that leveraged and inverse ETFs are simply not appropriate investment vehicles

for retail investors.  *See* Complt. ¶¶ 193-195, 201-207.  Plaintiffs cannot connect the dots,

however, to explain what these pronouncements or plaintiffs' allegations of unsuitability have to

---

[16] Plaintiffs do not explain the source for the formula other than to allege that it is an approximation of a formula utilized by ProShares.  *See* Complt. ¶ 105.

[17] This textual description is consistent with the SEC's emphasis on "plain English" disclosures. *See* 17 C.F.R. § 230.421.

do with registration statement liability under Section 11 – as there is no connection.  The FINRA

notices cited in the Complaint say nothing about the inadequacy of any issuer's registration

statements.  To the contrary, subsequent to the initial FINRA statements cited by plaintiffs,

FINRA and the SEC issued a joint statement regarding leveraged and inverse ETFs.  In this

statement, the regulators affirmatively encouraged investors to *read the prospectuses before*

*investing*, because the prospectuses disclosed the risks of investing in an ETF.  *See, e.g.*, Joint

FINRA/SEC Release at 2 (Aug. 18, 2009) (directing investors "to read the prospectus, which

provides detailed information related to the ETFs' investment objectives, principal investment

strategies, risks, and costs.") (available at http://www.sec.gov/investor/pubs/ leveragedetfs-

alert.htm) (Skinner Decl. Ex. 7); *see also*, SEC Q&A at 1 ("Before purchasing ETF shares, you

should carefully read all of an ETF's available information, including its prospectus.") (available

at http://www.sec.gov/answers/etf.htm) (emphasis in original) (Skinner Decl. Ex. 8).[18]

      Indeed, plaintiffs point to no statement by FINRA or the SEC suggesting that ETFs are

not suitable for retail investors.  Instead, the regulators caution that ETFs have daily investment

objectives and that any investors seeking to hold them for longer periods of time should be

prepared to monitor them closely – the same cautionary statements that ProShares provided in its

registration statements.  *See, e.g.*, Complt. ¶ 197.  The FINRA notice that plaintiffs quote (*id.* at

¶193) is directed at the brokers who advise individual investors on the suitability of ETFs for

---

[18] The Court may properly consider these documents in deciding this Motion to Dismiss.  *See,*
*e.g.*, *Garber v. Legg Mason, Inc.*, 347 Fed. Appx. 665 (2d Cir. 2009) (noting that courts can
consider matters of which judicial notice may be taken, including SEC filings and newspaper
articles); *ATSI Commc'ns, Inc.*, 493 F.3d at 98 (stating that, in deciding a motion to dismiss, a
court "may consider any written instrument attached the complaint, statements or documents
incorporated into the complaint by reference, legally required public disclosure documents filed
with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in
bringing the suit").  Indeed, plaintiffs themselves relied on the SEC press release in some of their
individual complaints.

them, not at the ETFs themselves.  *See, e.g.*, 9/28/07 RS at 120 ("For information about

acquiring Shares through a secondary market purchase, please contact your broker.  If you want

to sell Shares of a Fund on the secondary market, you must do so through your broker."); *cf.*

*Donovan v. American Skandia Life Assurance Corp.*, 96 Fed. Appx. 779, 781 (2d Cir. 2004)

("By its terms, NASD Notice 99-35 applies only to registered representatives recommending the

purchase of a variable annuity; it does not require annuity issuers to include a warning in a

prospectus").  In short, the FINRA notices lend no support to plaintiffs' Section 11 claim.

### F.    The 2009 Registration Statement Disclosures do not Establish or Support Liability for Earlier Statements

Plaintiffs cannot establish liability for the registration statements in the class period by

relying upon subsequent disclosures.  As evidenced in the attached Appendices, ProShares'

disclosures often changed over time as periodic updates were issued.  The 2009 disclosures were

the next stage of this evolution.[19]  The fact that the 2009 disclosures included some additional

language regarding the same risks that had been disclosed in the prior versions does not establish

in any way that the prior disclosures were inadequate.  The disclosures during the class period

are more than sufficient, for all the reasons discussed above.  In any event, the more recent

disclosures cannot be used as evidence that the previous disclosures were inadequate.  *See, e.g.*,

*Krouner v. Am. Heritage Fund, Inc.*, 899 F. Supp. 142, 147 (S.D.N.Y. 1995) (refusing to

consider later prospectus since FRE 407 indicates evidence of subsequent measures not

admissible to prove culpable conduct); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)

("[T]he complaint is an example of alleging fraud by hindsight.  For the most part, plaintiff has

---

[19] Some of this evolution was mandated by the SEC, which issued amendments to Form N-1A on January 13, 2009, requiring that key information appear in plain English in a standardized order at the front of the statutory prospectus – known as the "summary prospectus."  *See* Securities and Exchange Commission, Enhanced Disclosure and New Prospectus Delivery Option for Registered Open-end Management Investment Companies, *available at* http://www.sec.gov/rules/final/2009/33-8998-secg.htm.

simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.").[20]

## II.   PLAINTIFFS' SECTION 11 CLAIM ALSO FAILS BECAUSE THE ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED MISSTATEMENTS OR OMISSIONS

Plaintiffs' Section 11 claims must also fail for the independently sufficient reason that none of the alleged misstatements or omissions could have caused the decline in plaintiffs' investments.  A plaintiff is not entitled to damages if the decline in value of the securities resulted from something other than the alleged misstatements or omissions in the registration statement.  Section 11(e) of the Securities Act provides that:

> [I]f the defendant proves that any portion or all of such damages represents *other than* the depreciation in value of such security *resulting from* such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e) (emphases added).  This "loss causation" prerequisite requires a "causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  While lack of loss causation is an affirmative defense under Section

---

[20] Moreover, plaintiffs' reliance on the 2009 disclosures as somehow "correcting" omissions in the earlier statements is undermined by the named plaintiffs' own conduct.  Some of the named plaintiffs have continued to buy and hold ProShares' ETFs even after the 2009 FINRA notices, the contemporaneous media reports, and ProShares' 2009 disclosures.  *See* Complt. Ex. D; Complt. ¶¶ 193-205.  Had there been a material difference between the class period disclosures and the information that "emerged" in 2009, the named plaintiffs should have stopped buying and holding the ETFs.  *See, e.g.*, *ECA*, 553 F.3d at 197 (noting that a false or misleading statement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act") (internal citations and quotation marks omitted); Plaintiffs' behavior has not changed, though.  *See, e.g.*, Exhibit D to the Complaint (showing that, among others, named plaintiffs Martin Norris, Dorothy Lovell, and Edward Cisneros have all made purchases of ETFs in 2010 that are still open).  The most likely explanation is that these investors knew the risks of buying and holding these ETFs yet chose to invest anyway, just as they did during the class period.

11, *see* 15 U.S.C. § 77k(e), courts have dismissed Section 11 claims under Rule 12(b)(6) when it is apparent on the face of the complaint that the alleged loss is not causally connected to the alleged misstatement or omissions.  *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003); *see also In re Vivendi Universal, S.A. Secs. Litig.,* 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009) (noting that the same loss causation standards that apply to Rule 10b-5 actions apply to Section 11 claims as well, except that defendants have the burden of negating causation).[21]

In the securities context, loss causation requires that "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered" and that "the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the security."  *Lentell v. Merrill Lynch Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis added).  The alleged misstatements or omissions – and not "changed economic circumstances" – must themselves be the source of plaintiffs' losses.  *See Dura Pharms., Inc.*, 544 U.S. at 343.  It is not enough for plaintiffs to allege that they would not have purchased shares of the respective funds had the allegedly omitted disclosures been made.  Such allegations assert only *transaction* causation, not loss causation, which is required by Section 11(e).  *See Vivendi,* 634 F. Supp. 2d at 360; *see also Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 21 (D. Mass. 2004) ("A securities plaintiff must plead and ultimately prove two kinds of causation: transaction causation (what induced the purchase) and loss causation (what caused the stock to decline in value and produce a loss).").

---

[21] *See also*, *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579 (S.D.N.Y.2006);  *In re Morgan Stanley and Van Kampen Mut. Fund Secs. Litig.*, No. 03 Civ. 8208(RO), 2006 WL 1008138 (S.D.N.Y. 2006)

Plaintiffs cannot plausibly allege in this case that the disclosure of some previously concealed or misrepresented "truth" is what caused the Funds' share price to decline.  The price of shares of ETFs is not determined purely by the forces of supply and demand as in traditional open-market securities trading, where misstatements or omissions might distort the market's perception of the value of the security.  Instead, the market prices of the shares of the funds track the funds' NAV.[22]  Because the NAV of the funds is determined by the price of the underlying securities, alleged misrepresentations regarding a fund's investment objective – rather than the inputs into the NAV calculation – can have no effect on a fund's share price.[23]  *See, e.g.*, *Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) (noting that the price of "shares in a mutual fund . . . [is] unaffected by alleged misrepresentations and omissions concerning the fund itself") (citing *Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998).

Here, none of the misstatements or omissions alleged by plaintiffs caused the funds' NAV to be inflated (and thus the share price as well), only to decline later as a result of the "truth" becoming known through a corrective disclosure. The NAV declines that caused plaintiffs' losses were due to the decline in the value of the funds' underlying investments, regardless of what was disclosed about the investment objective of the funds.  The securities held in each fund's portfolio would have experienced the same market value losses, causing the same depreciation in the Fund's NAV, regardless of what was disclosed. Whether a plaintiff gains or loses by holding for long periods of time depends on the market.  As plaintiffs' cherry-picked graphs show, during periods of extreme volatility (exacerbated by compounding and leverage),

---

[22] See pg. 5, *supra* for a discussion of why this occurs for ETFs.
[23] *See* David M. Geffen, *A Shaky Future for Securities Act Claims Against Mutual Funds*, 37 Sec. Reg. L.J. 20, 23-27 (2009).

the ETFs were likely to underperform (a risk that was repeatedly disclosed in the registration statements). The vagaries of the market, not any misrepresentation or omission, caused plaintiffs' losses. *See, e.g.¸ Dura Pharm., Inc.*, 544 U.S. at 343.[24]

## III.   PLAINTIFFS LACK STANDING TO BRING THE CLAIMS AS ALLEGED IN THE COMPLAINT

Even if plaintiffs had a cognizable Section 11 or 15 claim, they do not have standing to bring these claims as broadly as alleged in the Complaint. First, plaintiffs cannot bring claims with respect to funds that no named plaintiffs owned. According to the Complaint, plaintiffs purport to bring this action on behalf of a class consisting of all persons who acquired shares of any of the ProShares ETFs listed on Exhibit C between August 6, 2006 and June 23, 2009. Complt. ¶¶ 13, 38. There are 31 different ETFs listed on Exhibit C, 26 offered by ProShares Trust and five by ProShares Trust II. Plaintiffs can only bring suit, however, against funds in which a named plaintiff held shares. *See, e.g.*, *In re Lehman Bros. Secs. and ERISA Litig.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010) ("Named plaintiffs have purchased in nine of the ninety-four offerings. They have not alleged any personal injury stemming from the other eighty-five. They therefore have no standing to assert those claims"); *accord In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d at 607; *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885(SWK), 2005 WL 2677753, *9 (S.D.N.Y. Oct. 19, 2005). The named plaintiffs listed in Exhibit D only claim to have purchased shares in 21 of these funds. *See* Complt. ¶ 20, Ex. D. As such, plaintiffs do not have standing to bring suit regarding the other ten funds (listed in Exhibit 9 to the Skinner Declaration).[25]

---

[24] Plaintiffs have thus also failed to state a claim under Section 15 since they have failed to adequately plead a primary violation of the Securities Act under Section 11 as detailed above. *See, e.g.*, *Rombach*, 355 F.3d at 177-78.

[25] The summary at the beginning of Exhibit D actually only lists named plaintiffs for 19 out of the 31 Funds. An analysis of the verifications of the individual named plaintiffs, however,

Second, plaintiffs likewise do not have standing to bring suit for funds that were not purchased during the class period.  The class period defined in the Complaint is August 6, 2006 to June 23, 2009. Complt. ¶ 38.  As detailed in plaintiffs' own Exhibit D, certain funds were not purchased during this period and thus cannot form the basis for plaintiffs' claims.  For example, Martin Norris is the only named plaintiff who allegedly purchased shares of the UltraShort Semiconductors Fund ("SSG").  He did not make his first purchase until April 22, 2010 – well after the class period.  Similarly, Dorothy Lowell is the only named plaintiff who allegedly purchased the shares of the Short Financials Fund ("SEF").  She did not make her first purchase of SEF until June 22, 2009, the day before the end of the alleged class period.  Her decision to hold her shares for more than one day clearly happened outside the class period.

Third, plaintiffs do not have standing to bring claims challenging registration statements pursuant to which no named plaintiff purchased any of the ETFs listed on Exhibit C.  Despite the large number of registration statements listed on Exhibits A, B, and C to the Complaint, the named plaintiffs listed in Exhibit D apparently only purchased relevant shares pursuant to five of them:  those dated December 29, 2006, September 28, 2007, September 28, 2008 (all ProShares Trust) November 21, 2008, and February 27, 2009 (ProShares Trust II).[26]  *See* Skinner Decl. Ex. 10.  The other registration statements were either not operative when named plaintiffs bought their shares, covered ETFs not at issue in this case, or covered ETFs that no named plaintiff purchased.  Plaintiffs thus do not have standing to assert claims regarding these other registration statements.  *See e.g.*, *New Jersey Carpenters Vacation Fund*, 2010 WL 1172694 at *7 ("[T]he

---

reveals that two additional funds listed on Exhibit C (QID and REW) appear to have been purchased by named plaintiffs.  *See* Exhibit D.

[26] The post-February 27, 2009  ProShares Trust II "registration statements" listed on Exhibit B are merely one-page "stickers" designed to update certain information in the most recent operative prospectus.  Neither sticker concerns any of the disclosures at issue in this case.

harm Plaintiff may have suffered based on misstatements in the Offering Documents for the

Certificates they purchased has no bearing on any harm suffered by any other investors based on

alleged misstatements in other offering documents.").

**IV.   THE CLAIMS ASSERTED AGAINST THE ADDITIONAL DEFENDANTS IN THE AMENDED CONSOLIDATED COMPLAINT MUST BE DISMISSED**

**A.   The Claims Against the New Defendants are Barred by the Statute of Limitations**

The claims brought against defendants ProShares Trust II and Individual Defendants

Edward Karpowicz, William Seale, Charles Todd, Barry Pershkow, Steven Brancato, and

Stephenie Adams (collectively the "New Defendants") were asserted for the first time in the

Amended Consolidated Class Action Complaint filed on September 24, 2010.  *See* Complt. ¶¶

22, 27-28, 32, 34-36.  The applicable statute of limitations for these claims is set forth in Section

13 of the Securities Act, which provides that an action under Section 11 must be brought within

one year after "discovery of the untrue statement or the omission, or after such discovery should

have been made by the exercise of reasonable diligence. . . ."  15 U.S.C § 77m.  According to

their own allegations, plaintiffs either did discover or reasonably should have discovered the

facts upon which these claims are based more than one year before the filing of the Complaint.

ProShares Trust II issued its relevant registration statements between November 21, 2008

and June 1, 2009.  Named plaintiffs bought shares of ProShares Trust II ETFs in January and

March 2009.  *See* Exhibit D to the Complaint.  The individual New Defendants have all been

sued because they allegedly signed one or more of the registration statements for ProShares Trust

or ProShares Trust II, just as the original individual defendants were.  Thus, the gravamen of the

claims against the New Defendants is the same as those asserted against the original defendants –

issuing and/or signing the registration statements for the ETFs at issue.  The first class action

complaints alleging liability for the ProShares registration statements was filed on August 5,

2009.  Plaintiffs could have discovered at that point, with reasonable diligence, which

registration statements had been issued by the ProShares Trusts and who signed them.[27]  These

facts establish "uncontroverted evidence clearly demonstrat[ing]" that the plaintiffs should have

discovered the relevant facts before September 24, 2009.  *See Staehr v. The Hartford Fin. Servs.*

*Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).[28]

      **B.**     **The Claims Based on Defendants' Status as "Attorneys-In-Fact" Fail to State
a Claim**

      The claims against three of the New Defendants – Barry Pershkow, Steven Brancato, and

Stephenie Adams – fail for the additional reason that these defendants signed the registration

statements only in their capacity as "attorneys-in-fact."  Complt. ¶ 36.  Their signatures were not

an independent attestation as to the truth of the registration statement, but instead a substitute for

another person's signature.  "Signatory" liability under Section 11 attaches to the principal on

whose behalf the registration statement is signed by an attorney-in-fact.  *See, e.g.*, *In re Ambac*

*Fin. Group, Inc. Secs. Litig.*, 693 F. Supp. 2d 241, 259 (S.D.N.Y. 2010).

      There is no basis under the securities laws or agency principles to hold an attorney-in-fact

liable under Section 11 as a signatory to the registration statement.  An agent is not liable to third

parties for the principal's obligations when acting within his or her authority on a disclosed

principal's behalf.  *See Restatement (Third) of Agency* § 6.01.  If an attorney-in-fact could be

liable under Section 11, then the principal, by extension, would not be.  Plaintiffs attempt to have

it both ways, naming both the attorney-in-fact defendants and the actual signatories on whose

behalf they signed the registration statements.  To name both principals and agents as signatory

---

[27] Indeed, this information is all readily available on the SEC website.

[28] Since claims under under Section 15 of the Securities Act are entirely derivative of Section 11
claims, the same statute of limitations applies, *see Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 349
n.1 (2d Cir. 1993), and these claims must likewise be dismissed

defendants defies logic and common sense.  For this additional reason, the claims against

defendants Barry Pershkow, Steven Brancato, and Stephenie Adams must be dismissed.[29]

## V.  THE BREACH OF CONTRACT CLAIM ASSERTED BY INDIVIDUAL PLAINTIFFS STEVEN AND SHERRI SCHNALL FAILS TO STATE A CLAIM

Individual plaintiffs Steven and Sherri Schnall (the "Schnalls") assert a breach of contract

claim against ProShares Trust based on the same alleged material misrepresentations and

omissions as the Section 11 and 15 claims, *see, e.g.* ¶215.  This claim fails for the same reasons

as the Section 11 and 15 claims do, namely that the registration statements clearly disclosed the

daily investment objective of the SRS fund and that compounding, leverage, and index volatility

could all cause the cumulative returns of Fund to "diverge significantly" from the cumulative

returns of its underlying index when held for longer than one day.  *See* Sections I.A-E, *supra*;

Appendix A at 1.A – 5F.   Moreover the Schnalls do not even attempt to explain how their

purchase of shares of an ETF on the secondary market, through a broker and from a third party,

creates contractual privity with ProShares, the original issuer of the shares.[30]

### CONCLUSION

For all of the foregoing reasons, ProShares and the Independent Trustees respectfully

request that the Complaint be dismissed in its entirety with prejudice.

---

[29] The claims against Stephenie Adams must be dismissed for the additional reason that no named plaintiff bought any securities pursuant to a registration statement that Ms. Adams "signed" as attorney-in-fact.  She signed the November 8, 2008 ProShares Trust registration statement which covered no ETFs that are at issue here.

[30] The Schnalls attempt to claim that ProShares "promised" the Schnalls that if the DSJUREI index fell, their SRS shares would increase in value.  Complt. ¶ 238.  The registration statements stated that this was the objective of the fund, but, for a variety of reasons, correlation could not be guaranteed.  *See, e.g.*, Appendix A at 6.A.  To the extent the Schnalls are attempting to attach liability based on whether ETFs are suitable for them as individual investors, their claim is against their broker – a claim they are separately pursuing in FINRA arbitration.  *See Steven and Sherri Schnall v. LPL Financial Corp.*, FINRA Case Number 09-02157.

Dated:  November 15, 2010        Respectfully submitted,

ROPES & GRAY LLP

By: /s/ Robert A. Skinner
Robert A. Skinner
Prudential Tower
800 Boylston Street
Boston, MA  02199
Tel: (617) 951-7000
Fax: (617) 951-7050
robert.skinner@ropesgray.com

*Attorneys for defendants ProShares Trust,
ProShares Trust II, ProShare Advisors LLC, SEI
Investments Distribution Co., Michael Sapir, Louis
Mayberg, Edward Karpowicz, William Seale,
Ph.D., Simon Collier, Charles Todd, Barry
Pershkow, Steven Brancato and Stephenie Adams*

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ Arthur H. Aufses III
Arthur H. Aufses III
1177 Avenue of the Americas
New York, NY 10036
Tel: (212) 715-9100
Fax:  (212) 715-8000
aaufses@kramerlevin.com

*Attorneys for defendants Russell Reynolds and
Michael Wachs*

41

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2010, I caused a true and correct copy of the foregoing document to be served upon all counsel of record via the ECF system.


<u>/s/ Robert A. Skinner</u>
Robert A. Skinner