UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | x |  |
| IN RE PROSHARES TRUST | : | Civil No. 1:09-cv-06935-JGK |
| SECURITIES LITIGATION | : |  |
|  | x |  |

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Christopher Lovell (CL 2595)
Victor E. Stewart (VS 4309)
Ian T. Stoll (IS 3424)
Fred T. Isquith, Jr. (FI 1064)
Benjamin M. Jaccarino (BJ 1273)
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4677


Jacob H. Zamansky (JZ 1999)
Edward H. Glenn, Jr. (EG 0042)
Kevin D. Galbraith (KG 7512)
**ZAMANSKY & ASSOCIATES LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Lead Counsel for Plaintiffs*

## TABLE OF CONTENTS

Page

I.    SUMMARY OF ALLEGATIONS ................................................................. 1

      A.    Investors' Main Reason For Investing For More
            Than A Day  In Defendants' New ETFs .............................................. 3

      B.    The Inherent "Must Lose" Risks That Defeated The Main Reason For
            Investing In Defendants' ETF And Otherwise Threatened Large Losses ............. 4

            1.    Opposite Movement ............................................................ 6

            2.    The Absence of Any "Must Gain" Rewards ....................................... 6

            3.    The Resulting Disadvantage To Defendants Of Disclosing These Risks ... 7

            4.    Increasing Volatility From June 2008 Forward Creates The
                  Conditions In Which The "Must Lose" Risks Will Materialize ................ 7

            5.    Defendants Continue To Grow By Refusing To Disclose
                  The New Material Facts ....................................................... 8

      C.    SEC Rules Required The Important Risks To Be Disclosed In
            The Prospectus But Defendants Failed To Do So ................................... 9

      D.    Defendants Undertook To State The Results And Risks Of Investing In
            Their ETFs For A Year And, Thereby, Were Further Required To
            Disclose The Important Risks In Order to Avoid Misleading Investors ............. 10

            1.    The Correlation Risk Disclosures .......................................... 11

            2.    The Accompanying Graphs ................................................... 12

            3.    The Flat Or Trendless Market Statements .................................. 15

      E.    Additional Misleading Statements In The SAI, The Matrix, And The
            ProSharesTrust II Prospectus ................................................... 17

      F.    The Additional Misleading Statements In The 11/21/08 Registration
            Statement And The August 2008 N-CSR ........................................... 19

      G.    The Damages And Claim ......................................................... 22

II.     JURISDICTION AND VENUE ................................................................ 22

III.    PARTIES     .......................................................................................... 23

IV.    PLAINTIFFS' CLASS ACTION ALLEGATIONS.................................... 28

V.     UNDERLYING ALLEGATONS ............................................................. 30

     A.    The Registration Statement of ProShares Trust; The Registration Statement of ProShares Trust II and the Defendants Who Are Responsible Therefor................................................................................................ 31

     B.    The Circumstances In Which The Statements In Defendants' Registration Statements Were Made Include The Main Reason For An Investment In Defendants ETFs ......................................................................... 33

     C.    The Daily Investment Objective of Defendants' ETF ......................... 35

     D.    Defendants' Undisclosed Mathematical Formula Clearly Showed The "Opposite Movement" and "Must Lose" Risks of Large Losses From Investing in Defendants' ETFs ............................................................. 43

     E.    Undisclosed Risks Of Loss In Investing In Defendants' Ultra Short ETFs ......... 47

          1.    The Materialization of the "Must Lose Risk," in Ultra Short ETFs ......... 51

          2.    Such Moves In The Opposite Direction Were Not Aberrations But Inherent Characteristics of All of Defendants' Leveraged ETFs.............. 68

     F.    Ultra Long Funds ............................................................................... 69

          1.    Materialization of the Undisclosed Risk As To Ultra Longs.................... 71

     G.    Short or Single Inverse Funds and Materialization of Risks ................ 76

     H.    Class Securities ................................................................................. 87

     I.    Partial Disclosures During Summer 2009 Began To Correct Defendants' Misleading Registration Statements And Amendments Thereto ......................... 92

     J..    Additional Untrue or Misleading Statements Contained In Defendants' Registration Statements and Amendments Thereto............................................ 97

          1.    Correlation Risk ................................................................... 100

          2.    Volatility, Leverage, Mathematical Formula and Compounding ........... 108

K..     The Undisclosed Risks Hit The Radar ................................................................. 115

L.      Underperformance Bias .......................................................................... 121

M.     Other Misleading Statements .................................................................. 124

N.      Historical Volatility ............................................................................ 126

O.      Information Required To Be Disclosed in The Prospectus
         Could Not By Satisfied By Incorporation By Reference .................................. 127

VI.     THE INDIVIDUAL PLAINTIFFS .......................................................... 130

VII.    CLAIMS
        AS AND FOR A FIRST CLAIM
        (Violations of § 11 of the 1933 Act Against All Defendants) ....................................... 135

        AS AND FOR A SECOND CLAIM
        (Violations of § 15 of the Securities Act Against the Individual Defendants) .............. 138

        AS AND FOR A Third CLAIM
        (Breach of Contract Against Defendant ProShares Trust By Individual
        Plaintiffs Only) ............................................................................... 139

PRAYER FOR RELIEF ........................................................................... 141

JURY TRIAL DEMANDED ...................................................................... 142

Plaintiffs, individually and (except for Steven and Sherri Schnall) also on behalf of all others similarly situated, by their attorneys, allege the following, based on counsels' investigation, documents filed with the United States Government and Securities and Exchange Commission (the "SEC"), and information obtained by Plaintiffs.

## I.    SUMMARY OF ALLEGATIONS

1.    Plaintiffs and members of the Class purchased shares of the exchange traded funds ("ETF's) of Defendants ProShares Trust and ProShares Trust II pursuant to Defendants' registration statements.[1]  These registrations contained in the "Principal Risks" portion of the Prospectus benign and even self-congratulatory statements about investing in Defendants' ETFs for more than a day.  See ¶¶27-39 *infra*.  But they misleadingly omitted to disclose important risks of large losses from such investments.

2.    When these critical undisclosed risks materialized during the August 6, 2006 – June 23, 2009 Class Period, **Class members suffered billions of dollars in losses.**  These included large losses from market circumstances in which Class members' predictions about the market were correct.  But Defendants' ETFs not only failed to produce any gains.  They instead produced large losses.

---

[1] **Ex. A**, hereto is a list of Plaintiffs' Purchases of ProShares Trust and ProShares Trust II Exchange Traded Funds.  **Ex. B** hereto is a list of Defendants ProShares Trusts Registration Statement and Post-Effective Amendments filed with the Securities and Exchange Commission ("SEC").  **Ex. C** is a list of Defendant ProShares Trust II's Registration Statement and Post-Effective Amendments filed with the SEC.  **Ex. D**, hereto is a list of the Class Securities.  **Ex. E**, is a list of the Individual Defendants who signed or are otherwise responsible under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77 k, ("Securities Act") for untrue statements and omissions of material fact contained in the ProShares Trust Registration Statement and each post-effective amendment thereto.  **Ex. F**, is a similar list of Individual Defendants who signed or are otherwise responsible in the ProShares Trust II Registration Statement and each post-effective amendment thereto.

3.      Thus, the risks that Defendants failed to disclose were so important that, even when the investor's judgment on the direction of the market was correct, such risks could deprive the investor of any gains and cause the investor to suffer large losses.

4.      Risks as important as these should have been prominently disclosed in the "Principal Risks" portion of the Prospectus that was provided to each investor and constituted the main body of the Registration Statement.

5.      But if Defendants had earlier disclosed such risks of loss, Defendants would have revealed that Defendants' new ETF products had material defects.  Such defects would have caused Defendants' ETFs to suffer compared to alternative investment vehicles for pursuing investors' predictions about the direction of the market.  See ¶¶26-39 *infra*.

6.      By consistently failing to disclose such critical risks of investing in their new ETF products (including **after** the conditions had generally begun to materialize from June 2008 forward that caused the large losses), Defendants were able to build up broad public usage and acceptance of their new ETFs.

7.      Defendants thereby quickly vaulted their defective ETFs into $20,000,000,000 in shares outstanding.  They captured 99% of their market.  And they generated far more in **fees (in total, in excess of $500,000,000 in fees).**

8.      However, after Defendants' financial success in obtaining hundreds of millions of dollars of fees and Class members' financial disaster in suffering billions of dollars of losses, Defendants belatedly changed course.  They began to make on the last day of the Class Period an unfolding series of amendments to the "Principal Risk" disclosures in their Prospectus and other parts of the Registration Statement.  These new disclosures were sometimes cryptic and muted

due to concerns about liability in this case.  But they began to reveal for the first time by September 29, 2009 their ETFs' inherent risks of large losses and serious defects.

**A.      Investors' Main Reason For Investing For More Than A Day In Defendants' New ETFs**

9.      At various times in 2006-2007, Defendants created and began to sell three new types of ETFs.  A *leveraged* ETF (so called *Ultra*) sought to deliver a multiple of the daily performance of the index it tracked. An *inverse* ETF sought to deliver the opposite of the daily performance of the index it tracked. And a *leveraged inverse* ETF (so-called *Ultra Short*) sought a daily return that was a multiple of the opposite of the daily performance of the index it tracked.

10.      There was one main investment reason for investors to purchase and hold Defendants' new ETFs for more than a day.  This was the investor's prediction about the direction of the movement of the underlying index.  This investment reason could be pursued through numerous traditional means.  These included the purchase of puts or calls on the index, buying or shorting index futures, purchasing derivatives and other means.  Such other means included the use of a margin account to purchase or short all the constituents of the index.  See ¶¶96-97,104,157,261 *infra*.

11.      Defendants' newly created ETFs offered a convenient new way to pursue this reason for investing.  The shares of Defendants' ETFs traded continuously during the day and could be purchased on the exchange.

**B.      The Inherent "Must Lose" Risks That Defeated The Main Reason For Investing In Defendants' ETF And Otherwise Threatened Large Losses**

12.      Defendants' ETF creation was a new product.  But Defendants operated their three types of ETFs pursuant to or consistent with an undisclosed mathematical formula.  See ¶¶112-127, 188, 190 *infra* (alleging the mathematical formula and its consequences).

13.     Defendants' undisclosed mathematical formula very accurately predicted and described the relationship between the movements in each type of ETF's price and the movements in the index underlying the ETF **in any market scenarios**.  *See* ¶¶12-127, 133-153, 200, 200-253 *infra*.

14.     This mathematical formula very clearly revealed to Defendants before and during the August 6, 2006 – June 23, 2009 Class Period the inherent vulnerability of Defendants' ETFs to important risks of large loss.  *Id*.

15.     Defendants' undisclosed mathematical formula showed that, in certain market scenarios, investors who held ProShares products for extended periods of more than a day were in a "must lose" position.  *See* ¶¶134-156 *infra*.

16.     These market conditions existed when the volatility (*i.e.,* the day-to-day changes in prices) of the underlying index significantly exceeded its performance over time. Under Defendants' undisclosed formula, the more time the investment was held, the less the excess of index volatility over index performance that created "must lose" conditions.

17.     In these "must lose" conditions, Defendants' undisclosed mathematical formula showed that investors would:

a)  suffer large losses if the underlying index moved against the investor,

b)  suffer potentially large losses if the underlying index moved in favor of the investor, and

c)  suffer potentially large losses if the underlying index remained relatively unchanged.

**1.     Opposite Movement Risk**

18.     Most important, in the foregoing "must lose" conditions, not only was any amount of gain from favorable movement in the index entirely eliminated.  But the investor

4

actually lost monies.  Thus, even if the main objective of the investment was realized, the investor suffered losses.  This was because movements in the index that were in the investors' favor were accompanied by movements in Defendants' ETF share price in the **opposite direction** from that which the ETF's name and Defendants' disclosures indicated.  See ¶¶133-153 *infra* (alleging examples of materializations of these "opposite movement" risks from June 2008 forward).

### 2.   The Absence of Any "Must Gain" Rewards

19.     Defendants' undisclosed mathematical formula clearly demonstrated to Defendants (a) the foregoing risks, and (b) that their ETFs had absolutely **no** "must gain" conditions.  That is, there were no conditions in which the investor in Defendants' ETFs was sure to gain no matter what happened to the underlying index.

20.     Rather, the true investment proposition presented by Defendants' ETFs was asymmetric.  There was an inherent "must lose" risk of large losses even when the main investment objective (index direction) was realized. But there was no inherent offsetting "must win" reward or benefit.  On the contrary, even outside the "must lose" conditions, there were more market conditions in which to lose monies than to gain. See "Underperformance Bias" ¶¶250-262 *infra*.

### 3.   The Resulting Disadvantage To Defendants Of Disclosing These Risks

21.     Defendants' ETFs' defect of producing losses when the competing products produced the expected gains was an extremely important fact for investors to know.  This was true as a risk of loss from investing in Defendants' ETFs.  And it was also true as a materially negative change in the overall investment proposition presented by Defendants' ETFs compared to that presented by alternative investment vehicles.

**4.      Increasing Volatility From June 2008 Forward Creates The Conditions In Which The "Must Lose" Risks Will Materialize**

22.      The foregoing undisclosed facts became even more important as index volatility began to increase steadily from June 2008 forward.  Again, as this was happening, Defendants' mathematical formula told Defendants exactly what was going to happen to investors for each market scenario.

23.      Specifically, if index volatility continued at elevated levels above index performance or, worse, if index volatility kept on increasing (as, in fact, it did), then, over time, the following would occur. Defendants' ETFs would increasingly underperform. Then they would begin opposite movements. The opposite movements would steadily generate losses from moves in the index that were supposed to generate gains.

24.      This was especially true of Defendants' Ultra-Shorts.  They were three times as sensitive to volatility as were Defendants' other two ETFs.

**5.      Defendants Continue To Grow By Refusing To Disclose The New Material Facts**

25.      Defendants could project to the day exactly when such opposite performance and such losses would begin to occur in every market scenario.  But instead of issuing warnings and beginning to explain when and how their ETFs would produce losses, Defendants watched in silence.  The financial disaster then gradually descended upon Defendants' investors precisely as Defendants' undisclosed mathematical formula predicted.  But Defendants' ETFs grew greatly in the latter half of 2008 as, in the words of Defendants Sapir, "declining equity markets" meant that "investors have increasingly turned" to ProShares Ultra Short ETFs, *i.e.*, the product that was the most sensitive—three times as sensitive—to the increasing volatility.

26.        In order to foster the foregoing growth, Defendants self-servingly had to remain and did remain far behind the increasingly demanding disclosure curve during the second half of 2008 and the start of 2009.  Defendants then failed to disclose the following:

a.        In times of high volatility, Defendants' Ultra ETFs were defective and rendered dysfunctional for intermediate (more than a day) or long term investing.

b.        If volatility significantly exceeded performance, **both** Defendants' Ultra Short ETFs and their Ultra Long ETFs would lose money over the same one month, the same three month or longer periods

c.        After these high levels of volatility began to occur frequently in 2008, Defendants continued to fail to disclose the dangerous results of index volatility in excess of 40% **even though such** levels of volatility were actually occurring and threatening losses in many indexes.

d.        Defendants then also failed to disclose that Defendants' Ultra Short ETFs, to which investors were turning  for hedging purposes against the declines in many stock and commodity indexes, were the most vulnerable of all Defendants' funds to high volatility and the foregoing "must lose" and "opposite movement" risks.

e.        In fact, Defendants' Ultra-Short ETFs were approximately three times more sensitive to volatility than Defendants' very sensitive other two types of funds.

f.        But Defendants kept presenting their benign and self serving graphs in the ProShares Trust Prospectus solely for the Ultra Fund.  ¶¶27-39.

See also Underlying Allegations *infra* (alleging other important undisclosed risks as well as Defendants' partially disclosed "buy high, sell low" strategy (¶¶257-258), and that the sum total of undisclosed and disclosed characteristics of Defendants' ETFs created an inherent Underperformance Bias).

**C.     SEC Rules Required The Important Risks To Be Disclosed In The
         Prospectus But Defendants Failed To Do So**

27.     Defendants were required to disclose the foregoing important risks of large

losses under SEC rules.  These rules required Defendants to disclose "clearly" in the "principal

risks" portion of the Prospectus for each ETF the "fundamental… investment risks of the Fund

using concise, straightforward and easy to understand language".  SEC Form N-1A (Registration

Statement of Open-End Management Investment Companies), General Instructions, p. 6. *See* 17

C.F.R. § 230421 ("plain English").

28.     In violation of SEC disclosure requirements, Defendants failed during the

Class Period to make such disclosure.

**D.     Defendants Undertook To State The Results And Risks Of Investing In Their
         ETFs For A Year And, Thereby, Were Further Required To Disclose The
         Important Risks In Order to Avoid Misleading Investors**

29.     Separately, there is an additional reason why Defendants were required to

disclosure in the Prospectus the foregoing undisclosed fundamental risks of large losses.  It is

that Defendants undertook to make in the Prospectus very extensive descriptions of the results of

holding the ProShares products for extended periods of time.  *See* ¶¶101-102, 148, 170-174 *infra*

(alleging such disclosures).  Those disclosures included benign graphs and generalized text

descriptions of the expected performance and risks of an investment held in Defendants' ETFs

for a one year time period and other time periods.  *Id*.

30.     Once Defendants undertook to describe in their prospectus the results and risks of

one year long investments or other investments of more than a day in Defendants' ETFs,

Defendants were required to add any material facts required to make Defendants' other

statements not misleading.  17 CFR § 274.11A (Form N-1A, registration statement of open-end

management investment companies); 17 CFR § 232.130 (the term "rules and regulations,"  as

used in Sections 7, 10, and 19 of the 1933 Act, to include the forms used in the registration of securities and the instructions to those forms).

31.    A one year investment holding period for Defendants' ETFs extended far beyond the one week (or less) period that was required to give rise to the risks of large losses alleged herein.  Therefore, Defendants rendered their foregoing statements misleading by failing to disclose the material risks of large loss alleged in this Complaint.  Moreover, Defendants further lulled and misled investors by also affirmatively understating in the Prospectus the risks they did describe of holding an ETF for a period of one year.

### 1.    The Correlation Risk Disclosures

32.    For example, Defendants included a "Correlation Risk" section in ProShares' Trust's continuous Registration Statement as originally filed and as subsequently amended.  Ex. B hereto.  In Amendment Nos. 6, 8-14 to the ProShares Trust Registration Statement, Defendants stated "there is a special form of correlation risk that derives from these Funds' use of leverage, which is that for periods greater than one day, **the use of leverage tends to cause the performance of a Fund to be either greater than or less than** the index performance times the stated multiple in the fund objective, before accounting for fees and fund expenses. . ." [Emphasis added.]  ProShares Trust Registration Statement Amendment Nos. 6, 8-14, containing the 9/28/07 (6), 2/28/08 (8), 6/10/08 (9), 9/29/08 (10), 11/21/08 (11), 12/5/09 (12), 6/2/09 (13), 6/23/09 (14) Prospectuses.

33.    However, the bolded portion of the foregoing statement is misleading or untrue. This is because of Defendants' common omission in all their filings to disclose the following. **Whenever** the volatility of the underlying index significantly exceeded its performance over time, then "the use of leverage" in Defendants' undisclosed mathematical formula **automatically**

**"caused the performance of the Fund"** to be not only "less than" what was expected.  It caused the performance **to move in the opposite direction** of what was expected.  This locked the investor into an unexpected "must lose" situation.  It defeated the main reasons for the investment.  It meant that she lost regardless of whether the underlying index moved in her favor, moved against her, or was unchanged.  Neither the "use of leverage" nor any other aspect of Defendants' ETFs ever placed the investor in a "must gain" position.

### 2.       The Accompanying Graphs

34.     Defendants then presented three graphs. Defendants did so in order to illustrate representatively over a one year period the deviation of their Ultra Long ETFs' prices from the underlying index. This deviation subsumed and was supposed also to illustrate the increment of deviation caused by the use of leverage.

35.     These graphs each involved a supposedly different set of vaguely described market conditions.  They were: (1) a significant uptrend in the underlying index; (2) a significant downtrend in such index; and (3) a so called "flat or trendless" index. Flat or trendless" was not defined by Defendants until June 23, 2009, when they said that it meant "begins and ends the year at 0%".  See Amendment No. 14 to Registration Statement, filed June 23, 2009, p. 10.

36.     (a)     The first graph involved the so-called uptrend market.  This graph showed that the investor achieved a **substantial gain** of 29.3% in the ETF while the index increased by 15%.  This was **0.7% less** than the 30% gain that would have constituted perfect tracking of the index by an Ultra Long ETF.  This was a **very large gain**, not an unexpected loss, when the main investment objective (an increase in the index) had been realized.

(b)     By including this example in their Prospectus, Defendants' effectively characterize this 29.3% gain, which was a 0.7% **less gain** than perfect, as a deviation or

underperformance that constitutes a "fundamental risk" meriting disclosure in the "Principal Risks" portion of the Prospectus.

(c)     The actual deviations experienced during 2008 - 2009 of 300% and more, were many orders of magnitude beyond this deviation which was portrayed by Defendants' in the "fundamental" risks portion of the prospectus.  Full disclosure of these larger deviations, and a full explanation that (and how) they could defeat the main investment objective of using Defendants' ETFs, were also required to be made.

37.    (a) The second graph involved the so-called down-trend market.  In this graph, Defendants depicted a 29.4% loss in their ETF resulting from a 15% decline in the index.  This loss was **0.6% better than** the 30% (or double loss) that would have been a perfect correlation to the index.  Effectively, Defendants disclosed that, even where the investor was **wrong** on the direction of the index, the use of leverage in a double multiple fund provided for a loss that was **0.6% less than the loss should have been** in a perfect correlation.

(b) Defendants' 0.6% deviation here is actually a **benefit.**  In contrast, when the index moved against the investor in volatile markets, the amounts of losses were substantially **increased**, not **decreased** as in this graph. By Defendants' foregoing standard for disclosing a fundamental risk, Defendants were clearly obligated also to disclose in the Principal Risks portion of the Prospectus the "must lose," "opposite movement" and other important risks of large losses alleged herein.

38.    Finally, in Defendants' graph for the so-called flat or trendless market, Defendants depicted that the investor lost 2.2% when the underlying index was down 0%.  This 2.2% loss is Defendants' largest example of deviation and represents a 2.2% deviation.  Effectively, Defendants' standard for a fundamental risk here was a 2.2% deviation.

39.     By the disclosure standards Defendants' vouched for in the foregoing statements, all of the much larger risks alleged in this Complaint were fundamental risks.  As such, they were required to be disclosed in the "Principal Risks" portion of the Prospectus.  Defendants' failure to disclose them rendered all of their above-alleged graphs and statements grossly misleading, and violated the federal securities laws.

### 3.     The Flat Or Trendless Market Statements

40.     Defendants also made, including at times with the foregoing graphs, the statement that, in so-called "trendless or flat markets, it is expected that the Fund will underperform its benchmark index."  Form N-1A filed with the SEC August 30 and December 29, 2006, February 13, 2007, June 15, 2007, July 10, 2007 pp. 6-78.

41.     This statement and the total mix of Defendants' disclosures were very misleading or untrue for all the previously alleged reasons and the following reasons:

(a)     First, even in substantial up-trending or substantial down-trending markets, Defendants' ETFs were "expected" to underperform **whenever** the index volatility was significantly greater than such uptrend or downtrend in the underlying index.

(b)     Thus, there was also a clear category of up-trending and down-trending markets in which underperformance was fully "expected"—in fact, it was mathematically mandated.

(c)     Moreover, this undisclosed additional category of expected "underperformance" in up-trending and down-trending markets went beyond the partial absence of some amount of the expected gain.  It also included **opposite** performance *i.e.,* moving in the opposite direction of that expected in order to create a loss rather than a gain.

(d)     Further, as demonstrated above, what caused the "expected" underperformance was not, as Defendants implied, the vague and (until 2009) undefined status of a supposed "flat or trendless" market in the underlying index.

(e)     The totality of Defendants' self-serving "risk" disclosures in the Prospectus lulled and misled investors into a false comfort.  This was that the only market condition **necessitating** an "expectation of underperformance" was the undefined "flat or trendless" market.  Even then, the representative "underperformance" in Defendants' Prospectus disclosures was relatively small (2.2%), and did not involve a large loss of capital.

(f)     However, other market conditions necessitated such an expectation of both underperformance and, moreover, opposite performance.  These and other market conditions presented risks of far larger losses of capital than those misleadingly portrayed as representative by Defendants' graphs and textual statements.

42.     Defendants' other risk disclosures in the Prospectus were also rendered misleading by the undisclosed facts alleged herein.  ¶¶101-111 *infra*.

43.     Defendants' foregoing securities law violations and misleading mix of information in the Prospectus were not (and could not be) corrected or remedied by Defendants' disclosures in other documents.  There was no other disclosure document in the ProShares Trust Registration II Registration.  The only other document in the ProShares Trust Registration Statement and amendments was the SAI.

### E.     Additional Misleading Statements In The SAI, The Matrix, And The ProShares Trust II Prospectus

44.     The total mix of information in the various iterations of such SAIs were very misleading throughout the Class Period.  First, the SAI (or, in ProShares Trust II, the Prospectus) contained numerical matrix presentations on various levels of performance.  These presentations

misleadingly omitted (until after the Class Period) the dangerous levels of volatility in excess of 40%. After the Class Period, Defendants began to disclose higher levels (60% volatility). But not until September 29, 2009 did Defendants belatedly begin in the ProShares Trust I SAIs and the ProShares Trust II Prospectus to disclose the even higher levels of volatility between 60% and 100%. These levels had, by then, existed for more than fourteen months in some indexes, and showed the many "opposite movement" and "must lose" situations that existed in up-trending and down-trending markets. See ¶¶134, 219-221 *infra*.

45.     Defendants later asserted that these dangerous levels of volatility of above 40% were supposedly aberrant or unlikely to occur. However, this assertion was counter-factual for two reasons. Levels of volatility exceeding 40% already existed in various indexes from early summer 2008- through June 23, 2009. But Defendants misleadingly refused or failed to change their disclosures. Second, Defendants' mathematical formula showed that the levels of volatility producing opposite movements also occurred hundreds of times between 1978 and 2007 in the oil, gold, silver and equity markets alone. See ¶¶266-268 *infra*. Therefore, Defendants' excuses for non-disclosures were contrary to the facts.

46.     Further, Defendants themselves made the decision not to disclose these dangerous levels of volatility and the resulting risks of large losses. Their non-disclosure decision was and is contrary to the practice in securities market disclosures, and the letter as well as the caveat vendor spirit of the SEC disclosure requirements under the Securities Act.

47.     In addition, Defendants' "matrix" of numbers and the accompanying text in the ProShares Trust SAI and the ProShares Trust II Prospectus are misleading because they omit to disclose:

(a)        that Defendants new ETFs had an inherent opposite performance as well as extreme underperformance risks;

(b)        that these risks would cause large losses whenever index volatility significantly exceeded index performance over time, even if the index moved as the investor anticipated;

(c)        that these risks created a "must lose" risk in which investing and holding an ETF would cause losses no matter which way the index moved or which Ultra Fund (long or short) the investor chose;

(d)        that the Defendants' ETFs had no offsetting "must gain" characteristic;

(e)        that "must lose" conditions and opposite movements could occur during time periods that were materially less than a year in length, specifically including time periods between one and eight months in duration;

(e)        from June 2008 forward, that, if the volatility levels did not subside, then Defendants' undisclosed mathematical formula showed very clearly that all these risks would materialize and continue NOT as a "one-off" aberration but as expressions of the inherent characteristics of Defendants' ETFs; and

(g)        for all the additional reasons alleged in the Underlying Allegations.

**F.     The Additional Misleading Statements In The 11/21/08 Registration Statement And The August 2008 N-CSR**

48.        Remaining far behind the disclosure curve, Defendants' other documents incorporated into their Registration Statements also failed to disclose the foregoing facts. Instead, they made only a smattering of generalized or contingent statements.  These statements were made after the index volatility and the Defendants' ETFs' had increased to dangerous levels.  Defendants' undisclosed mathematical formula then showed that, if these conditions

continued, it was literally a matter of time before the "opposite movement" and other large losses occurred.

49.     Defendants' 5/31/08 N-CSR, filed August 8, 2008, included, at the following pages, the following misleading statements p. 328 ("In general, given a particular index return, increased volatility of the index will cause a decrease in the performance relative to the index performance times the stated fund multiple."); p. 2 ("In general, periods of higher index volatility will cause the effect of compounding to be more pronounced"); p. 6 ("Daily volatility for the U.S. equity markets increased from a year ago….At a given index return level, increased volatility tends to negatively impact performance over time.").

50.     Although these statements begin to provide more information, they are misleading for all the reasons alleged in ¶52 *infra*. In addition, "buried facts" not stated in the Prospectus may not be incorporated by reference into the Prospectus when such facts were originally required to be in the Prospectus.  See ¶¶217-218 *infra*.

51.     Finally, in the context of all their previous securities law violations and non-disclosures, Defendants made the following statement in Pre-Effective Amendment No. 5 to the ProShares Trust II Registration Statement and in the Prospectus effective November 21, 2008: "It is **possible** to lose money over time when an underlying benchmark is up (down) for the corresponding Ultra (Ultra Short) Fund due to the effects of **daily rebalancing, volatility, and compounding**."  [Emphasis supplied]  *Id*. at p. 22.

52.     This ambiguous statement and its "shortcut" use of parenthetical phrases misleadingly understates the true risks for all the reasons alleged in the previous paragraphs.  In addition, Defendants, in the statements alleged in ¶¶49 and 51 misleadingly:

   (a) do not speak of "material" losses;

16

(b) do not disclose that various market conditions dictated absolutely "certain" (not "possible" or "tends" to) losses;

(c) do not disclose that those conditions were then contemporaneously already **in existence**;

(d) do not disclose the soon to be realized material adverse effects if the dangerous levels of volatility did not quickly subside;

(e) do not disclose that the Ultra Short ETFs are three times more vulnerable to increases in volatility,

(f) do not disclose in their matrix (or otherwise) the effects of volatility levels above 40% even though such volatilities already were existing from June 2008 forward; and

(g) do not disclose the other material facts alleged herein.

Therefore, the belated statements in ¶¶49 and 51 misleadingly omit and materially understate the risks and are otherwise misleading.

### G. The Damages And Claim

53. As a direct result of Defendants' foregoing securities law violations, Class members lost billions of dollars.

54. After the fundamental risks of loss inherent in Defendants' product materialized, Wall Street brokerage firms prohibited the purchase of Defendants' product, banned it from managed accounts, or otherwise restricted use of Defendants' product. ¶¶243-245 *infra*. Also, the financial press criticized Defendants' product. ¶¶248-249 *infra.* This led to further revisions in Defendants' Registration Statements, in order to disclose, for the first time, in the numerical disclosures buried outside the Prospectus for ProShares Trust, the dangerous levels of index volatility in excess of 100%. See ¶¶189, 217-218 *infra*.

55.      Plaintiffs (except for Steven and Sherri Schnall) bring this class action on behalf of themselves and the Class alleged in ¶75 *infra* for relief against Defendants under Section 11 of the Securities Act.  Plaintiffs Steven and Sherri Schnall also bring the individual breach of contract clams alleged hereinafter.

## II.      JURISDICTION AND VENUE

56.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act 15 U.S.C. §§77k and 77o and under the common law.

57.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act and under pendent jurisdiction.

58.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because many of the acts and practices complained of herein occurred in substantial part in this District, and the shares of the SRS Fund trade in this District on the New York Stock Exchange.

59.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.      PARTIES

60.      Plaintiffs individually invested assets in the various ProShares Funds and were damaged thereby, as detailed in the schedule in Exhibit "A" attached hereto.

61.      Plaintiffs Steven and Sherri Schnall (the "Individual Plaintiffs"), individually and separate from the Class, sue Defendant ProShares Trust on an additional claim.  Individual Plaintiffs purchased shares in the UltraShort Real Estate ProShares fund (the "SRS Fund") offered by ProShares.  These shares were described by Defendant ProShares Trust in a false

and misleading Registration Statement[2] issued in connection with the SRS Fund public

offering.  The Individual Plaintiffs join in the class claims against all Defendants and also

assert a cause of action against Defendant ProShares Trust for common law breach of

contract.

62.      (a) Defendant ProShares Trust ("ProShares I" or collectively with ProShares II

referred to as "ProShares"), located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland

20814, is a Delaware statutory trust organized on May 29, 2002. ProShares Trust is registered

with the SEC as an open-end management investment company under the 1940 Act.  ProShares

has a series of ETFs, the shares of which are now all listed on the New York Stock Exchange.

(b) Defendant ProShares Trust II ("ProShares II" and referred to collectively with

ProShares as "ProShares"), located at 7501 Wisconsin Avenue, Suite 1000, Bethesda, Maryland

20814, is a Delaware statutory trust organized on October 9, 2007.  ProShares II is registered

with the Commodity Futures Trading Commission ("CFTC") as a commodity pool.  ProShares II

has a series of ETFs, the shares of which are all listed on the New York Stock Exchange.  Of the

44 ProShares ETFs listed in Exhibit D hereto, ProShares II caused the issuance of 6 of the 44:

AGQ, GLL, SCO, UCO, UGL and ZSL.

(c) Each ProShares ETF has its own CUSIP number and exchange trading

symbol.  Each ProShares ETF issues and redeems Shares on a continuous basis at net asset value

("NAV") in large, specified numbers of Shares called "Creation Units."  For each ETF, a

---

[2]      The "Registration Statement" was filed on August 30, 2006 with the SEC on Form
N1-A, and is incorporated by reference into ProShares' prospectuses dated January 23, 2007,
and October 1, 2008, as supplemented on December 1, 2008, January 15, 2009, April 7,
2009, and May 26, 2009, as well as ProShares Annual and Semi-Annual reports, and
Statements of Additional Information.  This definition of "Registration Statement" refers
specifically to those documents relating to the individual claim being brought separately from
the Class by the Individual Plaintiffs.

Creation Unit is comprised of 75,000 shares.  In 2008, ProShares ranked second among all U.S.

ETF companies in year-to-date net flows.  ProShares now manages over $20 billion, accounting

for 99 percent of the country's short and leveraged ETFs.

63.     Defendant ProShare Advisors LLC ("ProShare Advisors"), located at 7501

Wisconsin Avenue, Suite 1000, Bethesda, Maryland 20814, serves as the investment advisor to

the ProShares Funds.  ProShare Advisors provides investment advice and management services

to ProShares and its ETFs.  ProShare Advisors oversees the investment and reinvestment of the

assets in the ProShares Funds.  ProShare Advisors is owned by Defendants Michael L. Sapir,

Louis M. Mayberg and William E. Seale.

64.     Defendant SEI Investments Distribution Co. ("SEI"), located at 1 Freedom Valley

Drive, Oaks, PA 19456, is the distributor and principal underwriter for the ProShares Funds.  SEI

has been registered with the SEC and FINRA since 1982.  SEI was hired by ProShares to

distribute shares of the ProShares Funds to broker/dealers and, ultimately, shareholders.

65.     Defendant Michael L. Sapir ("Sapir"), an Interested Trustee of ProShares, has

been the Chairman and Chief Executive Officer of ProShare Advisors since its inception.  Sapir

signed both the ProShares I and ProShares II Registration Statements.

66.     Defendant Louis M. Mayberg ("Mayberg") has served as the Chief Financial

Officer; a member and a registered principal of the Sponsor since June of 2008, and Principal

Executive Officer of ProShares II since June of 2008.  In his capacity as Principal Executive

Officer, Mayberg signed the ProShares II Registration Statements on October 18, 2007 and

January 22, 2009.  He also signed the Pre-Effective Amendments 1-5 to the Registration

Statement in 2008, the last amendment (#5) having been signed on November 17, 2008, and the

Pre-Effective Amendment 1 dated February 13, 2009.  In addition, Mayberg was also a member of the ProShare Advisors LLC since January of 2005.

67.    Defendant Edward Karpowicz ("Karpowicz") has served as the ProShares II Principal Financial Officer since July of 2008 and has been employed by ProFund Advisors LLC since July of 2002 as Vice President of Financial Administration.  In his capacity as Principal Financial Officer, Karpowicz signed the ProShares II Registration Statement dated January 22, 2009 and the Pre-Effective Amendments 1-5 to the Registration Statement in 2008, the last amendment (#5) having been signed on November 17, 2008, and the Pre-Effective Amendment 1 dated February 13, 2009.

68.    Defendant William E. Seale, Ph.D. ("Seale"), has been the Chief Economist (since 2005), Chief Investment Officer (2003-2004 and October 2006-present) and Director of Portfolio (1997-2003) of ProFund Advisors.  Seale signed the ProShares II Registration Statement dated October 18, 2007.

69.    Defendant Russell S. Reynolds, III ("Reynolds") is a Non-Interested Trustee of ProShares who signed the ProShares I Registration Statement.

70.    Defendant Michael Wachs ("Wachs") is a Non-Interested Trustee of ProShares who signed the ProShares I Registration Statement.

71.    Defendant Simon D. Collier ("Collier") served as ProShares' Treasurer from June 2006 until December 2008.  In his capacity as Treasurer, Collier signed the ProShares I Registration Statement.

72.    Defendant Charles S. Todd ("Todd") has served as ProShares' Treasurer since December 2008.  In his capacity as Treasurer, Todd has signed the ProShares I Registration Statement.

73.     Defendant William E. Seale, as principal executive officer and principal financial and accounting officer, is signatory on the October 18, 2007 ProShares II Registration Statement.

74.     The Individual Defendants, in their respective roles, ultimately control the operations of the ProShares Funds.  The Board of Trustees of ProShares is responsible for the general supervision of all of the ProShares Funds.  The officers of ProShares are responsible for the day-to-day operations of the ProShares Funds.

### IV.     PLAINTIFFS' CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired, between August 6, 2006 and June 23, 2009,  shares of any one or more of the ProShares ETFs listed in Exhibit "D" hereto pursuant or traceable to the ProShares I and Proshares II Registration Statements and Amendments thereto (the "Class").[3]  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

76.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.

77.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

--------

[3]  Plaintiffs reserve the right to amend the Class definition or the class certification motion or otherwise.

78.     Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class and securities litigation.

79.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

<ol type="a">
<li>What are the true methods and risks involved in Defendants' operation of their leveraged investment funds;</li>
<li>Did Defendants disclose the risks of loss of an investment made in such funds;</li>
<li>whether Registration Statements and Amendments thereto filed by Defendants contained untrue statements' or statements that were misleading because of Defendants' failure to disclose material facts;</li>
<li>whether Defendants failed to disclose material risks;</li>
<li>whether the Securities Act was violated by Defendants' failures to disclose the risks and the related facts as alleged herein;</li>
<li>whether control person liability for such violations is appropriate; and</li>
<li>to what extent the members of the Class have sustained damages and the proper measure of damages.</li>
</ol>

80.     A class action is superior to other available methods, if any, for the fair and

efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively small, the

expense and burden of individual litigation make it impossible for members of the Class to

individually redress the wrongs done to them.  There will be no difficulty in the management of

this action as a class action.

## V.      UNDERLYING ALLEGATONS

81.     ETFs frequently track an index, a sector of stocks, or a commodity or currency.

In 1993, the American Stock Exchange launched the first traditional ETF, called the Spiders (or

SPDR), which tracked the S&P 500 index.  Soon after, more ETFs were introduced.

82.     ETFs are considered to be indexed mutual funds that trade like stocks.  ETFs, however, differ from traditional mutual funds in the following ways:

(a)     ETFs sell individual shares directly to investors and typically issue shares in large blocks (of 50,000 shares, for example) that are known as "Creation Units" but also may issue shares.

(b)     Investors generally do not purchase Creation Units with cash.  Instead, investors typically buy Creation Units with a basket of securities that generally mirrors an ETF portfolio.

(c)     After purchasing a Creation Unit, an investor often splits it up and sells the individual shares on a secondary market.  This permits other investors to purchase individual shares (instead of Creation Units).

(d)     Investors who want to sell their ETF shares have two options: (1) they can sell individual shares to other investors on the secondary market, or (2) they can sell the shares or, more typically Creation Units back to the ETF.

**A.     The Registration Statement of ProShares Trust; The Registration Statement of ProShares Trust II and the Defendants Who Are Responsible Therefor**

83.     Plaintiffs and Class members purchased shares pursuant and/or traceable to the continuous Registration Statement filed by Defendant ProShares Trust with the SEC and/or the continuous Registration Statement filed by Defendant ProShares Trust II.  *See* Ex. "B" and "C" hereto (listing the two continuous Registration Statements and the post-effective amendments to cover the continuous offering by each).

84.     Beginning in 2002 and continuing until the present, Defendants Pro-Shares Trust operated as open-ended investment company under Section 8 of the Investment Company Act ("ICA"), 15 U.S.C. § 80a-8.

85.     Beginning in 2008 and continuing until the present, Defendant ProShares Trust II operated as a commodity pool registered with the CFTC.

86.     Open-end investment companies and commodity pools are required, *inter alia*, to satisfy the registration requirements of the Securities Act of 1933 in order to sell securities to the

public.  Section 6 of the Securities Act of 1933, 15 U.S.C. § 77f (registration of securities and

signing of registration statement); Section 8 of the Investment Company Act of 1940, 15 U.S.C.

§ 80a-8 (registration of investment companies); Section 6 of the Commodity Exchange Act, 7

U.S.C. § 6 (regulation of futures trading and foreign transactions).

87.     An open-end investment company satisfies the registration requirements of the

Securities Act and the ICA by filing SEC Form N-1A.  17 C.F.R. § 274.11A (Form N–1A,

Registration Form for Open End Management Investment Companies) SEC (2052) ("Form N-

1A").

88.     A commodity pool satisfies the Registration requirements by filing SEC Form S-

1.

89.     The Proshares Trust Registration Statement was filed pursuant to SEC Form N-

1A.  It consisted of a Prospectus, a Statement of Additional Information ("SAI") and certain

other information including the cover page, the undertakings and the signature pages.  Under the

ICA, Defendants ProShares Trust had to update their prospectus at least annually, and ProShares

Trust filed multiple post-effective amendments to its Registration Statement, which is regarded

as a continuous  Registration Statement.

90.     Individual Defendants Sapir, Mayberg, Reynolds, Wachs, Collier and Todd

signed ProShares Trust's Registration Statements or amendments thereto and are responsible

therefor under Section 11.  Ex. E hereto.

91.     The Proshares Trust II Registration Statement was filed pursuant to SEC Form S-

1 and, later, SEC Form S-3.  It consisted of a cover page, the Prospectus and other information

including, undertakings, signature pages and certain exhibits.  Under SEC rules, ProShares Trust

II had to update the prospectus every three years.  ProShares Trust II also filed the multiple post-

effective amendments to its Registration Statement which also is regarded as a continuous Registration Statement.  Ex. C hereto.

92.     Individual Defendants Mayberg and Karpowicz signed the ProShares II Registration Statement or amendments thereto and are responsible therefor under Section 11. Ex. F hereto.

### B.     The Circumstances In Which The Statements In Defendants' Registration Statements Were Made Include The Main Reason For An Investment In Defendants ETFs

93.     Defendants created and operated three kinds of ETFs which had the following objectives.

a.   The net asset value of Defendants' "inverse" ETFs (sometimes called "single inverse" ETFs) would replicate the inverse movement of the specified index over one day.  Short ETFs are leveraged ETFs because of the borrowing involved in short positions.

b.   The net asset value of Defendants' "Ultra Long" ETF would **double** the performance of the underlying index or benchmark on a daily basis.

c.   The net asset value of Defendants' "Ultra Short" ETF would **double the inverse** of the performance of the underlying index or benchmark on a daily basis.  The Ultra Long and the Ultra Short ETFs are also leveraged.

94.     If the specific index, benchmark, sector or commodity on which an ETF is based, increases by 1% on a given day, then ProShares' corresponding **inverse** ETF would **decrease** by 1%; ProShares' corresponding **Ultra long ETF** would **increase** by 2%; and ProShares' corresponding **Ultra-short** ETF would **decrease** by 2%.

95.     The motivation or reason for an investment in an ETF of Defendants was to profit

from an anticipated movement in the direction of the index underlying such ETF.  For example,

in a July 17, 2006 article Defendant Sapir stated that ETFs could be used to:

> "to hedge stock portfolios against market pull backs,  the company said, ….Whether the
> strategy is to capitalize on a **trend or hedge against the risk of decline**, magnified
> exposure means the investor can commit half  the dollars to potentially obtain  the desired
> level of exposure." (Emphasis Supplied).

"Bearish investors get leveraged ETFs ProShares funds magnify gains when stock market falls,"

*MarketWatch* (July 17, 2006).

96.     There were many investment vehicles that provided viable alternatives for

accomplishing the same investment objective as an ETF.  These alternatives included purchasing

puts or calls on the index, purchasing or shorting the constituent stocks in the index, purchasing

or selling index futures, and using a margin account and to do any or all the foregoing.

97.     Defendants repeatedly compared ETFs to an investor's opening a margin account

and investing on margin.  *See* ¶¶103-111*infra.*

98.     It would be a material defect in any of these alternatives if such alternative

suffered from an inherent risk that, even if the investor were correct on the direction of the index,

she still may not receive any benefit or gain from this judgment because she chose the alternative

form of investment. It would be an even more critical defect if such alternative suffered from the

risk that the investor would also sustain large losses when she correctly judged the direction of

the index.

99.     Defendants' ETFs suffered from both the foregoing defects and risks of large

losses.  These are not vague "underperformance" risks.  See ¶¶37, 207, 209 *supra* (Defendants

equate the underperformance with a decrease in a gain of 30% to a gain of 29.4%).  Instead,

these are "no performance" and "opposite performance" risks.  In offering and selling their ETFs

to the public, Defendants were required to prominently disclose these "no performance" and "opposite performance" risks in the "Principal Risks" section of the Prospectus that was filed with the SEC and provided to investors.

### C.   The Daily Investment Objective of Defendants' ETF

100.   Defendants generally stated in their Registration Statements that Defendants' investment objective was for "daily returns,"; that Defendants did not seek to achieve long term cumulative investment returns in their ETFs; and that Defendants could not seek such returns. But Defendants, who could not operate if every person sold their ETF at the end of every trading day, did not prohibit investors from investing in their ETFs for more than a day.

101.   On the contrary, in the ProShares Trust and ProShares Trust II Registration Statements and Amendments thereto filed prior to and throughout the Class Period, Defendants undertook to describe and explain the effects of investing in and holding ProShares' leveraged ETFs for periods of time greater than one day, including periods of one year, five years, and ten years.

102.   Through this continuing series of updated statements, Defendants consistently encouraged investors to invest in ProShares' ETFs for extended periods.  This includes, for, example, Defendants' statements:

(a)   providing tables of different projected returns over a holding period of one year (*see* SAI in Sep. 28, 2007 Amend. No. 6, pp. 19-20; Feb. 28, 2008 Amend. No. 8, pp. 24-25; June 10, 2008 Amend. No. 9, pp. 20-21; Sept. 29, 2008 Amend. No. 10, pp. 18-19; Nov. 21, 2008 Amend. No. 11, pp. 19-20; Dec. 5, 2008 Amend. No. 12, pp. 20-21; June 2, 2009 Amend. No. 13, pp. 17-19; June 23, 2009 Amend. No. 14, pp. 17-18; July 31, 2009 Amend. No. 16, pp. 17-22; Aug. 18, 2009 Amend. No. 17, pp. 19-21; Sept. 28, 2009 Amend. No. 18, *passim*)).

28

(b)      providing charts illustrating the results of holding ETFs for one year period (*see* Exs. C and D; Sept. 28 2007 Amend. No. 6, p. 9; Feb. 28, 2008 Amend. No. 8, p. 8; June 10, 2008 Amend. No.  9, p. 10; Sept. 29, 2008 Amend. No. 10, p. 10; Nov. 21, 2008 Amend. No. 11, p. 10; Dec. 5, 2008 Amend. No. 12, p. 10; June 2, 2009 Amend. No. 13, p. 10; June 23, 2009 Amend. No. 14, p. 10; July 31, 2009 Amend. No. 16, pp. 408-10; Aug. 18, 2009 Amend. No. 17, p. 8; Sept. 28, 2009 Amend. No. 18, pp. 324-5)).

(c)      illustrating the amount of money that investors could save in Pro-Shares over ten years ((*see* Exs. C and D; Sept. 28, 2007 Amend. No. 6 ("Ultra ProShares", "Short ProShares"); Sept. 29, 2008 Amend. No. 10 ("Ultra ProShares" and "Short ProShares"); July 31, 2009 Amend. No. 16 ("Ultra MarketCap", "Ultra Style", "Ultra Sector", Ultra International", "Short MarketCap", "Short Style", "Short Sector", "Short International"); Sept. 28, 2009 Amend. No. 18 ("Individual Funds")).

(d)      providing sections showing the amount returns for each ETF over a period of one year (*see* Sept. 29, 2008 Amend. No. 10 ("Ultra ProShares" and "Short ProShares"); July 31, 2009 Amend. No. 16 ("Ultra MarketCap", "Ultra Style", "Ultra Sector", Ultra International", "Short MarketCap", "Short Style", "Short Sector", "Short International"); Sept. 28, 2009 Amend. No. 18 ("Individual Funds")).

(e)      describing the impact on investment results of  dividends – the receipt of  which required holding past times of ex-dividend dates (*see* Exs. C and D; Aug. 30, 2006 Amend. No. 1, p. 323; Dec. 29, 2006 Amend. No. 2, p. 333; Feb. 13, 2007 Amend. No. 3, p. 56; June 15, 2007 Amend. No. 4, p. 131; July 10, 2007 Amend. No. 5, p. 79; Sept. 28, 2007 Amend. No. 6, p. 124; Dec. 7, 2007 Amend. No. 7, p. 15; Feb. 28, 2008 Amend. No. 8, p. 61; June 10, 2008 Amend. No. 9, p. 33; Sept. 29, 2008 Amend. No. 10, p. 143; Nov. 21, 2008 Amend. No. 11, p.

52; Dec. 5, 2008 Amend. No. 12, p. 24; June 2, 2009 Amend. No. 13, p. 44; June 23, 2009

Amend. No. 14, p. 23; July 13, 2009 Amend. No. 15, p. 16; July 31, 2009 Amend. No. 16, p.

427; Aug. 18, 2009 Amend. No. 17, p. 15; Sept. 28, 2009 Amend. No. 18, p. 344).

   (f) describing the calculation of net long term capital gains on the performance of the

ETFs held for extended periods.  (*See* Exs. A and B; Aug. 30, 2006 Amend. No. 1, pp. 323-324;

Dec. 29, 2006 Amend. No. 2, pp. 333-334; Feb. 13, 2007 Amend. No. 3, pp. 56-57, and SAI, pp.

36, 39; Jun. 15, 2007 Amend. No. 4, pp. 131-132 and SAI, pp. 36, 39; Jul. 10, 2007 Amend. No.

5, pp. 79-80 and SAI, pp. 34, 37; Sep. 28, 2007 Amend. No. 6, p. 124 and SAI, p. 54; Dec. 7,

2007 Amend. No. 7, pp. 15-16 and SAI, p. 38; Feb. 28, 2008 Amend. No. 8, pp. 61-62 and SAI,

p. 48; Jun. 10, 2008 Amend. No. 9, pp. 33-34 and SAI, p. 46; Sep. 29, 2008 Amend. No. 10, pp.

143-144 and SAI, p. 56; Nov. 21, 2008 Amend. No. 11, pp. 52-53 and SAI, p. 45; Dec. 5, 2008

Amend. No. 12, pp. 24-25 and SAI, p. 61; Jun. 2, 2009 Amend. No. 13, pp. 44-45 and SAP, p.

41; Jun. 23, 2009 Amend. No. 14, pp. 23-24 and SAI, p. 42).

   (g) estimating the costs of investing $10,000 in the ETFs for periods  of one or three

**years**  assuming a 5% **annual return**, not a daily return. (*see* Exs. C and D; Dec. 29, 2006

Amend. No. 2 ("Ultra ProShares" and "Short ProShares"); Feb. 13, 2007 Amend. No. 3 ("Ultra

Styles" and "UltraShort Styles"); June 15, 2007 Amend. No. 4 ("Ultra ProShares" and "Short

ProShares"); July 10, 2007 Amend. No. 5 ("Ultra ProShares" and "Short ProShares"); Feb. 28,

2008 Amend. No. 8 ("Ultra ProShares" and "Short ProShares"); June 10, 2008 Amend. No. 9

("One Beta CDX ProShares", "Ultra CDX ProShares" "Short CDX ProShares"); Nov. 21, 2008

Amend. No. 11 ("Long ProShares" and "Short ProShares"); Dec. 5, 2008 Amend. No. 12 ("Ultra

BioTechnology"); June 2, 2009 Amend. No. 13 ("Ultra ProShares" and "Short ProShares"); June

23, 2009 Amend. No. 14 ("UltraProShares" and "Short ProShares" )); and

(h)     otherwise making numerous disclosures that enabled and encouraged investors to

hold ProShares for extended periods of time.  See ¶¶236-240 *infra* (Defendant Sapir's 2009

statement claiming that there is a very high correlation between ETF prices and the index for

"buy and hold" investors).

103.    As part of the circumstances in which Defendants made their foregoing

statements in their Registration Statements, Defendants repeatedly made statements comparing

investments in their leveraged ETFs to an investor's utilizing a margin account.  For example, on

or about June 21, 2006, Defendants first offered a group of four new exchange traded funds

known as "Ultra ProShares Funds."  Defendants announced they were designed to make it easier

for investors "to get magnified exposure to an index."

104.    Similarly, Defendant Michael Sapir, Chief Executive Offer of ProShare Advisors,

Inc. announced in a press release dated June 21, 2006, in pertinent part as follows:

> We look at ProShares as the start of a whole new chapter in the
> development of ETFs….  By providing built-in magnified exposure to the
> indexes, ProShares make it much easier to execute a number of powerful
> strategies.  In times like these, when the markets haven't necessarily
> offered a lot of help, we've seen investors interested in pursuing more
> sophisticated strategies – for example, hedging to manage risk.  **Now, to
> execute that strategy, they no longer have to go through the process of
> setting up margin accounts or covering margin calls – they can simply
> trade ProShares.**  (emphasis supplied)

105.    Likewise, on July 11, 2006, Defendants ProShares and Sapir again issued a press

release in connection with the issuance of its new leveraged funds and stated:

> We are very pleased that ProShares are generating such a high level of
> interest.  Clearly, their built-in short and magnified exposure to well-
> known indexes is appealing.  ETF investors who want to implement
> sophisticated strategies **but don't want to have to set up a margin
> account – have quickly discovered the benefits of ProShares.**
> (emphasis supplied)

31

106.     Again, on February 1, 2007, ProShares and Sapir again issued a press release and

stated in relevant part:

> ProShares is growing rapidly – both in the number of ETFs we offer and in assets.
> ProShares has attracted more than $2.5 billion since we launched our first eight
> ETFs last June.  We have clearly filled a need for investors who want an easier
> way to execute sophisticated strategies for managing risk or enhancing return.
> Like the other ProShares, the new Sector ProShares make getting short or
> magnified exposure as simple as buying an ETF.  **And unlike a margin account,
> you can't lose more than you invest**. (emphasis supplied).

107.     And on October 25, 2007, ProShares announced in a press release that they had

broken the $9 billion mark and also stated in pertinent part:

> Short and UltraShort ProShares offer may advantages over shorting
> baskets of stocks, individual stock or ETFs.  **Investors can achieve short
> exposure without opening a margin account – buying short exposure
> is as convenient and simple as purchasing an individual stock…**
> (emphasis supplied)

108.     In the Statement of Additional Information of the ProShares I Registration

Statement, filed June 22, 2006, as supplemented in Registration Statement Amendment No. 1,

filed August 30, 2006, Defendants, in a section entitled "Investment Policies, Techniques and

Related Risks" (p. 4), stated:

> Fundamental securities analysis is not used by ProShare Advisors in
> seeking to correlate with the Funds' respective benchmarks. Rather,
> ProShare Advisors primarily uses a mathematical approach to determine
> the investments a fund makes and techniques it employs.  While ProShare
> Advisors attempts to minimize any "tracking error," certain factors will
> tend to cause a Fund's investment results to vary from a perfect correlation
> to its benchmark.  See "Special Considerations." (emphasis supplied)

109.     Furthermore, in the section entitled "More on Investment Strategies and Risks" in

the ProShares Registration Statement Amendment No. 1 August 30, 2006, prospectus section,

Defendants also state: "In seeking to achieve each Fund's investment objective, ProShare

Advisors uses a mathematical approach to investing.  Using this approach, ProShare Advisors

determines the type, quantity and mix of investment positions that a Fund should hold to approximate the performance of its benchmark."  August 30, 2006 Amendment No. 1 to the Registration Statement, p. 304.

110.    Through the foregoing disclosures, Defendants attracted numerous investors and, literally, billions of dollars of investments to its leveraged ETFs.  In fact, Defendants became one of the largest providers of ETFs in the United States, managing approximately 99 percent of the country's leveraged ETFs.

111.    Moreover, Defendants also undertook in their Registration Statements to describe benignly the risks and rewards of investing in and holding Defendants' ETFs for extended periods.  See *e.g.*, ¶¶29-43 *supra* (alleging Defendants' statements about correlation risks).

### D.    Defendants' Undisclosed Mathematical Formula Clearly Showed The "Opposite Movement" and "Must Lose" Risks of Large Losses From Investing in Defendants' ETFs

112.    While Defendants made reference to a "mathematical approach" that will determine how investments will be made and what techniques are to be employed by a particular fund, Defendants have nowhere supplied the approximate mathematical formulae pursuant to which their leveraged funds operated.  However, employing methods that approximated these formulae inherently created the risks of catastrophic losses alleged herein.

113.    Based upon Plaintiffs' counsel analyses, Defendants' ETFs sought investment results, before fees and expenses, that corresponded to (or approximately to) the following mathematical formula which Defendants failed to disclose: $= \left(1 + R_T^{index}\right)^x \cdot e^{\frac{(x-x^2)\sigma^2 T}{2}}$

114.    In this formula, R is the index's return for the holding period, x is the leverage ratio, T is the time period (in years) that the investment is held, and σ is the annualized volatility

of the index during the holding period.  The formula is a good approximation of the results of Defendants' ETFs for holding periods longer than a few days.

115.    This formula has two parts:  (1) a return and (2) a multiplier.

116.    The return is $\left(1 + R_T^{index}\right)^x$ .  For x outside the range zero to one, this is never less than 1+xR.

117.    The multiplier is $e^{\frac{(x-x^2)\sigma^2 T}{2}}$ .

118.    In a non-leveraged ETF, the formula is 1+R because the return is raised to the power of 1 and the multiplier is 1.  Because the multiplier is 1, a non-leveraged ETF will always track the market regardless of (1) the volatility of the market or (2) the time period over which the investor holds the investment.

119.    Defendants' three types of ETFs were each leveraged ETFs.  The investment objective is never 1+R. The immediate objective is a return of 1+xR, where x is the leverage ratio.

120.    The formula requires the steps taken to preserve this objective over a number of days to cause the return to be a function of the index's return to the power of the leveraged ratio. The multiplier is the mathematical constant e (approximately 2.7183) taken to the following power: $\frac{(x-x^2)\sigma^2 T}{2}$ .

121.    The multiplier is always less than one.  It **decreases** with increasing time, leverage and index volatility.  The longer the holding period and more pronounced the day to day volatility of the underlying index, the more the deviation from the expected correlation.

122.     This effect could under certain circumstances be mitigated or overcome by the increasing effect on the return.  This is because $(1+R)^x$ is greater than $(1+xR)$.

123.     In the section of the prospectus part of the Registration Statement entitled "Principal Risk Considerations," Defendants failed to disclose that (and how) their leveraged ETFs lose money in market conditions that are adverse to Defendants' formula.  For example, Defendants failed to disclose (a) that the loss in a leveraged ETF will not be related to a **multiple** in the underlying index but rather to the **power** of the underlying index; and (b) that, when the day to day volatility of the underlying index is significantly in excess of the performance of the underlying index, and the index makes a very substantial move in the direction the investor desires, the leveraged fund would not only underperform substantially, but move in the opposite direction from that expected.

124.     Because of Defendants' failures to make mathematical **or** plain English disclosures of the foregoing risks involved in Defendants' leveraged ETFs, investors could not make informed decisions based upon the Registration Statement's disclosures.

125.     Rather than present the mathematical basis for their products and describe such products' resulting strengths and weaknesses in plain English, Defendants cobbled together instead an amalgam of qualitative discussions employing vague, undefined and artificial terms and self-serving graphs and matrices.

126.     This mix of information presented a green light for investors to make purchases and hold Defendants' ETFs for extended periods of more than a day.  It vaulted Defendants' ETFs over other alternatives for investing based on anticipated movements in the index price. And these disclosures made Defendants' ETFS into an extremely fast growing product that

grew to more than twenty billion dollars ($20,000,000,000) in funds outstanding, and produced more than **five hundred million dollars fees for Defendants.**

127.   All of Defendants' statements, including the very names of each of Defendants' leveraged ETFs in all Defendants Registration Statements during the Class Period were rendered misleading or untrue because they left wholly undisclosed (a) the foregoing risks of catastrophic losses from an investment in Defendants Ultra Short ETFs, UltraLong ETFs or Short ETFs that existed **even when** the investor was correct in their expectation that the underlying index or benchmark would make a substantial price move in a given direction, and (b) all the additional risks relating to the Defendants' ETFs alleged in the Summary of Allegations and below.

E.   Undisclosed Risks Of Loss In Investing In Defendants' Ultra Short ETFs

128.   Investors could gain from anticipated declines in a given index or benchmark by shorting the index or entering options or other transactions.

129.   In 2006, Defendants introduced their Ultra Short ETFs as a new investment that enabled investors to gain substantially from the decline in a given index or other benchmark. These ETFs were to move approximately twice the reverse of the movement in the underlying ETF.

130.   Investments designed to profit from a decline in the index—whether through shorting the index itself, through options or other transactions, or through Defendants' Ultra Short ETFs—could hedge against losses that investors would suffer from declines in such index.

131.   When introducing a new security and investment product, it is incumbent on the seller to disclose the material risks of that investment.

(a)   In the Code of Federal Regulations, 17 C.F.R. § 274.11A, the SEC states that Part A of Form N-1A must include the information required in a fund's prospectus under Section

10(a) of the Securities Act.  SEC Form N-1A, General Instructions, p. 7. Rule 130 of the Securities Act defines the term "rules and regulations," as used in Sections 7, 10, and 19 of the Securities Act, to include the forms used in the registration of securities and the instructions to those forms.  17 C.F.R. § 230.130.

(b)     The SEC's general instructions for filing a Form N1-A Registration Statement, expressly provide that: "The purpose of the prospectus is to provide essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described in the prospectus."  SEC Form N-1A, General Instructions, p. 7.  *See also* 17 C.F.R. § 274.11A, stating that Part A of Form N-1A must include the information required in a fund's prospectus under Section 10(a) of the Securities Act.

(c)     Cross-references to the Statement of Additional Information or shareholder reports are to be avoided if possible, see *id.*, and all major Risk Factors are to be clearly explained in the prospectus part of the Registration Statement.  See General Instructions, pp. 16 - 19.  As the SEC also makes abundantly clear: "The purpose of the SAI is to provide additional information about the Fund that the Commission has concluded is not necessary or appropriate in the public interest of for the protection of investors to be in the prospectus, but that some investors may find useful."  *See* General Instructions, p. 7.

132.    Defendants were required in the risk factor portion of the prospectus section of the Registration Statements and Amendments thereto to make, but failed to make, prominent disclosure of all of the facts alleged in the Summary of Allegations. In addition, Defendants were required to disclose each of the following important risks of the loss of a substantial portion of the investor's original investment in an UltraShort ETF.

(a)     The UltraShorts were approximately three times as sensitive to increased volatility as even the very sensitive UltraLong and inverse funds were.  Yet, in their self-serving graphs used during the Class Period, Defendants depicted only the Ultras' results **not** the UltraShorts' results.  ¶¶ 29-40 *supra.*

(b)     Even when the underlying index declined substantially, the Ultra Short Fund could not only fail to rise twice as much as the index declined, but could decline substantially.

(c)     In fact, an inherent risk of the loss of the original investment in a so-called Ultra Short ETF, was that the ETF could **decrease** substantially in price when the underlying index **decreased** substantially.

(d)     Even if an investor was correct in their expectation that a substantial decline would occur in a given index or benchmark, the investor could be wrong and suffer substantial losses if the investor chose to act on that expectation by investing in the ProShares Ultra Short ETF for that index or benchmark.

(e)     When the investor was correct that a substantial decline would occur in the index and the investor would have profited from such decline by shorting the index directly or through virtually any means of shorting the index other than through the purchase of the Ultra Short ETF, the investor could still suffer substantial losses of their original investment if the investor chose to short the index by means of purchasing an Ultra Short ETF.

(f)     The foregoing inherent risk of loss of an investment in an Ultra Short ETF existed no matter how large the decrease in the underlying index.  Contrary to Defendants' representations (*see* ¶35-42 *supra*) (1) the underlying index did not have to be "flat" or "trendless" over the investor's holding period for there to be an expectation (and mandate) that

losses would occur, and (2) in a substantial uptrend or downtrend in the index, very large underperformance and, indeed, opposite performance could occur .

(g)     An inherent characteristic and risk of loss in each and every so-called ProShares Ultra Short ETF was that it could generate the opposite returns from what its name indicated when the underlying index or benchmark decreased substantially.

(h)     The name Ultra Short was a misnomer because any Ultra Short fund could and, during late 2008-2009, many such funds actually did decline substantially when the underlying index declined substantially.

(i)     Just when investors most needed Ultra Short ETFs to provide gains in order to hedge against substantial declines in the index, the Ultra Short ETFs could not only fail to provide such gains.  They could greatly exacerbate the investor's losses by losing substantial amounts of the investor's investment in the Ultra Short ETF as well.  See ¶¶93, "hedge" by Sapir and ¶150. (Defendant Sapir's positive statements and later criticisms by the financial press).

(j)     Even if the underlying index declined substantially over a period of four months, the investor could sustain such extreme losses on the Ultra Short ETF, that the investor mathematically could not recoup their investment in the ETF when even in the (statistically more unlikely event) that the underlying index made a substantial further decline.

1.     **The Materialization of the "Must Lose Risk," in Ultra Short ETFs**

133.     During the latter half of 2008 and the first five months of 2009, there were many rapid, substantial declines in the index or benchmark underlying an Ultra Short ETF.  But the corresponding Ultra short ETF not only failed **to increase** by twice the amount of this decline; it also **decreased.**  This caused losses to Plaintiffs and Class members.

134.     This loss was due precisely to the undisclosed facts alleged herein, especially the high volatility of the underlying index.  Each of the following examples of the "must lose" conditions occurred when there was high index volatility (between .45 and .99) that significantly exceeded index performance in a down-trending market.  ¶¶ 135-161 *infra*. These levels of volatility also exceeded the 40% cap on volatilities that Defendants misleadingly imposed on their disclosures throughout the Class Period.

135.     In each of the following market conditions, not only did Defendants' Ultra Short Fund lose money but the Ultra Long (if any) lost substantial money as well. Defendants also never explained this dysfunctional "all Ultra ETFs must lose risk" of their ultra funds.

136.     In each of the market conditions alleged below, which are representative of hundreds of such conditions that materialized during the Class Period for similar or other date ranges in these or other Ultra Short funds, high volatility in the underlying index produced a situation in which an investor holding Defendants' Ultra-Short ETF

   a.  Lost if the index went up;
   b.  Lost if the index went down; and
   c.  Lost if the index remained unchanged.

137.     For example, the Dow Jones U.S. Real Estate Index ("DJUSRE"), which is tracked by the SRS Ultra Short Fund, fell from 130.96 on January 16, 2009 to 112.07 on April 20, 2009, a decline of 14.43%.  But the SRS Ultra Short Fund experienced, not a 28.85% gain, but a decline of 44.08% (net of distributions).



138.        Similarly, Lead Plaintiff Karasick purchased SRS in December, 2008 to

hedge against declines in real estate values.  From then until his April, 2009 sale, SRS lost

approximately 55% and URE, the Ultra Long Fund for the Dow Jones real estate index, lost

approximately 40%. The Dow Jones Real Estate Index was down steeply in March but recovered

in April to down only 5%.  Lead Plaintiff Karasick's opposite performance was 55% and his

underperformance from 10% to 0, was an additional 10%.

139.     The Dow Jones U.S. Financials Index, which is tracked by the SKF Ultra Short Fund, fell from 228.33 on January 6, 2009 to 176.18 on April 6, 2009, a decline of 22.84%. But the SKF Ultra Short Fund experienced, not a 45.68% gain, but a decline of 17.34% (net of distributions).



140.     The FTSE/Xinhua China 25 Index, which is tracked by the FXP Ultra Short Fund, fell from 17444.70 on September 9, 2008 to 11054.00 on November 26, 2008, a

decline of 36.63%.  But the FXP Ultra Short Fund experienced, not a 73.27% gain, but a decline

of 50.84% (net of distributions).



141.    The MSCI Emerging Markets Index, which is tracked by the EEV Ultra

Short Fund, fell from 868.58 on September 9, 2008 to 537.09 on December 8, 2008, a decline of

38.16%.  But the EEV Ultra Short Fund experienced, not a 76.33% gain, but a decline of

46.03%. (net of distributions).



142.       The Dow Jones U.S. Oil & Gas Index, which is tracked by the DUG Ultra

Short Fund, fell from 574.14 on September 11, 2008 to 437.08 on December 10, 2008, a decline

of 23.87%.  But the DUG Ultra Short Fund experienced, not a gain of 47.74%, but a decline of

24.18%. (net of distributions).



| Anticipated Returns 9/11/2008-12/10/2008 | | Actual Returns 9/11/2008-12/10/2008 | |
|---|---|---|---|
| DJUSEN INDEX | DUG Fund | DJUSEN INDEX | DUG Fund |

143.     The S&P500 Index, which is tracked by the SDS Ultra Short Fund, fell

from 1056.89 on October 6, 2008 to 927.45 on January 5, 2009, a decline of 12.25%.  But the

SDS Ultra Short Fund experienced, not a 24.49% gain, but a decrease of 9.44% (net of

distributions).



| Anticipated Returns | | Actual Returns | |
| 10/6/2008-1/5/2009 | | 10/6/2008-1/5/2009 | |
| SPX INDEX | SDS Fund | SPX INDEX | SDS Fund |

144.     The Dow Jones Industrial Average Index, which is tracked by the **DXD** Ultra Short Fund, fell from 9955.50 on October 6, 2008 to 8952.89 on January 5, 2009, a decline of 10.07%.  But the DXD Ultra Short Fund experienced, not a 20.14% gain, but a decrease of 10.61 % (net of distributions).

| Anticipated Returns 10/6/2008-1/5/2009 | | Actual Returns 10/6/2008-1/5/2009 | |
|---|---|---|---|
| INDU INDEX | DXD Fund | INDU INDEX | DXD Fund |



145.    The Russell 2000 Growth Index, which is tracked by the SKK Ultra Short Fund fell from 282.46 on October 8, 2008 to 242.81 on December 24, 2008, a decline of 14.04%. But the SKK Ultra Short Fund experienced, not a 28.07% gain, but a decrease of 13.83% (net of distributions).



146.     The Dow Jones U.S. Basic Materials Index, which is tracked by the SMN

Ultra Short Fund, fell from 183.24 on October 8, 2008 to 156.14 on January 8, 2009, a decline of

14.79%.  But the SMN Ultra Short Fund to experienced, not a 29.58% gain, but a decrease of

31.81% (net of distributions).



147.    The S&P Small Cap 600, which is tracked by the SDD Ultra Short Fund, fell from 302.2 on October 7, 2008 to 265.11 on January 7, 2009, a decline of 12.27%.  But the SDD Ultra Short Fund experienced, not a 24.55% gain, but a decrease of 12.47% (net of distributions).

49



148.     Defendants misleadingly implied in three charts repeatedly included in the "Correlation Risk" section of the prospectus part of the Amendments to the Registration Statement from September 2007 forward that results could improve by holding for a period of a year.  However, investors who held Ultra Short Funds for longer periods of time were actually subjected to a increasingly greater degree of exposure to the foregoing undisclosed risks.

149.     For example, the Dow Jones U.S. Real Estate Index ("DJUSRE"), which is tracked by the SRS Ultra Short Fund, fell from 255.49 on January 2, 2008 to 145.63 on June 1,

2009, a decline of 46%.  But the SRS Ultra Short Fund experienced, not a 92% gain, but a

decline of 78.96% (net of distributions).



| Anticipated Returns 1/2/2008-6/1/2009 | | Actual Returns 1/2/2008-6/1/2009 | |
|---|---|---|---|
| DJUSRE INDEX | SRS Fund | DJUSRE INDEX | SRS Fund |

     150.       The Dow Jones U.S. Financials Index, which is tracked by the SKF Ultra

Short Fund, fell from 463.36 on January 2, 2008 to 219.07 on June 1, 2009, a decline of 52%.

But the SKF Ultra Short Fund experienced, not a 104% gain, but a decline of 60.97% (net of

distributions).



151.     The FTSE/Xinhua China 25 Index, which is tracked by the FXP Ultra

Short Fund, fell from 25507.18 on January 2, 2008 to 17089.34 on June 1, 2009, a decline of

33%.  But the FXP Ultra Short Fund experienced, not a 66% gain, but a decline of 83.8% (net of

distributions).



152.    The MSCI Emerging Markets Index, which is tracked by the EEV Ultra Short Fund, fell from 1235.23 on January 2, 2008 to 802.21 on June 1, 2009, a decline of 35%. But the EEV Ultra Short Fund experienced, not a 70% gain, but a decline of 69.35% (net of distributions).

53



153.     The Dow Jones U.S. Oil & Gas Index, which is tracked by the DUG Ultra

Short Fund, fell from 684.51 on January 2, 2008 to 470.70 on June 1, 2009, a decline of 31%.

But the DUG Ultra Short Fund experienced, not a gain of 62%, but a decline of 55% (net of

distributions).



**2.** **Such Moves In The Opposite Direction Were Not Aberrations But Inherent Characteristics of All of Defendants' Leveraged ETFs**

154.    Critically, Defendants failed to disclose that the foregoing moves in the opposite direction were not "one-off" aberrations or accidents.

155.    Belatedly, Defendants' qualitative and quantitative disclosures were substantially changed by September 29, 2009 to begin to disclose the true risks of investing in Defendants' leveraged ETFs.  See "7" below.

**F.** **Ultra Long Funds**

156.      On or about June 21, 2006, Defendants first offered their Ultra Long ETFs.  Again, these ETFs were designed so that their net asset value would move in the same direction as, and replicate but double the movement of an underlying specified index of stocks or other benchmark, *i.e.,* they would deliver twice (200%) of the daily performance of the underlying index.

157.      In the Registration Statement, Defendants, in violation of federal law, failed to disclose the inherent risks and characteristics of the so-called Ultra Long funds and the material facts alleged in the Summary of Allegations and below.  These risks presented a potential extreme risk of large losses from an investment in such funds.

a.      Even when the underlying index increased substantially, the Ultra Long Fund could not only fail to rise twice as much as the index increased, but could decline substantially.

b.      In fact, an inherent risk of the loss of the original investment in a so-called Ultra Long ETF, was that the ETF could decrease substantially in price when the underlying index increased substantially in price.

c.      Even if an investor was correct in their expectation that a substantial price increase would occur in a given index or benchmark, the investor could be wrong and suffer substantial losses if the investor chose to act on that expectation by investing in the ProShares Ultra Long ETF for that index or benchmark.

d.      When the investor was correct that a substantial price increase would occur in the index and the investor would have profited from such increase by purchasing the index directly or through margin, options or other means, the investor could still suffer substantial losses of their original investment if the investor chose to purchase the index by means of purchasing an Ultra Long ETF.

e.      Even if the investor was correct and the underlying index increased substantially over a period of weeks or months, the investor still could lose substantially all their investment by investing in the Ultra Long ETF on that index.

f.      The foregoing inherent risk of loss of an investment in an Ultra Long ETF existed no matter how large the increase in the underlying index.  Contrary to Defendants' representations, the underlying index did not have to be "flat" or "trendless" over the investor's holding period for substantial losses to occur, and (b) even when a substantial uptrend in the index occurred, the investor could suffer.

g.      An inherent characteristic and risk of loss in each and every so-called ProShares Ultra Long ETF was that it could generate the opposite returns from what its objective or name indicated when the underlying index or benchmark increased substantially.

h.      A risk of the Ultra Long Fund was that the outcome of the movement of its NAV could morph into that resembling what was expected of short ETFs or even Ultra Short ETFs.

### 1.      **Materialization of the Undisclosed Risk As To Ultra Longs**

158.      In market conditions in which the underlying benchmark or index increased significantly in price but volatility was higher, the foregoing risks materialized.  For example, the following ProShares Ultra long funds experienced not twice the increase in the index, but substantial losses.  They are representative of scores of other materializations of such risks during the Class Period.

159.      Revealing the vulnerability of Defendants' Ultra Funds, when each of the following Ultra Long funds lost money, the Ultra Short lost as well.

160.     The Dow Jones U.S. Real Estate Index, which is tracked by the URE Ultra

Long Fund, increased from 131.10 on October 27, 2008 to 137.12 on January 28, 2009, an

increase of 4.59%.  But the Dow Jones URE Ultra Long Fund experienced, not a 9.18% gain, but

a decline of 26.63% (net of distributions).



161.     The Dow Jones U.S. Financial Index, which is tracked by the UYG Ultra

Long Fund, increased from 184.08 on January 15, 2009 to 194.94 on April 9, 2009, an increase

of 5.90%. But the UYG Ultra Long Fund experienced, not an 11.8% gain, but a decline of

11.77% (net of distributions).



162.    The Dow Jones U.S. Oil & Gas Index, which is tracked by the DIG Ultra

Long Fund, increased from 412.98 on October 9, 2008 to 456.53 on January 5, 2009, an increase

of 10.55%. But the DIG Ultra Long Fund experienced, not a 21.09% gain, but a decline of

3.85% (net of distributions).



163.     Between December 24, 2008 and March 24, 2009, the Dow Jones – UBS Crude Oil Sub-Index, which is tracked by the UCO Ultra Long Fund, increased from 196.42 on December 24, 2008 to 220.54 on March 24, 2009, an increase of 12.27%.  But the UCO Ultra Long Fund experienced, not a 24.55% gain, but a decline of 6.27% (net of distributions).



164.     Later, in Summer 2009, the Financial Investment National Regulatory

Association ("FINRA") also provided an example of what FINRA considered to be unacceptably

unexpected results:  "Between December 1, 2008, and April 30, 2009, a particular index gained 2

percent. However, a leveraged ETF seeking to deliver twice that index's daily return fell by 6

percent-and an inverse ETF seeking to deliver twice the inverse of the index's daily return fell by

26 percent."

**G.     Short or Single Inverse Funds and Materialization of Risks**

165.    Defendants also caused to be issued a series of inverse funds which do employ borrowing or leverage in order to short investments.  Defendants described these funds in their Registration Statements and Amendments thereto as having the objective of providing a minus 100% return of a specific index.

166.    Defendants made materially misleading statements about these funds as well.

167.    For example, on December 29, 2006, ProShares filed Amendment No. 2 to the Registration Statement.  One of the non-leveraged funds discussed in the filing was the Proshares Short Financials fund, or SEF fund.  Concerning that fund, the document stated, in pertinent part:

> INVESTMENT OBJECTIVE
> Short Financials ProShares seeks daily investment results, before fees and expenses, that correspond to the inverse (opposite) of the daily performance of the Dow Jones U.S. Financials Index.
>
> If Short Financials ProShares is successful in meeting its objective, its net asset value should gain approximately the same amount, on a percentage basis, as any decrease in the Dow Jones U.S. Financials Index (Index) when the Index declines on a given day. Conversely, its net asset value should lose approximately the same amount, on a percentage basis, as any increase in the Index when the Index rises on a given day.
>
> ****
>
> Inverse Correlation Risk    Shareholders in Short Financials ProShares should lose money when the index underlying the Fund's benchmark rises – a result that is the opposite from traditional equity or bond funds.
>
> PRINCIPAL RISK CONSIDERATIONS
> The Short Financials ProShares is subject to the following principal risks:
>
> • Aggressive Investment Technique Risk.  The Short Financials ProShares uses investment techniques and financial instruments that may be considered aggressive, including the use of futures contracts, options on futures contracts, securities and indices, forward contracts, swap agreements and similar instruments. Such techniques may expose the

Fund to potentially dramatic changes (losses) in the value of its portfolio holdings and imperfect correlation to the index underlying the Fund's benchmark. These techniques also may expose the Fund to risks different from or possibly greater than the risks associated with investing directly in the securities contained in the index underlying the Fund's benchmark.

• Correlation Risk   A number of factors may affect the Short Financials ProShares' ability to achieve a high correlation with its benchmark and there can be no guarantee that the Fund will achieve a high degree of correlation.

****

• Counterparty Risk   The counterparty to a financial instrument may default on its obligations under the related agreement. In this circumstance, the Short Financials ProShares may lose money.

• Concentration Risk   Short Financials ProShares may concentrate its investments in issuers of one or more particular industries to the same extent that its underlying index is so concentrated. There is a risk that those issuers (or industry sector) will perform poorly and negatively impact a Fund.

• Credit Risk   An issuer of debt instruments may be unable to make interest payments and repay principal. Changes in an issuer's financial strength or in an instrument's credit rating may affect an instrument's value and, thus, impact Short Financials ProShares' performance. As described under "Counterparty Risk" above, the Fund will also be subject to credit risk with respect to the amount a Fund expects to receive from counterparties in financial instruments transactions. If a counterparty defaults on its payment obligations to a Fund, the value of your investment in a fund may decline.

• Inverse Correlation Risk   Shareholders in Short Financials ProShares should lose money when the index underlying the Fund's benchmark rises – a result that is the opposite from traditional equity or bond funds.

In addition to the risks noted above, Short Financials ProShares is also subject to risks faced by companies in the financial services economic sector, including: extensive governmental regulation that affects the scope of their activities, the prices they can charge and the amount of capital they must maintain; adverse effects from increases in interest rates; effects on profitability by loan losses, which usually increase in economic downturns; banks and insurance companies may be subject to severe price competition; and newly enacted laws are expected to result in increased inter-industry consolidation and competition in the financial

sector. Further, stocks in the Index may underperform fixed income investments and stock market indices that track other markets, segments and sectors. As noted above, the Short Financials ProShares seeks to provide daily investment results, before fees and expenses, that correspond to the inverse (opposite) of the daily performance of the Dow Jones U.S. Financials Index, and thus these risk considerations for the Fund will generally be the opposite of those for a traditional mutual fund.

December 29, 2006 Amendment No. 2 to Registration Statement, pp. 159-160.

168.    Defendants' foregoing statements were misleading because Defendants, just as for the Ultra Short and Ultra Long ProShares ETFs, failed to disclose the important risks alleged in the Summary of Allegations and below.

169.    Defendants were required in the risk factor portion of the prospectus section of the Registration Statement to make, but failed to make, prominent disclosure of each of the following important risks of the loss of a substantial portion of the investor's original investment in an inverse fund:

a.    Even when the underlying index declined substantially, inverse fund would not only fail to rise as much as the index declined, but could decline substantially.

b.    In fact, an inherent risk of the loss of the original investment in an inverse fund, was that the ETF could decrease substantially in price when the underlying index decreased substantially.

c.    Even if the investor was correct that a substantial decline would occur in the index, the investor could be wrong and suffer substantial losses in the inverse fund.

d.    When the investor was correct that a substantial decline would occur in the index and the investor would have profited from such decline by shorting the index directly or through virtually any means of shorting the index other than through the purchase of the inverse fund, the

investor could still suffer substantial losses of their original investment if the investor chose to short the index by means of purchasing an inverse fund.

e.      Even if the investor was correct and the underlying index declined substantially over a period of weeks or months, the investor still could lose substantially all their investment by investing in the inverse fund on that index.

f.      The foregoing inherent risk of loss of an investment in an inverse fund existed no matter how large the decrease in the underlying index. For example, and contrary to Defendants' representations, the underlying index did not have to be "flat" or "trendless" over the holding period for losses to occur.

g.      An inherent characteristic and risk of loss in each and every inverse fund was that it could generate the opposite returns from what investors were led to expect from the Prospectus disclosures when the index decreased substantially.

h.      Just when investors needed non-leveraged inverse funds to provide gains in order to hedge against substantial declines in the index, the inverse funds could not only fail to provide such gains, but also greatly exacerbate the investor's losses on the index by losing substantial amounts of the investor's investment in the inverse fund as well.

170.      Defendants' many statement encouraging investors to hold Defendants' ETFs for extended periods, included their following statement concerning fees for the SEF Fund:

> The following examples are intended to help you compare the cost of investing in shares of the Short Financials ProShares with the cost of investing in other funds. Investors should note that the following examples are for illustration purposes only and are not meant to suggest actual or expected fees and expenses or returns, all of which may vary. The Fund issues and redeems shares in Creation Units principally on an in-kind basis for portfolio securities included in the relevant Index and cash. Shares are not redeemable in less than Creation Unit aggregations. The examples do not include the brokerage commissions that secondary market investors may incur to buy and sell shares.

65

The following example assumes that you invest $10,000 in the Short
Financials ProShares for the time periods indicated and sell all of your
shares at the end of those periods, but does not include transaction fees
on purchases and redemptions of shares. The example also assumes that
your investment has a 5% annual return each year and that the Fund's
annual operating expenses remain exactly as described in the fee table.
Although your actual costs may be higher or lower, based on the
assumptions, your costs would be:

1 year
$ 97
3 years
$ 397

December 29, 2006 Amendment No. 2 to Registration Statement, p. 162.

171.      Another example of a non-leveraged fund about which Defendants made

misleading statements is the ProShares Short MSCI Emerging Markets Fund, or EUM fund.  The

September 28, 2007 Amendment No. 6 to the Registration Statement stated as follows:

Short MSCI Emerging Markets ProShares
Ticker: EUM
CUSIP: 74347R396

Investment Objective
Short MSCI Emerging Markets ProShares seeks daily investment results,
before fees and expenses, that correspond to the inverse (opposite) of the
daily performance of the MSCI Emerging Markets Index.

If Short MSCI Emerging Markets ProShares is successful in meeting its
objective, its value (before fees and expenses) should gain approximately
the same amount, on a percentage basis, as any decrease in the MSCI
Emerging Markets Index when the Index declines on a given day.
Conversely, its net asset value (before fees and expenses) should lose
approximately the same amount, on a percentage basis, as any increase
in the Index when the Index rises on a given day.

Because the value of the Index is not computed as of the close of the
U.S. securities markets due to differences in trading hours between U.S.
and foreign markets, correlation to the Index will be measured by
comparing the daily change in the Fund's net asset value per share to the
performance of one or more U.S. exchange traded securities or
instruments that reflect the values of the securities underlying the Index

as of the close of the U.S. securities markets.

Shares of this Fund will not be offered until certain regulatory approvals have been obtained. As of the date of this Prospectus, it is expected that these approvals will be obtained in the fourth quarter of 2007, but this schedule is subject to change.

Principal Investment Strategy
The Short MSCI Emerging Markets ProShares' principal investment strategies include:

• Taking positions in financial instruments (including derivatives) that ProShare Advisors believes, in combination, should have similar daily price return characteristics as the inverse of the MSCI Emerging Markets Index. Information about the Index can be found on page 12.

• Committing at least 80% of its assets to investments that, in combination, have economic characteristics that are inverse to those of the Index.

• Employing leveraged investment techniques in seeking its investment objective.

• Investing assets not invested in financial instruments in debt securities and/or money market instruments.

Principal Risk
The Short MSCI Emerging Markets ProShares is subject to the following principal risks:

• Aggressive Investment Technique Risk, Correlation Risk, Counterparty Risk, Credit Risk, Early Close/Trading Halt Risk, Equity Risk, Emerging Market Risk, Geographic Concentration Risk, Foreign Currency Risk, Foreign Investment Risk, Liquidity Risk, Market Price Variance Risk, Market Risk, Non-diversification Risk and Small- and Mid-Cap Company Risk.

For more information on the Fund's principal investment strategies and risks, including a description of the principal risks noted above, please refer to "Principal Investment Strategies and Risks" beginning on page 7.

Fund Performance
Performance history will be available for the Short MSCI Emerging Markets ProShares after it has been in operation for a full calendar year.

September 28, 2007 Amendment No. 6 to Registration Statement, p. 109.

From November 1, 2007 to June 1, 2009, the MSCI Emerging Markets Index fell

***%.  But the EUM fund fell by ***% in that period.

172.      Defendants' statements concerning the EUM fund were materially

misleading for all the reasons given concerning the SEF fund.

173.      Similarly, Defendants' other Registration Statements and Amendments

thereto effective during the Class Period for their inverse funds contained identical or similar

statements in the same sections of those Registration Statements and Amendments thereto that

were misleading for the same reasons alleged herein.

174.      Defendants' many statements encouraging investors to hold Defendants'

leveraged ETFs for extended periods, included statements listing fees payable for 1, 3, 5, and 10

year periods:

> The following example assumes that you invest $10,000 in the Short MSCI
> Emerging Markets ProShares for the time periods indicated and sell all of your
> shares at the end of those periods, but does not include transaction fees on
> purchases and redemptions of shares. The example also assumes that your
> investment has a 5% annual return each year and that the Fund's annual
> operating expenses remain exactly as described in the fee table. Although your
> actual costs may be higher or lower, based on the assumptions, your costs
> would be:

| 1 Year | 3 Years | 5 Years | 10 Years |
|--------|---------|---------|----------|
| $97    | $360    | $644    | $1,453   |

Similarly, as with the SEF fund, Defendants discussed long-term investment considerations with

respect to the EUM fund, including distributions, which also reinforced that the fund could be

used over a long time period.  *See* September 28, 2007 Amendment No. 6 to Registration

Statement, p. 110.

175.      Examples of when the foregoing undisclosed risks materialized included

the following.  In each instance, Defendants' single inverse ETFs moved in the opposite of

expectations due to conditions of high index volatility.  The MSCI EAFE Index, which is tracked

by the EFZ Fund, decreased from 1426.09 on October 7, 2008 to 1218.05 on December 16,

2008, a decrease of 14.59%.  But the EFZ Fund experienced, not a 14.59% gain, but a decline of

11.10% (net of distributions).



176.     The MSCI EM Index, which is tracked by the EUM Fund, increased from 768.92 on September 17, 2008 to 571.85 on December 16, 2008, a decrease of 25.63%.  But the EUM Fund experienced, not a 25.63% gain, but a decline of 21.93% (net of distributions).



H.     **Class Securities**

177.     Defendants' ETFs listed on Exhibit "D" hereto ("Class Securities") experienced such rapid deviations, such opposite movements, and declined in NAV.

178.     Thus, even when the underlying index was not what Defendants called "flat" or "trendless", the NAV of Defendants' leveraged ETFs could not only substantially deviate by upwards of 10% or more from, but could move in the opposite direction of, its stated daily relationship with its underlying index.  It could do so within a matter of weeks or months and, at the longest, within one quarter (i.e., 63 trading days).  "Flat" or "trendless" market, as only belatedly defined by Defendants in their June 23, 2009 Amendment No. 14 to Registration Statement, p. 10, means "begins and ends the year at 0%".

The foregoing opposite performance occurred during the holding periods of multiple Plaintiffs. For example:

a.     Lead Plaintiff Mark Karasick bought shares of the SRS fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

b.     Additional named plaintiff Francisco Javier De Lion Diaz bought shares of the AGQ, EEV, SDS, SRS, and SSO funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

c.     Additional named plaintiff Rene LaCroix bought shares of the DDM, DXD, EUM, and QID funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

d.     Additional named plaintiff Anthony Kouri bought shares of the DIG, DUG, and UYG funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

e.     Additional named plaintiff Anthony Alexander bought shares of the DOG and SCC funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

f.     Additional named plaintiff Jay and Judy Bilyeu bought shares of the PSQ and DOG funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

g.      Additional named plaintiff Michael Eric Codlin bought shares of the DUG fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

h.      Additional named plaintiff Wendy Rockwell-Goff bought shares of the DUG fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

i.      Additional named plaintiff Robert Schumacher bought shares of the DUG and SMN funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

j.      Additional named plaintiff James and Dorothy Hershman bought shares of the DXD fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

k.      Additional named plaintiff Michael Adam Hyman bought shares of the DXD, QID, UYM and UYG fund during the Class Period and was caused loss by the violations. *See* Schedule A.

l.      Additional named plaintiff Scott Tessler bought shares of the DXD, EEV, QID, SKF, and FXP funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

m.      Additional named plaintiff Richard Rhoads bought shares of the EEV fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

n.      Additional named plaintiff Martin Gary Norris bought shares of the EFU and SCC funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

o.      Additional named plaintiff Dorothy Lowell bought shares of the EFZ, SEF, and SH funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

p.      Additional named plaintiff Nancy Hitchins bought shares of the EUM, SKF, and UCO funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

q.      Additional named plaintiff Thomas Truong bought shares of the FXP and SEF funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

r.      Additional named plaintiff Edward Cisneros bought shares of the FXP, SDS, SKF, and TWM funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

s.      Additional named plaintiff Chris Honcik bought shares of the MVV, PSQ, and SH funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

t.      Additional named plaintiff Stephen Shoap bought shares of the MZZ fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

u.      Additional named plaintiff Dmitri Routski bought shares of the MZZ, SDD, SIJ, and SZK funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

v.      Additional named plaintiff Elena Lavender-Bowen bought shares of the REW fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

w.      Additional named plaintiff David Bowman bought shares of the SCO, URE, UWM, and TWM funds during the Class Period and was caused loss by the violations.  *See* Schedule A.

x.      Additional named plaintiff David Chow bought shares of the SDD fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

y.      Additional named plaintiff Mark Everett Brown bought shares of the SDS fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

z.      Additional named plaintiff Jonathan Dean bought shares of the SKF fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

aa.     Additional named plaintiff Lawrence Lewis Sinsel, Jr. bought shares of the SMN fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

bb.     Additional named plaintiff Kenneth L. Kramer bought shares of the SRS fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

cc.     Additional named plaintiff Lawrence I. Weiner bought shares of the SSG fund during the Class Period and was caused loss by the violations.  *See* Schedule A

dd.     Additional named plaintiff John E. Killough bought shares of the TLL fund during the Class Period and was caused loss by the violations.  *See* Schedule A

ee.     Additional named plaintiff Alan Parker bought shares of the UYG fund during the Class Period and was caused loss by the violations.  *See* Schedule A

ff.     Additional named plaintiff Scott A. Smeltz bought shares of the UYM fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

gg.     Additional named plaintiff Howard Schwack bought shares of the UYM fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

hh.     Additional named plaintiff Douglas Jones bought shares of the UGL fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

ii.     Additional named plaintiff Stephen Herman bought shares of the SKF fund during the Class Period and was caused loss by the violations.  *See* Schedule A.

jj.     Moreover, the Plaintiffs listed below purchased  some or all of their shares in Defendants' ETFs during the exemplary opposite movement time periods for the ETFs alleged in  ¶¶ 137-176.

●     Lead plaintiff Mark Karasick bought all his SRS shares within the time parameters on the graph at paragraph 137.

●     Additional named plaintiffs Jonathan Dean, Nancy Hitchins, and Stephen Herman bought most of their SKF shares within the time parameters on the graph at paragraph 139.

●     Additional named plaintiffs Edward Cisneros and Scott Tessler bought all their SKF shares within the time parameters on the graph at paragraph 139.

●     Additional named plaintiffs Thomas Truong and Scott Tessler bought all their FXP shares within the time parameters on the graph at paragraph 140.

●     Additional named plaintiffs Edward Cisneros bought most of his FXP shares within the time parameters on the graph at paragraph 140.

●     Additional named plaintiffs Richard Rhoads and Scott Tessler bought all their EEV shares within the time parameters on the graph at paragraph 141.

●     Additional named plaintiff Robert Schumacher bought all his DUG shares within the time parameters on the graph at paragraph 142.

●     Additional named plaintiff Anthony Kouri bought some of his DIG and DUG shares within the time parameters on the graph at paragraph 162.

●     Additional named plaintiff Mark Brown bought some of his SDS shares within the time parameters on the graph at paragraph 143.

●     Additional named plaintiff Rene LaCroix bought some of his DXD shares within the time parameters on the graph at paragraph 144.

●     Additional named plaintiff Lawrence Lewis Sinsel, Jr. bought some of his SMN shares within the time parameters on the graph at paragraph 146.

●     Additional named plaintiff Dmitri Routski bought some of his SDD shares within the time parameters on the graph at paragraph 147.

● Additional named plaintiff Nancy Hutchins bought all her EUM shares within the time parameters on the graph at paragraph 176.

● Additional named plaintiff Alan Parker bought some of his UYG shares within the time parameters on the graph at paragraph 161.

● Additional named plaintiff John Killough bought all, and Nancy Hitchins some, of their UCO shares within the time parameters on the graph at paragraph 163.

● Additional named plaintiff Michael Hyman bought some of his UIM shares within the time parameters of an opposite movement.

## I.     Partial Disclosures During Summer 2009 Began To Correct Defendants' Misleading Registration Statements And Amendments Thereto

179.      Defendants belatedly began to partially disclose, in the Prospectus to the June 23, 2009 Amendment No. 14 to Registration Statement for two new products of 300% leveraged or inverse leveraged (UltraPro S&P 500 and UltraPro Short S&P 500) various facts. These statements, while still misleading, began to reveal the undisclosed risks.  For example, Defendants stated as follows:

> **Important Information About the Funds**
> . . . In periods of higher market volatility, the volatility of the benchmark may be at least as important to the Fund's return for the period as the return of the benchmark. . . .

June 23, 2009 Amendment No. 14 to Registration Statement, p. 6; July 31, 2009 Amendment No. 16 to Registration Statement, p. 8.  This effectively refuted Defendants' previous representation that their leveraged ETFs would definitely underperform only in markets that were "flat" or "trendless" for a year.  This began to reveal that such ETFs could also underperform ---indeed explode into catastrophic losses--- when an index made very substantial

moves in the direction desired by the investor.  By failing to make these disclosures previously, Defendants had violated the federal securities laws disclosure requirements.

180.     In other new partial disclosures in such June 23, 2009 Amendment No. 14 to Registration Statement and later, Defendants disclosed that:

> **. . . investors should recognize that the degree of volatility of the underlying index** can have a **dramatic effect** on a fund's longer-term performance.

July 31, 2009 Amendment No. 16 to Registration Statement, p. 410 (emphasis supplied).

However, it was Defendants themselves who had never previously made this disclosure. Defendants effectively admitted above that investors should have been told this by Defendants. Again, Defendants had violated the federal securities law disclosures requirements by failing previously to disclose this.

181.     Defendants also began belatedly to acknowledge as follows:

> The greater the volatility, given a particular index return, the greater the downside deviation will be of a fund's longer-term performance from a simple multiple (*e.g.*, 3x, -3x) of its index's longer-term return. As shown in the first example, it is even possible that a fund may move in opposite direction as the index.

*Id*.

182.     This new disclosure also began to explain the risks that "even if you are right on the direction of the index, you can lose substantially by investing in a ProShares ETF". However, even this partial disclosure was itself misleading.  Not only was it "possible" that the funds would move in the "opposite direction."  This was certain to occur in various market conditions.  Second, in the "first example", the outcome of the index was zero percent change, so there was no opposite movement.

183.     For another example, Defendants also disclosed in  the June 23, 2009 Amendment No. 14 to Registration Statement:

This effect is caused by compounding, which exists in all investments, but has a more significant impact in a leveraged fund. In general, during periods of higher index volatility, compounding will cause longer term results to be less than three times (or minus three times) the return of the index. **This effect becomes more pronounced as volatility increases. Conversely, in periods of lower index volatility, fund returns over longer periods can be higher than three times (or minus three times) the return of the index.** Actual results for a particular period, before fees and expenses, are also dependent on the magnitude of the index return in addition to the index volatility.

(Emphasis supplied) June 23, 2009 Amendment No. 14 to Registration Statement, p. 9. This is the first time that Defendants began to partially acknowledge the compounding effect, its relationship to index volatility.

184.    Defendants also disclosed in the July 31, 2009 Amendment No. 16 to Registration Statement: "Investors should understand the consequences of holding daily rebalanced funds for periods longer than a single day and should actively monitor their investments." *Id.*, p. 407.

185.    Likewise Defendants stated that "A one year period is used for **illustrative** purposes only. Deviations from the index return times the fund multiple can occur over **periods as short as two days**." July 31, 2009 Amendment No. 16 to Registration Statement, p. 407 (emphasis supplied). In the foregoing new partial disclosures Defendants effectively acknowledge that their previous Registration Statements and Amendments thereto were misleading and belatedly began to alert investors that they could not simply hold leveraged ETFS for extended periods.

186.    Also on July 31, 2009, Defendants stated: "Daily objective leveraged funds if used properly and in conjunction with the investor's views on the future direction and volatility of the markets can be useful tools for investors who want to manage their exposure to

various markets and market segments and who are willing to monitor and/or periodically rebalance their portfolios." July 31, 2009 Amendment No. 16 to Registration Statement, p. 410.

187.     Once again, Defendants effectively acknowledged that their previous disclosures were misleading and began to explain how Defendants' investment product should be properly used, and some of the tools which an investor would need to correctly analyze such ETFs.  Defendants still did not tell the investor HOW to do these calculations and rebalancing and any specific formula or even methods for doing so. In fact, Defendants even fail to explain what Defendants mean by "periodically rebalancing" their portfolio.

188.     Most important, Defendants substantially revised their disclosures in their SAI of the September 29, 2009 Amendment No. 18 to the Registration Statement and the ProShares Trust II Prospectus.  These revisions used 100% volatility parameters in the volatility matrix and thereby disclosed the opposite movement risks when the underlying index was not flat or trendless. This revelation became this Amendment No. 18 to the Registration Statement used 100% volatility parameters in its volatility matrix. That is, Defendants ceased to use the misleadingly low volatility they had previously confined themselves to.  Belatedly, three years late, they used appropriate parameters.

**J.  Additional Untrue or Misleading Statements Contained In Defendants' Registration Statements and Amendments Thereto**

189.     Rather than disclosing their mathematical formula, the resulting risks of catastrophic loss even when an investor was correct about the direction of the underlying index, and all the other risks previously alleged, Defendants made a series of statements in their Registration Statements and Amendments thereto concerning the risks, but which failed to disclose the existence and magnitude of the foregoing risks of investing in a ProShares leveraged ETF.

190.     The foregoing undisclosed, inherent risks of large losses were material

facts that rendered misleading, in all the circumstances each of the following statements

contained in Defendants' Registration Statements and Amendments thereto.

191.     In the Prospectus to their Registration Statement on Form N-1A, filed with

the SEC on June 22, 2006, Defendants stated:

> Over time, the cumulative percentage increase or decrease in the net asset
> value of the Fund may diverge significantly from the cumulative
> percentage increase or decrease in the multiple of the return of the
> underlying Index due to the compounding effect of losses and gains on the
> returns of the Fund.  Consequently, for periods greater than one day,
> investors should not expect the return of the Fund to be twice the return of
> the underlying Index.  **In addition, in trendless or flat markets it is
> expected that the Fund will underperform its benchmark Index.**

[Emphasis supplied].  Registration Statement on Form N-1A, filed June 22, 2006, p. 6.

192.     On August 30, 2006, ProShares filed Amendment No. 1 to the

Registration Statement with the SEC, which contained the following statement:

> The UltraShort Real Estate ProShares employs leveraged investment techniques
> to achieve its investment objective.  Over time, the use of leverage, combined
> with the effect of compounding, will have a more significant impact on the Fund's
> performance compared to the index underlying its benchmark than a fund that
> does not employ leverage.  Therefore, the return of the index over a period of time
> greater than one day multiplied by a fund's specified multiple or inverse multiple
> (e.g., 200% or -200%) will not generally equal a fund's performance over that
> same period.

August 30, 2006 Amendment No. 1 to Registration Statement, p. 275.

193.     The September 28, 2007 Amendment No. 6 to the Registration Statement

also describes a series of risks that might make it difficult for a particular ETF, and especially a

leveraged ETF, to track precisely the desired performance in relation to the underlying index on

a daily basis.  The reader is left with the impression that these are all reasons for what

Defendants call "Correlation Risk".  *Id*., pp. 7-8; *see* August 30, 2006 Amendment No. 1 to

Registration Statement, p. 308.  Under "Correlation Risk (All Funds)", the Prospectus to

Amendment No. 6 to the Registration Statement undertakes to disclose the further risks when

leverage is being used.

> Certain Funds are "leveraged" funds in the sense that they have
> investment objectives to match a multiple of the performance of an index
> on a given day.  These Funds are subject to all of the correlation risks
> described above.  In addition, there is a special form of correlation risk
> that derives from these Funds' use of leverage, which is that for periods
> greater than one day, the use of leverage tends to cause the performance of
> a Fund **to be either greater than or less** than the index performance times
> the stated multiple in the fund objective, before accounting for fees and
> fund expenses.

September 28, 2007 Amendment No. 6 to Registration Statement, p. 8, covering all ProShares'

products.  In other words, leverage in the ETF moves the NAV more as the index up-trends or

downtrends.

194.    The September 28, 2007 Amendment No. 6 to the Registration Statement

then provided three graphs to illustrate this point (page 9), assuming a zero and +15% / -15%

index performance, and showing how the leveraged ETF can both underperform and over-

perform the stated goal.  Amendment No. 6 explains: "[t]he graphs demonstrate that, for periods

greater than one day, **a leveraged Fund is likely to underperform or over-perform (but not**

**match) the index performance times the stated multiple in the fund objective"** (page 8).  In a

further section devoted to describing the SRS fund in more detail (pages 100-101), the text refers

the reader back to the same risk factors and concerns discussed above.

195.    In the SAI of the September 28, 2007 Amendment No. 6 to the

Registration Statement, Defendants provide a section entitled "Special Considerations" (page

18).  This section repeats many of the same statements regarding tracking, correlation and

leverage found in the Prospectus section of Amendment No. 6 to the Registration Statement.

196.     This SAI also contains a special paragraph entitled "Special Note Regarding the Correlation Risks of Leveraged Funds" that identifies six primary influences on the performance of leveraged funds for periods longer than one day: a) index performance; b) index volatility; c) financing rates associated with leverage; d) other fund expenses; e) dividends paid by companies in the index; and f) period of time (page 18).

197.     The foregoing paragraph goes on to state:

> As discussed in the Prospectus, each of the Funds are "leveraged" funds in the sense that each has an investment objective to match a multiple of the performance of an index on a given day.  These ProFunds are subject to all of the correlation risks described in the Prospectus.  In addition, there is a special form of correlation risk that derives from these ProFunds' use of leverage, which is that for periods greater than one day, the use of leverage tends to cause the performance of a ProFund to be either greater than, or less than, the index performance times the stated multiple in the fund objective.

SAI of September 28, 2007 Amendment No. 6 to Registration Statement, p. 18.

198.     In addition, Defendants' following statements were further misleading for all the reasons previously alleged previously herein and alleged below.

**1.     Correlation Risk**

199.     One evolving series of statements that Defendants made concerned correlation risks – the risk that an ETF held for a year would not exactly equal the appropriate result in relation to the ETF.  Originally, Defendants stated:

> Over time, the cumulative percentage increase or decrease in the net asset value of the Fund may diverge significantly from the cumulative percentage increase or decrease in the multiple of the return of the underlying Index due to the compounding effect of losses and gains on the returns of the Fund. Consequently, for periods greater than one day, investors should not expect the return of the Fund to be twice the return of the underlying Index. **In addition, in trendless or flat markets it is expected that the Fund will underperform its benchmark Index.**

[Emphasis supplied] *E.g*., Prospectuses in Amendment Nos. 1 through 5 to the Registration

Statement, as filed with the SEC on August 30, 2006, December 29, 2006, February 13, 2007,

June 15, 2007 and July 10, 2007, pp. 6-7.

      200.      ProShares described the correlation risk for each of their products in the

prospectuses in the June 22, 2006 Registration Statement and Amendment Nos. 1 through 5 to

the Registration Statement as follows:

> **Principal Risk Considerations**
> The **[Fund]** is subject to the following principal risks:
>
> **Correlation Risk** A number of factors may affect the **[Fund's]** ability to achieve a high correlation with its benchmark and there can be no guarantee that the Fund will achieve a high degree of correlation. . . .

*E.g.*, Prospectus in June 22, 2006 Registration Statement, p. 6.

      201.      ProShares included a subsection on correlation risk in the Prospectus in

June 22, 2006 Registration Statement titled "More on Risks" as follows:

> **Correlation Risk** (*All Funds*) A number of factors may affect a Fund's ability to achieve a high degree of correlation with its benchmark, and there can be no guarantee that a Fund will achieve a high degree of correlation. A failure to achieve a high degree of correlation may prevent a Fund from achieving its investment objective. The following factors, including fees, expenses, transaction costs, costs associated with the use of leveraged investment techniques, may adversely affect the a Fund's correlation with its benchmark and a Fund's ability to meet its daily investment objective: 1) use of sampling techniques; 2) investment in securities or financial instruments not included in its Underlying Index; 3) large movements of assets; 4) the receipt of transaction information after the relevant exchange or market closes, potentially resulting in over- or under-exposure to the benchmark; 5) the early close or trading halt on an exchange or market; 6) a restriction on security transactions, which may result in the inability to buy or sell certain securities or financial instruments; or 7) a Fund may not have investment exposure to all securities in its underlying benchmark index, or its weighting of investment exposure to such stocks or industries may be different from that of the Underlying Index. In such circumstances, a Fund may be unable to rebalance its portfolio, accurately price its investments and may incur substantial trading losses.

*E.g.*, *id.*, p. 6.

      202.      Then Defendants stated:

> Ultra ProShares are designed to correspond to a multiple of the daily performance of an underlying index. The Short ProShares are designed to correspond to the inverse of the daily performance or twice (200%) the inverse of the daily performance of an underlying index. The Funds do not seek to achieve their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results.

*E.g*., Prospectuses in Amendment Nos. 6 through 9 to Registration Statement, as filed with the SEC on September 28, 2007, December 7, 2007, February 28, 2008 and June 10, 2008, pp. 5-6.

203. In the prospectus of each of ProShares' Amendment Nos. 6 through 9 to the Registration Statement, as filed with the SEC on September 28, 2007, December 7, 2007, February 28, 2008, and June 10, 2008, respectively, ProShares included a new general section titled "**Overview of Investment Objectives, Principal Investment Strategies and Risks.**" Prospectus in Amendment Nos. 6, 7, 8 and 9 to Registration Statement, filed with the SEC on September 28, 2007 (pp. 5-17), December 7, 2007 (pp. 5-9), February 28, 2008 (pp. 5-16), and June 10, 2008 (pp. 6-14), respectively.

204. The new general disclosure section was followed by disclosures for each product (grouped by type of product, for example, Ultra MarketCap, Ultra Style, Ultra Sector, Short MarketCap, Short Style, Short Sector and Short International) and other general disclosure sections.

205. The new general section titled "**Overview of Investment Objectives, Principal Investment Strategies and Risks**" contained a subsection titled "**Principal Risks**". Therein, a paragraph titled "**Correlation Risk** *(All Funds)*" reflected an explanation on the correlation of movement between underlying index and the leveraged ETFs.  September 28, 2007 Amendment No. 6 to Registration Statement, p. 8.   The Prospectus to Amendment No. 6 to the Registration Statement states that "there is a special form of correlation risk that derives from these Funds' use of leverage, which is that for periods greater than one day, the use of leverage

tends to cause the performance of a Fund to be either greater than or less than the index performance times the stated multiple in the fund objective, before accounting for fees and fund expenses. . . ." *Id.*

206.     The foregoing statement is accompanied by graphs showing three types of underlying index market movement:  1) Flat (trendless) market one year simulation, 2) upward trending market one year simulation, and 3) downward trending market one year simulation.  *Id.*, p. 9. *See ¶¶*20-30 *supra*

207.     The graphs in Amendment Nos. 6, 8, 9 and 10 to the Registration Statement, filed with the SEC on September 28, 2007, February 28, 2008, June 10, 2008 and September 29, 2008, respectively, showed that for a flat market, the index performance over one year period was 0% while the 200% leveraged fund performance was (-2.2%); in the upward trending market, the index return was 15% while the 200% leveraged fund return was 29.3%; lastly, in the downward trending market, the index return was (-15%) while the 200% leveraged fund return was (-29.4%).

208.     The graphs in Amendment No. 11 to the Registration Statement, filed with the SEC on November 21, 2008, showed that for a flat market, the index performance over one year period was 0% while the 300% leveraged fund performance was (-6.5%); in the upward trending market, the index return was 15% while the 300% leveraged fund return was 42.2%; lastly, in the downward trending market, the index return was (-15%) while the 300% leveraged fund return was (-42.6%).

209.     The graphs in Amendment No. 12 to the Registration Statement, filed with the SEC on December 5, 2008, showed that for a flat market, the index performance over one year period was 0% while the 200% leveraged fund performance was (-2.2%); in the upward

trending market, the index return was 15% while the 200% leveraged fund return was 29.3%; lastly, in the downward trending market, the index return was (-15%) while the 200% leveraged fund return was (-29.4%).

210.    The foregoing graphs are small, the lines on the graph are thick, and the graphing is difficult to follow.  But the accompanying textual disclosure is, if anything, even worse.  It states and implies that it is innocuous to hold an ETF for one year because there will be less than perfect correlation but not any substantial deviation in any up-trending or down-trending market. *See ¶¶20-30 supra.*

211.     (a) Indeed, Defendants' foregoing risk disclosures stated or showed that, in conditions in which the underlying index was moving in an upward trend or downward trend, the correlation risk was relatively low over a period of one year.

(b) If the underlying index was "flat" over the year, then the percentage of simulated correlation risk could be somewhat greater.  But such risk disclosures lulled the investor by also stating that many indices or benchmarks had higher historical volatility than the volatility in the risk disclosure simulation.  This implied that these indices would be somewhat less likely to experience a "flat" market in a period of one year duration, i.e., would be less likely to underperform.

212.    The graphs even misleadingly implied that if a fund was held for a longer period of time, the results would be better.  Until 2010, Defendants chose misleadingly not to include in the Risk Disclosure section, any graphs of the results of the ETFs most vulnerable to the undisclosed extraordinary risks of Defendants' undisclosed formula, that is, the ProShares Ultra Short funds.

213.     Defendants did not define a "flat" or "trendless" market until June 23, 2009 when Defendants state in respect of the "One-Year Simulation:  Index Flat (0%) [--] (Annualized Index Volatility 25%" graph: "This graph shows a scenario where the index is flat or trendless over the year (i.e., begins and ends the year at 0%), but the UltraPro and UltraPro Short ProShares are down."  Prospectus in Amendment No. 14 to the Registration Statement, filed with the SEC on June 23, 2009, p. 10.

214.     Further, nowhere did Defendants explain what determines the portrayed relatively small **amounts** of imperfection or decay in correlation.  For example, investors were never warned that, in conditions of substantial volatility, achieving a high degree of correlation would not even be a possibility.

215.     Moreover, Defendants never supplied sufficient information to make their correlation risk discussions meaningful to investors.  For example, in the specific disclosures regarding the leveraged long Ultra Basic Materials ProShares fund ("UYM"), Defendants state under "Principal Risk Considerations – Correlation Risk" that: "[a] number of factors may affect the Ultra Basic Materials ProShares' ability to achieve a high correlation with its benchmark and there can be no guarantee that the Fund will achieve a high degree of correlation."  *Id.* at p. 12.

216.     Buried in the SAI, ProShares repeated the following statement.  There was a risk of loss on an investment in the Ultra Short ETF if it was held for a period of one year and the price of the underlying index was trendless or flat over such one year period.  SAI to Amendment No. 6 to Registration Statement, filed September 28, 2007, p. 18-20.

217.     This disclosure says nothing about holding periods of less than a year, e.g., two months or six months.  Most important, this statement was as alleged throughout this Complain, misleading for another reason: in certain markets in which there was a substantial

uptrend or substantial downtrend, the UltraShort ETF could not just underperform; it could also move very substantially in the opposite direction.

218.     Defendants did not tell the investor how to use their matrix in the Statement of Additional Information (or, in the ProShares Trust II, the Prospectus) to extrapolate or interpolate the effect of volatility on shorter or longer holding periods than one year.

219.     Defendants misleadingly failed to disclose in such matrix the dangerous levels of volatility in excess of 40%.

220.     This extremely misleading conduct continued after volatilities between .5 and .99 became steadily more common from July 2008 forward.

**2.     Volatility, Leverage, Mathematical Formula and Compounding**

221.     Defendants also used an evolving series of other qualitative disclosures with undefined terms regarding volatility, language, a mathematical formula and compounding.

222.     First, the cumulative impacts of these and all other risks on the degree of correlation were apparently all baked into and were not additional to the quantified correlation risks simulated in the graphs in the Risk Disclosure section of the Prospectus.  *See supra*.  In this context, all the following qualitative disclosures further and misleadingly encouraged investors to hold leveraged ETFs for periods of one year or more.

223.     In each of the prospectuses of ProShares' Registration Statement, as filed with the SEC on June 22, 2006, and Amendment Nos. 1 through 5 to the Registration Statement, as filed on August 30, 2006, December 29, 2006, February 13, 2007, June 15, 2007 and July 10, 2007, respectively, Defendants stated as to each product in pertinent part as follows:

**Principal Risk Considerations**
The **[Fund(s)]**  is subject to the following principal risks:  . . .

> **Volatility Risk — [Fund]** seeks to achieve a multiple of an index and therefore will experience greater volatility than the index underlying its benchmark and consequently has the potential for greater losses.

*E.g.*, prospectus in Registration Statement, as filed with the SEC on June 22, 2006, p. 7.

224.     The prospectus section titled "More on Risks" contained a two-sentence rephrasing of the foregoing "Principal Risk Considerations" statement regarding volatility risk. *E.g.*, prospectus in the Registration Statement, as filed with the SEC on June 22, 2006, p. 38 ("**Volatility Risk** (*UltraProShares and UltraShort ProShares*) The Funds subject to volatility risk seek to achieve daily returns equal to multiple of an index. Therefore, they experience greater volatility than the indexes underlying their benchmarks and thus have the potential for greater losses.").

225.     The prospectuses in the June 26, 2006 Registration Statement and Amendments thereto through July 10, 2007 do not contain disclosures on day-to-day volatility of the underlying benchmark or index.  They only discuss the impact of other factors on volatility. *E.g.*, prospectus in the Registration Statement, filed June 22, 2006, pp. 16, 37 ("short sales can increase volatility";  "equity markets are volatile . . . [and t]his volatility may cause the value of an investment in a Fund to decrease.").

226.     Under "Principal Risk Considerations – Volatility Risk" for that same Fund, Defendants did not warn potential investors about the real and potentially catastrophic risk of volatility in the underlying index being tracked and instead emphasize as the sole important volatility risk the obvious fact that: "Ultra Basic Materials ProShares seeks to achieve a multiple of an index and therefore will experience greater volatility than the index underlying its benchmark and consequently has the potential for greater losses." *Id.* at p. 13.

227.     Under "Principal Risk Considerations – Volatility Risk" for that same Fund, Defendants say nothing about the inherent, and potentially catastrophic risks of the day to day volatility in the underlying index or benchmark.  Defendants instead emphasize as the sole important volatility risk the fact that: "UltraShort Financials ProShares seeks to achieve a multiple of an index and therefore will experience greater volatility than the index underlying its benchmark and consequently has the potential for greater losses."  *Id.* at p. 66.

228.     The SAI in the June 22, 2006 Registration Statement and Amendments thereto through July 10, 2007 consisted of, among others, disclosure sections titled "Investment Policies, Techniques and Related Risks" and Special Considerations".  *E.g.*, SAI in Registration Statement, as filed with the SEC on June 22, 2006, pp. 4, 14.   The prospectuses and the SAIs in the June 22, 2006 Registration Statement and Amendments thereto through July 10, 2007 do not contain any tabular or graphical examples of volatility risk.

229.     The SAI in the June 22, 2006 Registration Statement and Amendments thereto through July 10, 2007 contained one sentence on volatility risk within the "Special Considerations" section on leverage:

> **Special Considerations**
> To the extent discussed above and in the prospectus, the Funds present certain risks, some of which are further described below. . . .
> **Leverage**
> . . . Leverage should cause higher volatility of the net asset values of these Funds' Shares. . . .

*E.g.*, SAI in Registration Statement, as filed with the SEC on June 22, 2006, pp. 14-15.

230.     All the foregoing statements were untrue for the reasons previously alleged.

231.    Further, for all the foregoing reasons, Defendants' Registration Statements and Amendments thereto filed with the SEC contained statements that were untrue or misleading statements, including:

a.    the statements contained in the "correlation risks" section Amend. No. 1 to the Registration Statement, filed August 30, 2006 [Ultralong, Ultrashort, Short], p. 308; Amend. No. 2 to the Registration Statement, filed December 29, 2006 [Ultralong, Ultrashort, Short], p. 317; Amend. No. 3 to the Registration Statement, filed February 13, 2007 [Ultralong, Ultrashort], p. 48; Amend. No. 4 to the Registration Statement, filed June 15, 2007 [Ultralong, Ultrashort, Short], pp. 120-121; Amend. No. 5 to the Registration Statement, filed July 10, 2007 [Ultralong, Ultrashort, Short], p. 70; Amend. No. 6 to the Registration Statement, filed September 29, 2007 [Ultralong, Short, Ultrashort], pp. 8-9; Amend. No. 8 to the Registration Statement, filed February 28, 2008 [Ultralong, Short, Ultrashort], pp. 8-9; Amend. No. 10 to the Registration Statement, filed September 29, 2008 [Ultralong, Short, Ultrashort], pp. 9-10; Amend. No. 11 to the Registration Statement, filed November 21, 2008 [Mega Proshares, MegaShort Proshares], pp. 9-10; Amend. No. 12 to the Registration Statement, filed December 5, 2008 [Ultralong, UltraShort], pp. 9-10; Amend. No. 13 to the Registration Statement, filed June 2, 2009 [Ultralong, Ultrashort], pp. 9-10; Amend. No. 14 to  the Registration Statement, filed June 23, 2009 [Ultralong, Ultrashort], pp. 9-10.

b.    the statements contained in the "Volatility Risk" section of the Amend. No. 1 to the Registration Statement, filed August 30, 2006 [Ultralong, Ultrashort], p. 310; Amend. No. 2 to the Registration Statement, filed December 29, 2006 [Ultralong, Ultrashort], p. 319; Amend. No. 3 to the Registration Statement, filed February 13, 2007 [Ultralong, Ultrashort], p. 50; Amend. No. 4 to the Registration Statement, filed June 15, 2007 [Ultralong,

Ultrashort], p. 122; Amend. No. 5 to the Registration Statement, filed July 10, 2007 [Ultralong, Ultrashort], p. 72;

        c.     the statements contained in the "leveraged risk" section of Amendment No. 1 to the Registration Statement, filed August 30, 2006 [Ultralong, Ultrashort], pp. 308-9; Amend. No. 2 to the Registration Statement, filed December 29, 2006 [Ultralong, Ultrashort], p. 318; Amend. No. 3 to the Registration Statement, filed February 13, 2007 [Ultralong, Ultrashort], p. 49; Amend. No. 4 to the Registration Statement, filed June 15, 2007 [Ultralong, Ultrashort], p. 121; Amend. No. 5 to the Registration Statement, filed July 10, 2007 [Short Proshares, UltraShort Proshares], p. 71; SAI in Amend. No. 6 to the Registration Statement, filed September 28, 2007 [Ultralong, Short, UltraShort], pp. 18-20; SAI in Amend. No. 8 to the Registration Statement, filed February 28, 2008 [Ultralong, Short, UltraShort], pp. 22-25; SAI in Amend. No. 10 to the Registration Statement, filed September 29, 2008 [Ultralong, Short, UltraShort], pp. 17-19; SAI in Amend. No. 11 to the Registration Statement, filed November 21, 2008 [Mega Proshares, MegaShort Proshares], pp. 18-20; SAI in Amend. No. 12 to the Registration Statement, filed December 5, 2008 [Ultralong, Ultrashort], pp. 18-21; SAI in Amend. No. 13 to the Registration Statement, filed June 2, 2009 [Ultralong, Ultrashort], pp. 17-20; SAI in Amend. No. 14 to the Registration Statement, filed June 23, 2009 [Ultralong, Ultrashort], pp. 16-19.

        d.     the statements contained in the "Special Consideration" section of the SAI in Amendment No. 1 to the Registration Statement, filed August 30, 2006 [Ultralong, Ultrashort, Short], p. 16; SAI in Amend. No.  2 to the Registration Statement, filed December 29, 2006 [Ultralong, Ultrashort, Short], p. 16; SAI in Amend. No. 3 to the Registration Statement, filed February 13, 2007 [Ultralong, Ultrashort,], pp. 16-17; SAI in Amend. No. 4 to the Registration

Statement, filed June 15, 2007 [Ultralong, Ultrashort,], p. 16; SAI in Amend. No. 5 to the

Registration Statement, filed July 10, 2007 [Ultralong, Ultrashort, Short], pp. 15-16; SAI in

Amend. No. 6 to the Registration Statement, filed September 28, 2007 [Ultralong, Ultrashort,

Short], pp. 18-20; SAI in Amend. No. 8 to the Registration Statement, filed February 28, 2008

[Ultralong, Short, UltraShort], pp. 22-25; SAI in Amend. No. 10 to the Registration Statement,

filed September 29, 2008 [Ultralong, Short, UltraShort], pp. 16-19; SAI in Amend. No. 11 to the

Registration Statement, filed November 21, 2008 [Mega ProShares, MegaShort ProShares], p.

18; SAI in Amend. No. 12 to the Registration Statement, filed December 5, 2008 [Ultralong,

Ultrashort], p. 18; SAI in Amend. No. 13 to the Registration Statement, filed June 2, 2009

[Ultralong, Ultrashort], pp. 16-17; SAI in Amend. No. 14 to the Registration Statement, filed

June 23, 2009 [Ultralong, Ultrashort], pp. 15-16.

      232.     Generally, statements similar to all the foregoing were made in the

ProShares II Registration Statement and Amendments thereto reflected on Exhibit C.  Such

statements were misleading for the reasons previously alleged.

     **K.**    **The Undisclosed Risks Hit The Radar**

      233.     However, on June 11, 2009, FINRA issued Regulatory Notice 09-31, in

which FINRA "remind[ed] firms of their sales practice obligations in connection with leveraged

and inverse ETFs." In particular, FINRA admonished that sales materials related to leveraged

and inverse ETFs "must be fair and accurate." FINRA further cautioned:

    Suitability
    NASD Rule 2310 requires that, before recommending the purchase, sale or
exchange of a security, a firm must have a reasonable basis for believing that the
transaction is suitable for the customer to whom the recommendation is made. This
analysis has two components. The first is determining whether the product is suitable for
any customer, an analysis that requires firms and associated persons to fully understand
the products and transactions they recommend.
                         * * *

Communications With the Public

NASD Rule 2210 prohibits firms and registered representatives from making false, exaggerated, unwarranted or misleading statements or claims in communications with the public. Therefore, all sales materials and oral presentations used by firms regarding leveraged and inverse ETFs must present a fair and balanced picture of both the risks and benefits of the funds, and may not omit any material fact or qualification that would cause such a communication to be misleading.... (Emphasis supplied).

234.     FINRA spokesman Herb Perone has stated: "Exotic ETFs, such as inverse, leveraged and inverse-leveraged ETFs, are extremely complicated and confusing products, and the marketing and sale of these products to unsophisticated retail investors is very much on FINRA's radar screen." (Emphasis supplied).

235.     In a June 30, 2009, research report, Morgan Stanley advised that leveraged and leveraged inverse ETFs are "not appropriate for most investors…."  In that same research report, Morgan Stanley warned that "As a result of the daily 're-leveraging' or 'deleveraging,' leveraged and leveraged inverse ETFs are likely to significantly underperform point to point returns of their benchmark index in volatile-trendless markets."

236.     Even as these FINRA cautionary warnings were circulating in the marketplace, Defendants still staunchly maintained that their leveraged ETF products were safe and could effectively be held for long periods of time.  Thus, in a self-serving interview that occurred on July 2, 2009, Reuters reported that:

> Sapir also took issue with Finra's determination that the non-traditional ETFs are unsuitable for retail investors who hold them for long periods. "The empirical data is significantly inconsistent with that notion," he said. An internal ProFunds study of rolling periods over the past 50 years concluded that the impact of compounding during a 91-day span or less was virtually zero, and over half-year and full-year periods the impact was 0.7 percent or less.

237.     FINRA issued additional guidance on July 13, 2009 by way of a podcast on its website.  FINRA reiterated that most leveraged and inverse ETFs reset each day and are designed to achieve their stated objective on a daily basis - but with the effects of compounding

over a longer time frame, results differ significantly.  In spite of this admonishment, Defendant

Sapir maintained that ProShares' leveraged and inverse ETFs can be used "for more than a day

successfully."

238.    In reaction to FINRA's additional guidance, Defendant Sapir, in an article

that appeared in Investment News on the same day, stated:

> That [protecting investors] may be Finra's intent, but saying that leveraged and inverse ETFs are unsuitable for investors who plan to hold them longer than a day is false, said Michael Sapir, chairman and chief executive of ProShare, the largest provider of such ETFs.
>
> "You can use them for more than a day successfully," he said.
>
> The key is to monitor performance, and if a leveraged or inverse ETF deviates from its benchmark by more than is desired, "what you should do is buy or sell shares to bring it back in line," Mr. Sapir said.

239.    Defendants nowhere provided any guidance in any of their ProShares'

Registration Statements and Amendments thereto regarding how investors were to determine

when a performance deviation might be "more than desired," or how an investor was to "buy or

sell shares to bring it back in line."  Nor did Defendant Sapir say how to make such purchases.

By failing to provide proper disclosures of the risks of the day to day volatility of the underlying

index or benchmark and further failing to provide the mathematical and other tools necessary to

inform an investor on how to rebalance a skewed leveraged ETF holding, Defendants effectively

left investors who held their leveraged ETF products for more than a day clueless and

defenseless.

240.    A further article by Tom Lydon that appeared in etftrends.com on July 14,

2009 reported:

> Michael Sapir, chairman and chief executive of ProFunds, which offers the ProShares ETFs, told Herbert Lash for Reuters that he's supportive of FINRA's notice, except for their belief that they are one-day only investments. ProFunds

feels this is an inaccurate perception of these ETFs.

As Defendant Sapir also commented in an Investors Business Daily interview in May 2010 when asked what were the appropriate and responsible ways to trade Defendants' leveraged ETF products:
Sapir: Geared ETFs are often used for relatively short-term periods \ to express a view on a segment of the market or to help manage risk.  Investors can use them for longer periods, but those who do should be aware of the effect compounding should have.

241.     On July 15, 2009, Massachusetts' Secretary of State William Galvin announced that Massachusetts had begun a probe into the sales practices of ProShares, among other firms heavily involved in structuring leveraged ETFs.  Galvin stated: "[s]ince 2006 these products have become increasingly popular. Yet, due to the daily nature of the leverage employed, there is no guarantee of amplified annual returns and they generally incur greater transaction costs than traditional exchange traded funds."

242.     On July 21, 2009, as reported by the Wall Street Journal in an article entitled "Getting Personal, Edward Jones Drops ETFs," Edward Jones & Co. ("Edward Jones") halted the sale of its non-traditional, leveraged ETFs, such as the SRS Fund.  Edward Jones called ETFs like the SRS Fund "one of the most misunderstood and potentially dangerous types of ETFs." (Emphasis supplied).

243.     On July 27, 2009, in a letter to wealth management clients, as reported by the Wall Street Journal in an article entitled "Strange Traded Funds," UBS said it would not trade ETFs that use leverage or sell an underlying asset short.  Similarly, on the heels of the FINRA Notice, Ameriprise Financial and LPL Investment Holdings Inc. also prohibited sales of leveraged ETFs that sought more than twice the long or short performance of their target index. Wells Fargo also reportedly reviewed its policy on non-traditional ETFs.

244.     On July 30, 2009, *The Wall Street Journal* published an article entitled "Warning Signs Up For Leveraged ETFs," in which it was reported that Morgan Stanley Smith Barney is reviewing how it sells leveraged ETFs. The article also observed that Charles Schwab ("Schwab") issued an unusual warning on July 28 to clients who buy non-traditional ETFs. Schwab offered a strongly worded warning on its website noting that "while there may be limited occasions where a leveraged or inverse ETF may be useful for some types of investors, it is extremely important to understand that, for holding periods longer than a day, these funds may not give you the returns you may be expecting.... Proceed with extreme caution." (Emphasis supplied). The disclosures in the Registration Statements and Amendments thereto simply do not rise to this "[p]roceed with extreme caution" level of clarity.

245.     After Defendants' disclosures had materially changed, investors were advised to read the disclosures.

246.     On August 1, 2009, Reuters reported that Massachusetts subpoenaed four major financial institutions seeking details as to how leveraged ETFs are marketed and sold.

247.     On August 1, 2009, *The Wall Street Journal* quoted Morningstar's director of ETF analysis, Scott Burns, who pointedly observed: "Hedges [like the SRS Fund] aren't supposed to become less trustworthy when you really need them." (Emphasis supplied).

248.     On August 25, 2009, in an article entitled "Spotlight shines on leveraged, inverse ETFs," SNL Financial reported that Merrill Lynch has restricted the sale of leveraged and inverse ETFs to unsolicited orders in brokerage accounts and, in early August 2009, banned them completely in advisory accounts.

## L.     Underperformance Bias

249.   The undisclosed "must lose" conditions, the absence of any "must gain" conditions, and the vulnerability to high volatility, all dictated that Defendants ETFs had a bias to underperform the index in time periods, involving, in part, high volatility.

250.   The partially disclosed other characteristics of Defendants ETFs made it likely that Defendants would underperform in other markets as well.  On the contrary, in the best conditions for an investor in Defendants' ETFs, where index volatility was lower than index performance, an investor would still:

> (a) suffer losses from any adverse movement in the underlying index;

> (b) suffer losses if the underlying index "broke even" or even moved slightly in the investor's favor; and

> (c) reap gains from a significant favorable movement in the underlying index.

251.   The two "must lose" conditions alleged above and the three "must lose" conditions alleged in the Summary of Allegations, show that five out of the six possible market conditions following an investment in Defendants' ETFs were "must lose" conditions.

252.   The "five out of six outcomes must lose" aspect of an individual investor's investment in Defendants' ETFs, as alleged in ¶8 above, is **before** other deductions.  That is, it is **before** the effects of transaction costs, fees, actual transaction prices in a bid-ask market, commissions, interest and (where applicable) dividends.

253.   In addition, the word compounding denotes that, without any further cost or action, accretions in the period subject to the compounding will, along with the original principal, be subject to accretions in the next period.  BLACK'S LAW DICTIONARY (8th ed. 2004), p. 230 (compound interest is "interest paid on both the principal and the previously accumulated

interest"); Investopedia[4] (compound interest is "interest that accrues on the initial principal and the accumulated interest of a principal deposit, loan or debt. Compounding of interest allows a principal amount to grow at a faster rate than simple interest, which is calculated as a percentage of only the principal amount.").

254.   Thus, compound interest means that, passively and without further conduct or transaction costs, the interest on the principal earns interest.  For passively doing nothing, one receives incremental accretions on the accretions from one's money.

255.   However, compounding, as used by the Defendants, was not passive or cost free nor did it involve merely accretions receiving additional accretions.

256.   Instead, Defendants' use of the word "compounding" was code speak for actively spending more money to buy high (or buy higher than yesterday), actively receiving money in order to sell low (or lower than yesterday), and actively incurring transaction costs even in markets in which the transaction costs could have a material adverse impact on performance.

257.   To the extent that yesterday's price is correlated to today's price, compounding, as used by Defendants, was a code for intentionally acting to buy high and intentionally acting to sell low.  *See* Samuelson, Paul A., *Proof That Properly Anticipated Prices Fluctuate Randomly*, 6 Industrial Management Review 2, (Spring 1965) (yesterday's price is the best prediction of today's price).  This implanted a tilt that mandated that each ETF act affirmatively to buy high and sell low compared to yesterday's prices, and continue to do so notwithstanding daily transaction costs.

---

[4] Available at:  http://www.investopedia.com/terms/c/compoundinterest.asp

258.    Finally, in Defendants' undisclosed mathematical formula, the "power" of leverage worked in opposition to, against, and could overcome the effect of compounding.

259.    When all the foregoing aspects of investing in Defendants' ETFs for an extended period of time, particularly one encompassing a period in which index volatility significantly exceeded index performance, are considered, Defendants' ETFs were more likely to underperform.

260.    Thus, for example, purchasing stocks in standard margin accounts, substantially outperforms Defendants' ETFs.  *The Cost of Investing in Leveraged and Inverse ETFs*, Ilan Guej, Ph.D., Guoha Li, Ph.D. and Craig McCann, Ph.D., pp. 6-9 (2010).

## M.    Other Misleading Statements

261.    Plaintiffs and members of the Class have purchased three types of defective products from Defendants: ProShares Ultra ETFs, ProShares UltraShort ETFs and ProShares Short ETFs.  All of the allegations in the Complaint regarding misrepresentations and omissions relate to the inherent characteristics of those defective products, and not to the specific nature of any of the underlying indices, commodities or other securities that such ETFs are tracking.  Thus, for example, the purchaser of an UltraShort ETF has standing to represent the purchaser of any other UltraShort ETF, because all of the allegations of wrongdoing in the Complaint concern the inherent characteristics of the defective UltraShort ETFs and how they perform in various market conditions, and if the risks connected with those performance results were properly disclosed. To find otherwise would be the equivalent of distinguishing standing in a case involving defective automobile engines based upon the roads on which the cars containing the engines had been driven.

262.    Defendants' repeated ambiguous statements that its Ultra and UltraShort Funds seek daily investment results is vague and misleading because it does not make clear that no matter what happens, purchasers must purchase and sell their entire position at the end of the day or risk serious losses. The Registration Statements and prospectuses identified in Exhibits B and C purposefully obfuscated the true nature of the risks involved in investing in the defective ProShares ETF products, either by using hyper-technical language or language so equivocal that a reasonable investor would not be able to attach the appropriate importance to what was being read.  Defendants deliberately and wrongfully failed to convey to potential investors, in language capable of understanding, that the ProShares Funds were at best one-day trades, not investments at all, and that purchasers needed to purchase and sell their entire positions on the same day, or suffer a substantial and often certain risk of loss that accompanied holding ProShares fund shares for longer than one day.

263.    Throughout the Class Period and after, Defendants misleadingly failed to disclose critical material facts concerning the inherent risks of loss of their defective ETF products.  In fact, among other things, Defendants failed to disclose to investors that the Funds named in Exhibit D were not appropriate for reasonable investors who intended to hold positions in these Funds beyond a single trading session.  Defendants failed to adequately and meaningfully disclose the extent and magnitude of the risks of loss to investors who purchased shares in the ProShares Funds named in Exhibit D and who did not sell all of their shares during the same trading session in which they were purchased.

264.    Defendants misleadingly failed to disclose that the ProShares Funds named in Exhibit D were not to be used by, purchased by and are not appropriate for, investors who intend to hold positions for more than one day.

265.      ProShares's Annual Report filed on August 8, 2008 misleadingly omitted to disclose to the reasonable investor that investment in ProShares's ETFs shall be made only for one day and the other factors previously alleged at ¶¶48-52 concerning the risks inherent in the performance of such ETFs.

### N.      **Historical Volatility**

266.      The forward-looking statement doctrine applies only to forward-looking statements and does not apply to misstatements or omissions concerning historical or current facts or inherent conditions or risks.  Disclosure practice and the federal securities laws provide "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty the Grand Canyon lies one foot away."

267.      High annualized volatility conditions of above 40% on a daily basis occurred at least 1,820 times (based upon the previous month) and at least 1,782 times (based upon the previous quarter) within the last forty years in the gold, silver and oil markets and the DJIA and S&P averages alone.  They have occurred as far back in financial history as there are time and price data records available.

268.      Thus, applying Defendants' mathematical formula for the Ultra, UltraShort and Short ETFs to readily available historical data, shows the following three types of ETFs would have historically suffered hundreds of "must lose" and "opposite movement" instances for oil, silver, gold and the Dow Jones Industrial Average in the years before the Class Period.

### O.  **Information Required To Be Disclosed in The Prospectus Could Not By Satisfied By Incorporation By Reference**

269.      Open-end investment companies must satisfy the registration requirements of the Securities Act of 1933 in order to sell securities to the public.  An open-end investment

company satisfies the registration requirements of the acts by filing Form N-1A.  17 CFR §

270.8b-16; 15 U.S.C. § 77j(a)(3).

270.     Rule 130 of the 1933 Act defines the term "rules and regulations,"  as used

in Sections 7, 10, and 19 of the 1933 Act, to include the forms used in the registration of

securities and the instructions to those forms.

271.     Form N-1A is divided into Part A (Prospectus); Part B (Statement of

Additional Information); and Part C (Other Information Required in a Fund's Registration

Statement).  The registrant is required to provided the following information in each part:

(a) *Part A*. Part A includes the information required in a Fund's prospectus under section 10(a) of the Securities Act. **The purpose of the prospectus is to provide essential information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described in the prospectus**. In responding to the Items in Part A, avoid cross-references to the SAI or shareholder reports. Cross-references within the prospectus are most useful when their use assists investors in understanding the information presented and does not add complexity to the prospectus.

(b) *Part B*. Part B includes the information required in a Fund's SAI. **The purpose of the SAI is to provide additional information about the Fund that the Commission has concluded is not necessary or appropriate in the public interest or for the protection of investors to be in the prospectus, but that some investors may find useful**. Part B affords the Fund an opportunity to expand discussions of the matters described in the prospectus by including additional information that the Fund believes may be of interest to some investors. The Fund should not duplicate in the SAI information that is provided in the prospectus, unless necessary to make the SAI comprehensible as a document independent of the prospectus.

*(c) Part C*. Part C includes other information required in a Fund's registration statement.

*See* Form N-1A, General Instructions, p. 7 (emphasis supplied).

272.     The Statement of Additional Information is incorporated by reference into

the Prospectus; and amendments to Form N-1A require that a fund provide information or

disclosure in its SAI.

273.     Rule 8b-32 of the 1940 Act allows an investment company to incorporate by reference, as an exhibit, any document filed with the SEC under any Act administered by the SEC.  *See* Investment Company Act Release No. 13436 (Aug. 12, 1983) (adopting Form N-1A), at 12 ("[i]f a mutual fund incorporates the Statement of Additional Information by reference, the Statement would be a part of the prospectus as a matter of law.").

274.     The instructions to Form N-1A provide additional specific rules with respect to incorporation by reference into Form N-1A.  For example:

(a) A Fund may not incorporate by reference into a prospectus information that Part A of this Form requires to be included in a prospectus, except as specifically permitted by Part A of the Form. (b) A Fund may incorporate by reference any or all of the SAI into the prospectus (**but not to provide any information required by Part A to be included in the prospectus**) without delivering the SAI with the prospectus. (c) A Fund may incorporate by reference into the SAI or its response to Part C, information that Parts B and C require to be included in the Fund's registration statement.  Form N-1A, p. 9 (emphasis supplied).

(d) Incorporation by Reference. . . . . Except where a registrant or issuer is expressly required to incorporate a document or documents by reference . . . , **reference may not be made to any document which incorporates another document by reference if the pertinent portion of the document containing the information or financial statements to be incorporated by reference includes an incorporation by reference to another document**. . . .  17 CFR 229.10(d).

(a) Prospectus. Except as provided by this section, Item 1100(c) of Regulation AB (Sec.  229.1100(c) of this chapter) for registered offerings of asset-backed securities, or unless otherwise provided in the appropriate form, **information shall not be incorporated by reference in a prospectus**. . . .
 (d) General. Any incorporation by reference of information pursuant to this section shall be subject to the provisions of Rule 24 of the Commission's Rules of Practice restricting incorporation by reference of documents which incorporate by reference other information. Information incorporated by reference shall be clearly identified in the reference by page, paragraph, Caption or otherwise. If the information is incorporated by reference to a previously filed document, the file number of such document shall be included. Where only certain pages of a document are incorporated by reference and filed with the statement, the document from which the information is taken shall be clearly identified in the reference. An express statement that the specified matter is incorporated by reference shall be made at the particular place in the registration statement where

the information is required. **Information shall not be incorporated by reference in any case where such incorporation would render the statement incomplete, unclear or confusing**. 17 CFR 230.411 (emphasis supplied).

. . . (b) If a filer incorporates by reference into an electronic filing any portion of an annual or quarterly report to security holders, it must also file the portion of the annual or quarterly report to security holders in electronic format as an exhibit to the filing, as required by Regulation S-K Item 601(b)(13) (Sec. 229.601(b)(13) of this chapter) and Regulation D-B Item 601(b)(13) (Sec. 228.601(b)(13) of this chapter). If a foreign private issuer incorporates by reference into an electronic filing any portion of an annual or other report to security holders, or of a Form 6-K report (Sec. 249.306 of this chapter) filed or submitted in paper, it also must file the incorporated portion in electronic format as an exhibit to the filing. **The requirements of this paragraph do not apply to incorporation by reference by an investment company from an annual or quarterly report to security holders**. 17 CFR 232.303.

(c) **In each case of incorporation by reference, the matter incorporated shall be clearly identified in the reference. An express statement shall be made to the effect that the specified matter is incorporated in the registration statement, application or report at the particular place where the information is required**. 17 CFR 270.04 (emphasis supplied).

275.     However, the overriding principle with respect to incorporation by reference is as follows:

Information shall not be incorporated by reference in any case where such incorporation would render the statement incomplete, unclear or confusing.

17 CFR 230.411 (emphasis supplied).

## VI.     THE INDIVIDUAL PLAINTIFFS

276.     On or about January 2007, ProShares registered the SRS Fund as an ETF.

277.     According to the SRS Fund's Registration Statement, Defendant ProShares represented that the SRS Fund would invest in securities intended to produce 200% of the *inverse* rate of return of the Dow Jones U.S. Real Estate Index (the "DJUSREI").  In other

words, investors in the SRS Fund were told that they would make a profit if the Index *fell*, not if it rose.

278.     In early 2008, the Schnalls acquired the SRS shares and reasonably anticipated earning a profit in the event the DJUSREI fell.

279.     The DJUSREI declined by 50% in 2008, and continued to decline in 2009.

280.     However, instead of *increasing* in value as the DJUSREI declined, the value of the SRS shares *also declined.*  More specifically, while the DJUSREI *fell*, the SRS Fund also *fell* over the same period, contrary to Defendant ProShares' disclosures in the Registration Statement, and the SRS shares declined dramatically in value.

281.     In other words, the SRS Fund performed in a manner that was *precisely the opposite* of Defendant ProShares' disclosures.

282.     The Registration Statement did not disclose that the SRS Fund would not meet the investment objective of purchasers, like the Schnalls, who anticipated an increase in value as the DJUSREI fell.

283.     The Registration Statement contained material misrepresentations and omissions regarding the SRS ETF.  More specifically, the disclosures in the Registration Statement were false and misleading because, *inter alia*, they failed to disclose:

> A)     The inverse correlation between the SRS Fund and the DJUSREI over time would only happen in the rarest of circumstances, and inadvertently if at all;

> B)     The extent to which performance of the SRS Fund would inevitably diverge from the performance of the DJUSREI -- i.e., the probability, if not certainty, of spectacular tracking error;

> C)     The SRS Fund offers a seemingly straightforward way to obtain desired exposure, but such exposure is not attainable through the SRS Fund.

284.     Perhaps most importantly, Defendant ProShares failed to disclose that mathematical compounding actually ***prevents*** the SRS Fund from achieving its stated investment objective over a period of time greater than one day.

285.     Rather, the Registration Statement discloses that there may be a slight "correlation risk."  In other words, the Registration Statement discloses that the return of the index over a period of time greater than one day multiplied by a fund's multiple or inverse multiple "may" or "will not generally" equal a fund's performance over that same period. The charts included in the Registration Statement to "illustrate this point" show only a point or two difference between the index's return and the fund's multiple return, thus making the point that the inverse relationship may not be perfect, but will be very close:



(Showing a **.7%** mis-correlation)



(Showing a **.6%** mis-correlation)

286.       Here, the SRS Fund had more than a slight mis-correlation -- instead of *increasing* in value as the DJUSREI declined, the value of the SRS Fund *also declined.*   A chart showing the SRS Fund's extreme mis-correlation is below:



287.       According to the Registration Statement, when the DJUSREI went down by 41.44%, the SRS Fund should have increased approximately 82.88% in value, with a slight chance of a point or two mis-correlation.  Instead, when the DJUSREI went down by 41.44%, the SRS Fund dropped 47.71% in value, equaling mis-correlation of over **130%.**

288.       The disclosures and illustrations in the Registration Statement, which explain there may be a slight mis-correlation between the return of the index and the fund's performance (.6%), are misleading.

289.       As a mutual fund, ETFs are unsuitable day trading vehicles and should not be used for that purpose.  Indeed, if literally limited to day trading, the SRS Fund would have zero assets at the end of each trading day, and Defendant ProShares would earn no

management fees -- an outcome clearly not anticipated, intended or disclosed by Defendant

ProShares.  Defendant ProShares knew that investors, including the Schnalls, did not view

ETFs as day trading investment vehicles and did not day trade the SRS Fund.

290.     In fact, the Registration Statement provides hypothetical examples of

fees that investors may encounter over *1-year, 3-year, 5-year, and 10- year periods – not one

day*.

## VII.   CLAIMS

### AS AND FOR A FIRST CLAIM
### (Violations of § 11 of the 1933 Act Against All Defendants)

291.     This Claim is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C.

§77k, on behalf of the Class, against all Defendants.

292.     Plaintiffs incorporate by reference all of the prior allegations as if set forth

herein. This Count is asserted against all Defendants.

293.     ProShares is the issuer of the shares sold via the Registration Statement.

The Individual Defendants are signatories or authorizers of the Registration Statement.

294.     ProShares is absolutely liable for the material misstatements in and

omissions from the Registration Statement.  The other Defendants owed purchasers of shares the

duty to make a reasonable investigation of the statements contained in the Registration Statement

to ensure that said statements were true and that there was no omission to state any material fact

required to be stated in order to make the statements contained therein not misleading.  These

Defendants knew or, in the exercise of reasonable care, should have known of the material

misstatements and omissions contained in the Registration Statement as set forth herein.  None

of these Defendants made a reasonable investigation or possessed reasonable grounds for the

belief that statements contained in the Registration Statement and Prospectus were true or that

there was not any omission of material fact necessary to make the statements made therein not misleading.

295.     As signatories or authorizers of the Registration Statement, directors, officers of the ProShares Funds or controlling persons of the issuers, Defendants owed the purchasers of the ProShares Funds' shares, including Plaintiffs and the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time that it became effective, to ensure that said statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew or, in the exercise of reasonable care, should have known of the material misstatements and omissions contained in the Registration Statement and Prospectus as set forth herein.   As such, Defendants are liable to Plaintiffs and the Class.

296.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.  As a direct and proximate result of Defendants' wrongful conduct, the market prices for each and every ProShares Funds' shares were materially different from the prices that Defendants purposefully misled Plaintiffs and the Class into believing they would be through the reliance of Plaintiffs and the Class upon the false and misleading Registration Statements and Prospectuses signed by Defendants and issued by them during the Class Period, and thereby causing Plaintiffs and the Class to suffer substantial damages in connection with the purchase of the ProShares Fund shares.  Plaintiffs and the Class all purchased ProShares Funds' shares issued pursuant and/or traceable to the Registration Statement.

297.     Each of the named Plaintiffs in the Second Amended Consolidated Class Action Complaint have made claims against Defendants arising out of the common conduct, transactions and occurrences set out in the Amended Consolidated Class Action Complaint and the original, pre-consolidated class action complaints filed in this action.  As a result, Plaintiffs' claim relate back to the initial class complaint involving Defendants' conduct in its SRS Fund as alleged in the first complaint filed in this matter on August 5, 2009.

298.     Each of the named Plaintiffs in the Second Amended Consolidated Class Action Complaint were adversely affected by the same common material misstatements and material omissions set forth in the Amended Consolidated Class Action Complaint and the original, pre-consolidated class action complaints and suffered the same injury caused by the same wrongful conduct during the Class Period.

299.     None of the Defendants who are named in this Second Amended Consolidated Class Action Complaint will be unduly prejudiced by the addition of new Plaintiffs.  Throughout the Class Period, Defendants made a continuous offering of three basic types of defective ETF products, varying only in respect to what benchmark a particular ETF would track, by making certain repeated misrepresentations and omissions in their offering documents.  Thus, each of the Defendants has been on notice of the claims set forth herein since the filing of the initial class action complaint in August 2009 and well prior to this Second Amended Consolidated Class Action Complaint.

300.     The claims against ProShares Trust II relate back at least as far as to the filing of the class action complaint on October 30, 2009 styled David Bowman v. ProShares, Civil Action No. 09-civ-9109, which involved the ProShares Trust II SCO Fund.  In drafting the Bowman complaint, plaintiff and putative class representative Bowman misapprehended the

specific identity of the ProShares Trust II and ProShare Capital Management, LLC, and instead

named as Defendants ProShares Trust and ProShare Advisors LLC.  Plaintiff Bowman also

named Michael L. Sapir (who was listed in the ProShares Trust II Registration Statement as

Chairman and Chief Executive Officer and Principal of the Sponsor of ProShares Trust II and

who also executed the ProShares Trust II Registration Statement dated October 28, 2007), Louis

Mayberg (Principal Executive Officer of ProShares Trust II), as well as ProShare Capital

Management, LLC, the sponsor, advisor and pool operator for ProShares ETF products.

Mayberg also executed the ProShares Trust II Registration Statements dated October 28, 2007,

November 17, 2008, January 22, 2009 and February 13, 2009.   Sapir was also the Chairman and

Chief Executive Officer of the Sponsor, ProShare Capital Management LLC and ProShare

Advisors LLC.   At all times material hereto, Defendants Sapir, Mayberg and Karpowicz

exercised control over all aspects of ProShares Trust II.

      301.    As a result of the direct control exercised by Defendants Sapir, Mayberg

and Karpowicz over ProShares Trust II, each of the Defendants named herein, including

ProShares Trust II and Edward Karpowicz, Principal Financial Officer of ProShares Trust II,

have been on notice of the claims set forth herein since the filing of the initial Bowman

complaint and at all times prior to the filing of this Second Amended Consolidated Class Action

Complaint.   Additionally, but for Plaintiff Bowman's mistake, he would have named ProShares

Trust II, as well as Edward Karpowicz, in his original complaint.  The failure to name these

Defendants was clearly a mistake and certainly not a strategic decision by Plaintiff Bowman.

Plaintiffs, including  Plaintiff Bowman, corrected the mistake as to the ProShares Trust II by

naming ProShares Trust II and Edward Karpowicz in the Amended Consolidated Class Action

Complaint.

302.     Each of the named Plaintiffs in the Second Amended Consolidated Class Action Complaint, with respect to ProShares Trust II, were adversely affected by the same common material misstatements and material omissions set forth in the Amended Consolidated Class Action Complaint and the pre-consolidated class action complaints and suffered the same injury relating to the defective Ultra and UltraShort Funds issued by ProShares Trust II during the Class Period.

303.     Defendants ProShare Trust II and Edward Karpowicz, who are named in the Amended Consolidated Class Action Complaint and in this Second Amended Consolidated Class Action Complaint, cannot be unduly prejudiced by the addition of additional Plaintiffs and Funds arising out of ProShares Trust II.  Defendants made a continuous offering of two types of defective ETF products based upon common misrepresentations and omissions during the Class Period.  Each of the Defendants has been on notice of the claims set forth herein since the filing of the initial Complaint and prior to this Second Amended Consolidated Class Action Complaint.

304.     At the time of their purchases of shares of the ProShares Funds, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered the material misstatements and omissions prior to June 23 and, indeed, September 28, 2009.  Less than one year has elapsed from the time that Plaintiffs and other members of the Class discovered or reasonably could have discovered the facts upon which this Complaint is based.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiffs first filed their various complaints in this action.

305.     This action is timely filed under Section 13 of the Securities Act of 1933.

## AS AND FOR A SECOND CLAIM
### (Violations of § 15 of the Securities Act Against the Individual Defendants)

306.     Plaintiffs incorporate by reference all prior allegations as if set forth herein. This Claim is asserted against the Individual Defendants.

307.     Each of the Individual Defendants named herein acted as a controlling person of the Company within the meaning of Section 15 of the Securities Act.  The Individual Defendants were each trustees or officers and/or directors of ProShares, and were charged with the legal responsibility of overseeing its operations.  The Individual Defendants each had intimate knowledge of the day-to-day operations of ProShares and of the inherent defects and dangers in the ProShares leveraged ETF products, yet culpably participated in the decisions not to disclose such risks to the investing public in a full and proper manner and instead to maximize revenues through the sale of such leveraged ETF products by marketing them as safe and predictable hedging instruments and investment securities.  Each controlling person had the power to influence and exercised the same to cause his controlled person to engage in the unlawful acts and conduct complained of herein.

308.     By reason of such conduct, Defendants named in this Count are liable pursuant to Section 15 of the Securities Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the ProShares Funds.

## AS AND FOR A THIRD CLAIM
**(Breach of Contract Against Defendant ProShares Trust By Individual Plaintiffs Only)**

309.     The Individual Plaintiffs incorporate by reference all the prior allegations, as if set forth herein.

310.     Defendant ProShares Trust offered securities pursuant to the Registration Statement, which offer was accepted by the Individual Plaintiffs and confirmed with transaction confirmations.

311.     This offer and acceptance created an agreement between the parties (the "Agreement"), pursuant to which the parties agreed to purchase and sell securities.

312.     The Individual Plaintiffs fully performed under the Agreement by paying for the shares of the SRS ETF.

313.     The Individual Plaintiffs entered into the Agreement and promised to pay for the shares of the SRS ETF, while Defendant ProShares promised that the value of the shares of the SRS ETF would increase if the value of the DJUSREI declined.

314.     Contrary to Defendant ProShares' promise, as the DJUSREI declined in value, so did the price of SRS ETF shares.

315.      As a direct and proximate result of Defendant ProShares' breaches of the promise that it made in the Agreement, the Individual Plaintiffs suffered substantial damages, including lost profit on the SRS ETF shares that would have increased in value had the SRS ETF performed as promised by Defendant ProShares.

316.     The Individual Plaintiffs are entitled to recover benefit of the bargain damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     determining that this action is a proper class action and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.      awarding compensatory damages in favor of Plaintiffs, individual Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      awarding punitive damages to Plaintiffs, individual Plaintiffs and members of the Class;

D.      awarding Plaintiffs, individual Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E.      awarding the Individual Plaintiffs benefit of the bargain damages;

F.      for a declaratory judgment that Defendants' Registration Statements were false and misleading; and

G.      such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiffs, the Class, and Individual Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: New York, New York
       January 31, 2011

**LOVELL STEWART HALEBIAN JACOBSON LLP**

*/s/ Christopher Lovell*
Christopher Lovell (CL 2595)
Victor E. Stewart (VS 4309)
Ian T. Stoll (IS-3424)
Fred T. Isquith, Jr. (FI 1064)
Benjamin M. Jaccarino (BJ 1273)
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

116

**ZAMANSKY & ASSOCIATES LLC**
Jacob H. Zamansky (JZ 1999)
Edward H. Glenn, Jr. (EG 0042)
Kevin D. Galbraith (KG 7512)
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Lead Counsel for Plaintiffs*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein (bernstein@bernlieb.com)
Sandy A. Liebhard (liebhard@bernlieb.com)
U. Seth Ottensoser (ottensoser@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
Brian Lehman (lehman@bernlieb.com)
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**GILMAN AND PASTOR, LLP**
Kenneth Gilman (kgilman@gilmanpastor.com)
Rene Potkay (rpotkay@gilmanpastor.com)
16 14th Avenue
Wareham, MA  02571
Telephone: (508) 291-8400
Facsimile: (508) 291-3258

**Wolf Haldenstein Adler Freeman & Herz LLP**
Mark C. Rifkin
Gustavo Bruckner
270 Madison Avenue
New York , NY 10016
212-545-4600
Fax: 212 545-4653
rifkin@whafh.com
Bruckner@whafh.com

**Pomerantz Haudek Block Grossman & Gross LLP**
Jeremy Alan Lieberman
100 Park Avenue, 26th Floor
New York , NY 10017
(212)-661-1100
Fax: (212)-661-8665
jalieberman@pomlaw.com

**Stull Stull & Brody**
James Elliot Lahm
6 East 45th Street, 5th Floor
New York , NY 10017
212-687-7230
Fax: 212-4902022
ssbny@aol.com
jlahm@ssbny.com

**Wolf Popper LLP**
Robert C. Finkel
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Fax: (212) 486-2093
*Additional Class Counsel*

**Ackerman, Link & Sartory**
Thomas R. Grady
Dana E. Foster
222 Lakeview Avenue
Suite 250
West Palm Beach, Fl 33401
(561) 838-4100
Fax: (561) 838-5305
trgrady@alslaw.com
afoster@alslaw.com

**Timothy J. Dennin, P.C.**
Timothy John Dennin
316 Main Street
Northport , NY 11768
(631) 261-0250
Fax: 631 261-0395
secatty@denninlaw.com

**Shalov Stone Bonner & Rocco LLP**
Ralph M. Stone
260 Madison Avenue, 17th Floor
New York, New York  10016
(212) 239-4340
Fax (212) 239-4310
www.lawssb.com

*Counsel for Individual Plaintiffs*