UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In Re ProShares Trust Securities Litigation | ) ) ) ) ) ) ) ) ) |

Master Case No. 09-cv-6935 (JGK)

ECF Case

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................... 5

    A.   The Defendants ..................................................................... 5

    B.   The Structure and Operation of ETFs ...................................... 6

    C.   The Registration Statements at Issue ....................................... 7

    D.   ProShares' Registration Statements Contain Detailed Descriptions of the ETFs' *Daily* Investment Objectives and the Operation and Performance of the ETFs over Longer Periods ................................................................................. 9

        i.   The ETFs have daily investment objectives ........................... 9

        ii.   The ETFs do not seek to achieve their objectives for longer than one day ............. 10

        iii.   Compounding prevents the ETFs' cumulative returns from matching a multiple of the cumulative returns of the index for longer periods ...................................... 10

        iv.   Leverage amplifies the effect of compounding on cumulative returns ................... 11

        v.   Volatile markets further amplify the effects of compounding and leverage on cumulative returns .................................................... 12

ARGUMENT ....................................................................................... 13

    I.   THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR OMISSIONS IN THE PROSHARES REGISTRATION STATEMENTS ............... 14

        A.   ProShares' Registration Statements Fully and Accurately Disclosed the Daily Nature of the Investment Objectives and the Impact a Daily Objective has on Cumulative Returns over Longer Periods .................................... 15

            i.   The Registration Statements Clearly Disclosed the Risks that Allegedly Caused Plaintiffs' Losses ................................................... 16

            ii.   None of Plaintiffs' Arguments Contradict the Plain and Explicit Language of the Disclosures ....................................... 17

        B.   The Complaint Alleges No Actionable Misstatements or Omissions Relating to the Performance of the Funds for Periods Longer Than a Day ......................... 20

        C.   Plaintiffs Cannot Establish Liability by Hindsight by Comparing Supposedly "Anticipated" and "Actual" Cumulative Returns over Arbitrarily Selected Periods ... 24

i

D.  The Complaint Alleges No Actionable Misstatements or Omissions Regarding the Magnitude of the Risk of Holding ETFs for Longer Periods ...................................... 27

E.  Plaintiffs Cannot Establish Liability by Attempting to Create New Obligations via a Mathematical Formula ............................................................................................... 30

F.  FINRA's Statements Regarding ETFs Do Not Establish or Even Support a Claim for Registration Statement Liability ........................................................................... 33

G.  The 2009 Registration Statement Disclosures do not Establish or Support Liability for Earlier Statements ................................................................................................. 34

II.  PLAINTIFFS' SECTION 11 CLAIM ALSO FAILS BECAUSE THE ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED MISSTATEMENTS OR OMISSIONS ........................................................................... 35

III.  PLAINTIFFS LACK STANDING TO BRING THE CLAIMS AS ALLEGED IN THE COMPLAINT ................................................................................................................... 36

IV.  THE CLAIMS ASSERTED AGAINST THE ADDITIONAL DEFENDANTS IN THE AMENDED CONSOLIDATED COMPLAINT ARE BARRED BY THE STATUTE OF LIMITATIONS ................................................................................................................. 38

V.  THE BREACH OF CONTRACT CLAIM ASSERTED BY INDIVIDUAL PLAINTIFFS STEVEN AND SHERRI SCHNALL FAILS TO STATE A CLAIM ............................. 39

CONCLUSION ................................................................................................................... 40

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Amorosa v. AOL Time Warner Inc.*,
 2011 WL 310316 (2d Cir. Feb. 2, 2011).................................................................35

*Ashcroft v. Iqbal*,
 129 S. Ct. 1937 (2009).............................................................................................14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007)................................................................................14, 34

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)......................................................................................15, 30, 31

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)..........................................................................................13, 14

*Clark v. Nevis Capital Mgmt., LLC*,
 No. 04 Civ. 2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ..............................36

*Denny v. Barber*,
 576 F.2d 465 (2d Cir. 1978).....................................................................................35

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005).................................................................................................35

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000).....................................................................................27

*Garber v. Legg Mason, Inc.*,
 347 Fed. Appx. 665 (2d Cir. 2009)..........................................................................34

*Greenberg v. ProShares Trust*,
 No. MRS-L-0011-1-09 .............................................................................................17

*Halperin v. eBanker USA.COM, Inc.*,
 295 F.3d 352 (2d Cir. 2002)................................................................15, 16, 18, 22

*In re AES Corp. Sec. Litig.*,
 825 F. Supp. 578 (S.D.N.Y. 1993)...........................................................................28

*In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*,
 1996 WL 551732 (S.D.N.Y. Sept. 27, 1996)..........................................................39

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004) ...................................................37

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) ...................................................14

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...................................................37

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005) ...................................................14

*In re Lehman Bros. Sec. and ERISA Litig.*,
   684 F. Supp. 2d 485 (S.D.N.Y. 2010) ...................................................36

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...................................................15

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   289 F. Supp. 2d 429 (S.D.N.Y. 2003) ...................................................35

*In re Salomon Smith Barney Mut. Fund Fees Litig.*,
   441 F. Supp. 2d 579 (S.D.N.Y. 2006) ...................................................37

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
   382 F. Supp. 2d 1173 (N.D. Cal. 2004) .................................................36

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009) ...................................................35

*Krouner v. Am. Heritage Fund, Inc.*,
   899 F. Supp. 142 (S.D.N.Y. 1995) .......................................................34

*Landmen Partners Inc. v. Blackstone Grp., L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009) ...................................................15

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ...............................................................35

*Lin v. Interactive Brokers Grp., Inc.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008) ........................................... passim

*McGraw-Hill Cos. v. Vanguard Index Trust*,
   139 F. Supp. 2d 544 (S.D.N.Y. 2001) ....................................................7

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland*,
   720 F.Supp.2d 254 (S.D.N.Y. March 26, 2010) .............................25, 38

iv

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir. 1996)............................................................................28

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)............................................ passim

*Press v. Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000)........................................................................19

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................14, 36

*Rubin v. MF Global, Ltd.*,
    634 F. Supp. 2d 459 (S.D.N.Y. 2009)..............................................15, 16

*Schoenhaut v. Am. Sensors, Inc.*,
    986 F. Supp. 785 (S.D.N.Y. 1997).....................................................18, 23

*Scibelli v. Roth*,
    2000 WL 122193 (S.D.N.Y. Jan. 31, 2000) ..........................................19

*Spicer v. Chicago Bd. Options Exch., Inc.*,
    No. 88 Civ. 2139, 1992 WL 380929 (N.D. Ill. Dec. 10, 1992) ............22

*Steinberg v. PRT Grp., Inc.*,
    88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000)..............................................16

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)....................................................................................31

*Staehr v. The Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)......................................................................39

**STATUTES**

15 U.S.C. § 77k.............................................................................................15

15 U.S.C. § 77k(a) ............................................................................14, 23, 24

15 U.S.C. § 77k(e) .........................................................................................35

15 U.S.C § 77m...............................................................................................38

15 U.S.C. §77s(a).............................................................................................22

Investment Company Act of 1940 .................................................... passim

Securities Act of 1933 § 11 ................................................................. passim

Securities Act of 1933 § 15 ........................................................................... passim

**OTHER AUTHORITIES**

17 C.F.R. § 274.11A ...........................................................................7, 21

Fed. R. Civ. P. 8 ...............................................................................14

Fed. R. Civ. P.  9(b) ...........................................................................14

Fed. R. Civ. P.  12(b)(6) ...............................................................14, 16, 35

Fed. R. Evid. 407 .............................................................................35

Joint FINRA/SEC Release (Aug. 18, 2009) .............................................33

*Margin: Borrowing Money to Pay for Stocks* (SEC publication) ..................24

Securities and Exchange Commission, Exchange-Traded Funds; Proposed Rule, 17
    C.F.R. Parts 239, 270, 274 ("SEC ETF Release") ........................................6, 7, 19

## PRELIMINARY STATEMENT

Plaintiffs purport to bring this class action[1] on behalf of investors in forty-four ProShares exchange-traded funds ("ETFs") with daily investment objectives tied to an underlying benchmark index.  All of the ETFs at issue have a key common feature:  their investment objectives are stated solely in terms of *daily* results.  In the Second Amended Consolidated Class Action Complaint (the "Complaint"), plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933, as amended (the "Securities Act"), alleging that the registration statements for the ProShares ETFs contained material misstatements and omissions relating to the risk that the funds would not achieve their stated objectives on a *cumulative* basis for periods longer than a day.  Crucially, plaintiffs do *not* allege that the ETFs failed to meet the funds' stated investment objectives on a *daily* basis.  Instead, the plaintiffs contend that, contrary to their expectations, the "actual" *cumulative* returns of the ETFs (for periods of time carefully selected by plaintiffs from the latter part of the class period) did not match the *cumulative* returns for those periods that the plaintiffs "anticipated."

The plaintiffs' claims all fail as a matter of law because the Complaint identifies no material misstatement or omission of fact.  The very risks plaintiffs describe in the Complaint were clearly and consistently explained in the funds' registration statements.  Shareholders were informed that "[t]he Funds do not seek to achieve their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results."  *See, e.g.*, Appendix of ProShares Trust Disclosures ("Appendix A"), attached as Exhibit 1 to the Declaration of Robert A. Skinner filed herewith ("Skinner Decl."), at

---

[1] Moving defendants are ProShares Trust, ProShares Trust II, ProShare Advisors LLC, SEI Investments Distribution Co., Michael Sapir, Louis Mayberg, Edward Karpowicz, William Seale, Simon Collier and Charles Todd (collectively, "ProShares"), together with defendants Russell Reynolds and Michael Wachs (the "Independent Trustees").

2.F.  The effect of compounding on cumulative returns was then explained in further detail, both in words and in charts.  For example, an ETF designed to provide double the daily returns of its underlying index made the following disclosure, which was typical of all the funds:

> Over time, the cumulative percentage increase or decrease in the net asset value of the Fund *may diverge significantly* from the cumulative percentage increase or decrease in the multiple of the return of the Underlying Index due to the compounding effect of losses and gains on the returns of the Fund.  Consequently, *for periods greater than one day, investors should not expect the return of the Fund to be twice the return of the underlying index.*

Appendix A at 3.A (emphases added).  The registration statements went on to illustrate that this compounding effect was more likely to have a negative impact on a fund's cumulative returns during periods of high volatility.  In light of these disclosures, no investor could reasonably "anticipate" that the ETFs' cumulative returns would track the cumulative returns of the underlying index over time – instead, investors were specifically told that they "should not expect" that outcome.  Plaintiffs have no plausible claim that they were misled about this basic feature of the ETFs.[2]

Plaintiffs assert several theories of liability in an attempt to plead around the clear disclosures regarding cumulative returns.  First, plaintiffs allege that, despite many *explicit* disclosures to the contrary, ProShares *implied* that investors' cumulative returns over time would match their supposed "anticipated" cumulative returns by including information in the registration statements on annualized returns and fees.  Plaintiffs ignore, however, that the Securities and Exchange Commission ("SEC") *requires* funds to include such information in their registration statements – and indeed specifies the very time periods and assumed rates of return that should be used in such illustrations.  Plaintiffs cannot establish liability based on

---

[2] Indeed, the purchase and sale records attached to the Complaint show that a number of the named plaintiffs themselves engaged in short-turnaround purchases and sales of their ETF shares in the span of one or a few days, demonstrating that they understood the daily nature of the funds' investment objectives.

SEC-mandated information.

Second, plaintiffs allege that the registration statements issued during the 2006-09 putative class period failed to warn investors about two aspects of the ETFs' "actual" returns over selected periods of time in 2008 and 2009:  (i) the potential *magnitude* of the differences between "anticipated" and "actual" cumulative returns; and (ii) that the "actual" returns could be in the *opposite direction* from the "anticipated" returns for the selected periods.  But this is classic pleading by hindsight, using transparently arbitrary comparisons.  2008-09 saw the most volatile financial markets in living memory, and the periods of time used in plaintiffs' comparison charts were cherry-picked by plaintiffs for dramatic effect – with no apparent connection to the dates on which any plaintiff actually bought and sold the funds' shares.  The supposedly large divergence between "anticipated" and "actual" cumulative returns disappears if different end dates (still within the proposed class period) are used for the comparisons.  This illustrates why courts uniformly reject pleading by hindsight in securities cases:  the registration statements were required to be accurate and forthcoming about the nature of the funds and their prospective risks when issued – they were not required to predict the future and anticipate the extreme level of market volatility in 2008-09.  Nor were they required to describe in advance the specific numerical effect of such volatility on the cumulative returns of the ETFs, as plaintiffs now insist they should have.

Third, plaintiffs attempt to mask their hindsight pleading by alleging that ProShares actually *knew in advance* (and misleadingly failed to disclose) the likely magnitude and direction of the differences between "anticipated" and "actual" returns during 2008-09.  The alleged source of ProShares' knowledge is an "undisclosed mathematical formula" (Complt. ¶ 12) that predicts the returns of the ETFs as compared to the underlying index for periods longer than a

day.  Thus, according to plaintiffs, ProShares had the ability to "project to the day exactly when such opposite performance and such losses would begin to occur in every market scenario" (Complt. ¶ 25) and knew that investors faced a "must lose" outcome in "certain market scenarios" (Complt. ¶ 15).  Even taking as true plaintiffs' allegations about the predictive abilities of the "undisclosed formula," the absence of specific predictions regarding the ETFs' cumulative returns in 2008-09 does not render the registration statements misleading.  As described by plaintiffs, the formula calculates a fund share's return as a function of several variables, including the length of time the share was held and the degree of market volatility during that holding period – inputs that ProShares could not know in advance.  Plaintiffs' theory suggests that ProShares should have calculated and disclosed *every* possible return permutation based on *every* possible holding period and volatility level.  But the securities laws do not impose so great a burden.  Issuers are required to explain the potential risks faced by investors, not to spell out every conceivable manifestation of those risks.

The Complaint suffers from additional failings as well.  First, any decline in the funds' share prices was not the result of any purported misstatement or omission, and thus loss causation is absent.  Moreover, Plaintiffs purport to bring claims regarding several funds in which no named plaintiff owned shares or experienced a loss, and claims regarding many registration statements pursuant to which no plaintiff claims to have purchased fund shares.  Plaintiffs lack standing to bring these claims.  Further, plaintiffs named additional defendants for the first time in the consolidated amended complaint filed on September 24, 2010 (claims that remain in the Second Amended Consolidated Complaint filed on January 31, 2011).  These claims against ProShares Trust II and three individual defendants are barred by the one-year statute of limitations governing Securities Act claims, as plaintiffs were demonstrably on notice

of their claims against these defendants no later than August 5, 2009 – when the first class action

complaint in this case was filed.  Finally, the breach of contract claim asserted by individual

plaintiffs Steven and Sherri Schnall, which is quite transparently a Section 11 claim dressed up in

common law clothing, fails for the same reasons as the securities law claims asserted by class

plaintiffs – the registration statements' disclosures of the risks regarding cumulative returns

belies any alleged "promise" that those returns would track the underlying index over time.

## **BACKGROUND**

### A.  **The Defendants**

Defendants ProShares Trust and ProShares Trust II (together, the "ProShares Trusts") are

Delaware statutory trusts.  ProShares Trust is an open-end management investment company

registered with the SEC under the Investment Company Act of 1940, as amended (the "1940

Act").  *See, e.g.*, 9/28/07 Registration Statement ("RS") at SAI 4 (Skinner Decl. Ex. 3).[3]

ProShares Trust II is a publicly offered commodity pool regulated by the Commodity Futures

Trading Commission ("CFTC").  Complt. ¶ 62(b).  Both ProShares Trusts are comprised of a

number of separate investment portfolios ("ETFs" or "funds"), each organized as a separate

series of one of the Trusts, and each with its own trading symbol.  *Id.* at ¶ 62(a)-(c).  Certain of

the ETFs have been offered to investors since 2006.  5/31/07 N-CSR at 1.  Defendant ProShare

Advisors LLC ("ProShare Advisors") serves as the investment advisor for ProShares Trust and

---

[3] All the registration statements cited herein are referenced in the Complaint.  For ProShares
Trust, the prospectus and SAI comprising its registration statement typically have separate, non-
sequential page numbering; thus, page number references to the SAI portion of a registration
statement are cited herein as "at SAI _".  ProShares Trust II's registration statements do not
contain (and are not required to contain) a separately numbered SAI and are marked (PS II).  All
ProShares registration statements are publicly available on the SEC's website.  An exemplar
registration statement is included as Exhibit 3 to the Skinner Declaration, while the relevant
disclosures from all the registration statements at issue in the putative class period are
summarized in Appendices A and B (Exhibits 1 and 2 to the Skinner Declaration).

its ETFs.  9/28/07 RS at 2.  Nonparty ProShare Capital Management LLC ("PCM") is the

sponsor, commodity pool operator, and commodity trading advisor for ProShares Trust II and its

ETFs.  11/21/08 RS (PS II) at 1.  Defendant SEI Investments Distribution Co. ("SIDCO") serves

as the distributor for all the funds.   Complt. ¶ 64.  Each of the eight Individual Defendants is

named because, in his role as an officer or trustee of one of the foregoing entities, he allegedly

signed one or more of the registration statements in question.  *Id.* at ¶¶ 65-72.

**B.**      **The Structure and Operation of ETFs**

As the SEC noted in a recent release, ETFs have become "an increasingly popular

investment vehicle."  Securities and Exchange Commission, Exchange-Traded Funds; Proposed

Rule, 17 C.F.R. Parts 239, 270, 274 (hereinafter "SEC ETF Release") at 14618, available at

http://www.sec.gov/rules/proposed/2008/33-8901fr.pdf (Skinner Decl. Ex. 4).  An ETF typically

is comprised of a portfolio of securities designed to track an underlying benchmark or index.  A

*leveraged ETF* seeks to deliver a multiple of the daily performance of the index it tracks.[4]  An

*inverse ETF* seeks to deliver the opposite of the daily performance of the index it tracks.  A

*leveraged inverse* ETF thus seeks a daily return that it is a multiple of the opposite of the daily

performance of the index it tracks.[5]

Most ETFs are investment companies regulated by the SEC under the 1940 Act while

some are publicly offered commodity pools regulated by the CFTC.  ETFs are similar in many

ways to traditional open-end mutual funds (or traditional commodity pools), but feature some

important structural differences.  First, whereas traditional mutual fund shares are purchased by

---

[4] For example, ProShares Trust offers the Ultra S&P 500, a fund designed to provide daily
investment results of double the daily performance of the S&P 500 Index.  9/28/07 RS at 24.

[5] ProShares Trust offers the UltraShort Russell 2000, a fund designed to seek daily investment
results that correspond to twice the inverse of the daily performance of the Russell 2000 Index.
*Id*. at 79.

investors directly from the fund itself and later "redeemed" or sold back directly to the fund, ETF

shares are bought and sold by investors on the secondary market (other than for certain large

institutional purchasers of "Creation Units," as described below) through brokers – much like

how shares in a public company are traded.  Second, because of this secondary market, shares of

ETFs can be bought and sold throughout the trading day, at market prices that can vary over the

course of a day.  Complt. ¶ 11; SEC ETF Release at 14619.  By contrast, the share price of a

traditional mutual fund is typically set just once a day, as of the close of the market, and is

required by law to be equal to the *pro rata* net asset value ("NAV") of the securities comprising

the fund's portfolio.  Although ETF share prices are set by the secondary market, the prices tend

in practice to track the NAV of the fund very closely.  *See* SEC ETF Release at 14619 n.9 ("The

shares of many ETFs often trade on the secondary market at prices close to the net asset value

("NAV") of the shares . . ."); *McGraw-Hill Cos. v. Vanguard Index Trust*, 139 F. Supp. 2d 544,

546-47 (S.D.N.Y. 2001) (same).[6]

**C.**     **The Registration Statements at Issue**

ProShares Trust's registration statements are filed with the SEC on Form N-1A.  *See* 17

C.F.R. § 274.11A; Form N-1A, *Registration Form for Registered Open-End Management*

*Investment Companies* (SEC 2052) ("Form N-1A") (Skinner Decl. Ex. 5); Complt. ¶ 87.  Under

---

[6] The close tracking between share price and NAV is the result of the mechanism by which ETF shares are distributed to the market place.  Shares are issued by an ETF in large blocks known as "Creation Units," which are generally purchased by large financial firms and other institutional investors ("authorized participants") at a price equal to the NAV.  The Creation Unit investors can also sell shares back to the fund at the NAV.  Individual investors in turn purchase smaller blocks of shares from the authorized participants on the secondary market at a market price, with the assistance of brokers.  In the event of a meaningful disparity between the market price for a share and its NAV, a salutary arbitrage opportunity arises for the institutional Creation Unit investors, which eliminates the disparity.  *See* SEC ETF Release at 16420; *see also* 9/28/07 RS at 120 (noting that the Funds are expected to be attractive to arbitrageurs, whose "trading activity is critical to ensuring that shares trade at or close to net asset value per share").

the federal securities laws, the registration statement of a mutual fund is comprised of its prospectus, its statement of additional information ("SAI"), and certain other information, including exhibits and undertakings.  Complt. ¶ 89.  ProShares Trust issues prospectuses covering the multiple ETFs that comprise the Trust.  Pursuant to the requirements of the Securities Act and 1940 Act, ProShares Trust is required to update each fund's prospectus at least annually.  *Id*.  This update is occasionally supplemented or reissued during the year, and a new prospectus will sometimes be issued as part of the offering of a new fund during the course of the year.  The 1940 Act also mandates that ProShares Trust send shareholders semi-annual updates listing, among other things, the amounts and values of the securities and other instruments held by each fund.  The Trusts' semi-annual and annual reports are all incorporated by reference into the prospectuses, and are filed with the SEC using form N-CSR.  *See, e.g.*, 12/29/06 RS at 337.[7]

Plaintiffs purport to assert claims with respect to misstatements and omissions in the 23 registration statements listed in the Complaint at Exhibit B (for ProShares Trust) and Exhibit C (for ProShares Trust II).  The disclosures relevant to the Complaint are similar across all registration statements.  Appendix A (ProShares Trust) (Skinner Decl. Ex. 1) and Appendix B (ProShares Trust II) (Skinner Decl. Ex. 2) contain the relevant disclosure provisions from each of the registration statements and show how these disclosures changed over time (if at all).  This memorandum will focus primarily on the December 29, 2006, September 28, 2007, September

---

[7]  ProShares Trust II files its registration statements with the SEC using Form S-3.  *See, e.g.*, Complt. ¶ 91.  Under the federal securities laws, the registration statement of a publicly traded commodity pool is comprised of a prospectus and other information, including certain exhibits and undertakings.  *Id*.  ProShares Trust II issues prospectuses covering the multiple ETFs that comprise the Trust.  Pursuant to the requirements of the CFTC, ProShares Trust II is required to update each fund's prospectus at least every twelve months, though as a practical matter it is often updated more frequently in connection with the launch of new funds.

29, 2008 (ProShares Trust) and November 21, 2008 (ProShares Trust II) registration statements

(the registration statements pursuant to which the vast majority of the named plaintiffs purchased

their shares), although Appendices A and B demonstrate that there is no meaningful difference

between the disclosures in these documents and those covering other periods.

D.      **ProShares' Registration Statements Contain Detailed Descriptions of the ETFs'
        *Daily* Investment Objectives and the Operation and Performance of the ETFs over
        Longer Periods**

Consistently throughout the class period, the operative registration statements for the

Trusts clearly disclosed that (i) ProShares ETFs have *daily* investment objectives; (ii) the funds

do *not* attempt to achieve their objective for periods longer than a day; (iii) compounding

prevents the funds' cumulative returns from matching the cumulative returns of the index for

longer than one day, and may cause a significant divergence; (iv) the effect of compounding on

cumulative returns is amplified in funds that utilize leverage (as ProShares' ETFs do); and

(v) volatile markets further amplify the effects of compounding and leverage on cumulative

returns.

i.      ***The ETFs have daily investment objectives***

The registration statements issued throughout the putative class period disclose

repeatedly that each ProShares ETF has an investment objective of tracking (inversely and/or by

a multiple) its respective index for one day.  For example, the earliest registration statement

listed by plaintiffs in Exhibit B states that both Ultra ProShares and UltraShort ProShares funds

"seek to provide daily investment results" that corresponded to the "daily performance of their

applicable indexes."  6/19/06 RS at 6, 24.  This information was repeated in each subsequent

operative registration statement throughout the class period for both ProShares Trusts.  *See, e.g.*,

12/29/06 RS at 4, 108, 74; 9/28/07 RS at 6, 19, 66; 9/29/08 RS at 6, 21, 66; 11/21/08 RS (PS II)

at 1-2.  This daily objective was also reiterated in the information section for *each individual*

*fund. See, e.g.*, 12/29/06 RS at 74 ("[DIG] seeks daily investment results . . . that correspond to twice (200%) the daily performance of the Dow Jones U.S. Oil & Gas Index"); 9/28/07 RS at 100 ("[SRS] seeks daily investment results . . . that correspond to twice (200%) the inverse (opposite) of the daily performance of the Dow Jones U.S Real Estate Index."). Indeed, the phrase "daily investment" appears over 250 times in each of the operative registration statements, including on the *very first page* (after the table of contents). *See, e.g.*, 12/29/06 RS at 4; 9/28/07 RS at 6, 9/29/08 RS at 6, 11/21/08 (PS II) at 1.

ii.      **The ETFs do not seek to achieve their objectives for longer than one day**

The registration statements throughout the class period also specifically stated that the funds did not seek to achieve their respective investment objectives for longer than one day. *See, e.g.*, 12/29/06 RS at 313 ("The Funds do not seek to achieve their stated investment objective over a period of time greater than one day because mathematical compounding prevents the Funds from achieving such results."); 9/28/07 RS at 6 (same); 11/21/08 RS (PS II) at cover, 1-2 (same). This point was reiterated in the annual reports sent to shareholders and incorporated by reference into the funds' registration statement. *See, e.g.*, 5/31/08 N-CSR at 2 ("ProShares ETFs are designed to provide either 200%, -200% or -100% of index performance on a daily basis (before fees and expenses). A common misconception is that the Funds also should provide 200%, -200% or -100% of index performance over longer periods, such as a week, month or year. However, Fund returns over longer periods are generally less than or greater than the returns that would result from such an expectation.").

iii.     **Compounding prevents the ETFs' cumulative returns from matching a multiple of the cumulative returns of the index for longer periods**

The registration statements further explained that compounding prevents the funds from achieving cumulative returns that match the cumulative returns of the index (or the inverse or

stated multiple thereof) for periods longer than a day.  *See, e.g.*, 12/29/2006 RS at SAI 16

("While close tracking of any Fund to its benchmark may be achieved on any single trading day,

over time the cumulative percentage increase or decrease in the net asset value of the Shares of a

Fund may diverge significantly from the cumulative percentage decrease or increase in the

benchmark due to a compounding effect."); 9/28/07 at SAI 18 (same); 9/29/08 at SAI 17 (same);

11/21/08 (PS II) at 4, 22 (same).  Investors were specifically warned that they should *not* expect

the funds' cumulative returns to match those of the index (or the inverse or stated multiple

thereof) for periods longer than a day, and that such divergence may be "significant."  *See, e.g.*,

12/29/06 RS at 7 ("Over time, the cumulative percentage increase or decrease in the net asset

value of the Fund *may diverge significantly* from the cumulative percentage increase or decrease

in the multiple of the return of the underlying Index due to the compounding effect of losses and

gains on the returns of the Fund.  Consequently, *for periods greater than one day, investors*

*should not expect the return of the Fund to be twice the return of the underlying Index.*")

(emphases added).[8]

### iv. *Leverage amplifies the effect of compounding on cumulative returns*

The effect of compounding on cumulative returns is *amplified* in a fund that uses

leverage, as the ProShares ETFs do.  Leveraged ETFs use a variety of derivative instruments

---

[8]  The concept of compounding is of course a familiar one to the reasonable investor, and undeniably within the "public domain."  This basic mathematical principle is common to all investments that earn cumulative returns over time, and can have both positive and negative consequences for cumulative returns.  For example, if a mutual fund's NAV is equal to $10,000 and gains 1% on Day 1, the resulting NAV will be $10,100 ($10,000 original value plus the 1% increase of $100).  If the NAV gains another 1% on Day 2, the new NAV will be $10,201 ($10,100 plus the 1% increase of $101) – which is more than a 2% cumulative increase.  Because of compounding, the two consecutive 1% increases result in more cumulative gain than a single 2% increase.  By the same token, if the same fund lost 1% on Day 2 following its 1% gain on Day 1, the resulting NAV would be $9,999 ($10,100 less the 1% decrease of $101).  Because of compounding, the cumulative effect of the 1% gain followed by the 1% loss is a net decrease of $1 – and does not simply bring the fund back to its starting NAV.

such as swaps and futures contracts as a means of magnifying the effect of market movements so that they can attempt to achieve results equal to two or three times the performance (or inverse) of their underlying index. *See, e.g.*, 12/29/06 RS at 318. The registration statements clearly disclose the additional risks resulting from the use of these leveraging techniques. *See, e.g.*, *id*. at 318 ("Over time, the use of leverage, combined with the effect of compounding, will have a more significant impact on a Fund's performance compared to the index underlying its benchmark than a fund that does not employ leverage. Therefore, the return of the index over a period of time greater than one day multiplied by a Fund's specified multiple or inverse multiple (*e.g.*, 200% or -200%) will not generally equal a Fund's performance over that same period."); 9/28/07 RS at 8 ("[T]here is a special form of correlation risk that derives from these Funds' use of leverage, which is that for periods greater than one day, the use of leverage tends to cause the performance of a Fund to be either greater than or less than the index performance times the stated multiple in the Fund objective"); 9/29/08 at 9 (same); 11/21/08 (PS II) at 23-24 (same). This warning is repeated in the annual reports sent to shareholders. *See, e.g.*, 5/31/08 N-CSR at 328.

**v.** ***Volatile markets further amplify the effects of compounding and leverage on cumulative returns***

Finally, the registration statements also disclosed that volatile markets could make the effects of compounding and leverage even more pronounced. *See, e.g.*, 9/28/07 RS at 9 ("This volatility may cause the value of an investment in the Fund to decrease."); 9/29/08 RS at 11 (same); 11/21/08 RS (PS II) at 4 ("price volatility, which is exacerbated by the use of leverage, may possibly cause the total loss of an investor's investment"); *id*. at 22 ("It is possible to lose money over time when an underlying benchmark is up (down) for the corresponding Ultra (UltraShort) Fund due to the effects of daily rebalancing, volatility, and compounding."). The

registration statements also included multiple "wedge" graphs to show that increased index

volatility will increase the likelihood that the ETF will underperform if held for longer periods of

time – including results in the *opposite direction* in periods of high volatility.[9]  *See* 9/28/07 RS at

SAI 18-20 (three examples of a "wedge" graph can be seen in Appendix A at 5.A.); 9/29/08 RS

at SAI 17-19 (same); 11/21/08 RS (PS II) at 24-26 (same).[10]  This principle is reiterated in the

annual reports sent to shareholders.  *See, e.g.*, 5/31/08 N-CSR at 328 ("In general, given a

particular index return, increased volatility of the index will cause a decrease in the performance

relative to the index performance times the stated fund multiple."); *Id.* at 2 ("Fund returns over

longer periods are generally less than or greater than the returns that would result from such an

expectation. . . . This is due to several factors, but a significant one is index volatility and its

effect on fund compounding.  In general, periods of higher index volatility will cause the effect

of compounding to be more pronounced, while periods of lower index volatility will produce a

more muted or even positive effect."); *Id.* at 6 ("Daily volatility for the U.S equity markets

increased from a year ago. . . .  At a given index return level, increased volatility tends to

negatively impact performance over time.").

## **ARGUMENT**

When challenged by a motion to dismiss, plaintiffs' factual allegations must be sufficient

"to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

547 (2007).  To survive a motion to dismiss under *Twombly*, a complaint must contain factual

allegations sufficient "to raise a right to relief above the speculative level."  *Id.* at 555.  It is not

---

[9] The wedge graphs show that these opposite direction divergences can be particularly
pronounced for UltraShort ETFs.  *See* Complt. ¶132(a); Appendix A at 5.A (third graph).

[10] The registration statements included warnings about the effects of compounding and leverage
on ETFs held longer than one day from the first offering of ETFs in 2006.  Beginning in 2007,
ProShares separated out index volatility as another factor that could cause divergence of an ETF
from its underlying index when held for periods longer than one day.

enough for a plaintiff to plead facts that are "merely consistent with" a right to relief; a plaintiff must allege facts "plausibly suggesting" liability. *Id.* at 557. While the court must take all well-pleaded facts as true in deciding a motion to dismiss under Rule 12(b)(6), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

In addition, the particularity requirement of Rule 9(b) applies to claims brought under Section 11 of the Securities Act when those claims are "grounded in fraud." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). When applicable, Rule 9(b) requires that a plaintiff specify which statements were fraudulent, identify who made the statements, specify when and where the statements were made, and explain why the statements were fraudulent. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs assert allegations of intentional or reckless misrepresentation by alleging that the defendants provided a misleading mix of information to be filed with the SEC in order to enable the funds to grow quickly. *See, e.g.*, Complt. ¶¶ 5-8; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) (complaint "sound[s] in fraud" when it contains 'wording and imputations . . . classically associated with fraud") (quoting *Rombach*, 355 F.3d at 172). In the end, whether plaintiffs' claims sound in fraud is of little matter. The Complaint fails to meet the pleading standards of either Rule 8 or Rule 9(b) since the disclosures in the registration statements on their face fully and accurately describe the nature of the securities and the risks described in the Complaint.

## I.    THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR OMISSIONS IN THE PROSHARES REGISTRATION STATEMENTS

To state a claim under Section 11 of the Securities Act, a plaintiff must allege that an offering document contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *In re Fuwei*

14

*Films Sec. Litig.*, 634 F. Supp. 2d 419, 433-34 (S.D.N.Y. 2009); *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459, 466 (S.D.N.Y. 2009). To state a claim based on an omission, a plaintiff must demonstrate that the omission is material and that defendants had a legal obligation to disclose the allegedly omitted information. *See* 15 U.S.C. § 77k; *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003). For an omission to be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Landmen Partners Inc. v. Blackstone Grp., L.P.*, 659 F. Supp. 2d 532, 540 (S.D.N.Y. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). An actionable misrepresentation claim arises only if the relevant disclosure documents *read as a whole* could have misled a reasonable investor about the securities offered. *See Lin v. Interactive Brokers Grp., Inc.*, 574 F. Supp. 2d 408, 418-19 (S.D.N.Y. 2008). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.COM, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

A.    **ProShares' Registration Statements Fully and Accurately Disclosed the Daily Nature of the Investment Objectives and the Impact a Daily Objective has on Cumulative Returns over Longer Periods**

Plaintiffs' Section 11 claim fails as a matter of law because the Complaint points to no fact in the funds' registration statements that is even arguably false or misleading, and asserts no omission of material fact necessary to make the registration statements not misleading. Simply put, the registration statements, read as a whole, could not have misled a reasonable investor about the daily nature of each fund's investment objective and the impact of having a daily objective on cumulative returns for periods longer than a day. A complaint alleging material

misstatements and omissions cannot survive a motion to dismiss if the registration statement

amply discloses the risks in question.  As explained by the court in *Steinberg v. PRT Grp., Inc.*:

> If a plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint.  In such a situation, dismissal of the complaint is proper, for no additional facts can prove the claims.  The Second Circuit has consistently affirmed Rule 12(b)(6) dismissals of securities claims where the risks of which plaintiffs complained were disclosed in the prospectus.

88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (internal citations omitted).  Courts in this circuit

routinely dismiss securities claims where the registration statement sufficiently discloses the

risks about which plaintiffs claim to have been misled.  *See, e.g.*, *Halperin*, 295 F.3d at 361;

*Rubin*, 634 F. Supp. 2d at 470.

> ### i.     The Registration Statements Clearly Disclosed the Risks that Allegedly Caused Plaintiffs' Losses

As detailed in the Background section above and as set forth in the attached Appendices

(Skinner Decl. Exs. 1 and 2), the operative registration statements for the ProShares ETFs amply

disclosed the funds' features as to which plaintiffs claim to have been misled.  In clear and oft-

repeated disclosures, the registration statements explained that:  (i) ProShares' ETFs sought daily

investment results; (ii) ProShares' ETFs did not attempt to track their underlying indexes for

longer than one day; (iii) because of compounding, for time periods longer than one day the

percentage increase or decrease of a fund could "diverge significantly" from the percentage

decrease or increase in its benchmark index and investors "should not expect" them to match

over time; (iv) the use of leverage amplifies the effects of compounding on cumulative returns;

and (v) increased volatility of the underlying index could also cause a decrease in the fund's

performance relative to the index performance times the fund multiple, including causing

"opposite direction" performance.  These disclosures are easily of "sufficient precision and

clarity to alert prudent investors to the nature of the offerings and the risks entailed."  *Panther*

*Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008).

In a recent New Jersey state court action against ProShares asserting state securities fraud and common law fraud claims, the court dismissed the shareholders' claims because the registration statement made ample disclosures regarding the daily nature of the relevant fund's investment objective. The judge noted in a decision read from the bench that the ProShares prospectus made clear that its ETF had a daily investment objective and was not designed to track a multiple of the index over time. Thus, even if (as alleged by the plaintiff there) a sales representative had assured the plaintiff that the fund's cumulative returns would track a multiple of the benchmark's returns over time, such representations were contradicted by the clear disclosures in the prospectus – thus defeating the claims. *See Greenberg v. ProShares Trust*, No. MRS-L-0011-1-09, Transcript of Motion (July 9, 2010) at 39-44 (Skinner Decl. Ex. 6). The same reasoning applies with equal force in this case: the express disclosures in the registration statement conclusively trump plaintiffs' attempts to read contrary meaning into the documents.

ii. **None of Plaintiffs' Arguments Contradict the Plain and Explicit Language of the Disclosures**

The Complaint does not directly address these extensive disclosures to explain how a reasonable investor could be misled by them. Instead, plaintiffs summarily dismiss the disclosures as "benign" and "self congratulatory" (*see, e.g.*, Complt. ¶¶ 1, 26(f), 29, 111), arguing that they are not in the "right place" in the registration statements (*see id.* ¶¶ 50, 269-75), and alleging that ProShares did not intend for investors actually to heed these warnings (*see id.* ¶¶ 100, 289). These arguments are flatly contradicted by the plain language of the disclosures.

First, the warnings regarding cumulative returns are hardly "benign." The registration statements in question repeatedly advise investors that they risk a "significant divergence" between the funds' cumulative returns and those of the benchmark over time and that they

17

"should not expect" the cumulative returns that plaintiffs assert they were promised.  *See* pp. 11,

*supra*.  Plaintiffs focus on one set of graphs that show a relatively small divergence in

cumulative returns and thus conclude that the entirety of the disclosures were misleadingly

"benign."  Complt. ¶¶ 34-38.  But individual statements must be read in context with the

disclosures as a whole.  *See Lin*, 574 F. Supp. 2d at 418-49; *Halperin*, 295 F.3d at 357.  These

graphs are simply one set of hypothetical examples showing one possible divergence that could

occur.  The language accompanying the graphs clearly tells the investor that this divergence is

only based on one volatility assumption and directs the investor to the SAI for more information

on how volatility will affect the amount of divergence.  *See, e.g.*, 9/28/07 RS at 8-9.  There, the

registration statement shows explicitly (and repeatedly) that the divergence can range widely

(including going in the opposite direction from the "expected" returns).  *See, e.g.*, *id*. at SAI 18-

20, Appendix A at 5A; Appendix B at 5A.  There is simply no way a reasonable investor could

read the total mix of disclosures and conclude that a minimal divergence was the only possible

outcome.  *See Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997)

("Reading the Prospectus as a whole and taking the challenged statements in context . . . the

challenged statements were surrounded by express cautionary language addressing the substance

of the challenged statements.").

Second, plaintiffs characterize these disclosures as "buried" (*see* Complt. ¶ 50) and

attempt to discredit them because some of the disclosures appear in the SAI and/or are

incorporated by reference (*see id*. ¶¶ 269-275).  Yet ProShares explained, in plain English, the

daily investment objective of the funds on the *first page* (after the Table of Contents) of every

prospectus, and repeatedly thereafter throughout the prospectus and SAI.[11]  *See* Appendix A and

---

[11] The contents and structure of a fund prospectus are mandated by the SEC's form requirements.

B at 1 and 2.  Per SEC guidelines, the prospectus specifically directs the investor to the SAI for

more detail on certain topics.  *See, e.g.*, 9/28/07 RS at 9.  Indeed, the very purpose of the SAI

under the SEC's disclosure regime is to provide further detail supporting the plain English

disclosures found in the prospectus.  The SAI is attached to the prospectus both on ProShares'

website and on the SEC's website.[12]  The annual and semi-annual shareholder reports are

similarly available for free on both websites and sent to all shareholders free of charge.  The

information in both is clearly part of the "total mix" of information available to the reasonable

investor.  Because of this, courts in this district routinely look to SAIs and documents

incorporated by reference therein in evaluating a Section 11 claim.  *See, e.g.*, *Press v. Quick &*

*Reilly, Inc.*, 218 F.3d 121, 124, 130 (2d Cir. 2000) (considering disclosures made both in

prospectus and SAI); *Scibelli v. Roth*, 2000 WL 122193 at *4 (S.D.N.Y. Jan. 31, 2000) (finding

that disclosures in a 10-Q that had been incorporated by reference into the prospectus contained

the information plaintiffs' claim was omitted).  Plaintiffs themselves include the annual and

semi-annual shareholder reports and the SAIs in their definition of a registration statement for

the breach of contract claim (Complt. p. 61 n.2).

Finally, plaintiffs suggest that these disclosures are merely pretext, as the ETFs were

never intended as or understood to be appropriate for trading on a daily basis.  *See, e.g.*, Complt.

¶ 100 ("Defendants . . . could not operate if every person sold their ETF at the end of every

trading day."); ¶ 289 ("ProShares knew that investors . . . did not view ETFs as day trading

investment vehicles and did not day trade . . .").  In addition to being unsupported by any factual

allegations, plaintiffs' "pretext" theory is disproven by the investment choices of the named

---

*See* SEC Form N-1A (Skinner Ex. 5).

[12] The SEC considers an SAI incorporated by reference to be part of the prospectus as a matter of law.  *See, e.g.*, SEC ETF Release at 37930.

plaintiffs in this case.  Exhibit A to the Complaint sets forth each named plaintiff's declaration of his or her purchases and sales of ProShares ETFs.  These records reflect that a number of the named plaintiffs executed multiple short-term buys and sells of ProShares' ETFs within the course of a single day or just a few days.  For example, Exhibit A demonstrates that plaintiff Wendy Rockwell-Goff repeatedly engaged in intra-day trading of a number of different funds.  Indeed, almost 75% of her transactions involved selling her shares of a Fund the same day she bought them.  Similar buying and selling patterns can be found throughout the named plaintiffs' verifications in Exhibit A.[13]  Plaintiffs cannot credibly allege that a reasonable investor could read the registration statement and not understand the daily nature of the ETFs' respective investment objectives.

**B.    The Complaint Alleges No Actionable Misstatements or Omissions Relating to the Performance of the Funds for Periods Longer Than a Day**

Faced with the repeated risk disclosures in the registration statements regarding cumulative returns over time, plaintiffs allege that these warnings were somehow rendered ineffective because ProShares "consistently encouraged investors to invest in ProShares' ETFs for extended periods."  Complt. ¶ 102; *see also* Complt. ¶¶ 29-31, 102(a)-(h), 170, 174.  Notably, however, plaintiffs point to no assertion in any of the registration statements that ProShares' ETFs were attempting to track their benchmark indices for more than one day, or any statement that the funds would in fact achieve this.  As discussed above, the registration statements stated flatly the opposite, that investors "should not expect" such results.  Unable to assert the falsity of the funds' actual disclosures, plaintiffs instead attempt to make out their case by *implication* –

---

[13] Despite adding numerous new named plaintiffs, the latest amended complaint did drop one plaintiff named John White from the previous version.  Not coincidentally, Mr. White sold hundreds of thousands of shares the same day or the next trading day after he bought them.  Apparently, Mr. White no longer fit the plaintiffs' narrative of investors being unaware of the Funds' daily objectives.

that the registration statements misleadingly *implied* that cumulative returns over time would match supposed "anticipated" cumulative returns, thus "encouraging" long-term investments based on a false premise.  *See, e.g.*, *id*. at ¶ 148 ("Defendants misleadingly *implied* . . . that results could improve by holding for a period of a year.") (emphasis added).

To this end, plaintiffs point to tables and other disclosures in the registration statements illustrating various effects of holding ETF shares for a year or even longer periods.  *See, e.g.*, *id*. at ¶¶ 102(a)-(h), 170, 174.  Plaintiffs suggest that such disclosures somehow misleadingly implied to the reasonable investor that the cumulative returns for such periods would match those of the index.  Plaintiffs also allege that ProShares had some "extra" disclosure obligation because "Defendants undertook to make in the Prospectus very extensive descriptions of the results of holding the ProShares products for extended periods of time."  *Id*. at ¶ 29.  But plaintiffs ignore the fact that many of these illustrations regarding longer-term investments are in fact *required by SEC regulation* to be included in the registration statement in order to allow investors to compare mutual fund features (*e.g.*, performance history, fees) on an apples-to-apples basis.  *See* 17 C.F.R. § 274.11A; SEC Form N-1A at 11-12, 16-17 (Skinner Decl. Ex. 5).  Indeed, the SEC specifies the very time periods and assumed rates of return that funds should utilize in such illustrations.  *See id.*  For example, plaintiffs point to ProShares' illustration of the costs of investing $10,000 in its ETFs for periods of one or three years assuming a 5% annual return, Complt. ¶¶ 102(g), 170, *see also id*. ¶ 174 (including periods of five and ten years as well), yet this precise disclosure is specifically mandated by the SEC:  *compare* 9/28/07 RS (Skinner Decl. Ex. 3) at 21 *with* SEC Form N-1A (Skinner Decl. Ex. 5) at 12; *compare* Complt. ¶ 102(e) (allegations regarding the inclusion of dividend information) *with* 9/28/07 RS at 124 (providing distribution and dividend information) *and* SEC Form N-1A at 23 (requiring distribution and

dividend information).  Such mandated disclosures cannot possibly establish liability against

ProShares, particularly where plaintiffs make no allegation that the illustrations are inaccurate.

*See* 15 U.S.C. §77s(a) ("No provision of this subchapter imposing any liability shall apply to any

act done or omitted in good faith in conformity with any rule or regulation of the Commission.");

*see also Spicer v. Chicago Bd. Options Exch., Inc.*, No. 88 Civ. 2139, 1992 WL 380929 at *4

(N.D. Ill. Dec. 10, 1992) (noting that defendant complied with SEC prospectus regulations, and

if defendant included language "in good faith reliance on the SEC rule, then no liability

follows").  There is no plausible basis to assert that ProShares was sending an implicit message

to potential investors by including SEC *mandated* disclosures that appear in virtually identical

form and fashion throughout all mutual fund and exchange-traded fund prospectuses.

      Plaintiffs would also have the Court ignore the context in which these illustrations are

presented, including express warnings of the risks that plaintiffs assert were being implicitly

downplayed.  But the law requires that the registration statements be read as a whole when

determining whether a reasonable investor could be misled.  *See Lin*, 574 F. Supp. 2d at 418-19;

*Halperin*, 295 F.3d at 357.  There is simply no basis to conclude that ProShares *implied* in the

registration statements that cumulative results would track the benchmark when the *express*

disclosures in the same document state precisely the opposite.

      For example, plaintiffs allege that ProShares provided tables of different projected returns

for its ETFs over a period of one year.  *See* Complt. ¶ 102(a).  But plaintiffs omit the following:

(i) the title of the table specifically stated "the Fund Objective is to Seek Daily Investment

Results"; (ii) the lead-in section to the tables stated "for periods greater than one day, the use of

leverage tends to cause the performance of a ProFund to be either greater than, or less than, the

index performance times the stated multiple in the fund objective"; and (iii) the tables referred

investors to the sections in the prospectus and the SAI on "Correlation Risk," which again warned investors that the fund may diverge from its index over periods longer than one day. *See* 9/28/07 RS at SAI 18-20; Appendix A at 5.A. This surrounding cautionary language prevents reading the projected return illustrations as an implicit assurance regarding cumulative returns. *See, e.g.*, *Schoenhaut*, 986 F. Supp. at 793 ("Reading the Prospectus as a whole and taking the challenged statements in context . . . the challenged statements were surrounded by express cautionary language addressing the substance of the challenged statements.").

The Complaint also points to interviews and other public statements attributed to ProShares CEO Michael Sapir regarding the ability of investors to hold ProShares ETFs for more than a day. *See, e.g.*, Complt. ¶¶ 236-40. Such comments are not part of the registration statement and thus form no basis for liability under Section 11. *See* 15 U.S.C. § 77k(a). Moreover, even if the Court were to take Mr. Sapir's comments into consideration in ruling upon Section 11 liability, the substance of his comments provides no support for plaintiffs' claims. Mr. Sapir's statements in no way contradict ProShares' ample disclosures. Mr. Sapir simply stated that an investor could pursue a "buy and hold" strategy using ProShares ETFs as long as the investor carefully monitored the investment's performance and rebalanced the position if necessary to bring it in line with the desired investment result. *See* Complt. ¶ 238. ("The key is to monitor performance, and if a leveraged or inverse ETF deviates from its benchmark by more than is desired, 'what you should do is buy or sell shares to bring it back in line.'"); *see also id.* at ¶ 240 ("Investors can use [ETFs] for longer periods, but those who do should be aware of the effect compounding should have.").[14] Such statements are perfectly consistent with ProShares' disclosures. The ETFs have a daily investment objective. If they are to be held for longer than

---

[14] Contrary to Plaintiffs' assertion (Complt. ¶ 239), ProShares' website contains a specific "rebalancing" tool to aid an investor with this process.

one day, they need to be monitored to ensure that the effects of compounding, leverage, and

volatility do not cause them to deviate significantly from the investor's investment objectives.

This analysis applies equally to Mr. Sapir's statements comparing ETFs to margin

accounts. *See* Complt. ¶¶ 104-107. Nowhere do plaintiffs allege that Mr. Sapir's comparison is

false. And of course a margin account, which leverages the account-holder's investment returns

through borrowing, must also be monitored on an ongoing basis. Nowhere do plaintiffs explain

how such a comparison (even if relevant to their Section 11 claim) could mislead investors into

thinking that the cumulative returns of the funds would match those of the index over time. Nor

do plaintiffs explain how Section 11 liability would attach even if a margin account were better

suited for certain investors in certain market conditions. *See, e.g.*, *id*. at ¶ 21.[15] Mr. Sapir never

stated that ETFs would always provide a better return than a margin account, only that they

offered another "sophisticated" alternative to a margin account. *See, e.g.*, *id*. at ¶¶ 104-05.

### C.   Plaintiffs Cannot Establish Liability by Hindsight by Comparing Supposedly "Anticipated" and "Actual" Cumulative Returns over Arbitrarily Selected Periods

Many pages in the Complaint are devoted to graphs purporting to show divergence

between what plaintiffs dub the "anticipated" cumulative returns for the ETFs (based on the

underlying benchmark's cumulative returns) and the "actual" cumulative returns achieved for

selected periods of time. *See, e.g.*, Complt. ¶¶ 137-147; 149-153; 160-63; 175-76. Plaintiffs

apparently intend by this to convince the Court that something *must* have been wrong with

---

[15] Plaintiffs also ignore the fact that investing in an ETF limits an investor's losses to the money she deposits, unlike a margin account. *See, e.g.*, Complt. ¶ 106 ("Like the other ProShares . . . [a]nd unlike a margin account, you can't lose more than you invest."); SEC, "Margin: Borrowing Money to Pay for Stocks," (noting that "margin accounts can be very risky," that "you can lose more money than you have invested," and that, particularly in volatile markets, investors "may be required to provide additional cash" and that "the brokerage firm has the right to sell their securities that were bought on margin – without any notification and potentially at a substantial loss to the investor").

ProShares' disclosures, since investors in the funds at those times would have lost substantial sums of money.  By urging the Court to look at the results of hypothetical investments instead of evaluating the registration statements themselves, however, plaintiffs are engaging in classic hindsight pleading, which has been consistently rejected by the Second Circuit.  *See, e.g.*, *Lin*, 574 F. Supp. 2d at 421 ("To be actionable under Section 11, the registration statement must contain an untruth or material omission 'when such part became effective' . . . plaintiffs [must] at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were [ ] knowable, at the time of the offering.") (*quoting* 15 U.S.C. § 77k(a)); *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland*, 720 F.Supp.2d 254, 271 (S.D.N.Y. March 26, 2010) (dismissing as "hindsight allegations" plaintiff's claim that certain risk disclosures in a mortgage-backed security offering were insufficient); *Panther Partners*, 538 F. Supp. 2d at 66 ("In assessing whether a misrepresentation or omission was material, courts may not employ 20/20 hindsight; instead, they must consider whether the misrepresentation or omission was material on the date the prospectus or registration statement was issued.").

Rather than provide graphs based on the dates when any actual named plaintiff bought and sold the ETFs in question, plaintiffs cherry-pick date ranges for maximum effect, using different three-month ranges for UltraShort Funds (Complt. ¶¶ 137-147), UltraLong Funds (*id*. at ¶¶ 160-163), and Short Funds (*id*. at ¶¶ 175-176), as well as an additional 18-month range for some UltraShort Funds (*id*. at ¶¶ 149-153).  Given the previously discussed relationship between volatility in the benchmark indices and underperformance by the ETFs, a feature that was disclosed in the registration statements, it is not surprising that plaintiffs picked time periods (ranging from late 2008 to early 2009) characterized by extreme and historically unprecedented volatility in the underlying indices and markets generally.  *See, e.g.*, 5/31/09 N-CSR at 4

25

("Similar extreme volatility levels were reached previously only during the Great Depression period (1929 to 1932) and in the equity market crash of 1987."). For example, plaintiffs include a graph depicting the performance of the Ultra Real Estate Fund ("URE") from October 27, 2008 to January 28, 2009 (Complt. ¶ 160) without explaining why this graph is relevant, given that no named plaintiff held shares of URE during any part of that time frame. Indeed, no named plaintiff even bought shares of URE until February 2009. *See* Exhibit A (named plaintiff David Bowman first bought shares of URE in February 2009 and named plaintiff Martin Norris first bought URE shares in September 2009). Similarly, plaintiffs include a graph depicting the performance of the MSCI EAFE Fund ("EFZ") from October 7, 2008 to December 16, 2008 (Complt. ¶ 175), despite the fact that no named plaintiff bought shares of EFZ until June 2009. *See* Exhibit A (named plaintiff Dorothy Lowell first bought shares of EFZ in June 2009).[16]

Plaintiffs also fail to provide an explanation for how they picked the cut-off date for each graph – a choice with significant consequences. For example, plaintiffs assert that from January 16, 2009 to April 20, 2009, the Dow Jones U.S. Real Estate Index ("DJUSRE") fell 14.43% but the UltraShort Real Estate Fund ("SRS") (which was designed to track on a daily basis double the inverse of the DJUSRE) fell 44.08% instead of gaining 28.85% as allegedly expected. Complt. ¶ 137. Plaintiffs provide no explanation for why April 20, 2009 is the correct date to evaluate, however. Had plaintiffs instead used January 16, 2009 to March 6, 2009, for example, the DJURE would have fallen 34.7% and shares of SRS would have gained 67.1%[17] – almost

---

[16] Plaintiffs note that some named plaintiffs bought some of the Funds "within the time parameters" of some of the graphs. Complt. ¶ 178. Certainly no named plaintiffs bought URE or EFZ during the relevant time parameters. Moreover, this begs the question why plaintiffs did not use the actual buy and sell ranges for at least one of these plaintiffs in making their graphs instead of picking arbitrary dates.

[17] Plaintiffs also complain that URE, the Ultra Long fund for DJUSRE, lost money during the same time period despite the fact that this is exactly what plaintiffs "expected" (the index

exactly the double of the inverse.[18]  Similarly, plaintiffs allege that from January 6, 2009 to April

6, 2009, the Dow Jones U.S. Financials Index ("DJUSFN") fell 22.84% but shares of the

UltraShort Financials Fund ("SKF") (which was designed to track on a daily basis double the

inverse of the DJUSFN) fell 17.34% instead of gaining 45.68% as allegedly expected.  Complt. ¶

139.  Again, however, had plaintiffs instead used January 6, 2009 to March 6, 2009, the DJUSFN

would have fallen 47.7% and shares of SKF would have gained 145.2% (more than triple the

inverse).  Clearly ProShares' ETFs were not inevitably going to "lose" or perform opposite the

way they were "supposed to", but instead "diverge[d] significantly" from their respective

benchmarks (both positively and negatively) when held for certain longer time periods due to a

combination of compounding, leverage, and index volatility – just as disclosed in the registration

statements.  Plaintiffs chose arbitrary date ranges to make the alleged omissions seem more

material by magnifying their purported losses; such pleading by hindsight does not support

plaintiffs' claims.  *See Panther Partners*, 538 F. Supp. 2d at 66; *Lin*, 574 F. Supp. 2d at 421.

### D.    The Complaint Alleges No Actionable Misstatements or Omissions Regarding the Magnitude of the Risk of Holding ETFs for Longer Periods

Faced with the comprehensive disclosures in the registration statements, plaintiffs

attempt to argue that ProShares did not disclose *enough* about the risks regarding cumulative

returns for periods longer than a day.  These claims are also flatly contradicted by ProShares'

actual disclosures.  The registration statements repeatedly disclosed that cumulative returns

---

declined so the ultra long fund "should" have declined as well).  In fact, using these same dates,
plaintiffs would be saved money since if the DJURE declined 34.70%, one would "expect" the
URE to fall 69.4% but the URE only fell 60%.

[18] These returns are calculated using the same publicly available share and index price data relied
upon by plaintiffs in the Complaint, but simply use different end dates.  Such data are
appropriate for a motion to dismiss.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d
Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock price without
converting the motion to dismiss into a motion for summary judgment.").

might diverge "significantly" from the benchmark.  *See, e.g.*, 12/29/06 RS at 7 ("Over time, the cumulative percentage increase or decrease in the net asset value of the Fund may diverge *significantly* from the cumulative percentage increase or decrease in the multiple of the return of the underlying Index due to the compounding effect of losses and gains on the returns of the Fund.") (emphasis added); 9/28/07 RS at SAI 18 ("While close tracking of any Fund to its benchmark may be achieved on any single trading day, over time the cumulative percentage increase or decrease in the net asset value of the Shares of a Fund may diverge *significantly* from the cumulative percentage decrease or increase in the benchmark due to a compounding effect.") (emphasis added); 9/29/08 RS at SAI 17 (same); 11/21/08 RS (PS II) at 4 (same).

Plaintiffs also attempt to argue that ProShares failed to disclose enough detail about the *magnitude* of the potential divergence or the circumstances under which the cumulative returns could trend in the *opposite direction* from the benchmark's cumulative return.  *See, e.g.*, Complt. ¶ 99.  Any such "failure" cannot establish liability.  Issuers of securities are under no obligation to anticipate and disclose risks in the particular fashion that plaintiffs may with hindsight believe they should have.  *See, e.g.*, *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 588 (S.D.N.Y. 1993) ("[W]hen defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves."); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 7 (2d Cir. 1996) (noting that while the prospectuses contained "no specific statement" about the alleged bias, a reasonable investor would not be unaware of the risk based on the other disclosures).

Moreover, the registration statements disclosed repeatedly that investors should not expect cumulative returns to match those of the index, and that the divergence of those returns would be amplified by leverage and by market volatility – all of which could cause a

28

"significant" divergence.  Indeed, the "wedge" graphs illustrate quite clearly that *cumulative*

*returns* could have a severe divergence and could trend in the opposite direction from the

cumulative return of their respective indices during periods of high volatility.  *See* 9/28/07 RS at

SAI 18-20, 9/29/08 RS at SAI 17-19; 11/21/08 RS (PS II) at 24-26; Appendix A at 5.A-F;

Appendix B at 5.A-F.  For example, the "wedge" graph illustrating one-year cumulative returns

for ETFs seeking to achieve 200% of the inverse of the index's daily return (Appendix A at 5.A

(3rd graph)), shows that in a one-year period with cumulative index returns of -5% (and thus

"anticipated" returns of +10% in plaintiffs' view), substantial index volatility could cause

significant *negative* cumulative performance in the fund in that year (as much as -31.4%,

assuming index volatility of 40%).[19]  Plaintiffs have no basis to allege that these disclosures

would lead a reasonable investor to believe that the funds' net cumulative return over time would

always trend in the same direction as that of the benchmark index.  By the same token, it cannot

have been a material omission not to explain all the possible permutations of how the funds'

cumulative returns might diverge from their benchmarks over time.  *See, e.g.*, *Panther Partners*,

538 F. Supp. 2d at 664 ("The securities laws do not require clairvoyance in the preparation of

offering documents; these documents are not guarantees of an offering's subsequent success, nor

do they insure investors against . . . the volatility of the stock market itself.") (internal citation

omitted).  Accordingly, this alleged omission cannot be seen as material, as there is not a

---

[19] Plaintiffs' attempt to discredit these "wedge" graphs by arguing that they only include scenarios with up to 40% volatility.  Complt. ¶ 44.  Plaintiffs fail to allege, however, how inclusion of higher volatility levels would materially alter the total mix of information available. The reasonable investor already knew that increased volatility risked amplifying the divergence of the Funds' cumulative returns from those of their respective benchmarks.  *See* Appendix A at 5A-F; Appendix B at 5A-F.  In addition, the wedge graphs depicted that "opposite direction" movements started at 20% volatility and got more severe as volatility increased.  *See, e.g.*, Appendix A at 5.A (third graph).  No reasonable investor could claim to be surprised that this trend would continue if volatility rose even higher.

"substantial likelihood" that a reasonable investor would view the alleged omissions as "significantly alter[ing] the 'total mix' of information made available." *Basic Inc.* at 232 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)).

### E.   Plaintiffs Cannot Establish Liability by Attempting to Create New Obligations via a Mathematical Formula

Plaintiffs also allege that the registration statements were rendered misleading by the omission of a mathematical formula that allegedly allows for prediction of the results of holding the ETFs for longer than a day.  *See* Complt. ¶¶ 112-126.  The formula is allegedly "[b]ased upon Plaintiffs' counsel analyses."  Complt. ¶ 113.  It strains credulity for plaintiffs to assert that a reasonable investor required the inclusion of this formula in order to fairly understand the nature of the investment and the risks it entailed.  Plaintiffs' formula is a complex quadratic function that required plaintiffs ten paragraphs to explain in the Complaint; it requires four variables as inputs, one of which is the "annualized volatility of the index during the holding period" – hardly a piece of information that the average investor is likely to have at her fingertips.  There is simply no reason to think that the average investor could in fact use such a formula to project for herself the likely cumulative returns over time of her ETF investment or the magnitude of divergence between these returns and those of the benchmark.  This is why the ProShares registration statements explain in prose and in the "wedge" graphs what the formula purports to explain algebraically – that the cumulative return over time will diverge from the benchmark, and that divergence will be amplified by leverage and market volatility.  The lack of the inclusion of the formula could only give an investor "a green light" (Complt. ¶ 126) to hold for extended periods of time if that investor ignored all the textual warnings (even assuming that the average investor could understand the formula in the first place).  Since those textual warnings are plentiful, however, the alleged omission of the mathematical formula cannot be

seen as material, as there is not a "substantial likelihood" that a reasonable investor would view the alleged omissions as "significantly altering the total mix of information made available." *Basic Inc.*, 485 U.S. at 232 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)).

Plaintiffs attempt to argue that the mere fact that ProShares allegedly uses such a formula in managing the funds imposes on ProShares an additional duty to "project to the day" (Complt. ¶ 25) what would happen and warn investors. This alleged obligation is the definition of pleading by hindsight. The formula only "clearly revealed" (*id*. at ¶ 14) what would happen if one knew the value of all the inputs to the formula. In other words, using the power of hindsight, plaintiffs could (in 2011) plug in the actual index return, the actual leverage ratio, the actual holding period, and the actual annualized volatility of the index into the formula and use the formula to "predict" what actually did happen. This, of course, conveniently ignores the fact that, *at the time ProShares disclosed these risks*, there were an almost infinite number of potential results based on which ETF was bought, the holding period, the return, the index volatility, etc.[20] It would be impossible for ProShares to disclose every possible permutation of these variables. Securities laws do not require ProShares to use a crystal ball to see what will happen in the future. *See, e.g.*, *Panther Partners*, 538 F. Supp. 2d at 664.

In the end, plaintiffs' focus on the alleged mathematical formula and the "must lose"

---

[20] Plaintiffs argue that there have been instances of high market volatility in the past and thus ProShares should have disclosed that such high volatility was possible. Complt. ¶¶ 266-268. Even assuming the accuracy of plaintiffs' uncited and unsupported volatility figures, examples of certain volatile periods in certain individual markets does not make it any more possible (or any more legally required) for ProShares to forecast every possible result going forward. Given that predicting the future was impossible, ProShares instead warned in text form and in graphical form about the possible effects of volatility, putting the reasonable investor on notice. Moreover, contrary to plaintiffs' assertion, the *overall* volatility in 2008-09 was an extreme historical outlier. *See, e.g.*, 5/31/09 N-CSR at 4 ("Similar extreme volatility levels were reached previously only during the Great Depression period (1929 to 1932) and in the equity market crash of 1987.")

scenarios that allegedly result from this formula is simply another way to try to convince the Court that something *must* have been wrong with the disclosures if investors were "destined" to lose money with these ETFs.  *See, e.g.*, Complt. ¶¶ 15-20.  As demonstrated above, however, a "must-lose" scenario is only as reliable as the inputs plaintiffs choose to utilize.  If one simply shifts the dates used in plaintiffs' graphs, the funds would have made money, even during these periods of unprecedented volatility.[21]  *See* Section I.C, *supra*.  Similarly, in creating their hypothetical "must lose" scenarios, plaintiffs focus only on the levels of return, volatility, etc. that would result in losses.  Plaintiffs never mention, however, the *actual* situations in which the divergence between the funds' cumulative returns and the cumulative returns of their respective benchmarks actually earned the plaintiffs more money than "expected."  For example, named plaintiff Anthony Alexander conducted four separate buy-and-sell transactions of the REW Fund and in each case held his shares for at least three months.  *See* Exhibit A.  As per the risks disclosed by ProShares, his cumulative return from holding this REW Fund for a long period did "significantly diverge" from his expected return based on the benchmark – he made 34% more than "expected."  *See* Exhibit 7 to the Skinner Declaration.  This is because compounding can add to performance in trending markets (*i.e.*, the Fund's cumulative performance can be higher than the performance of the index times the stated multiple).  Other such examples can be found in Plaintiffs' Exhibit A.  As with plaintiffs' hypothetical graphs, it is clear that ProShares' ETFs were not "destined" to lose money but instead could significantly diverge (in a positive or negative direction) from their underlying benchmarks when held for long periods of time due to the combined effects of compounding, leverage, and index volatility.

---

[21] Two of the most volatile indexes underlying the ProShares Funds were DJSURE (94.6%) and DJUSF (85.1%).  *See* 5/31/09 N-CSR at 4.  Despite this high volatility, both Funds tracking these benchmarks would have *made* money during these trending periods using the alternate dates specified in Section I.C, *supra*.

Indeed, the wide variety of potential results is precisely why the textual warnings that ProShares made are more helpful to the reasonable investor than the inclusion of a complex quadratic formula.  The potential divergence between the funds and their benchmarks could be large or small, positive or negative, based on a number of different factors, including volatility. It would be impossible for ProShares to publish the formula results for every individual investor's portfolio.  Instead, ProShares stated repeatedly, in plain English and in numerous illustrative examples, *whenever a Fund is held for more than one day*, there is a risk that its returns will diverge significantly from its benchmark.  That way, reasonable investors were on notice of the risks of compounding, leverage, and index volatility and could proceed with their investment decisions accordingly.

### F.    FINRA's Statements Regarding ETFs Do Not Establish or Even Support a Claim for Registration Statement Liability

Plaintiffs cite to a succession of FINRA notices and analyst reports, apparently in support of an argument that leveraged and inverse ETFs are simply not appropriate investment vehicles for retail investors.  *See* Complt. ¶¶ 164, 233-35, 241-248.  Plaintiffs cannot connect the dots, however, to explain what these pronouncements or plaintiffs' allegations of unsuitability have to do with registration statement liability under Section 11 – as there is no connection.  The FINRA notices cited in the Complaint are directed to the brokers who advise individual investors, and say nothing about the inadequacy of any issuer's registration statements.  To the contrary, subsequent to the initial FINRA statements cited by plaintiffs, FINRA and the SEC issued a joint statement regarding leveraged and inverse ETFs.  In this statement, the regulators affirmatively encouraged investors to *read the prospectuses before investing*, because the prospectuses disclosed the risks of investing in an ETF.  *See, e.g.*, Joint FINRA/SEC Release at 2 (Aug. 18, 2009) (directing investors "to read the prospectus, which provides detailed information related to

33

the ETFs' investment objectives, principal investment strategies, risks, and costs.") (available at http://www.sec.gov/investor/pubs/leveragedetfs-alert.htm) (Skinner Decl. Ex. 8).[22]

### G.   The 2009 Registration Statement Disclosures do not Establish or Support Liability for Earlier Statements

Plaintiffs cannot establish liability for the registration statements in the class period by relying upon subsequent disclosures.  As evidenced in the attached Appendices, ProShares' disclosures often changed over time as periodic updates were issued.  The 2009 disclosures were the next stage of this evolution.[23]  The fact that the 2009 disclosures included some additional language regarding the same risks that had been disclosed in the prior versions does not establish in any way that the prior disclosures were inadequate.  The disclosures during the class period are more than sufficient, for all the reasons discussed above.  Indeed, many of the disclosures that plaintiffs allege were new starting in June 2009 (Complt. ¶¶179-186) had been included in previous SEC filings.  *Compare* Complt. ¶ 183 (noting that the June 24, 2009 registration statement "is the first time that Defendants began to partially acknowledge the compounding effect, its relationship to index volatility") *with* 5/31/08 N-CSR at 2 ("This is due to several factors, but a significant one is index volatility and its effect on fund compounding.  In general, periods of high index volatility will cause the effect of compounding to be more pronounced . . .").[24]  In any event, the more recent disclosures cannot be used as evidence that the previous disclosures were inadequate.  *See, e.g.*, *Krouner v. Am. Heritage Fund, Inc.*, 899 F. Supp. 142,

---

[22] The Court may properly consider these documents in deciding this Motion to Dismiss.  *See, e.g.*, *Garber v. Legg Mason, Inc.*, 347 Fed. Appx. 665 (2d Cir. 2009); *ATSI Commc'ns, Inc.*, 493 F.3d at 98.  Indeed, plaintiffs themselves rely on the joint FINRA/SEC press release.

[23] Some of this evolution was mandated by the SEC, which issued amendments to Form N-1A on January 13, 2009, requiring that key information appear in plain English in a standardized order at the front of the statutory prospectus – known as the "summary prospectus."

[24] Moreover, named plaintiffs continued to buy and hold these ETFs in 2009 and 2010, meaning the "new" information disclosed in 2009 could not have been material.

147 (S.D.N.Y. 1995) (refusing to consider later prospectus since Fed. R. Evid. 407 indicates

evidence of subsequent measures not admissible to prove culpable conduct); *Denny v. Barber*,

576 F.2d 465, 470 (2d Cir. 1978) (noting that plaintiffs allegations that disclosures made in later

annual reports should have been made in earlier ones was pleading by hindsight).

## II. PLAINTIFFS' SECTION 11 CLAIM ALSO FAILS BECAUSE THE ALLEGED LOSSES ARE NOT CAUSALLY CONNECTED TO THE ALLEGED MISSTATEMENTS OR OMISSIONS

Plaintiffs' Section 11 claims must also fail for the independently sufficient reason that

none of the alleged misstatements or omissions could have caused the decline in plaintiffs'

investments.  Under Section 11(e), a plaintiff is not entitled to damages if the decline in value of

the securities resulted from something other than the alleged misstatements or omissions in the

registration statement.  *See* 15 U.S.C. § 77k(e).  This "loss causation" prerequisite requires a

"causal connection between the material misrepresentation and the loss."  *Dura Pharms., Inc. v.

Broudo*, 544 U.S. 336, 342 (2005).  While lack of loss causation is an affirmative defense under

Section 11, *see* 15 U.S.C. § 77k(e), courts have dismissed Section 11 claims under Rule 12(b)(6)

when it is apparent on the face of the complaint that the alleged loss is not causally connected to

the alleged misstatement or omissions.  *See, e.g.*, *In re Merrill Lynch & Co., Inc. Research

Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003); *In re Vivendi Universal, S.A. Sec.

Litig.,* 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009); *Amorosa v. AOL Time Warner Inc.*, 2011 WL

310316 *3 (2d Cir. Feb. 2, 2011).

In the securities context, loss causation requires that "that the subject of the fraudulent

statement or omission was the cause of the actual loss suffered" and that "the misstatement or

omission concealed something from the market that, *when disclosed*, negatively affected the

value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir 2005)

(emphasis added) (internal citation omitted).  Plaintiffs cannot plausibly allege in this case that

the disclosure of some previously concealed or misrepresented "truth" is what caused the funds' share price to decline.  The price of shares of ETFs is not determined purely by the forces of supply and demand as in traditional open-market securities trading, where misstatements or omissions might distort the market's perception of the value of the security.  Instead, the market prices of the shares of the funds track the funds' NAV.  *See supra* pp. 7.  Because the NAV of the funds is determined by the price of the underlying securities, alleged misrepresentations regarding a fund's investment objective – rather than the inputs into the NAV calculation – can have no effect on a fund's share price.  *See, e.g.*, *Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) (noting that the price of "shares in a mutual fund . . . [is] unaffected by alleged misrepresentations and omissions concerning the fund itself"); *accord In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1188  (N.D. Cal. 2004).  The NAV declines that caused plaintiffs' losses were due to the decline in the value of the funds' underlying investments, regardless of what was disclosed about the investment objective of the funds.[25]

## III.   PLAINTIFFS LACK STANDING TO BRING THE CLAIMS AS ALLEGED IN THE COMPLAINT

Even if plaintiffs had a cognizable Section 11 or 15 claim, they do not have standing to bring these claims as broadly as alleged in the Complaint.  First, plaintiffs cannot bring claims with respect to funds that no named plaintiffs owned.  There are 44 different ETFs listed on Exhibit D, 38 offered by ProShares Trust and six by ProShares Trust II.  *See* Complt. ¶ 62, Ex. D.  Plaintiffs can only bring suit, however, against funds in which a named plaintiff held shares. *See, e.g.*, *In re Lehman Bros. Sec. and ERISA Litig.*, 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010);

---

[25] Because plaintiffs' Section 11 claim fails for the reasons set forth in the text, plaintiffs have thus also failed to state a claim under Section 15 – as they do not adequately plead a primary violation of the Securities Act.  *See, e.g.*, *Rombach*, 355 F.3d at 177-78.

*In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006). The named plaintiffs listed in the Complaint only claim to have purchased shares in 36 of these funds.  *See* Complt. ¶¶ 178(a)-(ii), Ex. A pp. 1-4.  As such, plaintiffs do not have standing to bring suit regarding the other eight funds (listed in Exhibit 9 to the Skinner Declaration). Further, for two of the other funds that were allegedly owned by named plaintiffs, the decision to hold these Funds for longer than one day did not occur during the class period.  These funds (also listed in Exhibit 9) must also be dropped for lack of standing.

Second, plaintiffs do not have standing to bring claims on behalf of those funds in which no named plaintiff suffered any losses.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347 (S.D.N.Y. 2003); *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F. Supp. 2d 192, 231 (S.D.N.Y. 2004).  Chris Honcik is the only named plaintiff who is listed in the Complaint as buying the MVV Fund.  His only trade of MVV during the class period was for a profit, as he sold 600 shares of MVV on January 19, 2007 for $79.20 per share after buying for $73.17 per share.  *See* Exhibit A.  Similarly, Dmitri Routski is the only named plaintiff who purchased shares of the SZK Fund.  His only trade of SZK was also for a profit (sold 15 shares of SZK on November 20, 2008 for $112.77 after buying them for $112.00).  *Id.*  These funds (listed on Exhibit 9) must also be dropped.

Third, plaintiffs do not have standing to bring claims challenging registration statements pursuant to which no named plaintiff purchased any of the ETFs listed on Exhibit D.  Plaintiffs list 23 registration statements on Exhibits B and C yet the named plaintiffs listed in Exhibit A only appear to have purchased relevant shares pursuant to seven of them:  those dated June 19, 2006, December 29, 2006, September 28, 2007; September 29, 2008 (all ProShares Trust) November 21, 2008, January 22, 2009, and February 27, 2009 (ProShares Trust II).  *See* Skinner

Decl. Ex. 10.   The other registration statements were either not operative when named plaintiffs bought their shares, covered ETFs not at issue in this case, or covered ETFs that no named plaintiff purchased.   Plaintiffs thus do not have standing to assert claims regarding these other registration statements.   *See e.g.*, *N.J. Carpenters Vacation Fund*, 720 F. Supp. 2d at 266.

## IV.   THE CLAIMS ASSERTED AGAINST THE ADDITIONAL DEFENDANTS IN THE AMENDED CONSOLIDATED COMPLAINT ARE BARRED BY THE STATUTE OF LIMITATIONS

The claims brought against defendants ProShares Trust II and Individual Defendants Edward Karpowicz, William Seale, and Charles Todd (collectively the "New Defendants") were asserted for the first time in the Amended Consolidated Class Action Complaint filed on September 24, 2010.   The applicable statute of limitations for these claims is set forth in Section 13 of the Securities Act, which provides that an action under Section 11 must be brought within one year after "discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . ."   15 U.S.C § 77m.   According to their own allegations, plaintiffs either did discover or reasonably should have discovered the facts upon which these claims are based more than one year before the filing of the Complaint.

The claims against ProShares Trust II are based upon its issuance of the registration statements listed in Exhibit C to the Complaint – with dates ranging between November 21, 2008 and June 1, 2009.   Named plaintiffs bought shares of ProShares Trust II ETFs between January and June 2009.   *See* Exhibit A to the Complaint.   The individual New Defendants have all been sued on the basis of their having allegedly signed one or more of the registration statements for ProShares Trust or ProShares Trust II, just as the original individual defendants were.   Thus, the gravamen of the claims against ProShares Trust II and the individual New Defendants is the same as those asserted against the original defendants – issuing and/or signing the registration statements for the ProShares leveraged and inverse ETFs.   The first class action complaint

alleging liability for the ProShares registration statements was filed on August 5, 2009.  Plaintiffs could have discovered at that point, with reasonable diligence, which registration statements had been issued by the ProShares Trusts and who signed them – information readily available on the SEC's website.  These facts establish "uncontroverted evidence clearly demonstrat[ing]" that the plaintiffs should have discovered the relevant facts before September 24, 2009.  *See Staehr v. The Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008).

## V.   THE BREACH OF CONTRACT CLAIM ASSERTED BY INDIVIDUAL PLAINTIFFS STEVEN AND SHERRI SCHNALL FAILS TO STATE A CLAIM

Individual plaintiffs Steven and Sherri Schnall (the "Schnalls") assert a breach of contract claim against ProShares Trust based on the same alleged material misrepresentations and omissions as the Section 11 and 15 claims, *see, e.g.*, ¶ 283.  This claim is, in short, a federal securities law claim masquerading as a contract claim, presumably in service of the ongoing efforts of the Schnalls and their counsel to maintain claims against ProShares outside the class action.  As an initial matter, the Schnalls do not even attempt to explain how their purchase of shares of an ETF on the secondary market, through a broker and from a third party seller, creates contractual privity with ProShares, the original issuer of the shares.

Even if this Court found that a contractual relationship did exist, the Complaint does not allege a plausible "promise" by ProShares that if the DJUSREI index fell, the SRS shares they owned would increase in value.  *See* Complt. ¶ 313.  Because the only alleged bases for such a promise are the registration statements that are the focus of the Section 11 and 15 claims asserted by the class plaintiffs, the Schnalls' contract claims fail for the same reasons detailed above – the clear and repeated disclosures regarding the daily nature of the SRS fund's objectives and the risks regarding cumulative returns over periods longer than a day.  *See also In re Alliance N. Am. Gov't Income Trust, Inc. Sec. Litig.*, 1996 WL 551732, *4 (S.D.N.Y. Sept. 27, 1996) ("The

investment objective announces the goal of the Fund, rather than a promise to investors.").

## CONCLUSION

For all of the foregoing reasons, ProShares and the Independent Trustees respectfully

request that the Complaint be dismissed in its entirety with prejudice.

Dated:  March 17, 2011                          Respectfully submitted,
                                                ROPES & GRAY LLP

                                                By: /s/ Robert A. Skinner
                                                Robert A. Skinner
                                                Prudential Tower
                                                800 Boylston Street
                                                Boston, MA  02199
                                                Tel: (617) 951-7000
                                                Fax: (617) 951-7050
                                                robert.skinner@ropesgray.com

                                                *Attorneys for defendants ProShares Trust,
                                                ProShares Trust II, ProShare Advisors LLC, SEI
                                                Investments Distribution Co., Michael Sapir, Louis
                                                Mayberg, Edward Karpowicz, William Seale,
                                                Ph.D., Simon Collier and Charles Todd*

                                                KRAMER LEVIN NAFTALIS & FRANKEL LLP

                                                By: /s/ Arthur H. Aufses III
                                                Arthur H. Aufses III
                                                1177 Avenue of the Americas
                                                New York, NY 10036
                                                Tel: (212) 715-9100
                                                Fax:  (212) 715-8000
                                                aaufses@kramerlevin.com

                                                *Attorneys for defendants Russell Reynolds and
                                                Michael Wachs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 17, 2011, I caused a true and correct copy of the foregoing document to be served upon all counsel of record via the ECF system.

<u>/s/ Robert A. Skinner</u>
Robert A. Skinner