UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| IN RE PROSHARES TRUST | : | Civil No. 1:09-cv-06935-JGK |
| SECURITIES LITIGATION | : | |
| | x | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Christopher Lovell (CL 2595)
Victor E. Stewart (VS 4309)
Ian T. Stoll (IS 3424)
Benjamin M. Jaccarino (BJ 1273)
**LOVELL STEWART HALEBIAN JACOBSON LLP**
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

Jacob H. Zamansky (JZ 1999)
Edward H. Glenn, Jr. (EG 0042)
Kevin D. Galbraith (KG 7512)
**ZAMANSKY & ASSOCIATES LLC**
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177

*Lead Counsel for Plaintiffs*

# TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, (U.S. Pa. 1997) .................. 32

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ........................................................ 20

*AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000) ........................................ 31

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ................................................ 20, 38

*Berry v. Village of Millbrook,* No. 09-CV-4234 (KMK),
    2010 WL 3932289 (S.D.N.Y. 2010) ................................................................ 37

*Blessing v. Sirius XM Radio Inc.*, No. 09 CV 10035 (HB),
    2010 WL 4642607 (S.D.N.Y. Nov. 17, 2010) ................................................... 31, 32

*Bowman* v. *ProShares, et al.* Civil Action No. 09-cv-9109 filed October 30, 2009 ................... 36

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001) ........................................ 31

*Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506 (S.D.N.Y. 2010) ........................... 8

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) .............................................................. 8

*First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998) ....................... 37

*Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419 (S.D.N.Y. 2009) ............................................. 8, 29

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154, (C.A.2 (Conn.) 2000) ...................................... 7

*Greenberg v. ProShares Trust*, No. MRS-L-0011-1-09, Trans. of Motion (July 9, 2010) .......... 29

*H.R. Huff Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008).................. 33

*Herman & MacLean v. Huddleston*, 459 U.S. 375 (1983) ............................................... 2

*Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) .................................................... 32

*Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (HB),
    2003 WL 21672085 (S.D.N.Y. July 16, 2003) ...................................................... 33

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998) ............... 5, 8, 23

*In re AES Corp.*, 825 F. Supp. 578 (S.D.N.Y. 1993)......................................................... 22

*In re Allbrand Appliance & Television Co.*, 875 F. 2d 1021 (2nd Cir. 1989)................................ 34

*In re American Intern. Group, Inc. 2008 Securities Litigation*,
    741 F.Supp.2d 511, (S.D.N.Y. 2010)............................................................................9

*In re AMF Bowling Sec. Litig.,* No. 99 Civ. 3023, 2001 WL 286758
    (S.D.N.Y. Mar. 23, 2001) .........................................................................................6

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*,
    2011 WL 223540 (S.D.N.Y. Jan. 19, 2011) ......................................................... 8, 9

*In re Blech Sec. Litig.*, 94 Civ. 7696 (RWS),
    2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ...................................................... 31

*In re Buspirone Patent Litig.,* 185 F.Supp.2d 363 (S.D.N.Y. 2002) ............................................ 29

*In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534 (N.D. Cal. 2009) ............................... 29

*In re CitiGroup Inc. Bond Litigation*, 723 F. Supp. 2d 568 (S.D.N.Y. 2010) .............................. 30

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB),
    2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000).................................................... 31

*In re Enron Corp.,* 298 B.R. 513 (S.D.N.Y. 2003)........................................................ 34

*In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419 (S.D.N.Y. 2009)........................................... 27

*In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68 (S.D.N.Y. 1996)................................... 8

*In re Prudential Sec. Inc.. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) ........................ 31

*In re South African Apartheid Litig.*, 617 F.Supp.2d 228 (S.D.N.Y. 2009) ................................ 31

*In re State Street Bank and Trust Co. Fixed Income Funds Investment Litig.*,
    --- F. Supp. 2d ----, 2011 WL 1206070 (S.D.N.Y. Mar. 31, 2011) .......................... 28

*In re Warnaco Group Sec. Litig.,* 388 F. Supp. 2d 307 (S.D.N.Y. 2005)...................................... 7

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2008 WL 728526 (S.D.N.Y.) ..................................... 7

*Iowa Public Employee's Retirement System v. MF Global, Ltd.*,
    620 F.3d 137 (2d Cir. Sept. 14, 2010) .................................................................. 5

*Krupski v. Costa Crociere S.p.A.,* 130 S. Ct. 2485, 177 L. Ed. 2d 48 (2010) ....................... 33, 34

*La Pietra v. RREEF America, L.L.C.*, 738 F. Supp. 2d 432, 439 n.1 (S.D.N.Y. 2010) ............... 30

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ......................... 27, 28

*Lin v. Interactive Brokers*, 574 F. Supp. 2d 408 (S.D.N.Y. 2008) ................................. 21

*Litwin v. Blackstone Group, L.P.* 634 F.3d 706 (2d Cir. 2011) ........................................ 2, 19, 20

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130 (U.S. Minn. 1992) ...................... 31

*Martens v. Thomann*, 273 F.3d 159 (2d Cir. 2001) ....................................................... 30

*Matrixx Initiatives, Inc. v. Siracusano*, --- S.Ct. ----, 2011 WL 977060 ...................................... 19

*Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51 (S.D.N.Y. 1993) ........................... 31

*Mimbre v. New Alliance Bancshares*, 206 Fed. Appx. 63 (2d Cir. 2006) .................................... 35

*Muhammad v. Pico,* No. 02 Civ. 1052 AJP, 2003 WL 21792158 (S.D.N.Y. 2003) ................... 33

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
    2010 WL 5222127 (S.D.N.Y. Dec. 22, 2010) ........................................................ 31

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ...................................... 21

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295 (U.S. 1999) ................................. 29, 30

*P. Stolz Family Partnership L.P. v. Daum*, 355 F. 3d 92 (2d Cir. 2004) .................................. 5, 8

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,* 538 F. Supp. 2d 662 (S.D.N.Y. 2008) ........... 21

*Public Employees' Ret. Sys. v. Goldman Sachs Grp.,*
    *Inc.*, 2011 WL 13582 (S.D.N.Y. 2011) ............................................................... 31

*Rafton v. Rydex Series Funds*, No. 10 Civ. 01171,
    2011 WL 31114 (N.D. Cal. Jan. 5, 2011) ......................................................... 20, 29

*Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459 (S.D.N.Y. 2009) .................................... 5

*Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785 (S.D.N.Y. 1997) ........................... 21

*Septembertide Pub, B.V. v. Stein and Day, Inc.*, 884 F.2d 675 (2d Cir. 1989) ........................... 35

*Spagnola v. Chubb Corp.*, 574 F.3d 64 (2d Cir. 2009) ................................................. 19

*Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000) ................................. 21

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) .................. 28

*Tedesco v. Mishkin*, 689 F. Supp. 1327 (S.D.N.Y. 1988) .............................................. 31

*TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438 (1976) ............................................... 7

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749 (U.S.Va. 1991) .............. 8

*VKK Corp. v. National Football League,* 244 F. 3d 114 (2nd Cir. 2001) ..................................... 32

*Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197 L.Ed.2d 343 (1975) ..................................... 29

*Woodhams v. Allstate Fire and Cas. Co.*, No. 10 Civ. 441 (JGK),
    - F.Supp.2d - , 2010 WL 3858440 at *4 (S.D.N.Y. Sep. 28, 2010) ........................................ 30

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA)*,
    341 F.Supp.2d 258 (S.D.N.Y. 2004) ................................................................ 35

## Statutes

15 U.S.C. § 77(a) *et seq* ........................................................................ 1, 19

## Other Authorities

Charles Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1357
    (3d ed. 2010 supp.) ........................................................................ 17

*MarketWatch* (July 17, 2006) ..................................................................... 11

## Rules

17 C.F.R. § 229.503 ........................................................................ *passim*

17 C.F.R. § 230421 ............................................................................... 2

Fed. R. Civ. P. 15(c) ........................................................................ 34

Fed. R. Civ. P. 15(c)(1) ........................................................................ 32

Fed. R. Civ. P. 15(c)(1)(B-C) ................................................................... 33

Fed. R. Civ. P. 8(a)(2) ........................................................................ 34

**POINT I.        SUMMARY**

Plaintiffs respectfully submit this memorandum in order to demonstrate that Plaintiffs have alleged valid claims under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77(a) *et seq* ("1933 Act"), and the Schnall plaintiffs have alleged a valid breach of contract claim.

Between August 6, 2006 and June 23, 2009 ("Class Period"), Plaintiffs and Class members suffered billions of dollars in losses from purchasing shares of certain Defendant Pro-Shares Trust exchange traded funds ("ETFs") pursuant to the ProShares Trust[1] Defendants' misleading Registration Statements and Amendments. Second Consolidated Amended Compliant ("Compl") paragraph ("¶")1-2 and Ex. B to Compl.  Separately, during 2008 and 2009, various Plaintiffs and Class Members suffered losses from purchasing shares of certain ProShares Trust II ETFs pursuant to the ProShares Trust II Defendants' misleading Registration Statements and Amendments.  See fn. 1; Compl. ¶¶1-2, 43 and Ex. B to Compl.

After the Class Period, Defendants belatedly began to make many new, very substantive disclosures (both qualitative and quantitative) that began to reveal the previously undisclosed important risks of large, rapid losses from an investment in Defendants' ETFs. ¶¶8, 44, 180-181, 183, 188.

### A.        <u>Plaintiffs Allege A *Prima Facie* Case By Pleading Material Omissions</u>

Section 11 of the 1933 Act…. was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.  **If a plaintiff**

---

[1] ProShares Trust, the signatories of the ProShares Trust Registration Statements and Amendments (Louis M. Mayberg, President; Michael L. Sapir, Trustee, Chairman; Russell S. Reynolds, III, Trustee;  Michael Wachs, Trustee; Simon D. Collier, Treasurer; and Charles S. Todd, Treasurer), and the other control persons of ProShares Trust (Defendant ProShare Advisors LLC) are referred to herein as the ProShares Defendants.

ProShares Trust II and the signatories to the ProShares Trust II Registration Statements and Amendments (Louis M. Mayberg, Principal Executive Officer; Edward Karpowicz, Principal Financial Officer) are referred to herein as the ProShares Trust II Defendants.

> **purchased a security issued pursuant to a registration statement, he [or she] need only show a material misstatement or omission to establish his *prima facie* case.**

[Emphasis added] *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

> "So long as a plaintiff establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, the general rule [is] that an issuer's liability ... is absolute."

*Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715-716 (2d Cir. Feb. 10, 2011) (internal citations omitted).

Plaintiffs have competently alleged a *prima facie* Section 11 claim by pleading that Defendants' Registration Statements contained "material omissions" of important risks of large, rapid losses. Under the *Blackstone* language quoted above, these material omissions both (1) violated "affirmative legal disclosure" requirements of the Securities and Exchange Commission ("SEC")[2]; and (2) were necessary to prevent from being misleading the disclosures in Defendants' Registration Statements of the names of the ETFs, the behavior of such ETFs during an investment holding period of longer than one day, and other aspects of the risk and rewards of investing in Defendants' ETFs. ¶¶ 18; 19-20; 22-24; 100-102; 127; 132-153; 156-157; 165-169.

The material facts which Defendants omitted to disclose were that investors could rapidly suffer large losses, even if they were correct in their judgment about the direction of the market,

---

[2] Specifically, by failing to disclose "clearly" in the "principal risks" portion of the Prospectus for each ProShares Trust ETF the "fundamental… investment risks of the Fund using concise, straightforward and easy to understand language", Defendants violated SEC Form N-1A (Registration Statement of Open-End Management Investment Companies), General Instructions, p. 6. *See* 17 C.F.R. § 230421 ("plain English").  Complaint ¶¶ 27-28.

For the ProShares Trust II ETFs, Defendants committed similar violations in using SEC Form S-1.  *See* Item 503 of Regulation S-K, 17 C.F.R. § 229.503 ("The registrant must furnish this information in plain English ... (c) Risk factors...").

by using Defendants' ETFs.[3]  The origin of this critical risk was that the undisclosed mathematical formula pursuant to which Defendants operated their new ETFs, was very vulnerable to one type of market condition. ¶¶112-126 (alleging in detail such mathematical formula and its consequences).  This type of condition was that the amount of volatility (that is, the day to day percentage change in price) of the index or other benchmark underlying the ETFs, significantly exceeded the performance of such index over any given period of time.  ¶¶15-16. When this condition existed, an investor who had made a correct judgment about the market could nonetheless rapidly suffer large losses if the investor acted on that judgment by investing in Defendants' new ETFs.  ¶¶17, 127, 132(d)-(e), 157 (c)-(g), 169 (c)-(g).

This type of market condition had come into existence hundreds of times between 1978 and 2007 in the equity, gold and silver markets alone. ¶¶ 45, 266-268.  It was materializing in most of the indexes Defendants followed from June 2008 forward. ¶¶ 22-24; 47(e); 52(f).  And Defendants' undisclosed mathematical formula told Defendants, to the day, when such large losses would begin if the excess index volatility did not subside. ¶¶ 13-16, 25-26. In fact, the excess volatility did not subside from June 2008 forward. ¶¶ 6, 22-24.  It worsened. ¶ 18, 133-153.

But, even after these dangerous conditions had materialized and were worsening, Defendants still continued to fail to disclose these important risks of rapid large losses.  ¶¶44-47; 48-52.  However, after the Class Period, Defendants belatedly began to disclose the qualitative and extreme quantitative risks of excess index volatility:

(a) ". . . **investors should recognize that the degree of volatility of the underlying**

---

[3] For one example, Plaintiff Karasick rapidly lost approximately one half his investment in a few months when he was right about market direction. ¶138; see ¶¶ 130-171 generally (alleging many other paradoxical rapid, large losses).

3

**index can have a dramatic effect on** a fund's longer-term performance." (*see* Complaint ¶ 180);

(b) "…In periods of higher market volatility, **the volatility of the benchmark may be at least as important to the Fund's return for the period as the return of the benchmark**…" ¶179.

(c) Defendants also disclosed for the first time the effects of index volatilities between 41 and 100% (even though such levels of index volatility had been in existence for more than 15 months). However, neither during nor after the Class Period, did Defendants disclose the debilitating effects of such dangerous levels of index volatility during periods of less than one year. Compare ¶¶22-24 *with* ¶138 (Lead Plaintiff Karasick lost almost half his investment in a few months time due to such dangerous, excess index volatility conditions).

Indeed, after the Class Period, Defendants promoted index volatility to co-equal status with the direction of the underlying index as ***the co-determinants*** of the outcome of an investment in the Defendants' new ETFs: "Daily objective leveraged funds if used properly and in conjunction with the **investor's views on the future direction and volatility of the markets can be** useful tools for investors..."[4] Complaint ¶¶185-186. During the Class Period, Defendants had not told investors that their ETFs could be a "useful tool" only "if used…in conjunction with the investor's views on the … volatility of the markets". Rather, the reason for investing in Defendants' ETFs had previously been the investors' views on the direction of the index. ¶¶2, 5,

---

[4] In addition to creating volatility disclosures, Defendants also emphasized after the Class Period that holding for more than a day without (what Defendants called) rebalancing the portfolio was subject to important risks. For example, in the sentence quoted in the immediately preceding text above, Defendants ended such sentence with "…who want to manage their exposure to various markets and market segments and who are willing to monitor and/or periodically rebalance their portfolios." *Id*. at 410, *see* Complaint ¶¶ 185-6. See fn 8 *infra*.

10, 186 (the only reason to invest was prediction on the direction of the underlying index).

### B.  Defendants' Arguments

Defendants concede, as they must, that they did not make any of the foregoing, very important quantitative and qualitative disclosures until, if at all, **after** the Class Period. Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Consolidated Complaint, filed March 17, 2011 (Docket No. 164) ("D.Br.") *passim*.  But Defendants then make here the same types of arguments that have repeatedly been rejected in this Circuit: generalized statements that do not warn of the specific risks, should supposedly suffice to dismiss Plaintiffs' claims at the pleading stage.[5]  Indeed, one of the primary authorities that Defendants rely upon was vacated for that reason.[6]

Defendants argue that they nonetheless provided sufficient disclosures to render immaterial the large risks at which Plaintiffs complain.  D. Br. pp. 12-19.

**First**, Defendants' "immateriality" argument cannot be reconciled with the many important new disclosures that Defendants made after the Class Period—even after the excess index volatility conditions no longer actually existed.  If Defendants are making such important disclosures when the excess index volatility conditions do **not** exist, Defendants certainly should have been making such important disclosures when such dangerous conditions were in existence and otherwise throughout the Class Period.

---

[5] *P. Stolz Family Partnership L.P. v. Daum*, 355 F. 3d 92, 97 (2d Cir. 2004) ("[T]he Second Circuit has held that risk language in a prospectus must "warn [ ] of the *specific contingency* that lies at the heart of the alleged misrepresentation." (emphasis supplied).);  *Hunt v. Alliance N. Am. Gov't Income Trust, Inc*., 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language ... must relate *directly* to that by which plaintiffs claim to have been misled") (emphasis supplied);

[6] *See Iowa Public Employee's Retirement System v. MF Global, Ltd.*, 620 F.3d 137 (2d Cir. Sept. 14, 2010), *vacating in pertinent part*, *Rubin v. MF Global, Ltd.*, 634 F. Supp. 2d 459 (S.D.N.Y. 2009) ("*Rubin*").  *See* D. Br. p. 16 (relying on the vacated part of the District Court's decision in *Rubin).*

**Second**, Defendants' main argument for **im**materiality is a non-starter that is contrary to the most important principle of statutory, contract and SEC disclosure document interpretation: the best interpretation is that which gives effect to *all the words* in the whole disclosure.[7] Defendants repeatedly urge this Court to give effect solely to an extremely limited portion of the Registration Statement that describes their ETFs' "daily" investment objectives, and states that holding periods of longer than one day will not have a perfect correlation to the daily objective. D. Br. pp. 9-10.  However, far more words and sections of the Registration Statement disclose at length the results of holding Defendants' ETFs for periods of more than one day (including a one year period, a five year period and other periods).  ¶¶101-102.  If a premature materiality assessment is to be made at this juncture, clearly the best interpretation of Defendants' disclosure document is as follows.  It advised investors of the results of holding Defendants' ETFs for a one year period, a five year period and other periods and undertook to describe that such outcomes could vary significantly from the outcome of the daily objective.

Contrary to Defendants' repeated *ipse dixits,* the totality of Defendants' disclosures about lack of a perfect correlation for holding periods of greater than a day, are **not** warnings of the specific risk that excess index volatility will cause large losses even when the investor is correct about the direction of the market.  ¶¶15-17, 32-33, 100-102, 108.  These generalized disclosures clearly do not reveal in any way the existence of the vulnerability of Defendants' mathematical

---

[7] *DeMaria v. Andersen,* 318 F.3d 170, 180 (2d Cir.2003) (in the context of determining the materiality of allegedly false or misleading statements or omissions found in registration statements or prospectuses, the document in question must be read "as a whole."); *In re AMF Bowling Sec. Litig.,* No. 99 Civ. 3023, 2001 WL 286758, at *4 (S.D.N.Y. Mar. 23, 2001) ("[i]n determining whether the statements contained in a prospectus are materially misleading, the prospectus must be read as a whole."); see *Dolan v. U.S. Postal Serv.,* 546 U.S. 481, 486 (2006) (interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis).

formula to excess index volatility and the resulting "must lose" conditions, of the ETFs.  Much less do they disclose that the Ultra Short funds are three times as sensitive to these conditions nor, for the last forty percent of the Class Period from June 2008 forward, that such conditions had already materialized.  ¶¶44-45, 47, 52(e), 134.

Indeed, after the Class Period, Defendants also greatly changed their "daily" objective disclosures to make them far more pointed.  How can this further need for substantial additional disclosure[8] be reconciled with Defendants' arguments of supposedly sufficient disclosure?

**Third**, trying to reconcile Defendants' during-and-post-Class Period disclosure practices at this juncture, is an **in**appropriate use of judicial resources because materiality is a fact-intensive issue usually **in**appropriate for resolution on a motion to dismiss.  *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 162 (2d Cir. 2000) (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450 (1976)) ("a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.").  *TSC Indus.,* 426 U.S. at 450 (because the determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inference to him," the materiality determination is "peculiarly one []for the trier of fact."); *see In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2008 WL 728526

---

[8] In addition to the new corrective disclosures in fn. 4 *supra*, Defendants also belatedly disclosed for the first time on July 31, 2009, that "A one year period is used for **illustrative** purposes only. Deviations from the index return times the fund multiple can occur over **periods as short as two days**." *Id.* (emphasis supplied), *see* Complaint ¶ 185; "Investors should understand the consequences of holding daily rebalanced funds for periods longer than a single day and should actively monitor their investments."  Amendment No. 16 at 407, *see* Complaint ¶ 184.

All these new disclosures also contradict Defendants' argument that, during the Class Period, investors were warned not to hold Defendants' ETFs for more than a day. Compare D. Br. pp. 33 *with* ¶¶100-102.

(S.D.N.Y.); *In re Warnaco Group Sec. Litig.,* 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005) ("The

question of materiality may be characterized as a mixed question of law and fact, and is

generally inappropriate for determination at the pleading stage of litigation.")

**Fourth**, as a matter of law, a Registration Statement cannot be held, at the motion to

dismiss stage, to transform an undisclosed material risk into an **im**material risk if that

Registration Statement fails to warn either of the specific risk[9] or of the likelihood or magnitude

of that risk.[10]  Analyzing the portions of Defendants' many Registration Statements that they rely

on, shows that Defendants failed to warn both of the specific risks here, failed to warn of the

imminent likelihood and extreme magnitude of such risks and now point to misleading

disclosures as truthful ones. See Point IV. *infra.*

**Fifth**, regarding magnitude and likelihood, even after the conditions creating the large

---

[9] *P. Stolz Family Partnership L.P. v. Daum*, 355 F. 3d 92, 97 (2d Cir. 2004) (prospectus
must "warn [ ] of the *specific contingency* that lies at the heart of the alleged misrepresentation.")
(emphasis supplied*); Hunt v. Alliance N. Am. Gov't Income Trust, Inc*., 159 F.3d 723, 729 (2d
Cir. 1998) ("The cautionary language ... must relate *directly* to that by which plaintiffs claim to
have been misled") (emphasis supplied); *In re Bear Stearns Cos., Inc. Sec., Derivative, and
ERISA Litig.*, 2011 WL 223540 at *56 (S.D.N.Y. Jan. 19, 2011) ("[t]o be "meaningful, a
cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk
of real deception drops to nil.'  True cautionary language must warn [ ] investors of *exactly* the
risk that plaintiffs claim was not disclosed.") (emphasis in original) (*quoting Virginia
Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S.Ct. 2749, (U.S.Va. 1991)); *See also*
17 C.F.R. § 229.503 (Item 503 of Regulation S-K requires an issuer to include "a discussion of
the most *significant* risk factors that make the offering risky or speculative") (emphasis added);
*cf. Citiline Holdings, Inc. v. iStar Fin. Inc*., 701 F. Supp. 2d 506, 519 (S.D.N.Y. 2010)
(discussing Item 503 in Section 11 context); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419,
442-43 (S.D.N.Y. 2009) ("Section 17…of the Code of Federal Regulations, also known as
'Regulation S-K,' provides standard instructions for filing forms under the Securities Act of
1933").

[10] *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The
doctrine of bespeaks caution provides no protection to someone who warns his hiking
companion to walk slowly because one might be a ditch ahead when he knows with near
certainty that the Grand Canyon lies one foot away."); *Edison Fund v. Cogent Inv. Strategies
Fund, Ltd*., 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (Koeltl, J.) (citing "Grand Canyon"
language with approval).

risks of rapid loss had materialized from June 2008 forward, Defendants continued to fail to disclose the immediate likelihood and large magnitude of loss from such excess volatility conditions.  "[W]arnings of specific risks…do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, No. 08 MDL 1963, - F.Supp.2d - , 2011 WL 223540 at *56 (S.D.N.Y. 2011), *quoting In re American Intern. Group, Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 531 (S.D.N.Y. 2010), *in turn quoting Credit Suisse First Bank Corp. v. American Fin. Grp., Inc.*, No. 99 Civ. 12046, 2001 WL 300733 at *8 (S.D.N.Y. May 28, 2001).

During the Class Period, Defendants' ETFs rapidly grew to $20 billion in shares outstanding as investors sought hedging protection from the declines in the equity markets, the commodity markets (or, in lead plaintiff Karasick's case) real estate.  ¶¶26(d); 62(c); 95; 104; 130; 137-138.  Defendants reaped more the than $500 million in management fees from this explosive growth in their ETFs (¶¶7, 289) during the times of their non-disclosures.  As a result, Defendants now have at least a significant social responsibility that is wholly contrary to any expectation that this Court should strive at the motion to dismiss stage to disentangle the fact intensive issues of materiality versus immateriality over a two-plus year Class Period involving multiple (forty four) different ETFs.  Regarding the multiple ETFs, another complexity is that twenty-five out of the forty four Class Securities were so-called "Ultra Short Funds".  These ETFs are three times more sensitive and vulnerable to large losses from the excess volatility condition.  ¶¶24-25; 52(e).  This greater sensitivity of the Ultra Short Funds (in which, for example, Lead Plaintiff Karasick invested) is yet another (fact intensive) disclosure that Defendants never made during the Class Period.  *Id*.

## C.  <u>Background: Defendants and their ETFs</u>

During the Class Period, ProShares Trust operated as an open-ended investment company under Section 8 of the Investment Company Act ("ICA"), 15 U.S.C. § 80a-8. ¶84.  From 2008 until the end of the Class Period, Defendant ProShares Trust II operated as a commodity pool pursuant to the Commodity Exchange Act ("CEA").  Complaint ¶85.  The ProShares and other Defendants (who are all described at ¶¶ 62-74) created or filed or signed registration statements for three "new" kinds of ¶¶ 9-11, 26, 75, 93.  These three new ETFs, which each employed leverage, were the following:

     a.     **Inverse ETFs**.  The net asset value of Defendants' "inverse" ETFs (sometimes called "single inverse" ETFs) would replicate the inverse movement of a specified index of securities or prices of a commodity or other benchmark over one day.

     b.     **Ultra Long ETFs**.  The net asset value of Defendants' "Ultra Long" ETF would **double** the performance of the underlying index, commodity or other benchmark on a daily basis.

     c.     **Ultra Short ETFs**.  The net asset value of Defendants' "Ultra Short" ETF would **double the inverse** of the performance of the underlying index commodity or benchmark on a daily basis.

¶93.  If the specific index, benchmark, sector or commodity on which an ETF is based, increases by 1% on a given day, then ProShares' corresponding **inverse** ETF would **decrease** by 1%; ProShares' corresponding **Ultra long ETF** would **increase** by 2%; and ProShares' corresponding **Ultra-short** ETF would **decrease** by 2%. ¶94.

On June 21, 2006, Defendants first offered their *inverse* ETF which sought to deliver the opposite of the daily performance of the index it tracked.  Plaintiffs thereafter purchased Defendants' ProShares Trust I Inverses DOG, PSQ and SH first issued at that time.

Subsequently Plaintiffs purchased Defendants' ProShares Trust I Inverses EFZ, first issued on

October 25, 2007; EUM, first issued on November 1, 2007; and SEF, first issued on June 12,

2008.

On or about June 21, 2006, Defendants first offered a *leveraged inverse* ETF (so-called

*Ultra Short*) sought a daily return that was a multiple of the opposite of the daily performance of

the index it tracked. *See* Complaint ¶ 9.  Various Plaintiffs purchased Defendants' ProShares

Trust I UltraShort MZZ, first issued at that time.  Subsequently, various Plaintiffs purchased

Defendants' ProShares Trust I UltraShorts DXD, QID and SDS, first issued on July 13, 2006;

SDD and TWM, first issued January 25, 2007; DUG, REW, SCC, SIJ, SKF, SMN, SRS, SSG

and SZK, first issued February 1, 2007; SKK, first issued February 22, 2007; SJF, first issued

February 27, 2007; EFU, first issued October 25, 2007; EEV, first issued November 1, 2007;

EWV and FXP, first issued November 8, 2007; and EPV, first issued June 18, 2009.  Certain

Plaintiffs also purchased Defendants' ProShares Trust II UltraShorts SCO, first issued on

November 25, 2008; and GLL and ZSL, first issued on December 3, 2008.  *See* Complaint ¶¶

178-79; Complaint Schedule A.

On or about June 21, 2006, Defendants first offered their Ultra Long ETFs which sought

to deliver a multiple of the daily performance of the index it tracked.  Certain Plaintiffs

purchased Defendants' ProShares Trust I Ultras DDM, MVV and SSO first issued at that time.

*See* Complaint ¶¶ 178-79; Complaint Schedule A. Subsequently, various Plaintiffs purchased

Defendants' ProShares Trust I Ultras UWM, first issued on January 23, 2007; DIG, URE, USD,

UXI, UYG and UYM all first issued on February 1, 2007.  *See* Complaint ¶¶ 178-79; Complaint

Schedule A. Various Plaintiffs then purchased Defendants' ProShares Trust II Ultras UCO, first

issued on November 25, 2008; UGL, first issued on December 3, 2008 and AGQ, first issued on

11

December 4, 2008. *See* Complaint ¶¶ 178-79; Complaint Schedule A.

> **1.  The Sole Reason For Investing In Defendants' ETFs, At Least During The Class Period, Was The Investor's Judgment About The Direction Of The Index**

The sole reason (until Defendants belated disclosures after the Class Period) for an investment in an ETF of Defendants was to profit from an anticipated movement in the direction of the index or other benchmark underlying such ETF.  ¶95.  Compare Complaint Ex. D (list of Class Securities) *with* Ex. A (Plaintiffs' purchases).  For example, in a July 17, 2006 article Defendant Sapir stated that ETFs could be used to:

> "to hedge stock portfolios against market pull backs,  the company said, ….Whether the strategy is to capitalize on a **trend or hedge against the risk of decline**, magnified exposure means the investor can commit half  the dollars to potentially obtain  the desired level of exposure." (Emphasis Supplied).

"Bearish investors get leveraged ETFs ProShares funds magnify gains when stock market falls," *MarketWatch* (July 17, 2006). ¶95.

There were many investment vehicles that provided viable alternatives for accomplishing the same investment objective as one of Defendants' new ETFs.  ¶96.  These alternatives included purchasing puts or calls on the index, purchasing or shorting the constituent stocks in the index, purchasing or selling index futures, and using a margin account and to do any or all the foregoing, purchasing or selling the commodity futures, etc. ¶96.  Defendants repeatedly compared their ETFs to an investor's opening a margin account and investing on margin.  ¶¶ 97,103-111.

It would be a material defect in any of these alternatives if such alternative suffered from an inherent risk that, even if the investor were correct on the direction of the index, or other benchmark, the investor would sustain large losses. ¶98.

Defendants' ETFs suffered this defect and numerous related risks of rapid, very large

losses.  ¶97. These risks were not described in the Defendants' Registration Statement pursuant to which Plaintiffs purchased shares of Defendants ETFs.

> ## 2.   The "Must Lose Even When You Are Right" Risk of Loss, And The Rapidity And Extreme Magnitude Of Such Losses

Defendants operated their funds pursuant to an undisclosed mathematical formula. ¶113. This formulaic operation automatically caused, in certain market conditions, large losses even when the investor was right in her judgment about the direction of the underlying index.  ¶3. These market conditions were that the volatility (the day to day percentage change in price) of the underlying index significantly exceeded the amount by which the index moved over the time period in question.  The greater the excess of volatility over performance, the more quickly the losses would occur. ¶¶180-182.

Under Defendants undisclosed mathematical formula, these unexpected losses were particularly rapid and large in Defendants Ultra Short ETFs.  ¶¶22-26; 52(e); 128-155. Obviously, any inherent risk that the investment would produce losses when the investor was correct in her investment judgment, was a serious risk (and defect) that sorely needed to be disclosed. ¶¶2-4.  Thus, Plaintiffs allege numerous related variations on this omitted material fact. E.g., ¶¶ 12-26, 96-98, 127, 132 (d)-(e), 157 (c)-(g), 169 (c)-(g).  These include the fact that it constituted an undisclosed defect in Defendants' ETFs compared to other investment alternatives, and negatively and materially changed the investment proposition offered by Defendants' ETFs.  ¶¶96-99.

This inherent risk of loss in Defendants' mathematical formula not only involved rapid and unexpected, indeed paradoxical, loss that altered the investment proposition. ¶¶ 16-17. It also involved potentially a very large **magnitude** of loss.

> ## 3.   The Extreme Magnitude Of The Risk Included Losing More Than Half The

13

**Investment In A Few Months Even When The Investor Is Right About The Direction Of The Index.**

Again, Lead Plaintiff Karasick purchased Defendants' Ultra Short real estate fund ("SRS") in December, 2008 to hedge against declines in real estate values. ¶138. Defendants' Ultra Short funds moved twice as much in the **opposite** direction as the benchmark index. Thus, if the real estate index declined 10%, Plaintiff Karasick should have made 20% on his substantial investment in SRS. From the time of his December 2008 purchase until Plaintiff Karasick's April 2009 sale, the underlying real estate index was down 5% and Karasick should have received a 10% gain on his substantial investment in SRS. ¶138.

Instead, Plaintiff Karasick rapidly suffered in less than 5 months the loss of almost one half of his investment (45%) in Defendants' SRS fund. ¶138. The critical risk that Defendants' undisclosed mathematical formula could cause Plaintiff Karasick or other class members to rapidly lose approximately one half of their investment in a few months' holding period, even when they were right on the direction of the market, was never disclosed by Defendants until **after** the Class Period when Defendants' corrective disclosures occurred.

Plaintiffs allege in detail twenty one other examples of rapid, large losses when the market moved in favor of the investor. ¶¶ 131-170. Part of the rapidity and magnitude of Lead Plaintiff Karasick's extraordinarily large, extraordinarily quick loss was due to the fact that he invested in an Ultra Short fund. ¶¶132, 138-139, 178(a). Again, Defendants' Ultra Short funds were three times as sensitive and vulnerable to conditions in which the index volatility exceeded its performance. ¶132(a) (alleging that this three times greater vulnerability of the Ultra Short funds is a separate actionable omission rendering numerous statements made about volatility or the Ultra Short funds wholly misleading). Again, Defendants did not disclose this important fact either.

14

**4. The Conditions Creating These "Must Lose" Risks Had Existed Hundreds Of Times Before The Class Period And Were Actually Materializing And In Existence From June 2008 Forward.**

These conditions in which the volatility significantly exceeded the performance of a given stock index or commodity had occurred hundreds of times between 1978 and 2007 (¶46), and generally began to materialize in all of Defendants' indexes from June 2008 through at least the June 23, 2009 end of the Class Period. ¶¶2, 6, 22-24, 26(c).

In June 2008, Defendants' undisclosed mathematical formula told Defendants, to the day, when the large losses from investors' correct judgments about the market would begin to occur if this excess volatility condition did not subside.  ¶¶13-16.  From June 2008 forward, such condition did not subside. ¶ 6.  It greatly worsened. ¶¶18, 133-153.

**5. By Failing To Disclose Such Risks, Defendants Grew Their Funds To $20,000,000,000 In Shares Outstanding And Created $500,000,000 In Management Fees.**

It would have cost Defendants nothing (except the loss of prospective customers), to disclose these specific risks.  Complaint ¶ 7, 25.  But, again, Defendants' new products' vulnerability to large losses when the investor was right about the direction of the market, was a serious defect compared to the many investment alternatives available to investors to pursue their same market judgments. ¶¶5, 21, 26-39, 96.  In any event, in their Registration Statements, Defendants expressly described the results of investing in their ETFs for periods of one year, five years, and ten years --- Complaint ¶ 102 (a) - (h) (alleging dozens of disclosures to this effect made by Defendants in the Registration Statements) --- and otherwise consistently encouraged investors to invest in ProShares' ETFs for extended periods. Complaint ¶¶ 101-102.

Defendants' did state in their Registration Statement that their ETFs' investment objective was for "daily returns"; that Defendants did not seek to achieve long term cumulative

investment returns in their ETFs; and that Defendants could **not** seek such long terms returns. ¶ 100.

But Defendants did not disclose the material risks of large and rapid losses from holding their ETFs for more than a day that arose from the excess index volatility conditions.  For example, the prospectuses in the June 26, 2006 Registration Statement and Amendments thereto through July 10, 2007 do not contain disclosures on day-to-day volatility of the underlying benchmark or index.  They only discuss the impact of other factors on the volatility various markets of the ETFs themselves.  *E.g.*, prospectus in the Registration Statement, filed June 22, 2006, pp. 16, 37 ("short sales can increase volatility";  "equity markets are volatile . . . [and t]his volatility may cause the value of an investment in a Fund to decrease.").  *See* Complaint ¶ 225.  The prospectuses and the SAIs in the June 22, 2006 Registration Statement and Amendments through July 10, 2007 do not contain any tabular or graphical examples involving index volatility.  *See* Complaint ¶ 228.  Such documents stated in the SAI only that: "To the extent discussed above and in the prospectus, the Funds present certain risks, some of which are further described below … Leverage should cause higher volatility of the net asset values of these Funds' Shares…"  *See* Complaint ¶ 229.  Thus, for more than the first year of the Class Period, the only substantive disclosure regarding volatility that Defendants made related to the volatility of the ETF **not** index volatility.

In fact, of the 44 ETFs that are the subject of the Complaint, based upon their inception dates, 10 of the 13 Ultras, 17 of the 25 UltraShorts and 3 of the 6 Inverses were originally issued and sold to investors without any material risk disclosures to investors regarding  index volatility whatsoever.

Beginning on or about September 28, 2007, Defendants dropped even the non-index

volatility risk factor entirely from "Principal Risks", and instead made volatility merely a factor

that affected correlation risk with leveraged funds: "there is a special form of correlation risk that

derives from these Funds' use of leverage, which is that for periods greater than one day, **the use**

**of leverage tends to cause the performance of a Fund to be either greater than or less than**

the index performance times the stated multiple in the fund objective, before accounting for fees

and fund expenses. . ." [Emphasis added.]  Complaint ¶ 32 (citing to  ProShares Trust

Registration Statement Amendment Nos. 6, 8-14, containing the 9/28/07 (6), 2/28/08 (8), 6/10/08

(9), 9/29/08 (10), 11/21/08 (11), 12/5/09 (12), 6/2/09 (13), 6/23/09 (14) Prospectus).

However, the "either greater or less than index performance" portion of the foregoing

statement was misleading or untrue in excess index volatility conditions:

> **Whenever** the volatility of the underlying index significantly
> exceeded its performance over time, then "the use of leverage" in
> Defendants' undisclosed mathematical formula **automatically "caused**
> **the performance of the Fund"** to be not only "less than" what was
> expected.  It caused the performance **to move in the opposite direction** of
> what was expected.  This locked the investor into an unexpected "must
> lose" situation.  It defeated the main reasons for the investment.  It meant
> that she lost regardless of whether the underlying index moved in her
> favor, moved against her, or was unchanged.  Neither the "use of
> leverage" nor any other aspect of Defendants' ETFs ever placed the
> investor in a "must gain" position.

Complaint ¶33.

Defendants stated that the results of holding their ETFs for more than a day could be

"significantly different" from the index performance times the stated multiple of the ETF.

Complaint ¶¶ 100-111; Registration Statement Amend. Nos. 6, 8-14, 16-18.

Defendants presented 0.7%, 0.6% and 2.29% as examples of the exacerbated significant

deviation from perfection that resulted from holding their ETFs over a one year period.  ¶¶33-38.

Thereby, Defendants lulled investors into believing that the standard for "significant deviation"

was set at a very tolerable, even low area.  These 0.7%, 0.6% and 2.29% per annum examples were extremely misleading in light of the fact that investors could, and necessarily did, repeatedly lose approximately one half their investments over holding periods of substantially **less than** a year.  Compare ¶¶ 33-39 *with* ¶138 and ¶¶ 130-170 generally.

In the context of the foregoing risk disclosures, the disclosure that, over one year, the performance would "deviate significantly" from an exact correlation to the expected performance, did not even begin to warn of (a) the true "must lose" risks, and (b) the extraordinarily large magnitude of loss from such risk. ¶¶ 12-17, 133-155, 156-164, 165-176, 178, 238.

### 6.    Compounding Risk Disclosures

Originally, Defendants stated: "Over time, the cumulative percentage increase or decrease in the net asset value of the Fund may diverge significantly from the cumulative percentage increase or decrease in the multiple of the return of the underlying Index due to the compounding effect of losses and gains on the returns of the Fund. Consequently, for periods greater than one day, investors should not expect the return of the Fund to be twice the return of the underlying Index. **In addition, in trendless or flat markets it is expected that the Fund will underperform its benchmark Index."** [Emphasis supplied] *See, e.g.*, Prospectuses in Amendments Nos. 1 through 5 to the Registration Statement, as filed with the SEC on August 30, 2006, December 29, 2006, February 13, 2007, June 15, 2007 and July 10, 2007, pp. 6-7. Complaint ¶199.

Defendants never explained during the Class Period the true extent to which volatility could affect compounding, and that in conditions of excess index volatility, investors could rapidly suffer large losses even if they were right about the market.  However, it was only after

the Class Period that Defendants began to acknowledge that: "[compounding] becomes more pronounced as volatility increases…" *See* June 23, 2009 Amendment No. 14 to Registration Statement, p. 9; Complaint ¶ 183.

****

Likewise, in the other portions of their Registration Statements during the Class Period, Defendants never disclosed these material risks of rapid large losses, even when the investor was right on the direction of the Market. Nor did Defendants disclose the facts that, from June 2008 forward, such risk was materializing and, if conditions did not change, Defendants' investors would soon suffer large losses. ¶¶5-6, 8, 22-26, 48-52.

However, after Defendants received their large, life-changing management fees (in excess of $500,000,000), Defendants belatedly began, in late June-September 2009, to disclose the vulnerability of their funds to large losses from favorable movements in the underlying index.  ¶¶179-188.  See pp. 5-7 *supra.*

**POINT II.    DEFENDANTS' FAIL THEIR BURDEN UNDER FRCP RULE 12(b)(6) WITH RESPECT TO THE MAGNITUDE OF THE UNDISCLOSED RISKS AND ALL OF DEFENDANTS' OTHER ARGUMENTS**

In moving pursuant to Rule 12(b)(6), Defendants bear the burden of showing that no claim has been stated. *Compare* 5B Charles Wright & Arthur Miller, Federal Practice and Procedure § 1357 (3d ed. 2010 supp.) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists.").  As this Court well knows, Defendants must shoulder their burden by taking "all well-pled factual allegations as true **and draw[ing] all reasonable inferences in the plaintiff's favor** to decide whether the plaintiff has pled a **plausible** claim for relief." [Emphasis added here and in all quotes unless otherwise noted.]  *Spagnola v. Chubb Corp.,* 574 F.3d 64, 67 (2d Cir. 2009).

A complaint alleging a violation of Sections 11 "need only satisfy the basic notice pleading requirements of Rule 8."[11] Under these guidelines, Plaintiffs' fact allegations clearly raise "a reasonable expectation that discovery will reveal evidence"[12] that Plaintiffs purchased shares of Defendants' ETFs pursuant to Defendants' registration statements which contained material omissions that violated affirmative disclosure requirements or were necessary to make the statements in the Registrations not misleading.  Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a); *Blackstone,* 634 F.3d at 715-716.  Most important, Defendants try to argue that the undisclosed extreme magnitude and undisclosed imminent likelihood of the undisclosed excess index volatility risks are not actionable.  D. Br. pp. 27-33.  But Defendants failed, until after the Class Period, to disclose such critical information which directly caused large losses to

---

[11] *Compare Blackstone supra*, 634 F.3d at 718 *with Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) ("short and plain' statement of the plaintiff's claim").

Contrary to Defendants, only if "the gravamen of the complaint is plainly fraud" does Rule 9(b) apply.  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  In this case, Plaintiffs need not prove, much less plead, that defendants intentionally made the misleading statements.  *See Blackstone*, 634 F.3d at 715.

Defendants give lip service to their argument that the Complaint sounds in fraud and must satisfy F.R.C.P. Rule 9(b).  But, tellingly, in support they only cite Complaint ¶¶ 5-8 – out of 316 paragraphs in the Complaint.  These paragraphs are completely in keeping with Section 11 allegations.  Paragraphs 5-8 simply describe how Defendants misstated the relevant risks and relate how the Funds grew into the billions of dollars.  *See* Complaint ¶¶ 5-8.  They show Defendants' significant social responsibility resulting from their huge profits.  They do not transform the rest of the Complaint into fraud allegations Defendants almost concede their half-hearted argument by stating that "[i]n the end, whether plaintiffs' claims sound in fraud is of little matter."  Def. Br. at 14.

[12] The critical question on an FRCP Rule 12(b)(6) motion is whether the allegations suffice "to 'raise a reasonable expectation that discovery will reveal evidence'" and thereby "'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Matrixx Initiatives, Inc. v. Siracusano*, --- S.Ct. ----, 2011 WL 977060 at *12 n.12 ((quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)); Asking for plausible grounds to infer [liability] . . . **does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the elements of the claim]**. . . .And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.' *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("*Iqbal*").

class members.  Even warnings of specific risks (which clearly were not made here) "…do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, No. 08 MDL 1963, - F.Supp.2d - , 2011 WL 223540 at *56 (S.D.N.Y. 2011), *quoting In re American Intern. Group, Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 531 (S.D.N.Y. 2010), *in turn quoting Credit Suisse First Bank Corp. v. American Fin. Grp., Inc.*, No. 99 Civ. 12046, 2001 WL 300733 at *8 (S.D.N.Y. May 28, 2001).

### A.     Defendants' Daily Investment Objective Disclosures Do Not Warn of The Specific Risks At Issue

Notwithstanding Defendants' very substantial new disclosures after the Class Period when the excess index volatility conditions have subsided, Defendants repeatedly argue that their disclosures of the ETFs' "daily investment objective" and that the ETFs' performance could vary significantly from the projected daily performance, render the alleged non-disclosures immaterial.  D. Br. pp. 9-13.  First, Defendants' "daily objective" and related disclosures must be read, as a whole, with Defendants' far more extensive disclosures describing the outcome if investors would buy Defendants ETFs, pay the management fees to Defendants, and hold the ETFs for periods of one year, five years and ten years.  See cases collected at fn. 7 *supra*.

Reading all the disclosures *in pari materia*, Defendants encouraged investors to hold Defendants' leveraged ETFs for extended periods and repeatedly implied that there were no material undisclosed risks involved. *See, e.g.,* Complaint ¶¶ 101, 102(a)-(h), 170, 174.

Defendants argue that these disclosures about one year and other holding periods were made only because they were required by SEC regulations. Def. Br. at 21.  However, Defendants nowhere qualified any of those statements or charts to apprise investors that such disclosures were only provided because they were required by the SEC.  Defendants nowhere stated they

were not to be relied upon in making investment decisions.  Instead, Defendants enticed

Plaintiffs to use their leveraged ETFs for periods much longer than a single day. *See Rafton v.*

*Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, (N.D. Cal. Jan. 5, 2011)

(disclosing the daily objective of the defendants' ETF fund and the effects of compounding were

insufficient at the pleading stage to gain dismissal).

Furthermore, disclosures that results may vary significantly if the ETF is held for more

than a day, must be read in light of the examples of the deviations provided in the Principal Risks

portion of the ProShares Trust prospectuses from September 2007 forward:  0.7% per annum,

0.6% per annum and 2.2% per annum.  ¶¶33-38.  Reading Defendants' disclosures as a whole,

they did not warn of the specific risks of excess index volatility let alone of the extreme

magnitude and, for June 2008 forward, the imminent likelihood of such large, rapid risks of loss

from an investment in Defendants' ETFs.

Defendants' case citations are thus inapposite.  *See Olkey v. Hyperion 1999 Term Trust,*

*Inc.*, 98 F.3d 2, 5-6 (2d Cir. 1996) ("prospectuses warn[ed] investors of *exactly the risk plaintiffs*

*claim was not disclosed*" by warning that "[a] significant decline in interest rates could lead to a

significant decrease in…net income and dividends.…"). Here Defendants did not disclose that, if

the index volatility significantly exceeded the index performance there would necessarily be

large losses. *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,* 538 F. Supp. 2d 662, 664

(S.D.N.Y. 2008) (risk statements about quality control "cover[ed] the exact risk later realized,

namely, the potential manifestation of a quality control problem"). Here, there was no mention of

index volatility risk, let alone disclosure of the large magnitude of losses that could result

therefrom nor the fact that the risks had materialized. Defendants' other cases are also inapposite.

*Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 305 (S.D.N.Y. 2000) ("[w]ith respect to PRT's

alleged failure to disclose certain risks involved with recruiting IT personnel, the prospectus is rife with references to the extremely limited pool of qualified IT professionals"); *Lin v. Interactive Brokers*, 574 F. Supp. 2d 408, 418-19 (S.D.N.Y. 2008) (rejecting as hindsight pleading the claim that defendants should have disclosed they were going to lose money at the end of the quarter);  *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 793 (S.D.N.Y. 1997) (rejecting allegations of misstatements concerning consumer demand where the defendants "specifically warn[ed] that consumer demand-both present and future-was subject to change and contingent on factors 'such as the timing of significant orders and the timing of new product introduction by the company and its competitors'"); *In re AES Corp.*, 825 F. Supp. 578, 587 (S.D.N.Y. 1993) (defendants warned of the specific risk at issue, the risk of local opposition to a cogeneration plant, and even disclosed an investigation concerning the plant; court also held that defendant "could not have known [and thus] need not have disclosed" the precise manifestation of risk).

In *Hunt v. Alliance N. Am. Gov't Income Trust, Inc*., 159 F.3d 723 (2d Cir. 1998), plaintiffs brought Section 11 claims alleging that various mutual fund prospectuses misleadingly stated that the fund manager intended to use hedging techniques to reduce currency risk when defendants knew, as a practical matter, that the fund could not use hedging techniques to protect against currency fluctuations.  *Id.* at 724-25.  The Second Circuit reversed the dismissal that because the defendants did not specifically disclose the *relevant* risk that plaintiffs alleged caused them the losses complained of, the disclosures were inadequate and actionable under Section 11:

> The cautionary language contained in the prospectus does not necessarily foreclose liability *because it warned investors of a different contingency than that which plaintiffs allege was misrepresented*. The prospectuses warned that the Fund's hedging maneuvers might fail, not that the

> Fund would have no opportunity to use hedging maneuvers. *Plaintiffs allege the prospectuses were misleading as to the latter.* That the prospectuses disclosed the possible inefficacy of hedges does not shield the Fund from liability for misrepresenting the availability of hedging opportunities. According to plaintiffs' theory, investors who trusted the astuteness of the Fund's managers would be reassured as to their ability to reduce risk through hedging, notwithstanding the warning that their hedging efforts might be foiled, whereas in truth, according to the Amended Complaint, the Fund would have no opportunity to reduce the risk of currency fluctuation by hedging….

*Id.* (emphasis supplied)

Courts in this District regularly hold such incomplete risk language in offering documents to be misleading where it did not specifically disclose the relevant risk. *See New Jersey Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 WL 1473288 at \*5 (S.D.N.Y. Mar. 29, 2010) ("[t]he cautionary language in the Offering Documents, however, cannot shield Defendants from liability here. The disclosures fail to make clear the magnitude of the risk"); *In re AIG,* 2010 WL 3768146, at \*15 (S.D.N.Y. Sep. 10, 2010) ("warnings of specific risks like those in [defendants'] Prospectus do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described"); *Freidus v. ING Groep N.V.*, 736 F. Supp. 2d 816, 841 (S.D.N.Y. 2010) ("extensive" and "detail[ed]" risk disclosures were insufficient where they were undercut by other statements and where other risks were accentuated; court could not "conclude as a matter of law that no reasonable investor would have found additional disclosures…immaterial as a matter of law"); *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 589 (S.D.N.Y. 2010) (executives liable under Section 11 for "underrepresent[ing] the full scope of risk")

### B.    Contrary to Defendants, They Did Violate SEC Disclosure Requirements

Under SEC rules, Defendants were required to disclose in the prospectus the "fundamental…investment risks of the Fund using concise, straightforward, and easy to

understand language." Compl. ¶27, ¶¶126(b)-(c) ("SEC's general instructions for filing a Form N1-A Registration Statement expressly provide that "[t]he purpose of the *prospectus* is to provide *essential* information about the Fund in a way that will help investors to make informed decisions about whether to purchase the Fund's shares described in the prospectus." (Emphasis supplied); *see also* 17 C.F.R. § 274.11A (cross-references to the Statement of Additional Information  or annual reports are to be avoided if possible, and all *major* Risk Factors are to be clearly explained in the prospectus part of the Registration Statement).

Defendants failed to disclose the excess index volatility risks and related facts in the Principal Risks portion of the prospectus part of the Registration Statement as required by SEC regulations.  ¶¶1-4, 27-28; *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) ("The question is whether, assuming the truth of plaintiffs' allegations, the Offering Documents omitted information that defendants were required to disclose.").

**1.  The Wedge Graphs Were Misleading And Otherwise Did Not Comply With SEC Disclosure Requirements**.  Defendants effectively argue that they began to comply with SEC guidelines during the latter part of the Class Period from September 2007 forward, for ProShares Trust I Registration Statements.  Def. Br. pp. 18-19.  They did so by including certain numerical "matrix" disclosures in the Statement of Additional Information.  *Id*.  However, Defendants' matrix disclosures were misleading because they failed to disclose the results of the dangerous levels of index volatility between 41% and 100% (even **after** such levels actually existed), further failed to disclose the effects of excess volatility during a time period of less than one year, and otherwise omitted material facts.  ¶¶44-47, 52(f), 134; see ¶¶218-219 (Defendants also failed to characterize how to use or extrapolate from the numbers).

Moreover, the matrix is not text disclosure.  Further, the matrix was put in the Principal Risks portion of the Prospectus in the ProShares Trust II Registration Statements during 2008.  If it could be put in the Prospectus there, it clearly could have been put in the Prospectus described to investors in the ProShares Trust Registration as well.  Finally, the numerical matrix presentations in the Principal Risk portion of the ProShares Trust II Registration Statements were not presented in terms of volatility risk.  The numerical matrix presentations in the principal risk portion of the ProShares Trust II Registration Statements was not presented for the purpose of highlighting index volatility risk but instead was included solely to illustrate the effects of the use of leverage as it affected correlation risk.  While Defendants used a heading containing the words "price volatility", it is clear from the context that such warning referred only to the purchase of certain swap agreements, futures and forward contracts and not the volatility of the commodities index being tracked. *See, e.g.*, ProShares Trust II Form S-1/A Am. #5 on 11/17/08 at pp. 24-26.  And the ProShares II matrix presentation was misleading for the same reasons that the ProShares Trust matrix was misleading.  ¶¶44-47, 52(f), 134, 218-219.

The large immediate risks of loss from excess index volatility that occurred over a matter of a few months to Lead Plaintiff Karasick, were not addressed in plain English anywhere in Defendants' disclosures, nor were they addressed anywhere in what Defendants call the "wedge" numerical presentations.  Further, the artificial limitation of such "wedge" graphs to 40% index volatility, after volatility levels were already in excess of 90%, left the numerical disclosures far behind the steepening disclosure curve.

Burying the critical information that was prominently disclosed after the Class Period (when index volatility had subsided) during the Class Period (when index volatility was at 90%-100%), did not begin to apprise investors of the material risks.  (A fact may come in discovery

and be supported by Defendants' own internal memoranda analyzing why they did not comply with standard disclosure practice and describe the consequences of investing for even a few months in the actually-existing conditions of 90%-100% index volatility).

**2.  Compliance With SEC Requirements Is Especially Appropriate For Extreme Risks Of Loss In Proprietary, New, Complex Products**.  After the Class Period and after the high index volatility had subsided, Defendants promoted the excess volatility risks to co-equal status with the direction of the index.  See pp. 4-5 *supra*.  Therefore, the Instructions governing Form N-1A, on which all ProShares Trust I registration statements were written, and those Federal Regulations governing all registration statements, clearly required that excess volatility risks were required to be prominently disclosed in the main body of each of the ProShares Trust and Trust II prospectus during the Class Period. Compl. ¶¶ 27 – 28, 269 – 275.

Indeed, such compliance with the simple, plain English disclosures requirement of the SEC is even more important where, as here, Defendants have created their own proprietary new Funds using an undisclosed mathematical formula.  See SEC, Final Rule: Registration Form Used by Open-End Management Investment Companies, SA Rel. No. 7512, EA Rel. No. 39,748, ICA Rel. No. 23,064, 63 Fed.Reg. 13,916, 13,928 n. 111 (Mar. 23, 1998).  Finally, Defendants' citations are inapposite.  *See, e.g., Press v. Quick & Reilly, Inc.*, 218 F. 3d 121, 124 (2d Cir. 2000) (contrary to Defendants' citation (Def. Br. at 19), *Press* did not involve Section 11 claims); *Scibelli v. Roth*, 2000 WL 122193, at *4 (S.D.N.Y. Jan. 31, 2000) (allegations involved Form 10-Q disclosure and not SAI disclosure).

**C.**      **The 2008 Random Disclosures Were Misleading**.

Defendants argue that they effectively disclosed the risk that Plaintiffs complain of because Defendants belatedly made limited statements during 2008.  D. Br. pp. 9-13.  However,

misleading statements cannot avoid materiality.  Plaintiffs allege in detail that these new

statements and similar statements during 2008 were misleading because they:

> (a) do not speak of "material" losses;
> (b) do not disclose that various market conditions dictated absolutely "certain" (not
> "possible" or "tends" to) losses;
> (c) do not disclose that those conditions were then contemporaneously already **in
> existence**;
> (d) do not disclose the soon to be realized material adverse effects if the dangerous levels
> of volatility did not quickly subside;
> (e) do not disclose that the Ultra Short ETFs are three times more vulnerable to increases
> in volatility.

¶52 (a)-(e); see ¶¶49-52 generally.  At the motion to dismiss state especially, such

incomplete and misleading statements cannot be found to apprise investors of the true risks.

From June 2008 forward, when volatility levels were exceeding 40% in many of the

indexes or benchmarks that were basis for Defendants ETFs Defendants also did not disclose if

market conditions did not change their ETFs would begin to perform the opposite of what was

expected at given dates which were known to Defendants. Complaint ¶¶ 6, 18, 22-24, 26(c),

52(f).  Their ETFs would begin to move in the exact opposite direction, if market conditions did

not change, on given dates.

### D. <u>Hindsight Pleading</u>.

Contrary to Defendants' spin on Plaintiffs' allegations, the undisclosed risks here are not

hindsight pleading.  D. Br. pp. 3, 24-27.  Rather, they are inherent perils of Defendants'

undisclosed mathematical equation.  The effect of excess index volatility on Defendants'

proprietary funds was to move the ETF prices in the opposite direction from that which the ETFs

name and disclosures indicated.  This created high risks of very substantial losses that existed

throughout the Class Period and should have been clearly disclosed.  Defendants did not need

hindsight.  Their mathematical formula gave them full knowledge.

**_Greenberg_**.  The facts in _Greenberg v. ProShares Trust_, the New Jersey state court action cited by the Defendants, are very different.  The _Greenberg_ plaintiffs alleged that a ProShares representative orally misrepresented elements of a ProShares product, and in reliance on those misrepresentations, the _Greenberg_ plaintiffs made substantial investments.  _See Greenberg v. ProShares Trust_, No. MRS-L-0011-1-09, Trans. of Motion (July 9, 2010), at p. 34-35.  In a decision read from the bench, the Court found that the prospectus directly contradicted these oral representations, and that, therefore, "there cannot be reliance under these circumstances."  _See Id_. at 44.  The Court did not analyze the adequacy of the disclosures, but merely noted that the oral representation and the language in the prospectus differed.  In the case at bar Plaintiffs do not assert oral representations, and ask the Court to examine the registration statements and analyze the specific misrepresentations and omissions therein.

**Defendants Do Not Carry Their Negative Causation Burden At This Preliminary Stage.**  Section 11 relieves Plaintiffs of any burden to plead or prove causation, and Section 11(e) places on Defendants the burden to prove an affirmative defense that the misleading Registration Statement did not cause the loss.  Because the "analysis of loss causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial."  _In re Fuwei Films Sec. Litig._, 634 F.Supp.2d 419, 444 (S.D.N.Y. 2009).  Worse, to try to support their defense here, Defendants point not to the Complaint, but to their analysis of the net asset value of each ETF. Def. Br. at 35-37.[13]

---

[13]  Case cited by Defendants in support of their right to assert a Section 11(e) affirmative defense at this point in the litigation are inapposite and clearly distinguishable on their facts.  In _In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig._, 289 F. Supp.2d 429 (S.D.N.Y. 2003), plaintiffs alleged Section 11 claims that the court found were time-barred. _Id._ at 432.  The court also found that defendants had no duty to disclose the allegedly omitted information, _Id._ at 434, and that the Section 11 claims were dismissible on their face since the alleged drops in value of the securities were pled to have occurred long before the corrective disclosures. _Id._ at

But Plaintiffs are not alleging that the registration statements mischaracterized the

NAV.[14]  And this is not a mutual fund case, where plaintiffs have invested in funds made up of a

basket of underlying securities, each of which is traded on a national exchange and easy to value

at the close of each trading day.  Rather, Plaintiffs invested in artificially created proprietary

financial instruments that were reset each day.

Nonetheless, Defendants argue that "The NAV declines that caused plaintiffs' losses

were due to the decline in the value of the funds' underlying investments, *regardless of what was*

*disclosed about the investment objective funds*."  D. Br.p. 36 (emphasis added).

Wrong! The NAV declines represented the materialization of the inherent material risks

that were not disclosed. The Second Circuit has repeatedly recognized materialization of risk as

---

437.  Here Plaintiffs have clearly alleged catastrophic losses occurring **after** the undisclosed
effects of high volatility were experienced in the market.  *See* Complaint *passim*.  In *In re
Vivendi Universal S.A. Sec. Litig.*, 634 F.Supp.2d 352 (S.D.N.Y. 2009), the court denied
defendants' motions for summary judgment.  The court never discussed raising a Section 11(e)
affirmative defense on a Section 12(b)(6) motion, and merely noted in passing regarding Section
11, that "defendants bear the burden of negating causation." *Id.* at 360.  *Amorosa v. AOL Time
Warner Inc.*, 2011 WL 310316 (2d Cir. Feb. 2, 2011), supports Plaintiffs' position.  While
plaintiff's Section 11 claim was found to be both time-barred and facially defective, as after the
alleged corrective disclosure the security price actually went up, the *Amorosa* court confirmed
the proper interpretation of the materialization of risk theory from *Lentell*, stating that: "[w]hen
relying on such a theory, a plaintiff must allege some specific misstatements or omissions made
by the defendant that can be connected to the plaintiff's eventual economic loss," *Id.* at *3, and
citing to *Lentell*, 396 F.3d at 173.  Here Plaintiffs have clearly pled that the failure of Defendants
to disclose the material risks regarding volatility and other important risks were the direct cause
of Plaintiffs' subsequent losses when volatile market conditions occurred and Defendants'
defective ETF products materially failed to perform.  The *Amorosa* court further found as a basis
for failure to establish loss causation that, unlike here, plaintiff failed "to identify specifically any
misstatements or omissions and, in turn, the risk that was thereby concealed, [therefore plaintiff]
has failed to establish loss causation on a 'materialization of risk' theory." *Amorosa*, 2011 WL
310316 at *3.

[14]   For this same reason, Defendants' citations to *Clark v. Nevis Capital Mgmt., LLC*, No.
04 Civ. 2702, 2005 WL 488641 (S.D.N.Y. Mar. 4, 2005) and *In re Wagoner Funds, Inc. Sec.
Litig.*, 382 F.Supp.2d 1173 (N.D. Cal. 2004) are completely inapposite.

classic loss causation.[15]  Defendants cite to *In re State Street Bank and Trust Co. Fixed Income Funds Investment Litig.*, --- F. Supp. 2d ----, 2011 WL 1206070, at *7 (S.D.N.Y. Mar. 31, 2011) ("*State Street*").  But *State Street* mistakenly ignores materialization of risk as the cause of the loss or decline in value. *State Street* mistakenly limits causation to "a revelation of the concealed risk and [a resulting]… depreciation in the value of the security."  *Id* at *8. The "loophole" that *State Street* recognized that its "revelation" requirement created (*Id* at *10) is contrary to the Second Circuit law cited above **and has been rejected by other courts**.  *Rafton v. Rydex Series Funds*, No. 10 Civ. 01171, 2011 WL 31114, at *11 (N.D. Cal. Jan. 5, 2011) (citing *In re Charles Schwab Corp. Secs. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (reasoning that Section 11 claim could never be brought against mutual funds if such "logic" were to be accepted).

### E.  Plaintiffs Should Be Allowed To Represent Investors In All 44 Funds

Defendants argue that Plaintiffs do not have standing to sue on the same Registration Statement for funds covered thereby unless Plaintiffs purchased the specific fund. D. Br. pp 36-38.  But Plaintiffs did purchase pursuant to that Registration Statement. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). What is crucial at this stage is that "each of the named plaintiffs has standing to bring at least some claims" against defendants within the meaning of Article III.  *Blessing v. Sirius XM Radio*

---

[15] See *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) ("*Lentell*") ("[t]his Court's cases – post-*Suez* and pre-*Suez* – require both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk.") (emphasis original) *citing to Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001); *see also Lentell*, 396 F.3d at 173, *citing to AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 238 (2d Cir. 2000) (Winter, J., dissenting); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 188 (2d Cir. 2001) ("[i]f the significance of the truth is such as to cause a reasonable investor to consider seriously a zone of risk that would be perceived as remote or highly unlikely by one believing the fraud, and the loss ultimately suffered is within that zone, then a misrepresentation or omission as to that information may be deemed a foreseeable or proximate cause of the loss. (footnote omitted).")

*Inc.*, No. 09 CV 10035 (HB), 2010 WL 4642607 at *3 (S.D.N.Y. Nov. 17, 2010); *In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002).  While it is true that standing is generally treated as a threshold issue, the Supreme Court has articulated an exception whereby federal courts may address class certification prior to standing in cases where the certification issues are "logically antecedent to Article III concerns."  *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831, 119 S.Ct. 2295, (U.S. 1999).

"While the Second Circuit has not directly addressed the issue, there has been a growing consensus among district courts that class certification is 'logically antecedent,' where its outcome will affect the Article III standing determination, and the weight of authority holds that in general class certification should come first. *Blessing*, 2010 WL 4642607 at *3.  This Court has had occasion to address this issue in two recent cases.  In *La Pietra v. RREEF America, L.L.C.*, 738 F. Supp. 2d 432, 439 n.1 (S.D.N.Y. 2010), this Court, while noting that some Southern District courts disagreed, held that standing in every fund was unnecessary in a case alleging federal securities violations, and finding that "class certification issues are 'logically antecedent' to Article II concerns, citing to *Ortiz*, 527 U.S. at 830, *quoting Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612, 117 S.Ct. 2231, (U.S. Pa. 1997).  This treatment is appropriate when, as this Court found in *La Pietra*, "the plaintiffs unquestionably have standing to sue against the defendants' conduct as it relates to DWS II [Fund], and because the allegations against each Fund are the same…" (but dismissing on other grounds); *Woodhams v. Allstate Fire and Cas. Co.*, No. 10 Civ. 441 (JGK),  - F.Supp.2d - , 2010 WL 3858440 at *4 (S.D.N.Y. Sep. 28, 2010) (same). *Compare Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action."); *Martens v. Thomann*, 273 F.3d 159, 173 n. 10 (2d Cir. 2001)

("[S]pecial standing rules exist for class representatives.").

      The facts of this case make deferral of the standing issue particularly appropriate.  All of the allegations regarding violations of Section 11 relate to material misrepresentations and omissions contained in the registration statements and prospectuses common to all of the charged ETFs.  For example, at the time Named Plaintiff Karasick purchased his shares in the UltraShort ETF SRS, the operative September 29, 2008 registration statement covering SRS also covered **all** of the other 6 Inverse, 10 Ultra and 20 UltraShort charged ETFs that were issued and outstanding as of that time.  When plaintiffs have pled such a clear and common source of injury based upon material misrepresentations and omissions regarding all charged ETFs, such general factual allegations of injury from defendants' conduct should suffice at the pleading stage.  *See In re South African Apartheid Litig.*, 617 F.Supp.2d 228, 294 (S.D.N.Y. 2009), *quoting H.R. Huff Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) and citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1, 112 S.Ct. 2130, (U.S. Minn. 1992); *compare Public Employees' Ret. Sys. v. Goldman Sachs Grp., Inc.*, 2011 WL 13582 at *7 (S.D.N.Y. 2011) (finding no standing where factual allegations in complaint focused on details contained in the prospectus supplements for individual charged funds and not the common registration statement).  Numerous courts in this district are in accord.  *See In re CitiGroup Inc. Bond Litigation*, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010) (finding plaintiffs who alleged Section 11 violations had standing to represent shareholders in 48 offerings where named plaintiffs bought in 19); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (HB), 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003) (appointing class representative for two mutual funds who only bought in one of the funds); *In re Blech Sec. Litig.*, 94 Civ. 7696 (RWS), 2003 WL 1610775, at *17 (S.D.N.Y. Mar. 26, 2003) (seven named representatives could represent purchasers of all

securities because "[t]here need not be a class representative for every Blech security, as long as the securities are part of a common fraudulent or manipulative scheme"); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) (named plaintiffs certified class representatives of investors in two different mutual funds); *In re Prudential Sec. Inc.. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) (certifying class who invested in series of partnerships all sponsored by the same defendants although named plaintiffs only invested in small subset of over 700 partnerships); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988); *cf. New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 5222127, at *6 (S.D.N.Y. Dec. 22, 2010) (noting "growing consensus among district courts in this circuit that, where the answer to standing challenges could depend upon the outcome of a class certification motion, such challenges may be deferred until after a decision on class certification").

Allowing Plaintiffs to proceed on behalf of all Funds is particularly fair here where named plaintiffs bought shares in 38 of the 44 Funds. Def. Br. at 37.[16]

---

[16] Defendants claim Plaintiffs bought shares in 36, rather than 38, of the 44 Funds, but that is mistaken. In an administrative oversight, Plaintiffs (i) omitted named plaintiff Norman Kansfeld from ¶ 178 of the Complaint, which lists the various Named Plaintiffs, but Mr. Kansfeld bought shares in the USD and UXI funds during the Class Period, submitted a certification for such investments, and suffered a loss in both funds (*see* Kansfeld certification behind USD and UXI tabs at Exhibit A); and (ii) omitted Lawrence Weiner's certification for the SKK fund (*see* Exhibit A hereto). Mr. Weiner was listed as a named plaintiff for the SSG fund. *See* Complaint Ex. A. Defendants cannot claim to have suffered any prejudice from such innocuous errors. Defendants also claim no named plaintiff suffered damages in the SZK and MVV funds, but Mr. Kansfeld is included under the MVV fund tab at Exhibit A to the Complaint. *See id.* Relatedly, Defendants claim Plaintiffs can only challenge registration statements pursuant to which named plaintiffs bought shares of the Funds. First, in their list on p. 37, Defendants ignore that named plaintiffs purchased Funds shares pursuant to Proshares II registration statements dated March 26, 2009 and June 1, 2009. Second, a court in this district recently held that plaintiffs had standing to represent shareholders who bought in different

Finally, Defendants argue that two named plaintiffs did not make the decision to hold shares longer than one day during the Class Period. Def. Br. at 37. This, too, is mistaken. Named plaintiff Dorothy Lowell bought UFZ shares on June 22, 2009, and the Class Period ends on June 23, 2009. Thus, she clearly has standing. There is no standing requirement that a shareholder hold for more than day. Ms. Lowell bought shares pursuant to a misleading prospectus, and suffered damages. Nothing more is required.[17]

### F. The Claims Asserted Against The Additional Defendants Named In The Complaint Relate Back To The Filing Of Plaintiffs' Initial Timely Complaints And Are Not Barred By The Statute Of Limitations

The claims asserted against Defendants ProShares Trust II and Individual Defendants Edward Karpowicz, William Seale and Charles Todd (collectively the "Additional Defendants") are not time-barred because they relate back to the original Consolidated Class Action Complaint, which was timely filed on August 5, 2009. *See* Fed. R. Civ. P. 15(c)(1); *see also, VKK Corp. v. National Football League,* 244 F. 3d 114, 128 (2nd Cir. 2001) ("If a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time barred if it 'relates back' to a timely filed complaint.").

Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading "relates back" to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations. Where an amended pleading changes a party or a party's name, the Rule requires, among other things, that "the party to be brought in by

---

registration statements, totaling 101 offerings, where the offerings related "to the same underlying conduct on the part of the defendants." *AIG*, 741 F. Supp. 2d 511 (S.D.N.Y. 2010). Indeed, Exhibit A to the Skinner Declaration demonstrates how similar the disclosures were across the various Registration Statements.

[17] Similarly, Defendants claim named plaintiff Douglas Jones does not allege he bought UGL shares during the Class Period. Skinner Decl. Ex. 9. While Mr. Jones' certification does not list trade dates, attached as Exhibit B hereto is proof that Mr. Jones' trades were indeed during the Class Period. *See id.*

amendment ... knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Rule 15(c)(1)(C). *Krupski v. Costa Crociere S.p.A.,* 130 S. Ct. 2485, 2489-90, 177 L. Ed. 2d 48 (2010).[18]

The claims against the Additional Defendants, as now set forth in the Complaint, clearly arose out of the same conduct, transaction and occurrence set out in the Plaintiffs' original timely filed action. Defendants do not dispute this, and, in fact, openly concede this point in their Motion to Dismiss when they state: ". . .[t]he gravamen of the claims against ProShares Trust II and the individual New Defendants is the same as those asserted against the original defendants – issuing and/or signing the registration statements for the ProShares leveraged and inverse ETFs." *See* Def. Br. at 38. The first requirement for relation back of the claims against the Additional Defendants is therefore easily satisfied. *See, e.g.,* Complaint ¶ 297-304.

The Additional Defendants had timely *constructive* notice of this action, if not *actual* notice. *See Muhammad v. Pico,* No. 02 Civ. 1052 AJP, 2003 WL 21792158 at *20 (S.D.N.Y. 2003) (actual or formal notice is not required; constructive notice is sufficient).  Each had been on notice of this action since the timely filing of Plaintiffs' original action in August of 2009 and the *Bowman* v. *ProShares, et al*. Civil Action No. 09-cv-9109 filed October 30, 2009, which involved the ProShares Trust II SCO Fund.  Further, as demonstrated by the allegations contained in the Complaint, each has an identity of interest with one or more of the Defendants

---

[18] An amendment adding a party to the complaint after the statute of limitations has run relates back to the timely filed complaint if: (1) the amendment asserts a claim that arose out of the "conduct, transaction or occurrence" set out – or attempted to be set out -- in the original pleading; and (2) within the period provided by Rule 4(m) for serving the summons and complaint (i.e., within 120 days of the filing of the original complaint), the newly named defendant: (i) "received such notice of the action that it will not be prejudiced in defending on the merits" and (ii) "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(B-C).

named in the original action.[19] *See e.g.*, Complaint ¶ 62, 66-68, 72-74.

Moreover, the Court can impute knowledge of the instant suit to the Additional

Defendants through their attorney, as the same attorney represented those parties who were

named as Defendants in the original Complaint. *See Berry v. Village of Millbrook,* No. 09-CV-

4234 (KMK), 2010 WL 3932289 at *4 n.6 (S.D.N.Y. 2010) (*see* cases gathered therein).

As to the third and final element necessary to establish relation back, the Supreme Court

has recently held "that relation back under Rule 15(c)(1)(C) depends on what the party to be

added knew or should have known, not on the amending party's knowledge or its timeliness in

seeking to amend the pleading." *Krupski*, 130 S.Ct. at 2490. This element is clearly satisfied.

Based upon all the facts here, Plaintiffs respectfully submit that this Court should, in its

discretion, permit relation back of the Complaint under Fed. R. Civ. P. 15(c).

### G. Individual Plaintiffs Have Pled A Viable Breach Of Contract Claim

Plaintiffs Steven and Sherri Schnall (the "Individual Plaintiffs"), individually and

separate from the Class, respond to ProShares' Motion to Dismiss their individual breach of

contract claim. The issues raised in ProShares' Motion are simply not appropriately addressed at

this stage of litigation. All that is required is "a short and plain statement of the claim showing

that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Under New York law, the elements of a breach of contract claim are: (1) the existence of

a valid contract, (2) performance of the contract by one party, (3) breach of the contract by the

other party, and (4) resulting damages. *See First Investors Corp. v. Liberty Mut. Ins. Co.*, 152

F.3d 162, 168 (2d Cir. 1998). Individual Plaintiffs have alleged that ProShares offered them

---

[19] Under the identity of interest exception, "the institution of an action against one party
will constitute imputed notice to a party subsequently named by an amendment of the pleading
when the parties are closely related in their business activities or linked in their corporate
structure." *See In re Enron Corp.,* 298 B.R. 513, 523 (S.D.N.Y. 2003) (quoting *In re Allbrand
Appliance & Television Co.,* 875 F. 2d 1021, 1025 (2nd Cir. 1989)).

shares in the Fund pursuant to the Prospectus, that the offer was accepted by them and confirmed

with transaction confirmations and that, through this offer and acceptance, a valid contract was

created between them and ProShares.  Complaint ¶¶ 310-11.  Individual Plaintiffs further allege

that while they fully performed their obligations under the agreement by paying for their shares,

ProShares breached the agreement by allowing the Fund to perform in a manner that contradicted

the promises it made in the Prospectus – namely, that the Fund would move in the opposite

direction of the DJIA Index.  Complaint ¶¶ 312-14.  Finally, Individual Plaintiffs allege that, as a

direct and proximate result of ProShares' breach of contract, they suffered substantial damages.

Complaint ¶ 315.

Individual Plaintiffs have stated "enough facts to state a claim that is plausible on its

face," and these allegations "give the defendant fair notice of what [Individual Plaintiffs'] claim

is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct.

1955, 167 L.Ed.2d 929 (2007).  At this stage, nothing more is required and the Motion to

Dismiss should be denied.[20]

## CONCLUSION

For all the foregoing reasons, Defendants' motion to dismiss should be denied in all

respects.  However, if, for any reason, the motion is granted in any respect, Plaintiffs should be

allowed leave to re-plead.

---

[20] The arguments raised by Defendant are simply wrong.  First, a prospectus can form a
valid contract.  *See, e.g., Mimbre v. New Alliance Bancshares*, 206 Fed. Appx. 63, 64 (2d Cir.
2006).  Second, it is not necessary for Individual Plaintiffs to have been named as third party
beneficiaries in the Prospectus, so long as the contract evidences an intent by ProShares to
benefit Individual Plaintiffs.  *See, e.g., Septembertide Pub, B.V. v. Stein and Day, Inc.*, 884 F.2d
675 (2d Cir. 1989).  Finally, statements such as those made in ProShares' Prospectus may be
considered "promises" for purposes of a breach of contract claim.  *See, e.g., Xpedior Creditor
Trust v. Credit Suisse First Boston (USA)*, 341 F.Supp.2d 258, 271 (S.D.N.Y. 2004).

Dated: New York, New York
      May 9, 2011

                  Respectfully submitted,

                  **LOVELL STEWART HALEBIAN JACOBSON LLP**

                  */s/ Christopher Lovell*
                  Christopher Lovell (CL 2595)
                  Victor E. Stewart (VS 4309)
                  Ian T. Stoll (IS-3424)
                  Benjamin M. Jaccarino (BJ 1273)
                  61 Broadway, Suite 501
                  New York, NY 10006
                  Telephone: (212) 608-1900
                  Facsimile: (212) 719-4677

                  **ZAMANSKY & ASSOCIATES LLC**
                  Jacob H. Zamansky (JZ 1999)
                  Edward H. Glenn, Jr. (EG 0042)
                  Kevin D. Galbraith (KG 7512)
                  50 Broadway, 32nd Floor
                  New York, NY 10004
                  Telephone: (212) 742-1414
                  Facsimile: (212) 742-1177

                  *Lead Counsel for Plaintiffs*

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein (bernstein@bernlieb.com)
Sandy A. Liebhard (liebhard@bernlieb.com)
U. Seth Ottensoser (ottensoser@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
Brian Lehman (lehman@bernlieb.com)
10 East 40th Street, 22nd Floor
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

**GILMAN AND PASTOR, LLP**
Kenneth Gilman (kgilman@gilmanpastor.com)
Rene Potkay (rpotkay@gilmanpastor.com)
16 14th Avenue
Wareham, MA  02571
Telephone: (508) 291-8400
Facsimile: (508) 291-3258

**Wolf Haldenstein Adler Freeman & Herz LLP**
Mark C. Rifkin
Gustavo Bruckner
270 Madison Avenue
New York , NY 10016
212-545-4600
Fax: 212 545-4653
rifkin@whafh.com
Bruckner@whafh.com

**Pomerantz Haudek Block Grossman & Gross LLP**
Jeremy Alan Lieberman
100 Park Avenue, 26th Floor
New York , NY 10017
(212)-661-1100
Fax: (212)-661-8665
jalieberman@pomlaw.com

**Stull Stull & Brody**
James Elliot Lahm
6 East 45th Street, 5th Floor
New York , NY 10017
212-687-7230
Fax: 212-4902022
ssbny@aol.com
jlahm@ssbny.com

**Wolf Popper LLP**
Robert C. Finkel
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Fax: (212) 486-2093
*Additional Class Counsel*

**Ackerman, Link & Sartory**
Thomas R. Grady
Dana E. Foster
222 Lakeview Avenue
Suite 250
West Palm Beach, Fl 33401
(561) 838-4100
Fax: (561) 838-5305
trgrady@alslaw.com
afoster@alslaw.com

**Timothy J. Dennin, P.C.**
Timothy John Dennin
316 Main Street
Northport , NY 11768
(631) 261-0250
Fax: 631 261-0395
secatty@denninlaw.com

**Shalov Stone Bonner & Rocco LLP**
Ralph M. Stone
260 Madison Avenue, 17th Floor
New York, New York 10016
(212) 239-4340
Fax (212) 239-4310
www.lawssb.com

*Counsel for Individual Plaintiffs*

41